**EXHIBIT 2**



IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF COLORADO

Civil Action No. 07-cv-000371-RPM-MEH

---

CHARLES CALDWELL, and
VICKI CALDWELL,

Plaintiffs,

vs.

THE COUNTY OF PARK, a body corporate and politic and a political subdivision of the State of Colorado,
FRED WEGENER,
MONTE GORE,
GREGORY S. FLINT,
STEVEN GROOME,
SHAWNA WHITEOWL, and
MARK DAMON,

Defendants.

---

DEPOSITION OF SHAWNA WHITE OWL
April 18, 2008

---

DEPOSITION OF SHAWNA WHITE OWL, taken on behalf of the Plaintiffs pursuant to Notice, at 105 East Moreno Avenue, Colorado Springs, Colorado, on April 18, 2008, at 10:41 a.m., before Melodie A. Krachmer, Certified Shorthand Reporter and Notary Public within Colorado.

O'Brien Krachmer & associates, inc.

Certified Shorthand Reporters • Registered Professional Reporters
728 South Cascade Avenue • Colorado Springs, Colorado 80903
(719) 635-0033 • Fax: (719) 635-3422 • (800) 643-3224

A P P E A R A N C E S

For the Plaintiffs: JAMES A. REED, ESQUIRE
James A. Reed, P.C.
320 South Cascade Avenue
Colorado Springs, CO 80903

For the Defendants County of Park, Wegener, Gore, Flint & Groome: KATHERINE M.L. PRATT, ESQUIRE
Hall & Evans, LLC
1125 17th Street
Suite 600
Denver, CO 80202-2052

For the Defendant White Owl: RICHARD LAMPHERE, ESQUIRE
Steven U. Mullens, P.C.
Suite 100
Colorado Springs, CO 80903

I N D E X

| | Page |
|---|---|
| EXAMINATION OF SHAWNA WHITE OWL | |
| By Mr. Reed: | 3 |

| | | Initial Reference |
|---|---|---|
| PLAINTIFFS' DEPOSITION EXHIBITS | | |
| 46-E | (Diagram drawn by Gregory S. Flint) | 147 |
| 48 | (February 2, 2006 Report of Investigation, Agent Dan Volz) | 70 |
| 57 | (Webber Park Ranch Filing 283) | 22 |
| 67 | (Defendant, Shawna White Owl's Answers to Plaintiffs' First Set of Interrogatories, Requests for Production, and Requests for Admissions.) | 111 |

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO
Civil Action No. 07-cv-000371-RPM-MEH

CHARLES CALDWELL, and
VICKI CALDWELL,
Plaintiffs,
vs.
THE COUNTY OF PARK, a body corporate and politic and a political subdivision of the State of Colorado,
FRED WEGENER,
MONTE GORE,
GREGORY S. FLINT,
STEVEN GROOME,
SHAWNA WHITEOWL, and
MARK DAMON,

Defendants.

DEPOSITION OF SHAWNA WHITE OWL
April 18, 2008

DEPOSITION OF SHAWNA WHITE OWL, taken on behalf of the Plaintiffs pursuant to Notice, at 105 East Moreno Avenue, Colorado Springs, Colorado, on April 18, 2008, at 10:41 a.m., before Melodie A. Krachmer, Certified Shorthand Reporter and Notary Public within Colorado.

APPEARANCES

For the Plaintiffs: JAMES A. REED, ESQUIRE
James A. Reed, P.C.
320 South Cascade Avenue
Colorado Springs, CO 80903

For the Defendants County of Park, Wegener, Gore, Flint & Groome: KATHERINE M.L. PRATT, ESQUIRE
Hall & Evans, LLC
1125 17th Street
Suite 600
Denver, CO 80202-2052

For the Defendant White Owl: RICHARD LAMPHERE, ESQUIRE
Steven U. Mullens, P.C.
Suite 100
Colorado Springs, CO 80903

INDEX

| | Page |
|---|---|
| EXAMINATION OF SHAWNA WHITE OWL | |
| By Mr. Reed: | 3 |

| PLAINTIFFS' DEPOSITION EXHIBITS | Initial Reference |
|---|---|
| 46-E (Diagram drawn by Gregory S. Flint) | 147 |
| 48 (February 2, 2006 Report of Investigation, Agent Dan Volz) | 70 |
| 57 (Webber Park Ranch Filing 283) | 22 |
| 67 (Defendant, Shawna White Owl's Answers to Plaintiffs' First Set of Interrogatories, Requests for Production, and Requests for Admissions.) | 111 |

WHEREUPON, the following proceedings were had:

The following Deposition was taken pursuant to the Federal Rules of Civil Procedure.

WHEREUPON,

SHAWNA WHITE OWL,

one of the Defendants herein, being first duly sworn to state the whole truth, testified on her oath as follows:

EXAMINATION

BY MR. REED:

Q. Please state your name.
A. Shawna White Owl.
Q. Spell your last name.
A. W-h-i-t-e O-w-l.
Q. Have you ever been known by any other names?
A. Yeah.
Q. Could you tell me what other names you've been known by?
A. Shawna De Young. That's my birth name. Well, my birth name is Robbi De Young.
Q. Could you spell that?
A. R-o-b-b-i.
Q. D --
A. D-e Y-o-u-n-g.
Q. Where were you born?

A. Burbank, California.
Q. Any other names?
A. No.
Q. Where were you raised?
A. In California.
Q. Is that in the Burbank area?
A. No.
Q. Whereabouts?
A. They used to call it Granada Hills. And then wher I was ten years old we moved up to Cupertino.
Q. They used to call it Granada Hills?
A. I think they call it Mission Hills now.
Q. Where did you go to high school?
A. Monte Vista High School.
Q. And you graduated from high school?
A. Yes.
Q. When did you graduate?
A. '73.
Q. What education have you had since high school?
A. I had college.
Q. Whereabouts?
A. I had De Anza College in California and at Pikes Peak Community College.
Q. Would you spell De Anza?
A. D-e A-n-z-a.

Q. Where's that --
A. Two words.
Q. -- located at?
A. Cupertino.
Q. What did you take in college?
A. Molecular biology. And then here I was taking Social Services.
Q. Did you get a degree in molecular biology?
A. No, I never finished.
Q. How far along did you get in that course of --
A. Probably just a year and a half. I had financial trouble. I never finished.
Q. Have you ever had your deposition taken before?
A. No.
Q. Let's go through a few rules. We already, each of us, has already broken one. Sort of the rules of taking a deposition, I ask you questions, you answer them. And the court reporter writes down each of what we have to say. Okay?
A. Okay.
Q. As I'm asking questions, you need to be quiet because if you're talking at the same time I'm talking, it makes it difficult for her to write down both streams of conversation. And the flip of that is, when you are answering, I'll try not to talk for exactly the same reason.

A. Okay.
Q. If I step on your answer and your attorney is kind enough to point it out to me, I'll certainly drop a ways back and let you finish your answer.
A. Okay.
Q. There's a certain amount of adrenaline that gets going in these things sometimes and we may be both talking at the same time. That's just not something that's fair to the court reporter, we have to let her get her job done.
Is there any -- do you have any health problems today that might affect your ability to testify?
A. No.
Q. Do you -- are you under any medications or other substances involving your ability to answer everything clearly and concisely?
A. No.
Q. You set aside the day, so you're not going to be distracted by having to be somewhere else?
A. Yes.
Q. Good. And you've done an excellent job and I'll just state the rules, but you've already shown me that you know how to do it. And that is that yeses and noes are very easy for her to transcribe. Noddings of the head, shakings of the head, huh-uh and uh-huhs and things like that -- at some point you'll get a chance to read this, and when we get

to uh-huhs and huh-uhs that I just gave you, you'll look at it, geez, which is which? And that's exactly why we try to not use those. So yeses and noes to give your answer as much clarity as possible. Okay?
A. Okay.
Q. I have a way of getting myself into these things, and if it becomes a marathon, I apologize for that. If at some point you need to take a break, you let us know you need to take a break.
A. Okay.
Q. Because the point here isn't to run you to exhaustion. It's to get your side of the story so we know what -- at least what evidence there might be and what your position is on various things. Do you understand that?
A. Yes.
Q. Okay. So we were going through your education and we talked about molecular biology. I asked you how far you got. You said "not very far." Is "not very far," a year, two years?
A. I thought I said a year and a half.
Q. You probably did. I probably missed that. And then you came -- after that year and a half, what did you do?
A. I went to work.
Q. Where did you go to work at?

A. I started in electronics, eventually went to work for Hewlett Packard.
Q. What was your job in electronics? What did you do?
A. Quality Control Inspector.
Q. And was that in California or out --
A. Yes.
Q. -- here? Where in California?
MR. LAMPHERE: Slow down, Shawna. Let him get the question all the way out.
Q (By Mr. Reed) Where in California?
A. Cupertino and also Palo Alto.
Q. How long did you do that, the quality control position?
A. I think one and a half years.
Q. Calendar year, when did we finish doing that?
A. I don't remember.
Q. What happened next after you did that?
A. I worked in a health food store for a year or so, and then I started doing construction work.
Q. Okay. What -- well, the health food store, that was also in California?
A. Yes.
Q. The Cupertino area?
A. Palo Alto.

Q. Palo Alto. And then what got you to move to Palo Alto from Cupertino? I don't know California that well, so --
A. Work.
Q. -- it might be right next to each other.
A. They are close, yeah.
Q. After the health food store, then what?
A. I started doing self-employment construction, house painting, then I went into carpentry.
Q. Let's deal with the house painting first. Where did you do that?
A. Santa Clara valley area of California.
Q. What got you into house painting?
A. Just helping my mom.
Q. Are we talking about the outside of houses, inside of houses?
A. Both.
MR. LAMPHERE: Go ahead, Jim, I'm listening.
(WHEREUPON, Mr. Lamphere briefly leaves the deposition room.)
Q (By Mr. Reed) So you did house painting for how long?
A. I'm not sure exact years. I did house painting and carpentry for over 20 years.
Q. All right. But your self-employed house painting was for how long?
A. I can't remember. Then I went to work for some companies.
Q. What companies?
A. I remember one, Four Seasons Painting in Reno, Nevada.
Q. Is that the first move away from California?
A. I think so. I think so.
Q. Based on what you are telling me, we are into, where, in the '70s, late '70s?
A. '80s.
Q. '80s.
A. I believe early -- I think it was 1981 I started house painting, started construction.
Q. What type of construction? You mentioned carpentry. What type of carpentry?
A. Remodeling, where you do a little bit of everything.
Q. All right. So you're doing framing?
A. Not too much framing, but I did do some. Mostly remodeling.
Q. Mostly finish carpentry?
A. Well, sheetrock, all of that. Little bit of plumbing.
Q. Do you work for yourself or somebody else?

A. I worked for others and myself.
Q. Well, let's deal with the companies you worked for first. What companies?
A. I can only remember Claudine Cavet, Cavet Construction.
Q. Spell Cavet.
A. C-a-v-e-t, I believe.
Q. Where was that?
A. California, San Jose.
Q. And when?
A. I can't remember.
Q. '70s or '80s?
A. '80s.
Q. So you moved to -- am I hearing you moved to Reno and then back away from Reno?
A. Yeah, I did. I went to Reno for about a year and then I moved back.
Q. Where is Cavet Construction?
A. San Jose.
Q. San Jose. What happened next in terms of your career, what's going on?
A. I stayed in construction working for various companies and myself, and I can't remember all the names because you move around a lot.
Q. When you say you did construction for yourself, are you indicating that you had a self-employed company that did construction for other people, or are you just doing your own construction on your own properties?
A. Self-employed myself doing work for other people.
Q. Did you have a license to do this?
A. No.
Q. You said you did plumbing in California?
A. Yes.
Q. Did you have a license to do plumbing?
A. No. It was like handyman work.
Q. So we get to -- we get to -- we're in the '80s. You said you've done this kind of work for awhile. I wasn't clear how long. How long did you stay in construction?
A. I started in 1981, and I did it for about 20 something years.
Q. Did there come a time when you moved to Colorado?
A. Yes.
Q. When did you move to Colorado?
A. 1988, February.
Q. Why did you move to Colorado?
A. Because I wanted to move to the mountains.
Q. And in 1988 did you do that then, move to the mountains?
A. Yes.
Q. Where did you initially move? Where did you buy?

A. Woodland Park, Colorado.
Q. The City of Woodland Park?
A. Yes.
Q. What was your address then?
A. 280 -- oh, I forgot the name of the street all of a sudden.
Q. Somebody asked me that the other day, where I lived in the '80s. I have to admit, I did just what you did.
A. Oh, I actually remember. Summer Haven Drive.
Q. Summer Haven Drive?
A. Right.
Q. 280 Summer Haven Drive, Woodland Park?
A. Right.
Q. How long did you live there?
A. Six and a half years.
Q. Were you employed at the time you were living there?
A. I worked for Kelly Cable.
Q. Doing what?
A. Located telephone lines. That's when I got injured, became disabled. Before that I worked for a fencing company working at Fort Carson.
Q. What was the name of the fencing company?
A. Academy Fence. I believe they are out of

business.
Q. Any jobs here in Colorado at that early stage that we haven't talked about yet?
A. Not that I can remember.
Q. You said you got disabled. Tell me about your disability.
A. I was a telephone locator. I was driving down the road, and a Cottonwood tree fell on my truck. A cat ripper, which is a big trenching equipment, the guy had driven by and hit it. And it didn't look broken to him, but it was broken under the ground, and I had the timing to drive by when it decided to fall.
Q. What sorts of injuries?
A. Hurt my head, a little bit more of back injury.
Q. You said you hurt your head. Did somebody give you a diagnosis of what exactly the damage was?
A. Yeah.
Q. What's the damage?
A. Um, I just remember him saying a mild to moderate head injury.
Q. Are we talking a concussion, a closed head injury?
A. I'm not sure.
Q. How did it affect you?
A. I hurt the English and speech side, so I have some trouble with it. I did have some memory trouble, but I

don't anymore. I've gotten better.
Q. Short-term memory or long-term?
A. Short.
Q. Well, let's go through some symptoms of a closed head injury. Balance problems?
A. I used to.
Q. Ringing in your ears?
A. Used to.
Q. Headaches?
A. I did for about a year and it stopped.
Q. Any other sensory sort of problems, hearing or smell?
A. I had loss of sense of smell for awhile, but I got most of it back.
Q. So am I to take it that you had your accident and got your injury and were off work for awhile?
A. Yes.
Q. How long were you off work?
A. I still am.
Q. So you've never gone back to work?
A. Oh, I tried going back to work a few times, tried working, and it didn't work out.
Q. When was your accident?
A. 1990, September 20.
Q. What have you tried to do since then work-wise?

A. I tried going back to construction, building sheds. I tried starting my own painting business again. I physically can't do it.
Q. Were you injured in any way besides the head injury?
A. I do have some back injury.
Q. And that's from the same accident?
A. No. I also hurt my back before in 1985.
Q. How severe is your back injury?
A. Not bad.
Q. How did you hurt it?
A. Hanging cabinets.
Q. So it's a strain type of injury?
A. Yes.
Q. So did something fall on you?
A. Strain type.
Q. All right. We're in -- I think the last date I heard was '88 or '89, and you moved to Colorado. You're living in Woodland Park. You lived there for about six years. What happens next?
A. I sold my cabin. I took a trip up looking for a place to live. And I came back and bought land in Webbe Park in 1994, May.
Q. Why Webber Park?
A. Because it's pretty.

Q. Did you know anybody at that time when you bought that lived in Webber Park?
A. No.
Q. We haven't talked socially. Is there -- are you married? Is there a husband anywhere in this process?
A. No.
Q. When you moved to Webber Park, you're moving there by yourself?
A. Yes.
Q. When you moved to Webber Park, did there come a time when you met neighbors?
A. Yes.
Q. Give me a list, basically, of who was living in the park when you first moved in.
A. I'm trying to remember his name. There was an older guy, Lupe Montanos. He came down and met me, and he told me I should go and meet the other neighbors that lived there. So he took me on up there to Jack Sworowski, Wayne Wodora, Dave Johnson, Ann Johnson, David and Ricky Vanvliet and Doug Growe.
Q. Doug's last name?
A. Doug Growe.
Q. Growe?
A. I think it's G-r-o-w. That what I heard, but I'm not sure.

Q. Initially, how did you get along with the neighbors?
A. Pretty good.
Q. Did there come a time when any of that changed?
A. Yes.
Q. When?
A. When I didn't want to do drugs with them.
Q. All right. Well, I was looking more for a day. I was going to get into what happened. Let's talk first about when that happened.
A. I do believe that was the first summer I was there. They got worried because I didn't want to smoke marijuana with them.
Q. So that would be the summer of 1994?
A. Yes.
Q. Let's identify them. Who wanted you to do drugs with them?
A. Dave Johnson, Jack Sworowski. I believe these were the only two that said that, mainly Jack Sworowski.
Q. What kind of drugs?
A. Marijuana.
Q. Well, if I understand your answers to interrogatories, you had -- you had done marijuana before, is that right?
A. Yes.

Q. Did you state why you objected to doing marijuana after moving into the Valley?
A. Yes.
Q. What did you say?
A. I said I used to use drugs myself, and I just choose not to anymore.
Q. How did they take that?
A. Not very well.
Q. What did they do?
A. They started -- Jack started telling me he thought I was a narc.
Q. Did you ask anybody to sell you anything without sampling it?
A. No.
Q. Did you give -- are you aware of anything you did that would have given him any impression you were a narc other than simply "I don't choose to smoke"?
A. No.
Q. Any other drugs beside marijuana discussed initially?
A. Mushrooms, hallucinogenic mushrooms.
Q. Who talked to you about hallucinogenic mushrooms?
A. Jack and his son Jake, and they pulled the bag out with dried mushrooms in it. But I can't tell you if that was hallucinogenic or not. I've never seen it.

Q. What kind of person is Jack Sworowski in your opinion?
A. He's actually a friendly and charismatic person.
Q. Have you ever known him to tease?
A. No.
Q. Practical jokes?
A. No.
Q. Say things that aren't true, but in a teasing way?
A. No.
Q. Mr. Sworowski, did you have any other problems with him as time went by?
A. Not that I can think of right now.
Q. Did there come a time -- so what I'm hearing is, even though he thought you might be a narc, what was your social standing in the Valley and especially here with Mr. Sworowski? Did you guys visit each other or not? How did you interrelate with Mr. Sworowski, if at all?
A. I did visit. I thought it would be best just to be casual friends.
Q. Did he seem to be willing to do that, be casual friends?
A. He did.
Q. Are you meeting anyone else in the Valley at this time frame? We're working our way from 1994, moving toward the present.

A. Oh, there's friends. George Porter came in later, Terry Rook.
Q. Let's try to put dates to these. About when did George Porter come in?
A. I can't remember.
Q. In the '90s or after?
A. I can't remember.
Q. How about Mr. Rook, Terry Rook?
A. He lived there before I moved.
Q. Let's spell Rook for the reporter.
A. I do believe it's R-o-o-k.
Q. Okay. Anyone else?
A. Well, Bill Swanson moved there.
Q. When?
A. And I can't remember when he did. Chuck and Vicki started coming out.
Q. That would be my clients, the Caldwells?
A. Right. And they had stop at my fence to talk to me when I was working in the yard and said they owned land up there and they were planning on moving here and wanted to meet me, so --
Q. Seemed pleasant enough?
A. Yes, they did.
Q. Were you pleasant to them?
A. Yes.

Q. Anyone else?
A. Well, I met Mark Damon. I used to go up to their little dinners they used to have sometimes, like Thanksgiving, Easter, where all the neighbors got together. And then that's when I met Mark Damon the first time.
Q. Whose dinners are you going to?
A. Sometimes -- the Thanksgiving dinner was at the Caldwells'. The Easter luncheon thing was at Jack Sworowski's. And we had breakfast one time at the Vanvliets'. They had little gatherings where we got together and ate, and it was kind of fun. But every time we did that, when the food was done, they started smoking marijuana, so I would leave early.
MR. REED: 57, if you would share that with your client, that would be nice, Counsel.
Q (By Mr. Reed) I'm having your counsel put in front of you what's been marked in a prior deposition as Exhibit 57. This has already been identified as a plat map of Webber Park, Ranch Filing 2 and 3 on the first page, and I believe it's Filing No. 1 on the second page. Do you see that? Do you have that in front of you?
A. Yes.
Q. Turning to the second page, I see the name Shawna White Owl written, the way mine is stapled at least, at the top of the second page. Do you see that?

A. You're talking right here? (Indicating)
Q. Yes.
A. Yeah, I see that.
Q. Does that accurately portray which of these tracts belongs to you?
A. Yes. I also owned this one at one time. (Indicating)
Q. "This one" being?
A. Three.
Q. Okay.
A. I sold it and bought one.
Q. And Tract 3 would be -- I take it, would be the property to the southwest of -- immediate southwest of the tract that's got your name in it?
A. Yes.
Q. I did that, and I probably shouldn't have. So let's go through that question again. I said "southwest," and you agreed with me, but when I actually tear these things apart and orient them the way they are supposed to be oriented, and if that north area is pointing to where it's supposed to be, the lot, Tract 3 you are talking about, would be to the -- more to the west than any other direction; isn't that right?
A. Yes.
Q. Okay. You sold that tract at some point?

A. Yes.
Q. When did you sell that tract?
A. Approximately a year and a half ago.
Q. Did you own any other property in the Valley?
A. Then I bought Tract 1.
Q. Tract 1 would be the one immediately to the south --
A. Yes.
Q. -- from the tract that's got your name in it?
A. Yes.
Q. Now, there are other names here. Let's look on page one for the time being, Susan Ross-Stewart. Do you see that name?
A. Yes.
Q. Who is Susan Ross-Stewart?
A. Jack Sworowski's common-law wife.
Q. What makes you say they are common-law husband ar wife?
A. They lived together for years.
Q. Well, did you know her by the last name Sworowski?
A. No.
Q. Did they introduce themselves as husband and wife?
A. No.
Q. So you're saying just because they lived together, they are husband and wife?

A. I thought so, that's how the law was in Colorado.

Q. And I do see a Doug Growe in here. This Growe's got an "e" on the end of his last name. Is that the same person you were talking about?

A. Yes.

Q. And I see Kit Ross and Bill Swanson both on one tract. More or less at the intersection of Pike View and Webber Park Drive.

A. Yes.

Q. Do you see that? Who's Kit Ross?

A. Susan's sister.

Q. And I take it, she must have been living with Mr. Swanson to be put on the same tract with him?

A. For a while she did.

Q. Do you remember when that was?

A. No.

Q. Now, did you have any participation in putting this exhibit together, Exhibit 57, writing any of these name in here or any of that?

A. No.

Q. Do you know who did it?

A. No.

Q. You said there came a time when you met Mr. Damon?

A. Yes.

Q. When was that?

A. At that Thanksgiving dinner at Chuck and Vicki Caldwells' house.

Q. Do you remember approximately what year that would have been?

A. No. I wrote it down on paper, and it is written down, but I don't have it in front of me.

Q. Do you ever -- sometimes people who have closed-head injuries, one of the coping skills they are taught is to write things down so that they -- because their short-term memories are bad, they don't remember things. Do you find yourself doing that a lot?

A. No.

Q. Were you ever taught that technique?

A. No. A law enforcement officer I knew told me I needed to write things down and document it.

Q. What law enforcement officer?

A. I can't remember his name. He was a friend.

Q. When?

A. 1995.

Q. What was it you were talking to a law enforcement officer in 1995 that he felt you should be writing down?

A. Terry Rook was harassing me.

Q. How?

A. Driving by, yelling at me and stopped at my gate and told me, "Shit's going to start happening now you

fucking bitch."

Q. Do you have any idea why he would do that?

A. I can't remember.

Q. Had you done anything to cause him to be angry with you that you remember?

A. I think it was because the conflict I had with the gal named Carol Jones.

Q. Who's Carol Jones?

A. It was a friend of Jack Sworowski.

Q. Did she live in the Valley?

A. For awhile.

Q. What was the nature of the dispute you had with Ms. Jones?

A. Came home, she was on my property, and their dog was killing my chicken, and her boyfriend was messing around with my horse.

Q. Well, let's talk first about the chicken. You had a chicken that died that you saw?

A. Yes.

Q. What kind of dog?

A. Husky.

Q. I assume you had a conversation with Ms. Jones at that moment asking her to remove her husky?

A. Yes.

Q. Did she agree?

A. She couldn't catch it. It took off running.

Q. Was the boyfriend there?

A. Yes. He took off and got in the car.

Q. Do you remember his name?

A. Carlos Castaneda is what he called himself.

Q. Did he live in the Valley?

A. For awhile.

Q. I assume the same, while she lived in the Valley?

A. Yes.

Q. Did you call the police about that?

A. Yes.

Q. When I say "police," unless I say otherwise, I'm really referring to the Sheriff's Office.

A. Yes.

Q. Okay. You said he was messing with your horse. What was he doing with your horse?

A. He said he was feeding it sugar cubes, but my horse got mean and crazy. And every time I got on him, he bucked me off, and he didn't do that before. So I asked him to leave my horse alone and told him to stay off of my property. And he only came on my property feeding my hors sugar cubes when I was gone.

Q. How do you know that if you weren't there?

A. I came home, found them doing it.

Q. More than once?

29

A. Yes.
Q. How many times?
A. I think maybe two or three.
Q. Was this the first problem you had with anybody in the Valley?
A. Maybe. I can't remember.
Q. Is this happening in 1994?
A. I can't remember.
Q. But your friend told you after you called the police, your friend who was a policeman at the Sheriff's Office, told you to start writing things down?
A. Yes.
Q. Why did he -- if he let you know, why did he tell you you should be doing that?
A. Because I told him when I make a report, nothing gets done about it.
Q. You made a report before that incident about somebody else?
A. I talked to him much later than that incident, maybe a year or two. I can't remember. There's several harassing incidents. I'd make a report and nothing would happen. Nobody would do anything.
Q. Let's start with '94. You talked about the incident with the horse and the dog attacking the chicken. What else happened in '94 that upset you that you called the

30

police about?
A. Oh, shooting.
Q. Who was shooting what?
A. Terry Rook was shooting high-powered rifles, and sometimes I would hear a bullet whiz, like hear a whizzing sound over my property.
Q. Did you see Mr. Rook with a weapon pulling the trigger, pointing in your direction?
A. No.
Q. How do you know it was Mr. Rook?
A. Because it was coming from his property, and he told me he was doing the shooting.
Q. Mr. Rook told you that?
A. Yes.
Q. So you called the police and told them about that?
A. Yes.
Q. What did the police do about it?
A. John Jasper came out, and we went up and talked to Terry Rook, because there was supposed to be covenants that said no shooting in Webber Park. And when John Jasper and I came back out and got on Webber Park Road, Terry Rook's shooting range was right here, he let off a shot right when we were there, and even John Jasper jumped.
Q. Explain to me a shooting range. Mr. Rook had an area where he would normally shoot?

31

A. Yes.
Q. And I think of most shooting ranges as having like an earthen backstop where bullets go into the earth?
A. Yeah. He had a dugout, but it was facing the road.
Q. Was there anybody else there at the time that you say you heard bullets whizzing across your property? Was there anybody else on Mr. Rook's property shooting with him?
A. Yes.
Q. So you don't really know whether it was Mr. Rook or somebody else, whether it was intentional or accidental?
A. It continued. It wasn't just one time the bullets flew over.
Q. When you say "it continued," on that one occasion it continued during the occasion or there was more than one occasion?
A. It continued for several years.
Q. Did a bullet ever hit any structure in your house or your fence or anything where you were able to recover a bullet?
A. No.
Q. What other problems in '94?
A. I mean, that continued for years. I can't think of any other problems in '94.
Q. How about the rest of the mid '90s, '95, '96?

32

A. I can't remember the exact years.
Q. Were there other occasions when you called the Sheriff's Office to come out for various problems you were having?
A. Yes, and I have it documented, the paperwork somewhere. I can't remember the dates offhand.
Q. Okay. Well, let's forget dates for a moment. What other kind of problems did you have?
A. People bringing their dogs down on purpose and shooing them on my property. This was Kit.
Q. Kit Ross?
A. Kit Ross.
Q. You saw her -- when you say "bring the dog down," was she driving the dog?
A. No, she walked. Her and her sister, Kit and Suzanne, walked -- Bill Swanson's dog -- I forgot the dog's name -- walked the dog down, took the leash off and shooed him on my property. She did that with another little dog. And they -- Suzanne used to bring the dog down in her car, just get outside of Webber Park, and let it out of the car and shoo it back towards me.
Q. When you say "shoo," several times you've done it here, let's describe for the record what I saw you doing. You put both hands out in front of you. So drop your palm facing your body with the back sides of your hands facing

away and then raising them like you're -- like you're telling something to going away?
A. Yes.
Q. That's an awkward thing to have to explain, but I hope I got it close. And you physically saw these people on these occasions do that sort of thing with those animals?
A. Yes.
Q. Did the dogs running up and down the road give you any trouble?
A. Yes.
Q. What trouble?
A. I've lost 33 chickens and geese.
Q. Do you know -- did you see dogs involved each time?
A. Most of the times I did see the dogs. I did see a coyote do it, and when the coyote grabs the chicken, nothing's left behind. When a hawk or eagle kills a chicken, a pile of feathers is left behind, sometimes the big fur. But when a dog -- and I've seen them killing a chicken -- they just maul the poor thing to death laying there. They don't eat it. They don't take off with it.
Q. Whose dogs did you see killing -- actually see killing your chickens?
A. Carol's dog.
Q. Carol's?

A. Carol Jones that lived with Jack Sworowski. I saw Beth's dog chasing my chickens on my property.
Q. Have we discussed Beth yet?
A. No.
Q. What's Beth's last name?
A. I don't know.
Q. Who else?
A. That -- that husky, Ally, was chasing my geese trying to bite them.
Q. I thought I heard that geese actually were killed. Did you see any geese killed?
A. My neighbor saw a goose killed.
Q. One of your geese?
A. Yeah, but he thought that was a wolf hybrid, Jack claims, and I don't know for sure. Jack said he brought a wolf hybrid out there and let it go.
Q. The way you prefaced that last statement, I'm not sure what you're telling me, so I need to explore it a little bit more. Jack Sworowski told you that he brought a wolf hybrid out and let it go in the Valley?
A. Yes.
Q. You started that by saying something about, "I don't know" or "I can't prove." What do you mean?
A. Oh, Jack told me that he brought that wolf hybrid out, but I can't say for sure if he did. He told me he did

that.
Q. You never saw, for example, him get out and shoo it?
A. Right. That point, no. I did see the wolf hybrid, and that's the one I watched taking most of my animals, and I finally shot it.
Q. You killed that dog?
A. It was a wolf hybrid on my property, yes.
Q. What other people's animals -- whose animals did you see, actually see attacking your livestock?
MR. LAMPHERE: I think that's been asked and answered.
Q (By Mr. Reed) I think we were giving a list, and I sort of interrupted her. I just want to make sure. Is there anyone else?
A. Now, you're confusing me. We're going in circles here.
Q. Is there any other -- we were talking about dogs killing your chickens. And I'm asking if there's any other people's dog we haven't already mentioned whose dogs were killing your chickens.
A. I can't say they killed my chickens, but there are other dogs, like Wayne's dog named Jasper was on my property chasing my chickens. And I caught the dog, put him in my truck.

Q. Any others?
A. Um, there was a bunch of dogs that they would bring them down and let them go. I can't remember them all. At one time I counted maybe 13. Carol Jones had a dog besides that husky. She had another big dog that come down chasing my chickens and eating chicken scratch. I said, "Don't you feed this dog?" And they said, "No, we want him to hunt on his own."
Q. Who said that to you?
A. Carol Jones.
Q. Have we exhausted the list? Anybody else?
A. Not that I can remember right now.
Q. And periodically, I take it, you would call the Sheriff's Office concerning these problems?
A. Yes.
Q. What results did you get from the Sheriff's Office?
A. Not much.
Q. Explain.
A. Sometimes they didn't even come out.
Q. Did they ever explain to you why they wouldn't come out?
A. No.
Q. Did they ever explain to you why you weren't getting much of a reaction from them?

A. No. One time they took Bill Swanson's dog, the one I saw Kit and Suzanne bring down on purpose. I caught him, put him in the back of my truck. I had a big shelf, like a big dog cage. Called Animal Control, they came and got the dog and took him back up and gave him back to Bill.
Q. How did that make you feel?
A. Not too good. And it went to court and it was all dropped.
Q. Do you know why it was dropped?
A. No. Nobody summoned me to court to talk about it. Nobody come out and interviewed me that I know of.
Q. Did you call the Sheriff's Office and complain that you didn't feel you were being -- your complaints weren't being taken seriously?
A. I can't remember.
Q. Any other problems concerning killing of livestock?
A. One time a goat looked like it got shot in the eye with a BB gun.
Q. You had a goat?
A. Right. The day before the court hearing for Bill Swanson's dog, or the day of it, I came home and there was -- looked like she got shot in the eye with a BB gun.
Q. Okay. What did you see? Was the eye intact or was --

A. There was a little hole in the middle sticking out.
Q. Did you recover the BB?
A. No, I put her down. She was suffering.
Q. Did -- well, after you put the animal down, did you recover the BB?
A. I tried to, but it made me sick so I stopped.
Q. Did you complain to the police about that?
A. I talked to Deputy Ficus. Actually, now I remember. That was during the 2005 problem with George Porter right before court, when I was supposed to go to court.
Q. Against Mr. Porter?
A. Yes.
Q. Did you talk to any neighbors about what had happened, that the animal had been shot?
A. Not at that time.
Q. Have you since talked to any neighbors about what happened?
A. I think I talked to Mark Damon about it.
Q. What did you and Mr. Damon discuss? What did you say?
A. I just told him I thought they shot my goat in the eye.
Q. And when was this conversation?

A. Last year.
Q. Are there neighbors in the Valley during the '90s that you are getting along with well?
A. No.
Q. How many people were living in the Valley in the '90s?
A. In the winter it was just Jack Sworowski, Wayne Wodora and me.
Q. How about in the summer?
A. Then it would be Dave Johnson, Ann Johnson, David and Ricky Vanvliet and Doug Growe. We got along casually but they always complained about everything I did. They didn't want me to build a barbed wire fence.
Q. Did they say why they didn't want a barbed wire fence?
A. They don't like barbed wire.
Q. Did you go ahead and build it anyway?
A. Yes.
Q. Any other disputes with these neighbors?
A. At what point?
Q. I guess in the mid '90s to the end of the '90s.
A. I'm having a hard time remembering right now. I know I wrote it all down and it's in the record.
Q. Was there ever a dispute about grading of the road, Webber Valley -- whatever the name of the road is,

Webber Valley Park Road?
A. Yes, there was.
Q. How did that come up?
A. Terry Rook rented a dozer.
Q. What was he doing?
A. Dozing the road, making a mess out of it, rocks were coming up. And he started trenching on private property. He trenched onto Tract 3. And at that time, someone else owned it and they asked me to watch their lan[d] for them and don't let anybody on it. And he was also dozing the road right up on my fence.
Q. Let's break that down, what you just said down a little bit. Dozing the road, am I to take it that he's running the equipment over the top of the road in some sort of an effort to smooth it out?
A. Yes.
Q. Was he having that result when he was done? Was smoother than when he started?
A. No.
Q. He did a bad job then?
A. Maybe he did better up there, but in front of me, he made it worse.
Q. Did you talk to him about dozing the road, that you didn't like what he was doing?
A. I can't recall.

Q. Is that the first time you had ever seen anybody doze that road?
A. I can't remember.
Q. The surface of this road, this is a dirt road, a gravel road? What are we talking about?
A. Dirt/gravel.
Q. Is it treated in any way?
A. No, never been maintained in like 30 years.
Q. I am familiar with back country gravel roads in the mountains getting washboarded. Do you understand the term washboarded?
A. Yes.
Q. Was this road getting washboarded?
A. Yes.
Q. So it was a rough road to drive on?
A. Yes.
Q. Does it make kind of sense that somebody at some point should make an effort to smooth that road out?
A. Yes.
Q. Now, you said that besides grading the road, he was doing something, he was trenching. What do you mean by trenching?
A. He had a dozer. He didn't have a road grader. So he made waves in the road, which puddled up with water. Then he tipped the blade and trenched along the side of the

road and trenched on private property when he was down by me, knocking out property pins. And then decided he was going to make a runoff ditch, and he went in and trenched on Tract 3. It was on Tract 3 on the other side of the posts.
Q. I sort of interrupted you. I apologize. Before he did anything with the road, did it have barrow ditches on both sides?
A. No.
Q. Do you know what I mean by a barrow ditch?
A. Yes.
Q. Just for the record, let me tell the record what I think a barrow ditch is. That is, that the water will somehow run off the road, end up in a depression on either side of the road, and then that follows the -- parallels the road out to some outlet where the water, hopefully, goes away. Is that what -- do I accurately describe what was there before he started?
A. There were no barrow ditches. There were no culverts to divert it off. He wasn't making that kind of ditch. He made a flat road, and then he went like three or four feet off and just dug a hole, a trench, that wouldn't make a -- and it was uphill.
Q. The road before he started, was the road higher than the surrounding properties?
A. No. It's been lower for years.

Q. So things actually were running from the surrounding properties out onto the road?
A. On my end, it's just actually running down the road. It's so gravelly out there, it doesn't run off the property. It just kind of soaks in. I don't know what it does up farther by them.
Q. When you say "it's running down the road," the road becomes, in effect, a riverbed for the water to leave the area?
A. Yes, dumps right in my driveway.
Q. And if it freezes, it's going to freeze on the road and make a hazard?
A. Yes, and he was burying my gate. So I would get out there and try to hand do a barrow ditch, whatever you called it, on the other side to try to divert it.
Q. Whatever he was doing to dig any sort of a ditch, you didn't agree with him?
A. No, he made it worse. He caused damage to my property because Sandy and James Comstock and I -- they paid for all the gravel and we fixed the big holes by us in the beginning. And we had it hand trenched so it wouldn't damage our properties. And he undid that when he got the dozer down there.
Q. Where are the Comstocks living or did they live at that time?

A. They live in Fountain.
Q. Did they own any property up in the Valley?
A. Yes.
Q. Which property?
A. Across the road from me.
Q. So if we got that map out again, it would be whatever lot is across the street?
A. Yes. It's 11 and 12, something like that. I can't read it.
Q. I know, I can't either, but it's roughly directly across the street from your place?
A. Yes.
Q. Do they have a house up there, a cabin?
A. No.
Q. You said you were watching the lot to the side of you, I think you said Lot 3?
A. Yes.
Q. Who owned it at that time?
A. I can't remember their names.
Q. Where did they live?
A. California.
Q. Was there a cabin on that property?
A. No.
Q. How is it they asked you to watch the property for them?

A. They would come out in the summer and visit, and we would visit with each other. They would camp. And then we would write letters back and forth when they were gone. People were driving across it trying to make a road. So they asked me to watch it for them, and if people drove on it, to call the police, the Sheriff's Department.
Q. Was that a problem, that there were people driving on their property quite a bit?
A. Yeah.
Q. Is there a street or a graded road that goes across their property?
A. No. They were trying to make a shortcut pass to the National Forest. The people knocked down the fence. So I put it back up for them and kept an eye on it.
Q. Do you know what people?
A. No.
Q. Did you ever call the Sheriff's Office because someone was knocking down the fence?
A. Yes.
Q. What reaction did you get?
A. I don't know what happened. They cut across my property, and they were apparently hunting. They had rifles in their trucks, and they called me a fucking bitch and told me that that wasn't private property. It was public property.

Q. So you actually saw somebody?
A. Yeah, I went out and talked to them and told them to get off my property. They were smashing my seedling trees.
Q. These are hunters from somewhere else?
A. Hunters that owned land up here. I forget their names. I called -- I do remember the report. I called, Bob Horn came out. I got their license plates.
Q. And who's Bob Horn?
A. He was a deputy back then.
Q. Deputy Sheriff?
A. I don't know what you call it. He was a deputy.
Q. Well, I don't know. Animal Control officer, Deputy Sheriff. Who else is possible? Department of Wildlife? I'm trying to figure out who he was.
A. He worked for the Sheriff's Department as a deputy. He became a detective later for the Sheriff's Department.
Q. Do you own a camera?
A. Yes.
Q. How long have you owned a camera?
A. Off and on for years.
Q. "Years," being maybe decades?
A. Well, I'm 50.
Q. Lots of years?

A. Sorry. Seems like a lawyer kind of question.
Q. You owned a camera for quite awhile, haven't you?
A. I thought everybody did. Sorry.
Q. I take that to be a yes?
A. Yes. Excuse me.
Q. Did you ever take pictures of any of these people doing things like knocking down fences or grading the roads?
A. Yes, Terry Rook. I took pictures of him on the road.
Q. On the road. What was he doing on the road?
A. He was driving the dozer. I took pictures of him doing that trench on private property.
Q. And did you give that picture to the Sheriff's Office?
A. Yes.
Q. What was the result?
A. Disappeared.
Q. I'm sorry. The pictures disappeared?
A. Yes, and I got charged with false reporting, went to court. District Attorney Paris, I think it was, talked to me. And I said, "Well," I said, "where's the pictures I sent you?" He said, "What pictures?" They didn't have the pictures.
Q. When was this, do you know?
A. Oh --

Q. '90s, aught anything?
A. I think it was -- might have been the '90s. I know I wrote it down. I just kept notes.
Q. Do you have these things written down that you have access to?
A. You should have them.
Q. These are handwritten notes?
A. I turned them all into my attorney.
Q. Let me just ask a question or two. These are handwritten notes?
A. Yes.
Q. And these are notes you wrote to allow yourself to remember things that you might have been concerned you woul forget?
A. Yes, and I saved also some of the court records. And I did save that one where I got charged with false reporting, so that states the year on that. I don't remember it off the top of my head.
Q. I want to be clear. These are not things, what you're talking about now, are not things that you wrote as a result of needing to tell your attorney in this lawsuit what was going on? Separate the two out, because I don't want to ask questions about things that are communications between you and your attorney.
A. Can you rephrase that? I don't understand you.

Q. Well, what I'm asking is, I want to make clear that we're just talking about things that you've written to help refresh your recollection as opposed to things you've written to give your attorney an idea of what's happened.

A. These were things that I had written through the years because of my friend, the police officer from Colorado Springs, that told me -- I told him nobody would do anything to help me. So he just said, "Just keep documenting it," and then eventually one day something might happen where they might catch them harassing me and I can show it's a pattern that's been happening.

Q. I misunderstood you early. I thought you said there was a Sheriff's Deputy who had done this. You're saying somebody from the Colorado Springs Police Department gave you this advice?

A. Yes.

Q. Who was that person?

A. I can't remember his name. I met him down here, and he wanted me to take his husky dog, and I did for awhile. It was really hyper, so I brought it back.

Q. Do you have any dogs of your own?

A. Yes.

Q. What kind of dogs do you have?

A. Right now I have an Akita shepherd. For 20 years I had a Malamute and Husky-wolf mixes, and I used to have

three at one time.

Q. Did you keep your dogs chained?

A. No.

Q. Did you keep your dogs in any sort of chain-link pen?

A. I kept them in a large enclosed fence, and I did have electric on the outside of it, because one of Wayne's dogs kept coming in and trying to breed with one of mine that wasn't fixed.

Q. Did you -- were there times when your dogs were out on your own property running loose?

A. No.

Q. So they were constantly being kept chained or not chained, but behind a chain-link fence?

A. A dog fence, so at least 700 feet of fencing. They were kept in the fence. Now, the last year or so my Akita Shepherd could run out front with me, because he doesn't take off.

Q. What do you mean by a dog fence? I'm not sure what that means.

A. It like a two-inch by four-inch square wire. It's called dog fencing, five feet tall, T-posts.

Q. Is this is metal or plastic?

A. Metal. It's not heavy-duty chain link.

Q. Problems with neighbors. We've talked about

animals. We've talked about dozing. What other problems, if any, have you had with your neighbor since '94 to now, if any?

A. There's a bunch, and I have it all written down.

Q. Well, give me as best you can.

A. I think I might need a break, because my brain is feeling tired.

Q. We've been at this approaching an hour.

(WHEREUPON, a break was taken from 11:40 a.m. to 11:51 a.m.)

Q. (By Mr. Reed) I think where we left off was that I was asking you about other problems, if any, you had with neighbors. You had indicated that, yes, there were, but you didn't exactly remember. That you had done some notes to help you remember, but you're not in possession of those notes anymore?

A. No, I gave them to my attorney.

MR. REED: Counsel, if it would be possible -- again, I'm not asking for anything that's a communication, but if these are notes to help her remember, we probably need to get our hands on them.

MR. LAMPHERE: I'm not the original attorney.

MR. REED: Maybe we have to work on that.

A. Mullens. I do remember some now that I took a break. I had troubles with George Porter.

Q (By Mr. Reed) What kind of troubles?

A. He'd drive by and yell at me. Um, I used to run my dog on the front of my mountain bicycle, had them tied out front because they were sled dogs. And I had both Terry Rook and George Porter swerve at my dogs with their truck, and I had to get them off the road.

And I had George try to take out my -- I don't know what words to say. He came down the middle of the night, 12 in the morning, revved his engine in front of my place and ran for the corner of my fence. And instead of hitting the fence, he hit a deadman post I had there and broke it.

One of the times right after the court hearing with one of the dogs, it was the one after Bill Swanson, I came home and there was a hot dog carved like a penis, like the head and a little hole in the end in a condom laying on the ground right by my gate.

Q. Now, do you have any idea who did that?

A. George Porter and Wayne. Mark Damon said they admitted to doing it. I thought it was one of them up there. And then the one time that I went to borrow, use Bill Swanson's telephone, George Porter was over there. An they teased me and said they wanted to come down and have sex with my goat because they liked goats and sheep.

Q. You used the word "teased." Is that how you took

it at that time?
A. When did I say teased? Oh, I just did?
Q. You just did.
A. Oh, I didn't mean -- I thought they were -- okay. I got to reword that. I thought they were teasing me. They said, "We want to come down and have sex with your goats. We like goats and sheep," and George said that. Bill Swanson goes, "Yeah, so do I."
Q. Did they have any goats and sheep of their own?
A. No. But I just thought, "Oh, these jerks. They are teasing me," is what I thought. Okay. Within a week or two, I come home. A female goat is laying down. She can't get up. She's partially paralyzed in the back end.
Q. This is a goat of yours?
A. Yes. And her vulva is torn up. And I didn't know what was wrong, and I couldn't afford a vet and I didn't call the cops, because they never did anything anyway.
Q. Now a vet never looked at this animal?
A. No. I didn't know what was going on. When I went to touch her, she was afraid. And all I ever said is, "My goat was sexually injured." And two -- a week or two before that, they told me they wanted to come down and have sex with my goat. I was working at Hutchison that day. Susanna Ross-Stewart came in, walked around the store, said hi to me and left. And I came home from work, my goat was down and

she's hurt.
Q. Now, when you say "hurt," was -- and you used the word "torn up" at one point. Am I to understand this was a physical injury to this goat?
A. Yes. Her vulva was swollen and it was ripped. There was a tear in it.
Q. She was bleeding?
A. Right, and she couldn't stand up. She tried to stand up and run from me like she was afraid, and I never hurt her. And she fell back down, because her back legs were partially paralyzed at the time.
Q. Well, how did this goat come out of this without vet care?
A. She did. She got better in a few days, and then she gave birth in two weeks. She was neurotic after that. I ended up having to put her down, because she was just a real pain.
But let me finish. A week after my goat was hurt, I didn't know what was wrong. I thought she was having problems giving birth, but she didn't birth for two weeks. And I never had goats give birth before. George Porter drives by when I'm working in my yard, Wayne Wodora's in the truck with him. George hangs out of the truck going, "Bah, bah, bah, bah," making the goat sound to me.
Q. And did you take that as teasing?

A. No, not at all. He wasn't being friendly about it either.
Q. Did you call the police about what you thought was an assault on your goat?
A. No, because like I told you a minute ago, nothing ever got done. And every time I called the police and made a report, the neighbors heard about it. I'm talking about Chuck and Vicki Caldwell, Jack Sworowski, Wayne Wodora George Porter. Every time I made a report they heard about it before the report was closed, and they would spread it around.
Mark Damon told me that Vicki came home from work one day and said, "Shawna wanted them to fingerpaint that condom, ha, ha, ha." So I didn't find that funny at all. The detective laughed at me on the phone.
Q. When you called the police, the Sheriff's Office and asked them or told them you had a complaint, do you understand that to investigate the claim, they might have to go to the people you are making the allegations against them and ask them what was going on?
MS. PRATT: Object to form.
Q (By Mr. Reed) Do you understand that would be occurring in a normal police investigation?
A. Not all of it. I thought some of it would be kept confidential.

Q. What's the point of making a complaint if you don't intend it to be pursued?
A. I just told them I thought some of it would be confidential. I knew some of it wouldn't, because they have to know about it, yeah. I have to calm down a minute. I'm getting angry.
When I came home and found that hot dog in a condom, I found that very humiliating, and to call the Sheriff and have them laugh is not funny.
Q. Do you know who did it?
A. No, I can't remember. I got upset. If it happened to anybody else's wife or daughter, they would have done something about it. They never even came out. They all seemed to think it was pretty damn funny, and I don't. It was almost liked like a real penis had gotten cut off. It was disgusting.
Q. One of the things that strikes me in reading through a lot of the documents here is that there's some continuation of a relationship between you and some of the people in the Valley, going over to their place for dinner and/or stopping and talking to them, that sort of thing. Is that happening as well during the -- well, let's say after 2003?
A. No, I quit going up there. After the Thanksgiving dinner at Chuck and Vicki Caldwells' when George Porter sa

he had pictures of himself giving a billy goat head and wanted to know if I wanted to see it. Said it in front of Chuck and Vicki and everybody else, I said, "No, I don't want to see it." I excused myself that night and left early.

Four days later, Chuck came up to me and said, "You shouldn't have told the cops about that. You shouldn't have said anything. It was just a picture for a DVD cover for their musical band they had."

Q. Had you shown a cop -- talked to the cops about a photograph of -- was it Mr. Wodora?

A. No. I called the cops and said it was Jack Sworowski's goat. I called actually Animal Control and I asked for Bobbi Priestly. And I asked her if she could help me find a goat -- I mean, a home for this billy goat, because Jack asked me to take it. He said, "That goat is problem. You take it." And I said, "Yeah, sure," so it wouldn't be abused any more. I said I'd take it, because I saw Jack get that goat drunk and let two big dogs attack it on Easter.

Q. Did you call the police and tell them about that?

A. No, because I was trying to stay out of all that stuff. I shouldn't have even went up there, but they invited me. And Ron Zaccagnini told me, "Stay friendly with them so they won't think you talked to the cops about them,

about stuff they do."

Q. When did Mr. Zaccagnini tell you that?

A. Probably 1995 and through the years.

Q. So you've been telling Mr. Zaccagnini things about these people since 1995?

A. Yes, since '94.

Q. What have you been telling Mr. Zaccagnini?

A. I told him about the drug use I saw them do. I told him about Jack Sworowski and Ricky Vanvliet had butchered a calf. It was a cattle calf. They had --

Q. Not an elk calf?

A. No, it was cattle. They had cattle rustled, I guess. It belonged to -- I don't know what you call it.

Q. What makes you come to the conclusion that it was cattle rustled?

A. It wasn't their calf. It belonged to Howard Stone.

Q. How do you know that?

A. Because I talked to Howard Stone. He has a lease out there. It was his cow. They don't own cows. They separated this calf, and the moms were bawling. So I got on my horse to see what was going down. It was down on the ground at the time dead and they was butchering it.

Q. Did you call the police?

A. No. I just figured I'd get in trouble because

they'd tell the neighbors about it. I called Howard Stone, and I told Ron Zaccagnini because Ron came to me and said he would help.

Q. Did he?

A. No.

Q. At some point there is an allegation in some of these documents that Mr. Zaccagnini is suspected of being corrupt. Do you have that opinion of him?

A. I don't know. I said that before. I said, "I think he's incredibly stupid, the things he did, or he must be corrupt." I don't know. I can't prove any of that.

Q. Any other complaints against the neighbors that we haven't talked about that you've remembered?

A. Now, I can't -- I get upset, because this went on for years, and that's why I had written it all down. When I get upset like that, I have a hard time thinking. They had -- Terry Rook harassed me for six and a half years including trying to run me off the road when I was driving. And then after he got arrested in Teller County for felony menacing, I think, someone else. And then after he quit harassing me, then George Porter started in.

And the other -- one of the other big things is I will tell you every time I left Webber Park, one of them would follow me. And Chuck Caldwell was in the -- was the main one after that 2005 incident.

Q. When you say "follow you," how far would they follow you?

A. Past Lake George and they'd usually turn around.

Q. So that's what, how many miles?

A. Fifteen, sometimes 18, 20.

Q. And so they'd make as much as a 40 mile total round trip to follow you out of the park?

A. Yes.

Q. Did you ever discover why they were doing it?

A. No. But it was after the 2005 incident with George Porter. I don't know what they were up to.

Q. Did you have problems with people following you a lot in that period of time?

A. That period, yes, summer 2005, yes.

Q. Where all would they follow you? Anywhere besid to Lake George and back? Anywhere else?

A. Sometimes Woodland Park.

Q. So someone followed you all the way to Woodland Park?

A. Yes.

Q. Do you know who that person was?

A. It was various people, their friends. I can't remember all their names right now. I can give you some c them.

Q. Well, give me some of them.

A. Bill Swanson, Wayne Wodora, George Quist, now it's Bobby Quist.
Q. What do you mean, now it's Bobby Quist?
A. I've been back for a little over a week, and now every time I leave -- I was back at my home for a little while. Every time I leave, Bobby Quist is there.
Q. I haven't heard the name Quist at all in these depositions. Who's Bobby Quist?
A. He's just friends with George Porter, Chuck Caldwell.
Q. And when you say "now," do you mean like this week?
A. Yes.
Q. You've moved away from Webber Park?
A. I'm in the process. I've been sleeping there for about a week, except I got afraid again and I left. I didn't sleep there last night.
Q. When you say you moved away, I don't need a street address. Where have you moved to generally?
A. I don't want to say that, because I'm afraid I might get harassed again.
Q. Well, and again, I'm trying to be sensitive to that. On the other occasion, I'm trying to figure out, is your property up in Webber Park for sale?
A. Yes.

Q. How long has it been for sale?
A. I have a buyer.
Q. You have a closing date?
A. Nope. I'm waiting for him to sell his house. He already bought Tract 1.
Q. You have a written contract?
A. No, verbal.
Q. Do you have some time, general time frame in mind when this is going to be completed?
A. Soon. He had thought he had a buyer for his house. And he said if he couldn't, he would get a bank loan and mortgage on his house and buy mine, and he has to do it by August.
Q. Why?
A. Because I put a mortgage on my place, so I could find a new place to live.
Q. Have you discussed with this buyer problems you've had in the Valley?
A. He knows it. He's the father to the neighbors across the road, the Comstocks.
Q. Am I to understand his name is Comstock?
A. No. And I actually, I don't remember his last name right now.
Q. What's his first name?
A. Ray or Dad.

Q. Dad? Is that what you said, Dad?
A. I call him Dad.
Q. Mr. Damon, we've talked sort of briefly about Mr. Damon in terms of you had this conversation with him, you've had that conversation with him. When did Mr. Damon move into the Valley, if you remember?
A. It was after the Hayman fire, and the Hayman fire was the summer of 2002, I believe.
Q. Okay. Had you known Mr. Damon before he moved into the Valley?
A. No.
Q. After he moved into the Valley, how did -- how did you relate to him in any way?
A. I saw him at the Thanksgiving dinner at Caldwells'. I think we just said hi. Then I didn't talk to him again until the feed store that I know, I went out to deliver a couple of tons of hay.
Q. About how long would that have been from the dinner?
A. I can't remember.
Q. Are we talking a year? Are we talking a week?
A. I really don't remember. I didn't pay much attention to that. I just went up to help Marina and Virginia unload the hay.
Q. You know what season Thanksgiving occurs in. What

general season is this hay being delivered?
A. Maybe it was a year. I don't know. Hay gets delivered in the fall.
Q. Would it have been as long as a year?
A. I can't remember. I did not pay attention to that.
Q. Well, how does the relationship develop, if any, from there with Mr. Damon?
A. We didn't become on a friendly basis -- we didn't become friends until after we got served with the summons.
Q. So am I to understand that you didn't even have a conversation with him on a friendly basis?
A. I just remembered that. We did talk off and on for awhile, um, a couple of years after he moved in. Um, maybe it was 2002 or 2003. I can't remember. I was friendly with him for awhile.
Q. Well, during the deposition today you've talked about that you mentioned this to him or he mentioned that to you, and I'm just trying to get a sense, you're having some conversations with him about what's going on in Webber Park
A. Yes, and that was -- we didn't talk about stuff like that. For a bit we did back in 2003, and then I just quit going up to that end of the Valley. Just seemed better. I just stayed down at my place for years.
Q. Did he come down and talk to you?

A. No, we didn't become friends until after we were served with the summons, and he came down here and talked to my attorney.
Q. Did there come a time when he introduced you to anybody concerning any of your complaints about the neighbors? And here I'm talking police officials.
A. No. I don't believe Mark introduced me to anybody.
Q. How did it come about that you met Mr. Flint?
A. Um, Deputy Ficus asked me to talk to him after the George Porter incident in the summer of 2005.
Q. And what did Ficus think, did he tell you, did he think you could tell Mr. Flint?
A. Well, I called Ficus up and said, "How come Chuck Caldwell's in town talking to Rebecca at Starkey's about this case?" I said, "Is the case closed already?" Because Rebecca told me she felt intimidated by him. So I called up Ficus and said, What's going on?"
Q. Are you aware that people had been interviewed?
A. I didn't know. No, I didn't know. So Deputy Ficus asked me if I would talk to Greg Flint about Chuck talking to my witness, because she was a witness for me of what happened. And Chuck wasn't even involved in it. It was about George Porter.
Q. Is it fair to say that people in the Valley seemed

to talk a lot with each other about what was going on involving people in the Valley?
A. Yes.
Q. So had the police been out to interview anybody, for example, Mr. Porter's business at the store? That's something other people in the Valley wouldn't necessarily have kept secret for very long, is that a fair statement?
A. I don't know. I don't know.
Q. If the police had gone and talked to Mr. Porter, Mr. Porter is certainly going to know you made a complaint or the people at the store made a complaint and pass it along to his neighbors?
A. I think that happened before they found George Porter, because he was hiding from them. And I saw a few deputies go out and come back, and I guess Rick Ficus finally got him. Rick Page came out. Mark Damon said he had seen him, had seen George Porter run.
Q. Well, how do you come to the conclusion Mr. Porter was hiding?
A. Oh, Mark told me he was hiding.
Q. So you had a conversation with Mark Damon about that at least?
A. That was later, though.
Q. Before this lawsuit?
A. No. It was after the lawsuit. We just discussed

some of the stuff after. But I could, to make things clearer here, I saw the deputies coming out a couple of times. And I do -- I can't remember the time limit. You'd probably have to ask the Sheriff's Department. But what Chuck told Rebecca was, "Don't worry. You won't have to go to court. Shawna's not a reliable witness. We've had problems with her before like this. She's crazy."
Q. Did you complain that Chuck Caldwell had threatened Rebecca in any way?
A. I didn't say that. I just said what I just said. I told Ficus what was said, and I told Ficus that Rebecca told me she felt intimidated. That's all I said, and that's what Rebecca told me.
Q. Did Rebecca tell you why she felt intimidated? What it was about --
A. No.
Q. -- this that was intimidating?
A. Sorry, I cut you off.
Q. Did she tell you why she felt intimidated or what about this made her feel intimidated?
A. I can't remember if she -- I just remember her telling me she felt intimidated by him coming in and talking about the case. I guess she thought she was still not knowledged that she was a witness. She wanted it kept private. It wasn't supposed to be in the public record is

what Ficus said.
Q. And the police talked to a number of people about what they saw concerning that date?
A. I don't believe they got out to the neighbors yet.
Q. Even if they only talked to people at the grocery store, do you have any question in your mind that that could get out to neighbors by word of mouth fairly quickly?
A. It can get to the neighbors, but why would someone that works in the Sheriff's Department interfere with an investigation?
Q. Well, how do you feel he was interfering? Was he telling her to say something untrue?
A. Why was he talking to her about it?
Q. Was he telling her to say something that wasn't true?
A. Not that I know of.
Q. Was he telling her not to show up at any sort of proceeding?
A. Not that I know of.
Q. Was he threatening her in any way concerning her involvement in this matter?
A. No, but he told her that I was crazy.
Q. If he told her that you were somehow not deemed to be reliable and there had been a number of cases dismissed, would you agree that somehow the Sheriff's Office seemed to

have stopped taking you seriously?
MS. PRATT: Objection to the form.
MR. LAMPHERE: I'll join.
Q (By Mr. Reed) Let me break it down, because it's an awkward question. By the time this happens, this event at the store happens, would you agree that there were a number of times the police stopped responding to your calls?
A. Yes.
Q. And when you talked to them, did you get a general sense they didn't think you were very reliable?
MS. PRATT: Objection to the form.
A. Yes.
Q (By Mr. Reed) That's something we didn't cover. When attorneys make objections like that, you get to answer anyway, okay? Because this is, after all, a discovery deposition, so you get to answer anyway.
A. Whoops.
Q. Unless your counsel instructs you not to testify, then that's going to be between you and him. If I think you should have to testify anyway, maybe me and the Judge. But in any event, then you get to answer unless somebody is telling you you can't. Okay?
A. Okay.
Q. Okay. Do you know a person from CBI named Dan Volz?

A. Yes.
Q. V-o-l-z. How do you know Mr. Volz?
A. I talked to him.
Q. He actually -- you're aware he actually has come up with a police report concerning his conversation with you, a CBI report?
A. You want to repeat that question?
Q. Are you aware that he has written a police report involving his investigation and his discussions with you involving his investigation?
A. I know he wrote a report. I don't know --
Q. I don't want to step on your answer. Are you done?
A. I don't know if he called it a report.
Q. Do you know what Mr. Volz was investigating? Did he tell you?
A. Yeah, the Webber Park possible meth labs, um, poaching, that's -- I get a little confused, because Greg Flint was also talking to me. Greg was the one who asked me to talk to Dan Volz. So we were talking about the meth, the poaching, the --
Q. Let me hand you what's been marked as Exhibit 48. I do have some copies of this. Have you ever seen this Colorado Bureau of Investigation Report of Investigation before?

A. No.
Q. Well, let's move to page two of this. At the bottom right it says, "Park-Caldwell 0706." Do you see that?
A. 0706, yes.
Q. I just want to make sure we're on the same page.
A. Yes.
Q. Towards the bottom there's a paragraph that starts, "On November 7, 2005," do you see that?
A. Yes.
Q. And I'd like to kind of work through this. This is a -- this is Mr. Volz' report concerning his investigation that's been testified to previously. "On November 7, 2005, the RA," which I take to mean the reporting agent, "conducted an interview with Shawna White Owl in Woodland Park, Colorado. The interview produced the following information." Do you see that?
A. Yes.
Q. Then he's got a series of bullets that continue for several pages, right?
A. You talking about the dots?
Q. Dots, right.
A. Okay.
Q. And starting on page 0707, which is page three of his report, let's just start there. "Shortly after White

Owl moved into Webber Park, Jack Sworowski told White Ow numerous crazy things when he would get drunk, including the following." The first paragraph after that talks about methamphetamine, that Mr. Sworowski had been taught how t make methamphetamine. Do you see that?
A. Yes.
Q. Other than what you say Mr. Sworowski told you, do you have any independent evidence concerning that he had been taught how to make methamphetamine?
A. I saw a triple beam scale at Dave Johnson's house, the kind that drug dealers use.
Q. And we're talking about Mr. Sworowski. Any more evidence about Mr. Sworowski?
A. Mr. Sworowski and Dave Johnson were close buddies, and they share land together.
Q. Any hard evidence that Mr. Sworowski was making methamphetamine?
MS. PRATT: Object to the form. You can go ahead and answer, sorry. I'm just stating my objection.
Q. (By Mr. Reed) Let me discuss what I mean by hard evidence. Did you take any photographs, for example, of a methamphetamine laboratory?
A. No.
Q. Did you recover any substance you thought was methamphetamine and give it the police so they could test it

to be sure what it was?
A. No.
Q. Did you -- were you able to find anybody buying methamphetamine from these individuals who has confirmed that they bought methamphetamine?
A. I saw what looked like George Porter selling something.
Q. Did the police -- did you tell the police about it?
A. No. Like I said, they didn't listen to me, so I quit talking. I did walk in on a big bowl of white crystallin stuff.
Q. What were you told that was?
A. Later -- nobody said anything. Then later, a few days, they said it was ceremonial salt, but when it happened, nobody said a word.
Q. Did you have any hard proof that it was anything other than ceremonial salts?
A. No. Their behavior -- when I picked the lid off, everybody sat there quiet, looked at me and looked angry.
Q. Well, do you understand that if you do what looks like searching through somebody's house they might get upset with you?
MR. LAMPHERE: I'm going to object to the form of the question.

Q (By Mr. Reed) Let me ask the question this way. Would you object if somebody started going through your personal items at your house?
A. I think your question is really off here.
Q. Well, maybe it's off, but I'm asking the question. Do you feel that just by being invited in somebody's house, you can look through things?
A. I wasn't looking through things. I was looking for my coffee cup and they were playing around, hiding it and giggling. And on the table I saw a bowl with a basket on it, so I assumed it was my coffee cup.
Q. When you say they were hiding your coffee cup, what leads you to that conclusion?
A. Because I left it up there, and they said they wouldn't give it to me yet, that they had it, but they weren't going to give it to me yet. They were just playing. So I thought I was playing back, and I picked that basket thing up thinking that's where the cup was.
Q. Do you have any hard evidence that the substance that you saw that day was anything other than ceremonial salts?
MS. PRATT: Object to the form.
MR. LAMPHERE: Join.
A. No.
Q (By Mr. Reed) Next bullet down, "Don Anthony tips

the Webber Park residents off." What hard evidence do you have that that happened?
MS. PRATT: Object to the form.
Q (By Mr. Reed) If any?
A. I can't say hard evidence other than Jack Sworowski told me he did. And one time --
Q. Did anybody else witness Mr. Sworowski telling that to you?
A. No. I was going to also say, one time I talked to Don Anthony, just in person at his office. A report was never made. And I told Don Anthony that Ricky Vanvliet, I thought, was growing marijuana in his basement, because his nephew told me he was. And I saw all the water pipes going to it. I told that to Don Anthony. I got in court with Terry Rook, when I tried to put a restraining order on him, Terry Rook said the exact same thing I said.
Q. Did anybody hear you tell that to Don Anthony?
A. No. Sworowski and Wayne Wodora burnt Terry Rook's house down because he was too violent, and they did not like his guns.
Q. Do you have any evidence to support that?
A. I can't recall. Wayne and Jack were talking to me, and I can't remember which one of those two said it. They told me that.
Q. Anybody else witness that?

A. No.
Q. Did you see the fire?
A. Nope.
Q. Did you collect any evidence that that -- hard evidence that would point to the truth of what you were saying they said to you?
A. Nope.
Q. Next sentence. "Bob Horns burnt his own house down to collect --"
A. Where? Have you skipped some?
Q. Well, I did Sworowski burned Terry Rook's house down. The next one is, "Bob Horns burnt his own house down
A. You skipped Sworowski wanted to have sex with me before I die.
Q. Point, show me where.
A. Right under "Don Anthony."
Q. Huh, I did skip that. Well, let's talk about that.
A. Um-hum.
Q. Now, what makes you say that?
A. Because he came down and told me that.
Q. Anybody witness that?
A. Nope.
Q. Any hard evidence that he ever said such a thing to you?

MS. PRATT: Object to the form.
A. Nope.
Q (By Mr. Reed) And do you know what I mean by hard evidence?
A. Nope.
Q. Any sort of tape recording of it happening, any other hard witnesses, witnesses who heard it and could independently come forward and say this?
A. No.
Q. Now, we're back. We did the next one. Now we're back. "Bob Horns burnt his own house down." Do you have any evidence of that?
A. No, he was -- it was Jesse Sworowski told me that. He said it in front of Frank and Kay -- oh, I forget their last name. But Frank used to work for the Sheriff's Department in the jail.
Q. Is there any indication that Jesse Sworowski -- Jesse Sworowski?
A. Yes.
Q. Knew what he was talking about?
A. I don't know.
Q. So what you're saying is you're repeating a rumor that somebody said, "I think this is what has happened," and you repeat that as true?
A. Is that a rumor when the guy tells me that?

Q. Well --
A. I just said what Jesse said. That's all I ever told people. I didn't say it was true. I said, "This is what they are saying." And if they are saying it to intimidate other people, I don't know. I'm just -- I just stated the facts of what they are saying to me.
Q. The next dark-colored bullet, "In 1995, White Owl saw." Do you see that?
A. Yes.
Q. That talks about "a large mound of a white crystal substance," and the last sentence of that paragraph says, "At the time, Sworowski told her it was ceremonial salts." I'm focused at that time.
A. I don't know who put that wording in this. It wasn't at the time. It was a few days later. I said, "Oops," and put the lid back down, and everybody sat there looking at me and I left.
Q. Next bullet, "Ricky Vanvliet." It says "Vanvliet --"
A. That's --
Q. -- and that spelling has got to be wrong, right?
A. Um, might be. I thought it was Van v-l-e-e-t, but it's Vanvliet. It's not fleet. It's vliet.
Q. It's different than from what I thought it was. I always thought there was an F in there somewhere.

V-a-n-v-l-e-e-t is the way you would say you think it's spelled?
A. I don't know.
Q. At any rate, Ricky Vanvliet's house, you said you had been in there. You couldn't go downstairs in the basement because they were growing marijuana? Did you at the time call the police?
A. Yes.
Q. Did the police get a search warrant?
A. No.
Q. Did you ever go downstairs and see the marijuana yourself?
A. No.
Q. Could you smell the marijuana?
A. I saw them smoking it all the time.
Q. Well, could you smell marijuana in the basement?
A. I didn't go in the basement. I told Don Anthony and it was never investigated.
Q. Did they give you any marijuana?
A. They passed it to me and I passed it on.
Q. Did you collect any marijuana and pass it to the police?
A. No.
Q. Is there any independent evidence that you are aware of that would indicate that Ricky Vanvliet had any

marijuana growing in his basement other than what you heard them say to you?
A. The only thing was I saw a bunch of water pipes going from what they called their wellhouse to underground, and it's an extensive amount of water pipes. It's not normal plumbing.
Q. I'm sorry, where did you see these pipes?
A. In his wellhouse on his property. Jack brought me in there. Ricky got mad and said, "Get her out of here."
Q. So you were inside of the wellhouse and saw the pipes leaving the wellhouse underground?
A. Yes, aiming towards the house.
Q. Did anybody tell you what those pipes were for?
A. No, but they had a windmill running the water nonstop when nobody was even there.
Q. Did you tell the police about this?
A. Yes.
Q. Did the police do anything about it?
A. No.
Q. As far as you're aware, is there any independent witness who saw these pipes?
A. Everybody that was there sees those pipes. I said Jack Sworowski was with me.
Q. Tell me somebody independently who's neither on your side nor their side, who's likely to repeat what you're

saying, that these pipes are there and what they are used for?
A. I can't think of a person.
Q. Next bullet. Next bullet is, "On numerous occasions White Owl observed Chuck and Vicki Caldwell smoking marijuana."
A. Yes.
Q. Do you see that?
A. Yes.
Q. At the time you saw these people smoking marijuana, were they employees of the Park County Sheriff's Office?
A. Vicki was.
Q. Okay. Do you understand that making this allegation could cost her her job?
A. Ah, I don't know. I didn't think about that.
Q. Well, now you're thinking about it, do you have a conclusion?
MS. PRATT: Object to the form. Object to the foundation.
A. I have no comment to that, because I think you're working my words around.
Q. (By Mr. Reed) I'm reading the words here. Did the officer get your words wrong?
A. No, I have seen her smoke marijuana when she

worked there.
Q. And when you are reporting that to this officer in November of 2005, November 7, 2005, you're aware she is still, in November, 2005, she's an employee of the office in Park County, the Park County Sheriff's Office?
A. Yes. I was stating a fact on what I observed. What happened to that fact, I didn't know what was going to happen.
Q. Are there any independent witness you can name who will come forward and support your position, that they were smoking marijuana?
A. I don't know.
Q. Can you give me one name?
A. There's probably other people that have seen it, but I don't know.
Q. Are you aware of anybody who will come forward and say they actually saw this?
A. No. No.
Q. In the next bullet, "In 2002 George Porter and Bill Swanson told White Owl -- Porter told White Owl he wanted to have sex with her goats." Anybody else hear that?
A. Bill Swanson.
Q. If Bill Swanson says it never happened, do you disagree with that?
A. Yes.

Q. Anybody else hear it?
A. No.
Q. Anybody you're aware of, any witness you can name, who can come forward and state that they heard that?
A. No, not that I know of. Nope.
Q. The next sentence talks about the unusual trauma. You indicated the goat was never seen by a vet, correct?
A. Yes.
Q. And you said a couple of weeks later, the goat actually gave birth to other goats, I assume? Right? The goat was pregnant at the time all this was going on?
A. Yes, she gave birth to two kids. One came out with an eye injury, but it healed.
Q. "Lately in the early morning hours --" excuse me, I skipped one. "In 2004, White Owl saw George Porter pass a small piece of cellophane to a guy at the Ponderosa Store."
A. Yes, I did.
Q. Ponderosa is where? Is that the one in Lake George?
A. Yes, it is.
Q. Did you get any sample of what was in the cellophane?
A. No.
Q. Do you know if anything was in the cellophane?
A. No.

Q. What's the significance of him passing a piece of cellophane, to you?
A. I was stating the fact, and I also stated in the report -- it's not in here -- the guy that was waiting for it on the deck was real nervous and pacing back and forth until George came up. And I've seen other drug dealers do this, because they do it in front of people, they do a little pat, kind of a funny handshake. Where they go like that and walk away. (Indicating) That guy took off. George turned around and looked at me, his face turned white and he looked angry.
Q. How many drug deals have you seen in your life personally?
A. I used to grow marijuana and I wrote that down. I've seen drug deals.
Q. So you didn't just use marijuana, you grew it?
A. Yes. I didn't use marijuana. I didn't like it. It was my boyfriend that grew it, so --
Q. How many drug deals have you seen in your life? I'm not talking necessarily marijuana. I'm talking you indicated this passing of cellophane from one hand to the other, how many of those sorts of things have you seen in your life?
A. Recently, two.
Q. Recently?

A. Recently.
Q. What do you mean by "recently"?
A. I saw Andy Sworowski and Skip do that in front of the laundromat in Woodland Park. I was sitting in my truck eating a sandwich. They looked up and looked at me and I was looking at them, and they took off really fast.
Q. When?
A. Be a year ago.
Q. Skip, have we heard of Skip in this context?
A. It's in the Webber Park Synopsis.
Q. Who is Skip?
A. I don't know his last name.
Q. How do you know his name at all?
A. Because he's a person that's around town and he's friends with all these people.
Q. He doesn't live in the Valley?
A. No.
Q. When you say people are passing drugs, how do you know they are passing drugs as opposed to just shaking hands?
MR. LAMPHERE: I'm going to object to the form of that question.
MS. PRATT: Join.
Q. (By Mr. Reed) Let me rephrase it. You testified that you've seen a number of drug deals, and this is the way

it's done with passing from one hand to the other. How do you know that isn't just simply shaking of hands? What makes you come to the conclusion that it's a drug deal?
A. I did not say it was a drug deal. I said he passed a small piece of cellophane.
Q. What's the significance to you of telling that to a police officer? Why do you think a police officer would care if they were passing cellophane back and forth? Why bring it up?
A. Um, I'm getting upset right now. I think you're just drilling me.
MR. LAMPHERE: You want to take a break?
THE WITNESS: Yeah, I think I need one.
MR. REED: There is a question on the table.
MR. LAMPHERE: Well, we'll finish the question on the table.
MR. REED: Okay.
MR. LAMPHERE: We'll take a break. Probably good time to take lunch, actually. Go ahead and finish your answer.
A. You'll have to reask the question, I'm stressed.
(WHEREUPON, the question beginning on line 6, page 86 was read back by the reporter.)
A. Because I thought they were selling drugs, because they told me they made drugs.

Q. (By Mr. Reed) So the message you are trying to convince -- trying to convey, rather, to the police officer is that a drug sale is going on?
A. Maybe.
MR. LAMPHERE: Okay. Can we take a break now?
MR. REED: Sure.
(WHEREUPON, a break was taken from 12:35 p.m. to 1:44 p.m.)
Q. (By Mr. Reed) All right. Let's go back on the record. We were working our way through Deposition Exhibit 48. Do you still have that in front of you?
A. Is this 48? Okay. Yes, I do.
Q. I think the last thing we had talked about was the passing of a small piece of cellophane back and forth, and I had asked whether you were trying to convey that there was a drug deal going on to the police officer when you were telling him this, and you said "Maybe." Do I have that right?
A. Yes, I think you do.
Q. Well, is maybe a yes or a no? What was your intent?
A. I thought -- I guess I thought they were doing a drug deal, so --
Q. And that's what you intended to convey to the

officer?
A. I don't really understand the way you keep wording that, because I did tell them I saw him pass a piece of cellophane and the way they reacted.
Q. You thought it was a drug deal and that's what you were conveying to the officer?
A. No, I said I thought maybe it was, and that's what I'm conveying, that I thought maybe.
Q. Did you use the word "drug deal" with the officer?
A. I don't remember.
Q. Going to the next bullet, "Lately," and this is again, this is dated February 2, 2006, it reflects an interview in November of 2005, so "Lately in the early morning hours, especially on Mondays, White Owl smells a chemical smell in the Valley that she associates with methamphetamine production." Do you see that?
A. Yes, I do.
Q. First of all, how do you associate that smell with methamphetamine production?
A. I wanted to see -- excuse me, but I have a cold, so I'm having a little trouble talking and not coughing. I didn't say -- I was talking to Greg Flint, and I told him what it smelled like. And I didn't know what it was, and I do believe Greg told me, "Meth smells that way."
Q. Was there anybody with you when you smelled the

smell?
A. No.
Q. So he can only associate what you are telling him with something from his experience?
MS. PRATT: Object to the foundation.
Q. (By Mr. Reed) Are you telling me you never smelled methamphetamine to your knowledge prior to that point?
A. No. I smelled someone that smoked methamphetamine, but I never smelled what it smelt like when they were making it. I described to Greg Flint this smell that I smelled.
Q. And he's the one who told you that was most probably methamphetamine?
A. Yes.
Q. And that's what you passed on to Agent Volz, is that his name, Volz?
A. I don't know if I passed onto Volz that I thought it was methamphetamine or not. I just remember saying, "This is what I smelled."
Q. The last couple of sentences there, let's analyze those, "The smell closely resembles burning plastic and styrofoam." Do you see that?
A. Yes.
Q. The last sentence says, "White Owl's neighbor

burns trash that contains a lot of plastic and it emits a similar odor." Do you see that?
A. Yes.
Q. Am I to understand those last two sentences to indicate that this smell you smelled might have been the burning of trash as opposed to some sort of drug manufacture?
A. No.
Q. So it smells like it, but not -- it's just a different smell?
A. I said it had a chemical smell of something similar to burning plastic, but that it also smelled like a really dirty cat box. Ammonia, cat liter smell from a really dirty cat box.
Q. Do you know where that smell was coming from?
A. Um, downwind from all my neighbors out there.
Q. And how many people at that point were living in the Valley?
A. Just Jack Sworowski, Wayne Wodora, Chuck and Vicki Caldwell, the whole group up there. Priestly, the ones that we talked about. They are the only ones.
Q. All the ones we've already talked about in this deposition?
A. Yes.
Q. So what I'm hearing is you smelled it on the wind,

but you're not sure what property it came from?
A. Yes.
Q. Since you told this to Mr. Flint, and Mr. Flint told you it sounded to him like manufacture of methamphetamine, have you had the opportunity to smell what's been positively identified to you as a methamphetamine manufacturing smell?
A. No.
Q. When you told this to Mr. Flint, Detective Flint, did he ask you to give him a call if you ever smelled it again? Call him right away?
A. I don't think so.
Q. You said you were smelling it lately. You were smelling it every Monday?
A. That's what I said.
Q. Did Officer -- Detective Flint suggest that maybe he should come out to your house in the next few Mondays and see if he could smell the smell?
A. I don't remember that.
Q. Did he do anything like that?
A. Not that I know of.
Q. At least, not at your house?
A. Not at my house, yeah.
Q. Did Detective Flint do anything about getting a search warrant to your knowledge?

A. Not that I know of.
Q. Are you aware of any independent hard evidence supporting the idea that you actually smelled methamphetamine as opposed to some other smell?
MS. PRATT: Object to the form.
MR. LAMPHERE: Join.
A. How do you get hard evidence of a smell? I don't understand your question.
Q. (By Mr. Reed) A chemist who's familiar with the smell of methamphetamine being produced from CBI, for example, shows up and is there to smell the smell for themselves. Anything like that ever happen?
A. Not that I know of.
Q. Did you ever find any substance that you thought was methamphetamine as a result of one of these smells and turn it into any police agency?
A. No.
Q. Did you talk to Mr. Damon about this smell?
A. Yes.
Q. What did he have to say?
A. I don't remember.
Q. Did he indicate whether or not he was smelling the smell?
A. I don't remember. I had just stated to him I smelt it and that's all I remember. I don't think he

commented.
Q. Were you aware at the point you told him about the smells, that he himself had been talking to the police about drug manufacture in the Valley?
A. I don't remember.
Q. Have you ever to your knowledge talked to Mr. Damon about the criminal behavior as you perceived it going on in the Valley?
A. Yes.
Q. When?
A. I can't remember when I first talked about it, but we did talk about it after we both got served with this lawsuit.
Q. What did Mr. Damon have to say about it after the lawsuit commenced?
A. We just did a bunch of small talk.
Q. Such as?
A. Gosh, I can't remember all that.
Q. Well, tell me what you do remember.
A. I can't remember.
Q. What did you to tell him after the lawsuit was filed about the subject of this lawsuit?
A. That I wasn't happy about it.
Q. Did you discuss the facts that were alleged at all?

A. I really can't remember everything on this.
Q. I'm just asking you what you do remember. Do you remember anything?
A. Yeah, I know we talked about the lawsuit.
Q. What did you say? What did he say?
A. We talked about the words in the lawsuit. I can't remember everything we said.
Q. I'm asking you what you do remember.
A. I said I don't remember.
Q. You don't remember anything?
A. I can't recall a particular phrase, okay?
Q. Well, tell me the gist of the conversations. What did you and he talk about?
A. I'm sorry. I can't think of it right now.
Q. You can't remember even the gist of what was being discussed?
A. No.
Q. Next bullet talks about poaching and gunshots. Do you see that paragraph, the last paragraph on page three of the report?
A. Yes.
Q. You indicated to this officer that you "did not know anything about poaching allegations until Mark Damon had told you about his knowledge about it."
A. I can't remember if Mark Damon told me first or if

Greg Flint told me. I can't remember who did, but I did not know about it.
Q. Would you have told Officer Volz something that wasn't true?
A. No.
Q. Okay. So if Officer Volz writes this down as what you told him at the time in November of '05, I'm trying to get a sense of whether you disagree with what he says you told him about this bullet?
MR. LAMPHERE: I'm going to object on foundation grounds. You can answer.
A. Well, he's confusing -- you're confusing me again on your question.
Q. (By Mr. Reed) I'm sorry.
A. I'm also going back and thinking of something else. I can't get to the new question yet. You asked me what Mark and I talked about.
Q. Sure.
A. Greg Flint had told us not to talk about the case too much, because he didn't want us hybridizing our stories.
Q. Okay. You're talking to me about the two of you talking to each after the lawsuit is filed.
A. Right. Just about how it's not right. We don't feel it's right.
Q. Did you talk about the specific details of the

lawsuit as to what you thought wasn't right about it?
A. No, I did not get into detail, because I was told we shouldn't talk about it.
Q. Other than merely saying, "Gosh, it sure doesn't seem right," did you discuss anything about the lawsuit?
A. I can't think of the details. I'm just telling you why we didn't talk about it much, because it was best not to, we were told.
Q. Let's go back -- can we go back to this last bullet then?
A. Another thing I remember staying on my mind, I just remember that the law enforcement officer told me to document.
Q. Who was that?
A. Denny McCormick.
Q. And he's with the Colorado Springs --
A. He was. Now I think he's up in Cripple Creek or he's in Victor, and his son. One of his sons was in Cripple Creek for awhile --
Q. Again --
A. -- or Teller County, his son was.
Q. I'm sorry. Again, how did you know Officer McCormick?
A. I met him down at a outdoor sporting store, and I had my little dogs in the back of the truck, my wolf hybric

dog and the other dog, and he asked me if I would take his dog. He had to find a home for it, so I did try taking his dog.

Q. Anything else?

A. No, that's it. Now we can go on.

Q. Okay. The last bullet on page three of the report by Agent Volz, "White Owl did not know anything about poaching allegations until Mark Damon told her about his knowledge of the crimes." Would you agree that the officer has correctly stated what -- at least what you told him at that time in November of 2005?

A. I don't know. I can't remember that interview that well. For one reason, it's because Don Anthony showed up to my interview, the Undersheriff, and it shocked me and it scared me. It was near the end of our interview and then I just got scared and couldn't -- I actually don't remember the interview real well.

Q. Where was the interview held?

A. Starbuck's in Woodland Park.

Q. And Mr. Anthony, did he approach you or approach Mr. Volz?

A. We were sitting outside in front at a table near the door. He just walked up, looked at us, and went in the store.

Q. Did you consciously tell Mr. Volz anything you

considered that wasn't true?

A. No.

Q. Next sentence, "Over the ten-year period that White Owl has lived in Webber Park," and again, this interview is as of November of '05, "she has heard 5-10 gunshots at night during the summer non-hunting season." Do you see that?

A. Yes.

Q. I just want to make sure what this says. Is that a total of five to ten gunshots over a ten-year period?

A. No, not over ten years. It had been a recent occurrence that I did hear gunshots just after dark in the Valley.

Q. I'm trying to determine frequency. This says, "Five to ten gunshots at night," and is that every night or is that over a ten-year period?

A. Not every night, but it was happening. It wasn't over a ten-year period. It was happening maybe that year. I was just saying I heard some shots at night. I don't remember telling him five or ten. I did hear some shooting at night wondering how could they see in the dark, that was my first thought. How do they see in the dark whoever's doing it?

Q. Did you ever see who was doing it?

A. No.

Q. Did you ever see any animals down as a result of it happening?

A. No.

Q. Do you know if any animals, in fact, were ever shot?

A. No.

Q. Next sentence, "Sometimes the shots were preceded by elk bugles and sometimes they were not." Do you see that sentence on the top of page four?

A. Yes.

Q. Do I understand that these elk bugles are -- maybe you couldn't tell, so I guess I'll ask that question. Could you tell whether these elk bugles were real elk or whether it was some sort of simulation by a man blowing some sort of contraption to sound like an elk?

A. I couldn't tell you whether it was a real one or a call.

Q. And there were times when shots were being had where there was no elk bugles at all?

A. I didn't hear that.

Q. At times -- there were evenings where there were shots being made, you're hearing shots, and you didn't hear any elk bugles at all?

A. True.

Q. Next bullet, "DOW Officer Ron Zaccagnini is

corrupt." What did you base that on?

A. I don't believe I said he's corrupt. I remember I said, um, because they asked me if I thought he was corrupt, and with the things I saw him do, I said, "He's either incredibly stupid or he is corrupt." I don't believe I said he's -- exactly that he's corrupt. I did say that I know he didn't turn some people in that he caught poaching.

Q. How do you know he caught anybody poaching?

A. I don't know for a fact. They just told me that.

Q. Who's "they"?

A. One was Louie Claudio. He told me Ron let him go on a poaching charge, so I asked Ron -- no, I didn't ask Ron. I told Ron that, "It was nice of you not to charge that guy because he's trying to feed his kids."

Q. What's Louie's last name?

A. Claudio.

Q. Any chance you could spell that?

A. C-l-a-u-d-i-o. And then another guy named Chance told me the same thing. He had a deer hanging and Ron caught him and didn't charge him. They thought he was a really nice guy for that.

Q. Where does Mr. Claudio live, if you know?

A. He moved. He's gone.

Q. Gone, out of state gone?

A. I don't know where he moved to.

Q. How about Chance?
A. I believe he's back in prison in Arizona.
Q. "Back in prison," you mean he was in prison before?
A. This is -- that's just hearsay, that he was on probation and went back. Ron Zaccagnini also told me they had busted Chance for growing marijuana out in South Park, but I don't know if it's true.
Q. "Zaccagnini looks the other way in certain instances involving poaching." Is that what we just discussed or is that some other event?
A. What we just discussed, that's it.
Q. "Zaccagnini uses his position as a DOW officer to try and have sexual relationships with females." And let's add the next couple of bullets, so we put this -- deal with all of this together at the same time.
"When Zaccagnini investigated the poaching allegations in Webber Park, he attempted to have sexual relations with White Owl by putting his hands inside the back of her pants.
"Zaccagnini also attempted to have sexual relations with White Owl's neighbor, 'Beth,' during the same investigation." What evidence do you have that any of this is true?
A. Well, one sentence is wrong, that's not what I

said.
Q. Which one?
A. When Ron Zaccagnini put his hands down in my pants, that was back in somewhere about 1994-'95.
Q. That was not dealing with any investigation?
A. Yes, it was. He was investigating -- I put my land for sale six months after I moved there, because the neighbors were -- said they like to run people out that don't do drugs with them, so I put my land for sale. Ron Zaccagnini asked me why I did that. So I told him, "Because the neighbors don't want non -- they don't want straights in the Valley." That's what Jack had told me.
Q. And that conversation with Zaccagnini was back in '94?
A. '94, I do believe so, and I told Ron that. You know, he asked me, "Why are you moving?" And I said, "Because of that, I don't want to be in the middle of this kind of stuff." He said, "Don't move. We'll get them. So tell me what you know about everything out there like the possible drug use."
Q. You seem to be getting away from his attempt to have sexual --
A. No, I'm not.
Q. Okay. Go to that point if you would, please.
A. So he was -- said he was investigating the

neighbors, and he kept coming out to see me, and he became friendly with me. He got real friendly.
Q. What is "real friendly"?
A. One time he wanted to give me a hug and he put his hands down my pants and grab both of my cheeks or my butt. Another time he came over to my travel trailer at night, and got me on the bed so he could adjust my back, and then I just got up and took off.
Q. He got as far as your bed in your bedroom in your house?
A. Yes.
Q. Did you complain to his supervisor about this behavior?
A. No.
Q. Why not?
A. Do people really listen to a woman when they say that? I hate to say that. If it wasn't outright rape, they aren't going to listen to that.
Q. Do you have any independent evidence that any of these three bullets, the things alleged here, happened?
MS. PRATT: Object to the form.
Q. (By Mr. Reed) Any evidence to times that they happened?
A. Beth told me that Ron was chasing after her. I was up there talking to Beth and I said something about

Ron's wife. She was talking about Ron Zaccagnini. Told me how he was coming up visiting her and asked something about what he was doing for Christmas.
Q. You asked her or she asked you?
A. She asked me. I said, "Well, he'll spend it with his family and his wife. They usually go to Denver," and she got mad when she found out he had a wife.
Q. Did she say why she was angry?
A. She said, "Well, if he's just going to come up here for sex, he's wrong with that." And then she didn't talk about it anymore and she ran him off. Told him not to come out.
Q. Did she tell you in any other fashion than you've just related to, she was either having sex with Mr. Zaccagnini or that he was attempting to have sex with her?
A. She did say that -- she said to me, "You wouldn't believe how hard he's coming on to me."
Q. But you don't know Beth's last name?
A. No.
Q. Any other independent evidence of these three bullets being true?
A. No. I just thought of one, where he had tried to have sexual relationships with females. I know he was having a long-time relationship with Terry Barton. I didn't

see him actually have sex, but I would ride with him to go help with the big horn sheep.
Q. I don't know anything about you riding with him to go to the big horn sheep.
A. I volunteered to help with the wildlife, and I would ride with him to go help tag the big horn sheep and give them shots and things like that.
Q. When was this?
A. Maybe '95 or something, and he would call Terry up a lot on the telephone and talk real intimate with her when I was riding with him.
Q. Was this before or after he'd put his hand down the back of your pants?
A. I can't remember.
Q. Anything else?
A. You just keep wanting to know why I think he did that.
Q. Well, I would like to have some independent evidence if you know of anything, anybody else knows abou it, somebody else you might have complained to at that time. Any sort of indication that there is anything behind this other than you just saying it happened.
A. The mail lady said she was having an affair with him.
Q. Okay.

A. But I don't know if it's true or not.
Q. Do you know her name?
A. Susan Burstedcr.
Q. And this is when you say "mail lady," I assume this is somebody who delivers the United States mail up there?
A. Yes.
Q. Was there any indication that he did this as a result of using his position as a DOW officer?
A. Not with Susan, probably.
Q. Anything else about -- any sort of other evidence you think might exist as to Officer Zaccagnini doing these things, using his position as a DOW officer?
A. No.
Q. Next paragraph without a bullet, "At the conclusion of the interview, white Owl conceded that she didn't have much evidence to support any allegation of ongoing criminal activity within Webber Park." Would you agree you told the police officer that?
A. I think so. I didn't have any hard evidence. I didn't collect samples, et cetera.
Q. Two paragraphs down starts, "White Owl admitted," do you see that paragraph?
A. Yes.
Q. Would you read that out loud?

A. "White Owl admitted that in the past she has exaggerated the facts regarding the Webber Park residents in attempts to finally get something done with them."
Q. Would you agree that you told the police officer Dan Volz that?
A. No.
Q. Is it your position that he's making that up?
A. No. He asked me if I did do that. I think he misunderstood my answer. At that point I was upset and shaking, because that's when Don Anthony showed up to my interview.
Q. Well, did you use the word "exaggerate," that you had been exaggerating your --
A. No.
Q. -- facts?
A. I said -- he asked me if I did that. I said, "No, I did not." I said, "They have done such bad things that I'd like them to get caught." I said, "And it was tempting to do that," I said, "but I'm not doing that. I'm trying to stay exactly to the facts and that's it."
Q. If Agent Volz is willing to testify under oath that you told him, you admitted to him that you were exaggerating facts, would he be lying?
A. I would say no. I think -- I don't think he would lie. I think he misunderstood what I was trying to say,

because I was so stressed at that point.
Q. Would you agree that by the time you had the conversation with Mr. Volz, that corroboration, independent corroboration of the things you told him would be awfully hard to do?
A. I don't understand that question.
Q. Do you understand what I mean by corroboration?
A. No.
Q. The ability to find other evidence that will support what you say happened.
A. Can you redo the whole question with that part in it?
Q. Okay. Would you generally agree, that the ability to support your statements as to what had happened in these various things we've gone through, various claims of the criminal behavior in the Valley, that it was not really possible to find this sort of independent verification by November of 2005?
MS. PRATT: Object to the form and the foundation.
MR. LAMPHERE: Join.
A. You lost me on that one. I thought if they investigated, they would find what I'm saying.
Q. (By Mr. Reed) Well --
A. I didn't have any hard evidence and it's not my

A. Um, like everyone in here, the Meth Valley sign, the writing looked and the style of the sign looked very similar to the one that said "Git," G-i-t, that was on George Porter's property.
Q. But --
A. And I asked Mark Damon after we got served, I said, "Who put up that stupid sign?" And he said that George said that he did it, because he wanted people not to buy land out there.
Q. So you have it indirectly, but nothing of your own observation?
A. That George did it?
Q. Right.
A. No, I don't know. I put in here just the fact that the writing looked similar.
Q. In looking through here, correct me if I'm wrong -- let's break it down into each area of criminal conduct. First with respect to the manufacture of methamphetamine, is there anything in your answer here that indicates that either Mr. or Mrs. Caldwell were involved in methamphetamine production?
A. No.
Q. Have you ever indicated to Detective Flint that you told Chuck and Vicki Caldwell were in any way involved in the manufacture of meth?

A. No, I had just said he was friends with people that said they make it.
Q. In any way did you tell Detective Flint that Chuck and Vicki Caldwell in your mind were acting as some sort of lookouts --
A. No.
Q. -- for methamphetamine production facilities?
A. No.
Q. Did you tell Officer Flint anything that you thought Chuck and Vicki Caldwell had to do with respect to poaching operations?
A. No.
Q. Same sort of question in terms of lookouts for poaching operations.
A. No.
Q. How about snuff films, Vicki and Chuck Caldwell, anything you told Detective Flint that indicated to you that they were involved in the making or marketing of snuff films?
A. No.
Q. Do you know what I mean by snuff films?
A. Yes, I do, because George Porter told me what it meant.
Q. How about pornography in general? Chuck and Vicki Caldwell, any information you have that you gave to Officer

Flint that Chuck or Vicki Caldwell were directly involved i[n] the manufacture of either pornographic films or any other pornographic material?
A. No.
Q. Any information you gave Detective Flint that would indicate in any way that Chuck was involved with th[e] problems you had with your goat that you described earlier in the testimony today, that is, that the female goat was -- looked abused and the one who gave birth just a couple of weeks later?
A. I didn't say that Chuck and Vicki Caldwell were involved in that, because I didn't think they were.
Q. So if in any way Mr. Flint suggested that in any of his writing, that wouldn't have been something he would have gotten from you? It would have been his mistake?
MS. PRATT: Object to the form and the foundation.
A. I can't say it would have been his mistake. I don't know what he wrote. I never told him that they were involved in the goat thing.
Q. (By Mr. Reed) We'll break this one down into two pieces. Other than the business at the store --
A. What page are you on?
Q. Well, this is sort of a general question. I'm kind of working off of page eight, but if you get lost on

page eight, you'll be lost.
What I'm suggesting is, and what I want my question to deal with, is other than what happened at the store involving witness intimidation, is there any other form of witness intimidation that you are accusing Chuck o[r] Vicki Caldwell of?
A. No.
Q. Let's go on to the store. Anything other than what we've discussed here today, that Chuck went to the store and suggested to this woman that you might be deeme[d] unreliable and that the case might not be going anywhere that you consider witness intimidation?
A. I'm sorry, I lost track of that one. That's the only thing that I ever said that I thought was witness intimidation, because that's what Rebecca told me.
Q. So you're not looking at anything other than the fact he went to the store, talked to these potential witnesses about you may be not being reliable and that the case didn't seem to be going -- he didn't think the case would go anywhere?
A. There is nothing else, no. I'm feeling confused, though. I don't know if I totally understood that.
Q. I'm not trying to confuse you. I'm trying to make sure I've got a complete overview of what you're saying and what you are not saying.

Detective Flint here, I'm working off of page ten, the first answer that's indicated at the top of the page, "Answer: Greg Flint had asked me," do you see that?

A. Yes.

Q. You, at Mr. Flint's request, you had a conversation with Mr. Flint concerning what he was investigating and what you thought might be criminal behavior taking place in the Valley, is that correct?

A. I'm sorry, my mind wondered. You want to say that one again?

Q. Is it true that Mr. Flint asked you what things you thought were going on in the Valley that you thought might be criminal?

A. Yes.

Q. And he did that at an interview he had with you, I assume, sometime in 2005?

A. Yes.

Q. Did he videotape that interview?

A. Yes.

Q. Did you have any other interviews with him besides the one that was videotaped?

A. We talked on the way.

Q. On the way to where?

A. Riding to the fire station where we were going to do the little video.

Q. And besides the trip to and then while you're at the fire station, any other interviews you and Mr. Flint had together concerning criminal behavior in the Valley?

A. I think that was it.

Q. Have you had a chance to review that videotape?

A. No.

Q. And, obviously, if there's no other conversation, am I correct in understanding there is no other videotape of any other conversation? In other words, I've got a videotape. I want to make sure it's the only time you talked to Mr. Flint is going to be on that videotape and that videotape has got some other conversation. It's a silly question, but I want to pin down that there's not going to be another conversation that will magically appear sometime later.

A. There was only one videotape where I talked, that's it.

Q. One conversation, one videotape, same event?

A. I told you, we talked also on the road. That's two conversations, one videotape.

Q. Let's talk about on the road. What did you discuss with Detective Flint on the road on the way to this videotaping?

A. Just some of the problems I was having in Webber Park with being harassed. Some of it was just even about --

it was personal talk, too, like -- I'm trying to think. Just about horses and goofy things like that, too.

Q. I'm trying to get a sense of during that conversation on the way to the videotaping, did you tell him what you thought was happening that might be illegal activities in Webber Park?

A. Did I tell him some -- I can't remember everything I said.

Q. Let's break them down. Poaching, did you talk to him about poaching?

A. No, because I didn't know about it.

Q. Did you talk to him about meth?

A. Yes.

Q. What did you tell him about meth?

A. Everything that's here, that I suspected it and that's it.

Q. I'm not sure what you mean by "here," because you --

A. Everything that's in this, what do you call it?

Q. The answers to interrogatories?

A. Yeah, and I've already said it over and over.

Q. Exhibit 67?

A. Yes.

Q. Anything that isn't in Exhibit 67?

A. No.

Q. Anything about pornography or snuff films or anything like that other than what's in 67?

A. No. Nothing more than what's here.

Q. Let's broaden it to any illegal activities you suspected were happening in Webber Park. Is there anything other than what you've indicated in your answers here that's now been marked as 67, that you think happened in the Valley that isn't on these answers to your interrogatories?

A. No.

Q. Did you ever talk to any other police officer or any other personnel at the Park County Sheriff's Office other than Detective Flint about what you thought was going on, criminal behavior along the lines of what we've been talking about in Webber Park?

A. Monte Gore.

Q. When did you talk to Monte Gore?

A. I can't remember, but it was after 2005, maybe 2006. I can't remember when I talked to him, and then Sven --

Q. Stop. One at a time. Monte Gore, where did that conversation take place?

A. Coffee shop in Fairplay.

Q. Am I hearing you suggest that it was fairly soon after 2005 or was it last week?

A. No. I said I think it was maybe 2006.

Q. And what did you and Mr. Gore have to discuss in 2006 at the coffee shop?
A. I forgot why I wanted to get ahold of him. Something was happening again, and I know about that time I was getting -- I'd come home and there would be some white powder floating in my animals' water bowl.
Q. Did you collect any of this white powder?
A. Yes, I did.
Q. Did you give it to the Park County Sheriff's Office?
A. I gave it to Sven right before Christmas and I can't recall what year. May have been 2006.
Q. I'm going to suggest Sven Bonnellycke.
A. Bonnellycke, I can't -- I don't know how to say it.
Q. But this was a Sheriff's Deputy?
A. Detective Sven Bonnellycke.
Q. However he pronounces it.
A. We just called him Sven, because it's easier.
Q. Are you aware if anything happened as a result of giving Sven this white powdery substance?
A. I never heard back from him.
Q. No criminal charges, at least of which you were aware, were ever filed against anybody?
A. No.

Q. Do you know how the white powdery substance got in the drinking water for your animals?
A. No, it happened more than once. It happened three times that I can remember.
Q. Now, you're in a pine forest?
A. Yes.
Q. You're in a Valley surrounded by a pine forest?
A. Yes.
Q. What time of year was that?
A. The pine trees were green when the pollen blows. One time a year right before Christmas, just like I said.
Q. You lost me. Was it when the pollen was blowing or not?
A. It's not when the pollen was blowing, and the pollen does not blow white, it's greenish. It gets all over everything. And I do remember one time as being in March and one time as being right before Christmas. Times in-between, I can't tell you when they were.
Q. Did you talk to Mr. Gore about any of the things that we've talked about today?
A. Yes, I did.
Q. And what did you talk to him about?
A. I can't remember.
Q. Are you sure you talked to him about it then?
A. Because I know I talked about it. I don't

remember exactly what I said.
Q. I don't want exact. I want the gist. What was the gist of what you talked about?
A. The gist of what I talked about is what's in here. What's in here. (Indicating)
Q. What did he have to say?
A. I don't remember.
Q. Did he indicate why no one ever got arrested for any of these things?
A. No.
Q. Did he make any promises about what to expect in the future?
A. No. I hate to say it, I can't quite remember the conversation and why I needed to get ahold of him.
Q. So it was you getting ahold of him?
A. Yeah, I got ahold of him for something. Something was happening that my neighbors were bothering me. I can't even remember what it was.
Q. Did you at any time ask him whether the restraining order against Mr. Porter was still in place?
A. Yes.
Q. Was that the purpose of getting ahold of him?
A. I don't know if it was that time. I don't think so.
Q. So it's been more than one time?

A. I talked to him on the phone before.
Q. Was there more than one time you met with him in person?
A. No, just once.
Q. Have you met with him in person -- excuse me, have you had any contact with him concerning this lawsuit?
A. Right after I got served, I called because I was confused. And I asked him, "Are you guys going to defend us, too?" Because I had no idea about it. And I said, "If you're not, let me know, I'll go get my own attorney." And I never heard back from him, so I got my own attorney.
Q. Did you discuss with him the facts that were alleged in the lawsuit?
A. No.
Q. Did you discuss with him any events, as you saw the events occur, comparing notes, so to speak, from '03, '04, '05?
A. No.
Q. Have you talked to anyone else at the Sheriff's Office concerning these matters besides Mr. Flint and Mr. Gore?
A. Not these matters, no.
Q. So since '03, who else have you talked to at the Sheriff's Office about any matters?
A. I talked to Fred Wegener one time.

Q. When and -- first, when?
A. Um, might have been last fall. They had given me a cell phone that they thought it would help, because I couldn't afford minutes on my phone, they thought it would help for my protection if I could call them, and they gave me a pager.
Q. What was the conversation last fall about?
A. I gave them back his telephone and his pager.
Q. Anything else?
A. No. It was small talk. Oh, no, I almost forgot. It wasn't small talk. I asked him why the building inspector boss had told my new buyer that I cut into a structural beam and my house wasn't safe. Because the building inspector said my neighbors, he wouldn't tell me who, he just said, "They were your neighbors," sent letters saying that I cut into the beam.
Q. Why did you expect that the County Sheriff would know anything about it?
A. Because he said there's no such letters. Because the old boss Doc, might have took them with him, so I was angry because I couldn't sell my house last fall and I told the building inspector, I know Caldwell was one of the ones that had talked to him about it, because I heard him talk about it at the jazz fest.
Q. Chuck Caldwell talked to who about what?

A. Chuck Caldwell was talking to -- I forgot the name. He's a building inspector on a job site when they were building Sourdough Sam's and said something about my place and I heard part of it.
Q. Did you hear Chuck Caldwell say anything about beams?
A. I can't remember what I heard.
Q. Did you hear Chuck Caldwell talk about anything -- indicating anything to the building inspector about whether your property was up to code?
A. It was something like that. I can't remember the exact words. So I asked the building inspector, "Was it Chuck Caldwell who said something?" And he said, "It was all of your neighbors out there." He said, "I have several letters complaining about you out there."
So I went to Fred Wegener and I said, "What's going on with the building inspector? He postponed the sale of my property by saying something he had no facts on." And I said --
Q. I'm trying --
A. Excuse me, I didn't finish.
Q. I'm trying to figure out who the "he" is. "He" delayed the sale of the property. Who's "he"? The building inspector?
A. Yes. By telling my potential buyer that my house

was not structurally sound, because my neighbors told him it wasn't. And he said he had letters, but no longer had it. There's no facts on that.
So I went to Fred Wegener and I said, "Do you happen to know where these letters are that this guy's going on?" And you know, I said, "Where's these -- do you happen to know where the letters are that my neighbors filed complaining that my house isn't sound?" If nobody knows where the letters are, then nobody should have said it then. But I'm still fussing on getting my house sold because of that statement.
Q. I take it, you've satisfied your buyer now that your house is sound?
A. No, I still have to pay extra money to get it proven that it is.
Q. So the oral contract you had might still fall through because of that?
A. Yes. It already fell through one time. I was going to be out of there last fall and I got stuck there all winter because of that. He's afraid it's not sound. I might have to hire an engineer to prove it's sound and that's not cheap.
Q. Let's talk about your property in general. I didn't actually ask you to kind of give a description of it. When was the house built?

A. I started building it, I do believe, in '98, '97. I can't remember.
Q. So was this house built from scratch?
A. Yes.
Q. It wasn't a preexisting? For example, some of the properties in there I know are literally restored cabins. This isn't one of those restored cabin properties?
A. No.
Q. So this house has regular electrical, regular plumbing?
A. It would when it was finished.
Q. Well, now you've confused me. Is it finished?
A. No.
Q. So it doesn't have those things?
A. No.
Q. Do you have a certificate of occupancy on this property?
A. No.
Q. Did you pull a building permit on the property?
A. Yes. Legally, I have the right to sleep in my travel trailer, but now, I don't even stay there.
Q. Do you suspect that perhaps not having a certificate of occupancy is causing you some trouble in getting this property sold?
A. No. Everybody's aware of it. He's buying it to

finish it. The discrepancy is, someone told him I cut into a structural beam.
Q. Have you received any death treats from anyone?
A. Yes.
Q. When?
A. Several times back in the past. I remember David Vanvliet, he asked me why Terry and I -- Terry Rook and I were fighting, and I can't remember the exact wording, but I told him that he had threatened to kill me.
Q. I'm sorry, there are too many "he's" in there. You told Vanvliet that Rook had threatened to kill you?
A. That's right.
Q. I'm sorry?
A. I said that's right.
Q. Oh, I misunderstood.
A. You're going to confuse me if you --
Q. Well, I didn't hear your answer, that's why I asked you to repeat it. How does this death threat from Ricky, how did that take place? What happened?
A. I just said, I don't remember the exact wording on it. David was asking me, "What's going on?" And I said, "Rook threatened to kill me," and David said, "Well, I thought about doing it myself." I had a rifle pointed at me in the face by a person.
Q. Hold on. Let's do this one at a time. First,

Mr. Rook, what evidence, if any, do you have that Mr. --
A. I just told you.
Q. No, you do -- you do Rook and then you do Vanvliet.
A. I did.
Q. Then you name somebody else doing it.
A. Yeah.
Q. I want to do one at a time.
A. That is one at a time. I just said --
Q. Three different people threatened your life, isn't it?
A. Well, there's more than that.
Q. Let's do it one at a time.
A. And I just told you --
Q. Let's do them one at a time, please.
A. I did one at a time. I told you the story about Terry Rook and his threats.
Q. What did Terry Rook threaten you with? What did he say?
A. I told you. I don't remember the exact wording. That was a long time ago.
Q. How long ago?
A. 1994 or five.
Q. All right. And you're saying it's a threat on your life, but you don't remember the wording?

A. That's right.
Q. How did it come up?
A. I don't remember. It's a long time ago.
Q. What was the dispute you were having with Mr. Rook at the time it came up?
A. Because I turned him in for shooting bullets over my house.
Q. Do you remember anything else about that threat?
A. No, I don't. There's a lot of things -- lots of things that happened.
Q. Let's go to the next one. You were talking about Vanvliet, I guess, about the Rook threat, and Vanvliet says, "Well, I thought about doing something like that to you myself"?
A. He said, "I felt like shooting you myself, because you keep bringing the cops out here." And that's because Ron Zaccagnini was coming out to visit me.
Q. Did Mr. Vanvliet do anything to make you believe that he was serious about that statement?
A. Well, he looked very angry and serious when he said it.
Q. All right. Did he have a weapon?
A. No.
Q. Did he indicate he had a weapon close by he could go get real quickly?

A. He doesn't need a weapon to kill a small woman when he's a big man.
Q. You just said he threatened to shoot you.
A. I said he threatened --
Q. Did he threaten to shoot you?
A. If I did, I didn't mean to say shoot. You're making me mad. I said he threatened to kill me. I thought that's what I said.
Q. Did he indicate at any point that he felt he would be acting on his word, you needed to worry about that he was going to kill you?
A. Well, he said he wanted to do it and he was angry, that's it.
Q. Anything else with respect to Mr. Vanvliet's threat?
A. No.
Q. As you perceived the threat?
A. No.
Q. You said there was a third threat. Somebody pointed a rifle at you?
A. Yes.
Q. Who was that?
A. I'm trying to remember his name, John Leash.
Q. Who is John Leash?
A. Leash, like a lease on a place.

Q. L-e-a-s-e?
A. L-e-a-s-h.
Q. Who is John Leash?
A. He was a contractor. Casual friends with my neighbors, with Jack -- well, they -- Chuck wasn't there yet. They used to eat at the restaurant together. And he did tell me he used to sell meth, John Leash.
Q. We're referring to death threats. I don't see where you're headed.
A. You have got to let me finish.
Q. I don't see where you're headed.
A. If you would let me finish, you would see.
Q. Go ahead. Let's see what you've got.
A. When you do that, you mess me up, so I can't finish my sentence.
Q. What have you got? How did Mr. Leash threaten your life?
A. I need to take a moment here.
Q. Go ahead.
A. I have to calm down. He took me for a ride out in the forest and said -- he said he was being my friend. He wanted to help finish building my house. We get out. We start going up this one road and I say, "Hey, that's a dead end." He goes, "Oh, that's okay." But then there's -- we get up there and there's people up there, so he turns around

and drives back and says, "Let's go somewhere else." So we went somewhere else.
He gets out and pulls his rifle out and goes, "Come on, I want to look at you through the scope." He goes stands on this cliff and looking at his scope and he's going like this. I'm standing here. He's starting to point my way. (Indicating)
Q. You said, "he's going like this," you held your arms up as if someone is looking through --
A. The scope on the rifle, and he's turning towards me slowing, looking through the scope. I got kind of nervous, so I walked back to the truck. And when he turned the rifle around to where I was, and I wasn't there, he was startled. And he looked at me and said, "I'm taking you home. You're making me feel bad about owning a gun." Okay So you can't say he definitely was going to you shoot me, but it sure felt like it.
Q. Was there any --
A. Never came around again, and, no, there's never been witnesses in all of these. These people never do something if there's someone there.
Q. Let's analyze that for a second. You're saying that there was no one else there, so if he wanted to shoot you with no one else there, he might have been able to shoot you?

A. But if he would have shot me next to the truck, he might have hit his truck.
Q. The point is, he was in a position to have acted on a threat, if he believed that he really wanted to act on a threat?
A. I don't believe that's the point, and that's all I have to say about that one.
Q. It almost defies logic to ask the question, but you didn't get shot, right?
A. Apparently not. I'm sitting here.
Q. Good. Anybody else threaten your life?
A. Jack Sworowski had told me when I first moved there, that they don't like people that ride their horses around on people's property.
Q. Did he indicate he was going to harm you for that?
A. Would you let me finish?
Q. Please.
A. I'm taking an air breath, because I have a cold. And it was early morning and he told me, "You wouldn't believe how close you were to taking a bullet, because we don't like people that ride around properties and we don't like straights." And somehow, and I can't tell you the exact wording, they had said that my life was in danger because I was a narc. I can't remember the wording, I'm sorry.

Q. Who said it?
A. Jack.
Q. Anybody else?
A. I really can't remember.
Q. Did you tell anybody, any police officer that your life had been threatened by Jack?
A. I don't think so, because I don't have any hard evidence.
Q. Anybody else threaten your life that we haven't already talked about?
A. I can't remember now. That's an upsetting thing. I'm sorry, I can't remember the exact wording to it.
Q. I don't want exact wording. Just, I mean, we kind of haven't done exact wording up to now.
A. What did you just say?
Q. We haven't done any exact wording to speak of up to now. Have you gotten a sense of a death threat from any other individual other than the ones we've already talked about?
A. I can't remember.
Q. And I'm not asking you for exact wording, at least in this question. I just want to know if you have perceived a death threat from anyone else?
A. I have perceived it, yes.
Q. Who?

A. One guy was named John that wanted me to go out in the forest with him and make a movie, and he wanted me to shoot my pistol at someone.

Q. And how did you perceive that was a death threat to you?

A. Because I said I didn't what to, and then he walked away and he dropped his bullets. I don't know if that's a death threat, but it made me nervous.

Q. Anyone else?

A. I can't think now.

Q. In your counterclaim, you're aware you filed an answer, but you also filed a counterclaim against the Caldwells, a two-part counterclaim. The first part talks in terms of abuse of process. And the exact language says that the Plaintiffs have sued Defendant White Owl in order "to improperly force her to testify to matters not true." Who has approached you to ask you to testify on behalf of the Plaintiffs as to anything?

THE WITNESS: I don't understand what he's asking me.

MR. LAMPHERE: Well, ask him.

Q. (By Mr. Reed) I'll rephrase it. What I'm after is, this is a lawsuit you filed against the Caldwells, and you're saying that the Caldwells -- the only reason the Caldwells filed this action was to somehow compel you to

testify against someone else to matters that weren't true. Have the Caldwells contacted you and asked you to testify to anything?

A. It's the last part I don't get, forcing me to testify to matters that aren't true.

Q. You don't have this in front of you.

A. No, I don't understand the question --

Q. Let me --

A. -- really.

Q. Let me let you read it. This is the paragraph I'm talking about. Why don't you read that paragraph and then look up when you are ready.

A. Start up here? (Indicating)

Q. Yes.

A. It's easier for me to read it than when I hear you say it.

Q. I thought it might be.

A. (Pause) I'm just having a hard time answering that.

Q. Have you finished? Have you finished?

A. I didn't read this part. (Indicating)

Q. No, no, just that one paragraph.

A. Oh, that's what I thought.

Q. Tell me when you are finished with just that one paragraph.

A. I think matters that aren't true is Vicki was not fired because of me and neither was Chuck.

Q. Has anyone approached you asking you to testify to anything on behalf of the Plaintiffs?

A. I'm sorry, it's confusing for some reason. I don't know why I'm not getting it.

Q. Well, the part that's highlighted here says that it's an abuse of process. In other words, the Caldwells have done something other than for the purpose of having a bona fide lawsuit. The purpose, the wrongful purpose was to improperly -- if I can read this upside down --

A. Um-hum, "force her to testify to matters not true."

Q. What have they asked you to testify to that's not true, if anything?

A. That I caused them to get fired.

Q. Well, who's asked you to testify to anything?

A. I don't know what it --

Q. Has anybody asked you to testify --

A. Well --

Q. -- as to anything?

A. I guess you are asking me to testify or you wouldn't have put my name on the summons, and you're asking me to answer these questions, so now you've confused me. Besides, I don't -- some of the legal words I don't get.

"Abuse of process," I feel like you have -- they have pulled me into something that really has nothing to do with me.

Q. Okay. Let's break it down by person. Have you and I ever spoken before today?

A. No.

Q. Have I ever written you a letter before today?

A. Excuse me. You are totally confusing me.

Q. Have I ever written you --

A. You pulled me in on this lawsuit.

Q. Go to this question. Just one question.

A. I need a break.

Q. Have I ever written you a letter before today?

MR. LAMPHERE: Answer his question.

Q. (By Mr. Reed) Just answer that question. Don't read anything into it. Have you and I ever communicated in any way?

A. Not one-on-one. I thought you wrote a letter when you filed this, that's what I'm thinking.

Q. You're thinking the summons is a letter?

A. Yeah.

Q. Okay. There is the confusion. Was there anything delivered with the summons that said, for example, contact me and maybe we can work this out?

A. No.

Q. All right. Was there anything from the Caldwells

that indicated that you might be able to work this whole thing out if you just agreed with them?
A. No.
Q. Have you talked to the Caldwells since the filing of this lawsuit?
A. No.
Q. Prior to the filing of this lawsuit, did you talk to the Caldwells and ever get the sense that they would not sue you if you would just cooperate with them?
A. No.
Q. Then I'm confused: What supports your claim that this lawsuit was filed in order to get you to say something that wasn't true?
MR. LAMPHERE: Object to form. You can answer.
A. I can't answer that, because you're confusing me. I don't get what --
Q. (By Mr. Reed) Has anybody approached you to say something that wasn't true on behalf of the Caldwells?
A. No.
Q. Okay. That's all I was trying to get at. Let's go on to the next --
A. I still feel confused.
Q. You can talk to your attorney about it. I'm sure he can explain it to you. The second counterclaim here, I'm

a little confused about, but let's sort of break it down. The first paragraph talks about the tort of harassment. That somehow by filing the Complaint against you, the Caldwells have harassed you in some way. Other than this concept of an abuse of process, that they are using the lawsuit for some reason other than the normal use people use lawsuits for, are you perceiving any form of harassment -- that's an awkward question. Let me completely start over again.
What facts do you base that first paragraph on? The first paragraph here that talks about the tort of harassment. What are you saying my clients have done to harass you?
A. By filing this Complaint against me. I find that as just another form of harassment, those neighbors included, that whole group of friends have wanted me to move out of the Valley and they said they don't want me there. And I felt like pulling me in on this lawsuit was just a form of harassment, because Greg Flint asked me to say what I knew. I did, and I don't believe whatever happened to Chuck had anything to do with me.
Q. How about the next paragraph?
A. Wait.
Q. Anything else on this one?
A. No, I don't know where -- I'm getting stressed and

confused.
Q. Anything else about harassment?
A. No. I think I was going to get onto this. (Indicating)
Q. That's what I'm trying to get you to. We have to tell the record what we're doing. So now we're on the third paragraph on this page. This is page five of six of your answer and counterclaim. It's the second paragraph of the second counterclaim. What do you base that paragraph on?
A. Let me read it. The first part of the paragraph is the posting in the newspaper saying I was a confidential informant and trying to get meth labs busted.
Q. Let's take that. You realize at this point, and in fact you were listed as a confidential informant in the paperwork that Mr. Flint filed?
A. I did not know then, and I'm not sure now what that really means. Nobody told me it was me.
Q. Are you confidential informant 2005-08?
A. I don't know.
Q. I'll hand you what's been marked in the previous depositions as Exhibit 46-E, and I will tell you that this is a diagram that Mr. Flint has indicated he prepared. It's got his signature and the handwritten name at the lower right-hand corner, and he's identified sort of this schematic here. First, I'll let you orient yourself a

little bit on this diagram.
A. Oh, I see it now.
Q. All right. And in the upper left corner of what you're looking at "CI: 2005-08," and below that it says, "Shawna White Owl." Do you see that?
A. Yes, I do. Where does it say who did this? It says, "Received Flint, drawn by," and I can't see the scribble.
Q. The scribble has been identified by Mr. Flint as his own initials.
A. Oh, I didn't know that before. I see it now. That's the first time I saw it.
Q. So if Mr. Flint identified you as one the confidential informants, do you understand that this lawsuit saying that you are one of the informants, at least, is consistent with what Mr. Flint has been saying?
A. I guess so.
Q. What else do you base that last paragraph we've been talking about on?
A. I can't recall exactly what the article in the paper was, but they had spread around the rumors that I was crazy, I was not a reliable witness, and some of the things that they said in the newspaper about that I claimed everybody's out to get me, and I never said it that way. It makes me look like I'm kind of a paranoid schizophrenic or

something, and that's not true. And even said in there that I accused them of sodomizing my goat. I found that embarrassing.

Q. Have you accused anybody of sodomizing your goat?

A. I didn't outright say that George did it. I said, "This is what George said, and this is what happened to my goat."

Q. Do you think there's some other purpose besides saying your goat suffered what looked like those types of injuries just based on what Mr. -- who was it, what George Porter said to you?

MR. LAMPHERE: Object to form.

MS. PRATT: Join.

Q. (By Mr. Reed) Let me rephrase the question.

A. Please.

Q. I'd have trouble answering that, I think. You called the police on a number of occasions concerning people in the park that you thought were doing things against you, is that a fair statement?

A. Yes.

Q. And you've done that from 1994 up until just this whole thing broke, is that a fair statement?

A. Yes, and I've called a couple of times after.

Q. And on a number of occasions, on most of the occasions the police have either reacted to what you had to

say, or if charges were filed, ultimately they were dropped, isn't that a fair statement?

MS. PRATT: Object to the form.

MR. LAMPHERE: Join.

A. Before 2005, that's a fair statement.

Q. (By Mr. Reed) Have you filed charges on anybody after 2005 that have stuck?

A. No, only the one in 2005, that charged -- George Porter was charged with harassment and it stuck.

Q. Other than that specific instance, any other allegation you've made to the Park County Sheriff's Office that resulted in anyone's conviction for anything?

MS. PRATT: Foundation.

Q. (By Mr. Reed) You can answer.

A. No, I just called him and said, "I want you to document this. That I got people sitting out front the day after this newspaper article came out. That night I had a pickup sitting right in front with his bright lights right on my house for about 20 minutes the day after it came out, which scared me. I called him up and said, "Somebody is just sitting out here with his brights on me and I'm afraid."

Q. Did the police come out?

A. No -- you know, I don't know. I can't say. They said they would send somebody out.

Q. Nobody checked in with you at least?

A. No, but they called me back and asked me if I was all right. I said, "Yes, I was." They didn't tell me whether they came out or not.

Q. So you don't know whether the people with the lights had anything to do with you or not, but it was at least causing you concern?

A. Yes.

Q. Anything else?

A. Susanna Ross-Stewart tried to have a load of wood delivered on my property. She was backing the guy into my fence and I went out there and --

Q. What does that have to do with this article, if anything?

A. You asked me if I called the Sheriff's Department since then, that's what I thought you asked.

Q. Did you call the Sheriff's Department when the load of wood was --

A. Yes, I called them up and said, "Hey, I want you to document this. This lady is trying to use my property when I told her not to trespass."

Q. So you told the person delivering the wood, that you didn't want the wood --

A. Yeah, he needed to -- I didn't want it put on my property, so he left.

Q. Went away?

A. Yeah, but we had -- she argued with me, so I just called them up and said, "Hey, you want to document this, that they are causing me trouble."

Q. When you say she argued with you, the person who was delivering the wood is the person who argued with you'

A. No, Susanna Ross-Stewart. They were driving -- with Jack Sworowski, and they were walking around my property and I already told them to stay off my property. They were trespassing when I told them to stay off.

Q. So the "she" in your sentence was Susanna Ross-Stewart?

A. Susanna Ross-Stewart and Jack Sworowski. I just called the lady at the Sheriff's Office, I said, "Do you just want to document this? I don't want to press charges, but these people are trespassing. I just want it documented." I don't know why. I just --

Q. Well, what did they argue with you about? What did they say? What did you say?

A. They wanted to put it there.

Q. Did they indicate why they thought they had the right to put wood on your property?

A. No, they just said they wanted to because, I suppose, because the truck couldn't get in.

Q. Any other times you called the police after the

fact that it stuck in any sense after this lawsuit started?
A. I haven't called, filed charges on anybody since 2005, that I can think of.
Q. So going back to the article, other than the -- and we'll talk about Porter in a second -- other than the one instance of Mr. Porter, is it fair to say that none of the calls you've made to the Sheriff's Office has resulted in a conviction of any person?
A. Didn't I just answer that? You're confusing me.
Q. I'm asking you to answer it, please. Has anybody been convicted of anything based on your calls to the Sheriff's Office?
A. No, because I haven't called to make a conviction.
Q. Well, you called from '94 on alleging dogs and chickens and goats and all kinds of other things.
THE WITNESS: What's he doing?
Q. (By Mr. Reed) Have you had any convictions as a result of any of the things you've alleged to the Sheriff for the last 14 years?
MR. LAMPHERE: And that's been asked and answered.
MS. PRATT: Join.
Q. (By Mr. Reed) Go ahead and answer.
A. It's been asked and answered many times already. You're stressing me.

Q. Have you had a single conviction, except Mr. Porter who we'll talk about, out of the last 14 years for any complaints you made to the Sheriff?
A. Not that I know of, because they don't always notify me.
Q. With respect to --
A. Excuse me.
Q. -- with respect to Mr. Porter, I'm aware of a restraining order, but was Mr. Porter ever convicted of making any threats or being harassing to you?
A. Yes, he was. I do believe he plea bargained out, though.
Q. You're saying there was a plea bargain conviction, criminal conviction?
A. As far as I know there was.
Q. Did you attend the court session when that happened?
A. They said I didn't have to. They sent me -- the DA sent me a letter that he plea bargained and he did anger management classes or something, one year unsupervised probation and a permanent restraining order.
MR. LAMPHERE: Can we take a break?
MR. REED: Let's take a break. I'm almost done.
(WHEREUPON, a break was taken from 3:16 p.m.

to 3:20 p.m.)
Q. (By Mr. Reed) We were on your counterclaim and we're on this last paragraph that we've been talking about how you've been injured. It says that you've suffered damage as a result of the publication in the newspaper that you said, basically, held you up to some sort of humiliation, did I get that right?
A. Yes.
Q. How have you been injured?
A. I've had people call me a rat, a rat fink, a tattletale, and I can't remember what everybody said, but I can remember some of them. And then the lady at the feed store didn't want me coming around, because she was afraid trouble would come on her. And one lady at the post office in Florissant came out and said, "I read the paper. I can't believe you are still alive." Yelled it across, where everybody looks at me. And then there is a lot of people in town that seem angry with me or they just don't want to talk to me now. They are just like (indicating). And then I was doing laundry and one guy yells at me in the laundromat with his wife. Said he was friends with Chuck. Heard about the lawsuit, and said, "I heard what you say is just a bunch of lies."
Q. Anything else?
A. Well, I don't feel safe living out there. There

is a lot of people that just don't like informants.
Q. Anything else?
A. Not that I can think of right now, because I'm tired from this long day.
Q. Well, first, have you satisfied yourself that you're not some sort of a rat fink or informer?
A. Am I satisfied?
Q. Are you satisfied in your own mind that you are not any of these things?
A. No.
Q. You think you might be a rat fink or --
A. No, I don't want to answer. It makes me want to cry. I don't like -- wait a minute. I don't like people calling me a rat fink and a snitch. I got called a snitch. Nobody likes to be an informant. They're worse than a narcotics officer.
Q. Well, did you talk to the police informing the police of things that you thought was criminal behavior in the Valley?
A. Yes, I did, because they wouldn't stop harassing me. I would not have said anything if they had just left me alone, and I told them that in the beginning. "I don't care what you do. I don't care if you do drugs, I just choose not to do them anymore." But Jack told me they wanted th straights out of the Valley. They don't like straights.

Q. With respect to the dollar damages --
A. Uh-huh.
Q. -- have you lost any employment as a result of this?
A. Yes, I have.
Q. Where have you sought employment? Where have you been?
A. Starkey's store for one.
Q. You've made an application to work at Starkey's store?
A. Yeah, she was going to hire me.
Q. Who's the "she" in this story?
A. Rebecca.
Q. And you're saying because of the newspaper article, she decided not to hire you?
A. Her husband didn't want me hanging around, it would bring problems on their family.
Q. You indicated it was the newspaper article that caused that?
A. Yup. Tanya's husband said she -- I'm sorry, it makes me sad. My friend, Tanya, the man she lives with doesn't want me coming around their house bringing the trouble there. There's a lot of people that have said that, "We don't want that trouble. Stay away from me."
Q. When you were injured, and here I'm talking back

in 1990, I think you said, when you were injured and filed your Workmen's Compensation claim, you received permanent total benefits of some sort or permanent benefits of some sort?
A. I'm on Social Security disability and I can work part time.
Q. Besides the Social Security disability, do you get any Workmen's Compensation benefits?
A. No, that was settled out.
Q. So you received some money as a result of that?
A. And that's how I built my house and I can't replace that, and it's not safe for me to live there.
Q. The Social Security benefits, those aren't affected in any way by the newspaper article or this lawsuit, are they?
A. Why would that -- how would that -- how do you even relate those two?
Q. I'm trying to figure out dollar damages. Is it your statement you lost any money out of your Social Security benefits?
A. No, but I was doing voc rehab, because I wanted to go back to work.
Q. Is there anything about this that has prevented voc rehab?
A. Yes, it is. I had to drop out of it, because I

can't -- I can't think straight and I'm afraid to drive by myself around here. I don't feel safe. These people have followed me.
Q. Who's following you?
A. Chuck even followed me and I told you that.
Q. When?
A. Summer of 2005.
Q. Who's done anything to you in the last three years?
A. Everybody.
Q. Who?
A. I can't even drive out of there without one of their friends following me, like Bobby Quist now, or one of their friends, Bill Swanson.
Q. How many main roads are there in and out of the Valley?
A. One. They can just sit on the back one. That's where they sit, and when I drive by, they pull in behind me. And I can tell you, they're smart enough to know not to do it when anybody is looking.
Q. So there was nobody --
A. Let me tell you something else. From now on, the rest of my life I'm going to have to keep looking around my back.
Q. So there are no other witness to them following

you?
A. Sorry, if I cry. No, I'm by myself a lot. Tanya saw them. Tanya saw it.
Q. You're selling this house up in the Valley?
A. Yeah.
Q. And you're going to be living somewhere else and I've honored that. You've not indicated to anybody where your moving to?
A. No, just my attorney.
Q. Okay. And I don't want to know what you have told your attorney. So you're concerned that somehow for the rest of your life under those circumstances people are going to be looking over their shoulder at you or you're going to have to look over your shoulder to see who's following you?
A. Yeah, they followed me before.
Q. Even though it doesn't seem as though anybody knows where you're moving to?
A. Come on. With the Internet, anybody can find where I live.
Q. But since you've move out of the Valley, has anybody been following you?
A. Not when I'm out of there.
Q. Any other financial damages that you're alleging you suffered as a result of the newspaper article in that one sentence, in that one paragraph?

A. Well, I can't get any part-time work around there in Lake George, because nobody wants me around.

Q. How many times before this lawsuit started had you applied for part-time work in the Webber Park Valley area?

A. I was working at Hutchison.

Q. What's Hutchison?

A. Hutchison Lumber. It was too physically draining, but whatever.

Q. So you left that, because it was too painful --

A. No, we were going to do a woodworking business. Ron Zaccagnini came in and caused trouble.

Q. You agree that has nothing to do with this lawsuit?

A. No, I don't know why you ask some of these questions. Excuse me, I'm getting upset.

Q. Well, what I'm asking, I'm trying to figure out what damages as a result of what you're saying in this lawsuit --

A. Okay.

Q. -- what damages you've suffered.

A. Chuck, and people have come back and told me, Chuck has gone around telling people I'm a liar. I made this stuff up. I'm crazy, you know, I'm not mentally stable. And the other people that don't believe that, they are afraid to be around me, because they don't want trouble

brought back on them.

Q. Do you consider yourself mentally stable?

A. Yes, I do except the stress from this business. I do now take antidepressants and antianxiety meds, and I started taking that after I got served with this.

Q. What doctor has prescribed these things?

A. The Dr. Jensen Fox is the one that's prescribing them, but it's a psychologist that Steve Mullens sent me to recommended that I take it.

Q. What's that psychologist's name?

A. Gamblin, maybe.

Q. Spell the last name.

A. Is it Gamblin, do you know? Gamblin, I'm not sure. I went to it once, and then voc rehab, they sent me to a psychologist, too.

Q. Tell me about voc rehab. There's no voc rehab claim in this case, is there?

A. No. Social Security offers you voc rehab so you can go back to work. I signed up for it before I got sued with this thing. I asked for it in November, and it got delayed. And then I started it, and then I got nailed with this and I couldn't concentrate, and then I was afraid.

Q. How many times have you seen Dr. Gamblin or whatever his last name is?

A. I think once, but I've seen a counselor through my

Dr. Jensen Fox. There is a counselor that talks to me.

Q. And how is it you went to Dr. Fox, is that also somebody that your attorney sent you to?

A. No, that's my medical doctor and Gamblin recommended that I go to my doctor and get antidepressants and he thought Skelaxin would be good. So I went and talked to her and told her what was going on and she did give it to me, and then when Mark's horse came up shot, that's when I dropped out of voc rehab.

Q. When Mark Damon's horse ended up shot and that's when you left rehab, is that what you just said?

A. Yeah. Somebody shot his horse in the back of the head last summer.

Q. Were you living in the Valley at that time?

A. I saw the hole.

Q. Say again.

A. I saw the horse dead with the hole in his head.

Q. Was this at Mark's property?

A. Yeah.

Q. And were you living at Mark's property at the time?

A. I was staying there off and on, because I didn't feel safe in mine. I wasn't there the night that happened.

Q. Do you have any idea -- let me ask you one point. Do you have any evidence as to who did the shooting?

A. I don't know who did it.

Q. Do you have any indication that the people who did it knew you were anywhere around?

A. I don't know. I went home that night, because I wanted to go home for awhile and sleep.

Q. Apparently, it didn't scare you so much at the time that you didn't feel like you could stay at your own place --

A. I went back --

Q. -- by yourself?

A. -- I went back to Mark's after that.

Q. I'm sorry. The night of the shooting --

A. Oh, I went home.

Q. -- where did you stay?

A. I went home to my house, because my dog has seizures. And I wanted him to sleep on my bed with me, so I could tell if he was shaking again, because he get seizures sometimes.

Q. All right. And is that the night the horse was shot?

A. Yeah, I went home just so I could be closer to my dog, so I could watch him.

Q. So after that night, you then went back to Mark's for some time?

A. Yes.

Q. So if anybody had been watching, for example, they would have known you weren't at the house where the shooting took place?
A. That's true.
Q. So why do you think that was aimed at you?
A. I didn't say it was aimed at me.
Q. Why have you taken it so hard?
A. Because I liked that horse.
Q. So I'm --
A. It's so evil in that Valley, that they got to kill a horse.
Q. So I'm hearing that it was -- it was that you were fond of the horse and that horse died, not so much that you feel you were personally threatened by that?
A. Not that the horse died. If somebody's mean enough to kill a horse, shoot it in the head, something's wrong, and it happened after this stuff came out. Now, you tell me if that wouldn't scare you.
Q. Now, did that shooting take place before or after this pleading was filed?
A. After.
Q. And did that -- did that take place before or after the newspaper article came out?
A. After. So after that, I got rid of all my goats, so they wouldn't get hurt, my chickens, because I was tired

of them getting killed. I miss my animals.
Q. Well, theoretically you're going to be moving somewhere else so nobody can find you and have goats and chickens and horses?
A. No, I can't afford what I had, because it costs so much to move. My house isn't done. I'm going to lose money on it. I got to move to a little place that I don't own the land. I have nothing like I had and I don't think that's right. Sorry if I get upset again.
Q. Anything else that you're pointing to, things you're pointing to as a factual basis for that last paragraph?
A. Not that I can think of except the part that I'm a liar and all that stuff, crazy, mentally ill. I'm not mentally ill.
Q. Was there anything in the newspaper article that said you were mentally ill, used those words?
A. No, but it sure does imply it, because you can ask people that. I said, "What do you think about what that says?" It says that I said, "Everybody's out to get me." And that's what a paranoid schizophrenic says and that's what most people think when they read it, and I said, "What did you think that phrase said?" And that's what they thought, too. I've never said, "Everybody's out to get me." But I did say some of my neighbors are.

Q. Before this lawsuit was filed, is it fair to say that you felt people were following you?
A. Yeah, they started -- Chuck and them started following me after the 2005 thing with George Porter.
Q. And is it fair to say that before this lawsuit was filed, you felt that people were turning their dogs loose on your chickens?
A. Yeah.
Q. And before this lawsuit was filed, you felt that people were shooting bullets across your property?
A. Yes, but before this was filed, this was a neighborhood dispute, not everybody in town knew about it
Q. But the point is, before this was filed you had sensed that the world, at least your part of the world, was out to get you?
A. That's a stupid thing to say. I never said the world was out to get me, and I just told you that.
Q. Your part of the world seemed out to get you. They're shooting at you. They're following you. They're killing your animals.
MR. LAMPHERE: I'm going to object to the form of the question. It's argumentative.
Q. (By Mr. Reed) Are you disagreeing with those things?
A. I never said the world was out to get me.

Q. Did you say that people were shooting at your -- across your property?
A. Yes, I did.
Q. And did you say animals were being turned loose, dogs were being turned loose to kill your chickens?
A. Yes.
Q. And did you say that people were following you?
A. Yes, I did after 2005.
Q. And when you said these things, were you able to produce any evidence other than just your own word that any of these things actually happened?
A. I had the hot dog and the condom in the freezer for a year.
THE REPORTER: I'm sorry, I didn't hear that.
A. I had that hot dog carved like a penis and the condom in my freezer for a whole year. No one came out an investigated.
Q. (By Mr. Reed) When --
A. Excuse me, the cops came out. I don't know what the deputies did. They came out and investigated the incident where Suzanne and Kit let that little black dog on my property, and they drove back up and saw the footprints of two people walking and a dog in there, but it still got dropped in court for some reason. There was physical evidence on that, the footprints. I had dogs caught and in

my truck on my property, like that dog, physical evidence that this dog was on my property.

Q. Well, you have evidence. You had the dog in your truck. There's no question about that.

A. If they looked around, they would have seen his footprints all over the place.

Q. The hot dog in the freezer, who did you show that to?

A. I threw it out, because nobody was interested. I got sick of looking at it after a year, and then I'm sorry I did, because George harassed me, and I could have taken it to court. Everybody seemed to think it was pretty funny, that it shouldn't bother me.

I have evidence of the bullets dropped. I gave them to my attorney. The bullets that were dropped at my gate when that guy wanted me to go out and make a movie, and another set of bullets that were dropped when I was building my fence. They said they didn't like fences. They didn't want me building fences. I came home to work on my fence again, and there's .357 bullets or whatever they are, laying there right where I was working on my fence.

Q. You don't know who left them?

A. No.

Q. You don't know why they left them?

A. But I know they weren't there the day before when

I was working on the fence.

Q. Other than your statement as to these things occurring, and the things you have just gone through in terms of what you turned over or didn't turn over, is there any other physical evidence that supports what you've been claiming for the last 14 years against your neighbors?

A. I had pictures that disappeared.

Q. Pictures of?

A. Terry Rook when he was dozing on that private property.

Q. Any other evidence?

A. No. I did not have the money for cameras, film, video, I didn't have the money for that, so I thought when I called the cops, they would investigate it.

MR. REED: No other questions.

MS. PRATT: I don't have any questions.

MR. LAMPHERE: I don't have any questions.

MR. REED: We're done.

(WHEREUPON, the within proceedings were concluded at the approximate hour of 3:40 p.m. on April 18, 2008.)

I, SHAWNA WHITE OWL, do hereby certify that I have read the above and foregoing deposition, and that the same is a true and accurate transcript of my testimony, except for the attached amendments, if any.

________________________

Shawna White Owl

The signature above of SHAWNA WHITE OWL was subscribed and sworn to before me this ____ day of ________________, _____.

________________________

Notary Public

My commission expires: ____________________

REPORTER'S CERTIFICATE

STATE OF COLORADO )
) ss:
COUNTY OF EL PASO )

I, Melodie A. Krachmer, Notary Public and Certified Shorthand Reporter, State of Colorado, do hereby certify that pursuant to Notice there came before me on April 18, 2008, at 10:41 a.m.,

SHAWNA WHITE OWL,

who was by me duly sworn to testify the truth in relation to the controversy between the parties hereto; that said deposition was taken in stenotypy by me at the time and place hereinbefore set forth, and was thereafter reduced to typewritten form under my supervision and the same is a true and correct transcript of my stenotypy notes then and there taken.

I further certify that I am not employed by, related to, nor counsel for any of the parties herein, nor otherwise interested in the outcome of this action.

IN WITNESS WHEREOF, I have affixed my signature and seal this _____ day of __________, 2008.

My commission expires December 7, 2008.

________________________

Melodie A. Krachmer, C.S.R.
Registered Professional Reporter

REPORTER'S CERTIFICATE

STATE OF COLORADO )
) ss:
COUNTY OF EL PASO )

I, Melodie A. Krachmer, Notary Public and Certified Shorthand Reporter, State of Colorado, do hereby certify that pursuant to Notice there came before me on April 18, 2008, at 10:41 a.m.,

SHAWNA WHITE OWL,

who was by me duly sworn to testify the truth in relation to the controversy between the parties hereto; that said deposition was taken in stenotypy by me at the time and place hereinbefore set forth, and was thereafter reduced to typewritten form under my supervision and the same is a true and correct transcript of my stenotypy notes then and there taken.

I further certify that I am not employed by, related to, nor counsel for any of the parties herein, nor otherwise interested in the outcome of this action.

IN WITNESS WHEREOF, I have affixed my signature and seal this 30th day of May, 2008.

My commission expires December 7, 2008.

MELODIE KRACHMER NOTARY PUBLIC STATE OF COLORADO

Melodie A. Krachmer, C.S.R.
Registered Professional Reporter