IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO

Civil Action No. 07-cv-00371-RPM-MEH

CHARLES CALDWELL, and
VICKI CALDWELL,

      Plaintiffs,

v.

FRED WEGENER,
MONTE GORE,
GREGORY S. FLINT,
STEVEN GROOME,
SHAWNA WHITEOWL, and
MARK DAMON,

      Defendants.

_____

### PARK COUNTY DEFENDANTS' MOTION FOR SUMMARY JUDGMENT
_____

Defendants, Fred Wegener, Monte Gore, Gregory S. Flint, and Steven Groome (the "Park County Defendants"), by and through their attorneys, Andrew D. Ringel, Esq. and Katherine M.L. Pratt, Esq., of Hall & Evans, L.L.C., pursuant to Fed. R. Civ. P. 56, hereby respectfully submit this Motion for Summary Judgment, and as grounds therefore state as follows:

### INTRODUCTION

Plaintiffs Charles Caldwell and Vicki Caldwell raise the following claims against the Park County Defendants: (1) discharging Plaintiffs in retaliation for their exercise of their First Amendment rights pursuant to 42 U.S.C. § 1983; (2) deprivation of Plaintiffs' liberty interests without due process of law pursuant to 42 U.S.C. § 1983; (3) defamation; (4) intentional infliction of emotional distress; (5) invasion of privacy; and (6) failure to pay them wages

alleged owed to the Plaintiffs.  The Park County Defendants now move for summary judgment on all of the Plaintiffs' claims.

## STATEMENT OF UNDISPUTED MATERIAL FACTS[1]

### *Chronology of Events Regarding Charles Caldwell's and Vicki Caldwell's Employment with the PCSO*

1.      Vicki Caldwell worked as the Business Manager for the Park County Sheriff's Office ("PCSO") from December 22, 2003, to December 15, 2005.  [*See* Deposition of Vicki Caldwell, at p. 48, l. 18 – p. 49, l. 12, p. 91, l. 7-21 & p. 94, l. 4-20, attached as Exhibit A-1; Vicki Caldwell Appointment by the Park County Sheriff, attached as Exhibit A-2; Vicki Caldwell Memorandum, 12/1/05, attached as Exhibit A-3].

2.      Charles Caldwell worked as a part-time case manager in the jail for the PCSO from April 27, 2005, to February 10, 2006.  [*See* Deposition of Charles Caldwell, p. 20, l. 15-18 & p. 98, l. 22 – p. 99, l. 9, attached as Exhibit A-4; Charles Caldwell Appointment by the Park County Sheriff, attached as Exhibit A-5].

3.      Charles and Vicki Caldwell live in an area of Park County, Colorado known as "Webber Park."  [*See* Charles Caldwell Dep., at p. 58, l. 8 – p. 60, l. 6, Exh. A-4].

4.      The PCSO Policy and Procedure Manual contains the following policy regarding non-commissioned personnel which was in effect during all relevant time-periods: "personnel will be on probation for one (1) year from the date of employment and may be extended for a

---

[1]  The following facts are undisputed only for the purposes of this Motion for Summary Judgment.  Defendants specifically reserve the right to contest every one of these facts at any later stage of this litigation, including at trial.

period of up to three (3) months for training or disciplinary purposes." [*See* PCSO Policy and Procedure Manual, Policy No. 303, attached as Exhibit A-6; *see also*, Park County Sheriff's Office Application for Employment and Personal Statement, p. 25, attached as Exhibit A-7].

5.      Mr. Caldwell was still a probationary employee of the PCSO at the time of his termination.  [*See* Deposition of Monte Gore, at p. 103, l. 15-21 & p. 116, l. 6-17, attached as Exhibit A-8; Deposition of Fred Wegener, at p. 104, l. 14-24 & p. 105, l. 12-18, attached as Exhibit A-9].

6.      On October 4, 2005, Detective Corporal Greg Flint signed and dated a synopsis of his investigation into potential criminal activity in the Webber Park neighborhood.  [*See* Webber Park Investigation/Brief Synopsis, 10/4/05, attached as Exhibit A-10].  Also included with the Webber Park Investigation/Brief Synopsis is a Witness/Victim List of the Webber Park Investigation also prepared by Detective Corporal Flint.  [*See* Witness/Victim List, 9/22/05, attached as Exhibit A-11].

7.      On or about October 13, 2005, then Undersheriff Don Anthony was placed on paid administrative leave pending an investigation into alleged sexual harassment.  [*See* Deposition of Don Anthony, at p. 29, l. 13 – p. 30, l. 13, attached as Exhibit A-12; *see also*, Memorandum dated October 13, 2005 from Sheriff Wegener to all personnel, attached as Exhibit A-13].

8.      Also on October 13, 2005, then Lieutenant Ed Rasch was also placed on paid administrative leave pending an investigation into alleged sexual harassment.  [Memorandum dated October 13, 2005 from Sheriff Wegener to all personnel, Exh. A-13].

9.      Mr. Caldwell was placed on paid administrative leave on October 14, 2005, pending the results of a criminal investigation and an internal affairs investigation.  [*See* Gore Memorandum to Charles Caldwell, 10/14/05, attached as Exhibit A-14; Charles Caldwell Dep., at p. 107, l. 4-16, Exh. A-4].

10.     Monte Gore became acting Undersheriff when Mr. Anthony was placed on administrative leave.  [*See* Gore Dep., at p. 9, l. 24 – p. 10, l. 8, Exh. A-8].

11.     Approximately one week after October 17, 2005, Mr. Gore met with Vicki Caldwell regarding an allegation of suspicious activity that was made against her regarding changes made to her computer and regarding an incident in which she appeared to be hiding something under her desk.  [*See* Gore Memorandum to Vicki Caldwell, 11/17/05, attached as Exhibit A-15; Vicki Caldwell Dep., at p. 74, l. 10 – p. 75, l. 12, Exh. A-1].

12.     During the meeting, Mr. Gore ordered Vicki Caldwell to report any communications she had with either Mr. Anthony or Mr. Rasch because of their suspensions and the ongoing investigation, and any requests they might make of Ms. Caldwell to Mr. Gore.  [*See* Gore Memorandum, 11/17/05, Exh. A-15; Vicki Caldwell Dep., p. 74, l. 10 – p. 75, l. 12, Exh. A-1; Gore Dep., p. 171, l. 16 – p. 173, l. 7, Exh. A-8].

13.     On November 16, 2005, Ms. Caldwell met with Mr. Anthony in the parking lot of the Sheriff's Office and agreed to check whether a personal expense that had been charged to a Park County credit card had been reimbursed by Mr. Anthony.  [*See* Gore Memorandum, 11/17/05, Exh. A-15; Vicki Caldwell Dep., at p. 68, l. 7 – p. 69, l. 6, Exh. A-1; *see also*, Vicki Caldwell's Memorandum dated 11/17/05, Exh. A-16].

4

14.     Ms. Caldwell failed to report the November 16, 2005, communication she had with Mr. Anthony to Mr. Gore.  [*See* Gore Memorandum, 11/17/05, Exh. A-15].

15.     On November 17, 2005, Mr. Anthony called Ms. Caldwell to say he would bring a check to the Sheriff's office later that day to reimburse Park County for his personal expense that was on Park County's credit card.  [*See* Vicki Caldwell Dep., at p. 63, l. 15 – p. 64, l. 25 & p. 68, l. 7 – p. 69, l. 6, Exh. A-1; Vicki Caldwell Memorandum, 11/17/05, Exh. A-16].

16.     On November 17, 2005, Mr. Anthony arrived at the Sheriff's Office and provided a check to Ms. Caldwell to reimburse the county for a personal expense and asked her for a receipt.  [*See* Vicki Caldwell Dep., at p. 63, l. 15 – p. 64, l. 25 & p. 68, l. 7 – p. 69, l. 6, Exh. A-1; Vicki Caldwell Memorandum, 11/17/05, Exh. A-16].

17.     While Ms. Caldwell went back to her office to get a receipt for Mr. Anthony, Mr. Gore saw Mr. Anthony in the lobby and questioned what he was doing there.  [*See* Vicki Caldwell Dep., at p. 63, l. 15 – p. 64, l. 25 & p. 68, l. 7 – p. 69, l. 6, Exh. A-1; Vicki Caldwell Memorandum, 11/17/05, Exh. A-16].

18.     After the communication and meeting between Mr. Caldwell and Mr. Anthony on November 17, 2005, Mr. Gore met with Ms. Caldwell and placed her on paid administrative leave for insubordination and failure to follow Mr. Gore's previous order to report any contact with Mr. Anthony directly to him.  [*See* Vicki Caldwell Dep., at p. 63, l. 15 – p. 64, l. 25 & p. 68, l. 7 – p. 69, l. 6, Exh. A-1; Vicki Caldwell Memorandum, 11/17/05, Exh. A-16; *see also*, Gore Memorandum dated 11/17/05, Exh. A-15].

19.     Mr. Anthony's employment with the PCSO was terminated on November 18, 2005, for insubordination and failure to follow directives.  [*See* Anthony Dep., at p. 31, l. 17-24, Exh. A-12].

20.     On November 21, 2005, Ms. Caldwell again had contact with Mr. Anthony at a restaurant while she was on administrative leave.  [*See* Vicki Caldwell Memorandum, 11/23/05, attached as Exhibit A-17; Vicki Caldwell Dep., at p. 89, l. 16 – p. 90, l. 8, Exh. A-1].

21.     On November 22, 2005, Ms. Caldwell returned to work at the PCSO.  [*See* Vicki Caldwell Dep., at p. 81, l. 13 – p. 83, l. 3, Exh. A-1].

22.     Upon returning, Ms. Caldwell met with Mr. Gore and Cindy Gharst, Director of Human Resources for Park County, who issued her a written reprimand.   [*See* Written Reprimand, 11/22/05, attached as Exhibit A-18; Vicki Caldwell Dep., at p. 83, l. 17 – p. 85, l. 15, Exh. A-1].

23.     Ms. Caldwell did not formally complain about or challenge the written reprimand to anyone at the PCSO or otherwise with Park County.  [*See* Vicki Caldwell Dep., at p. 87, l. 7-17, Exh. A-1].

24.     Ms. Caldwell submitted her resignation on December 1, 2005, effective December 15, 2005, and worked through December 15, 2005.   [*See* Vicki Caldwell Memorandum, 12/1/05, Exh. A-3; Vicki Caldwell Dep., at p. 91, l. 7-21 & p. 94, l. 4-20, Exh. A-1].

25.     Mr. Caldwell's employment with the PCSO was terminated on February 10, 2006. [*See* Charles Caldwell Dep., at p. 20, l. 15-18 & p. 98, l. 22-p. 99, l. 9, Exh. A-4; *see also*, Letter dated 2/22/06 from Sheriff Wegener to Charles Caldwell, attached here as Exhibit A-19].

***Don Anthony's Run for Sheriff of Park County***

26.     Mr. Anthony decided to run for Sheriff on or shortly before January 13, 2006. [*See* Anthony Dep., at p. 40, l. 17 – p. 41, l. 25, Exh. A-12].

27.     On January 13, 2006 the Fairplay Flume published a letter to the editor written by Mr. Anthony "thanking the citizens of Park County."  Nothing in the letter discloses any intent by Mr. Anthony to run for Sheriff.  [*See* Fairplay Flume Article, 1/13/06, attached as Exhibit A-20; Anthony Dep., at p. 40, l. 3-16, Exh. A-12].

28.     Mr. Anthony did not, however, publicize his decision to run for Sheriff until after March 1, 2006, when he filed his affidavit of candidacy with the Clerk and Recorder of Park County.  [*See* Anthony Dep., at p. 41, l. 1-23, Exh. A-12; *see also*, Affidavit of Don Anthony dated 3/01/06, attached here as Exhibit A-21].

29.     Mr. Anthony had no understanding that any of the Park County Defendants nor any employee of the PCSO knew he was planning to run for Sheriff until he filed his affidavit in support of his candidacy on March 1, 2006.  [*See* Anthony Dep., at p. 43, l. 19 – p. 44, l. 23, Exh. A-12; *see also*, Don Anthony Affidavit, Exh. A-21].

30.     In fact, Mr. Anthony wanted his candidacy "to be a surprise."  [*See* Anthony dep., at p. 44, l. 23, Exh. A-12].

31.     Mr. Anthony did not create a website, post signs, or distribute any campaign literature until after March 1, 2006.  [*See* Anthony Dep., at p. 45, l. 11 – p. 46, l. 6, Exh. A-12].

32.     Charles Caldwell and Vicki Caldwell did not make any campaign donations or hand out any literature or do anything else to support Mr. Anthony's campaign for Sheriff before March 1, 2006.  [See Anthony Dep., at p. 56, l. 13 – p. 58, l. 6, Exh. A-12; see also, Vicki

Caldwell Dep., at p. 143, l. 20 – p. 144, l. 21, Exh. A-1; Charles Caldwell Dep., at p. 150, l. 10-25, Exh. A-4].

***The Park County Defendants Did Not Know***
***of Mr. Anthony's Plans to Run for Sheriff.***

33.    Ms. Caldwell testified: "Q.   Okay.   Who – do you believe that Fred Wegener knew prior to Mr. Anthony's official announcement that he had plans to run for sheriff?   Mr. Reed: Objection to the form of the question.  A.  I don't know for sure that he did.  In looking back with the incidences that have occurred, I would think that he did, but I cannot say for sure. I have no actual knowledge of that."  [*See* Vicki Caldwell Dep., at p. 146, l. 4-12, Exh. A-1].

34.    Ms. Caldwell admitted her only basis for believing that Messrs. Gore and Flint knew she supported Mr. Anthony politically is because "it was generally known that we were friends and that I would – could easily be assumed to support him.  Whenever he ran."  [*See* Vicki Caldwell Dep., at p. 155, l. 1 – p. 156, l. 9, Exh. A-1].

35.    Ms. Caldwell testified that being someone's friend and voting for them or supporting them for political office are two different things.  [*See* Vicki Caldwell Dep., at p. 155, l. 8-17, Exh. A-1].

36.    Ms. Caldwell testified she had no basis to believe Mr. Groome knew she supported Mr. Anthony politically.  [*See* Vicki Caldwell Dep., at p. 156, l. 25 – p. 157, l. 7, Exh. A-1].

37.    Mr. Caldwell also testified that he had no information other that his "gut feeling" that any of the Park County Defendants knew Mr. Caldwell supported Don Anthony as a political candidate for sheriff before Mr. Caldwell's employment was terminated.  [*See* Charles Caldwell Dep., at p. 152, l. 4 – p. 155, l. 25, Exh. A-4].

38.     Mr. Caldwell also has no actual evidence beyond his own assumptions to support the notion that any of the Park County Defendants retaliated against him for his support of Mr. Anthony.  [*See* Charles Caldwell Dep., at p. 161, l. 23 – p. 166, l. 15, Exh. A-4].

39.     Mr. Caldwell testified: "Q.  Do you believe it was common knowledge that you were a supporter of Mr. Anthony at the Park County sheriff's office?  A.  I believe so.  Everyone knew that we were close friends.  Q.  Okay.  But would you agree with me that being close friends with someone and being a supporter of them in a political campaign might be different?  A.  That's true.  Yes."  [*See* Charles Caldwell Dep., at p. 155, l. 12-20, Exh. A-4].

### The Park County Defendants Did Not Publish Anything About the Plaintiffs.

40.     Mr. and Ms. Caldwell allege the Park County Defendants defamed them, engaged in intentional infliction of emotional distress and invaded their privacy based on the allegation the Park County Defendants were all involved in the disclosure of the Webber Park Investigation/Brief Synopsis and Witness/Victim List to the public in Park County. [Compl. ¶¶ 1, 35-49; Vicki Caldwell Dep., at p. 18, l. 17-22 & p. 157, l. 17 – p. 159, l. 13 & p. 162. l. 3-25, Exh. A-1; *see also*, Charles Caldwell Dep., at p. 25, l. 9 – p. 26, l. 8 & p. 170, l. 8-18, Exh. A-4].

41.     Ms. Caldwell testified: "Q. …   Okay.  Do you have any information that Mr. Wegener was involved with Ms. Wissel – A.  Wissel.  Q.  I'm sorry.  With Ms. Wissel's obtaining the Webber Park synopsis to give it to Mr. Coggin?  A.  I have no idea how she acquired it.  Q.    Okay.  So you don't know whether Mr. Gore, Mr. Flint, Mr. Groome, or Mr. Wegener was involved with her acquiring that one way or the other?  A.  No, sir, I don't.  Q.  Okay.  Do you have any other basis for understanding – for your conclusion that the Webber

42.     Ms. Caldwell also testified her only basis for believing Mr. Wegener defamed her was because he "would have had to have been involved in the release of that Webber Park synopsis and that he would have had knowledge of its release since it is a Park County sheriff's office report."  [*See* Vicki Caldwell Dep., at p. 157, l. 17 – p. 158, l. 4, Exh. A-1].

43.     Ms. Caldwell testified that she believes Mr. Gore defamed her in the same way as Mr. Wegener regarding the alleged release of the Webber Park synopsis and also by his written reprimand of her.  [*See* Vicki Caldwell Dep., at p. 158, l. 5 – p. 159, l. 4, Exh. A-1].

44.     No evidence exists that Mr. Gore's written reprimand of Ms. Caldwell was ever made public prior to this litigation when the Plaintiffs filed their Complaint and included it as an allegation.  [Compl. ¶¶ 17, 26-27].

45.     Ms. Caldwell testified Mr. Flint defamed her by authoring the Webber Park synopsis.  [*See* Vicki Caldwell Dep., at p. 159, l. 5-13, Exh. A-1].

46.     Ms. Caldwell testified as follows regarding Mr. Groome:  "Q.  Okay.  All right. What did Mr. Groome do to defame you?  A.  Well, he obviously was involved in this document, the Webber Park synopsis, and I believe it refers to him as being the -- I forget what it's called, but the holder of the reports and stuff.  He is the one who mailed it to us.  Therefore, he obviously had access to it.  And I don't know who else he may have given it to.  And as his position as County attorney, I would think that he would be the one that gave it out to the newspaper, but I don't know that for sure.  Q.  In fact, you don't know one way or the other

whether Mr. Groome gave it to anybody, other than you and your husband?  A.  I do not have evidence of that, no."  [*See* Vicki Caldwell Dep., at p. 161, l. 12 – p. 162, l. 2, Exh. A-1].

47.     Mr. Caldwell testified as follows regarding his allegations that the Park County Defendants defamed him:  "Q. … What statements did Sheriff Wegener make that you consider defamatory?  A.  Directly, none.  Q.  Okay.  Explain that.  Did he make – did he – A.  By approving of that synopsis and by approving of the way I was terminated, I took it as being very defamatory, but he didn't make the statement verbally as such.  Q.  Okay.  You believe Sheriff Wegener was involved in the publication of the synopsis; fair statement?  A.   I believe he was -- approved – involved in the approval of it.  Q.    Okay.  But you're not accusing him of making any statement directly that was defamatory to you?  A.    Correct.  Q.    Okay.  Same question with respect to Mr. Gore.  A.     It would be the same answer.  Q.    Okay.  How about Mr. Groome?  A.   As I said, I've never dealt with him, so I would use the same answer there, too.  Q.  Okay.  What about Mr. Flint?  A.  He made assumptions and made concrete statements about our activities in that valley, all of which were defamatory, none of which were true.  He wrote that synopsis as fact, not as question, and I consider them all defamatory.  Q.  Okay.  So his defamation of you is what he wrote in that synopsis?  A. Yes, sir."  [*See* Charles Caldwell Dep., at p. 171, l. 25 – p. 173, l. 7, Exh. A-4].

48.     Regarding how the Webber Park Synopsis was published to people in the community, Mr. Caldwell testified: "Q.  Okay.  All right.  From your understanding, how was the synopsis publicly disseminated, if it was?  A.  We had several citizens of that community that wound up with a copy.  Just how they got it or where they got it, we don't know.  The paper said that they received a copy of it.  I received it after termination when I wrote for other material and

was inadvertently sent that.  It's the first time I became aware of it.  So how it was disseminated to other members of the community, I don't know.  [*See* Charles Caldwell Dep., at p. 173, l. 8-18, Exh. A-4].

49.     On March 7, 2006, Mr. Caldwell requested "all documentation and tape recordings in regards to the investigations of all the alleged accusations against [him]."  [*See* Charles Caldwell Letter, 3/7/06, attached as Exhibit A-22].

50.     Then County Attorney Stephen Groome responded to Mr. Caldwell's letter on March 29, 2006, enclosing the eight-page synopsis of the Webber Park Investigation along with the four-page witness list.  [*See* Groome Letter, 3/29/06, attached as Exhibit A-23].

51.     Mr. Caldwell wrote to Mr. Groome on April 5, 2006, again requesting all documentation regarding any investigations and allegations against him.  [*See* Charles Caldwell Letter, 4/5/06, attached as Exhibit A-24].

52.     Mr. and Ms. Caldwell wrote again requesting information on any internal affairs investigations and the Webber Park Investigation on April 26, 2006.  [*See* Caldwell Letter, 4/26/06, attached as Exhibit A-25].

53.     Mr. Groome responded to the Caldwells' requests explaining that "the release of any additional information would be contrary to the public interest."  [*See* Groome Letter, 5/15/06, attached as Exhibit A-26].

54.     Similarly, Mr. Groome responded to an earlier request for information from Mr. Anthony by letter dated January 20, 2006.  At that time, Mr. Groome denied Mr. Anthony's request because the requested information was part of an on-going criminal investigation.  [*See* Groome Letter, 1/20/06, attached as Exhibit A-27].

55.     None of the Park County Defendants disclosed the Webber Park Investigation/Brief Synopsis and Witness/Victim List to the public other than in response to a request under the Colorado Criminal Justice Records Act or the Colorado Open Records Act. [*See, e.g.,* Gore Dep., at p. 125, l. 20 – p. 126, l. 3, Exh. A-8].

56.     Vicki Caldwell also testified: "Q.  Has anyone invaded your privacy other than the information that's in the Webber Park synopsis?  A.  I'm not thinking of any other incidents at this time that would be considered invasion of privacy, other than the Webber Park synopsis and it being given to people.  Q.  Okay.  A.  I would -- I'm not a police officer and I've never worked in law enforcement prior to this.  In the Webber Park synopsis, it speaks about Greg Flint and several other officers investigating things and videotaping things in Webber Park.  I mean, I have no idea if they were looking in my windows or what that means.  So that could be considered an invasion of privacy to me.  Q.  If, in fact, they were doing that kind of thing?  A.  Yes.  To me that -- yes.  Yes.  Q.  But you don't know one way or the other what their investigatory activities consisted of?  A.  Other than what's listed in there – in the report, no.  Q.  If it says they were doing surveillance, you don't know if that surveillance was looking at your house one way or the other?  A.  That's correct."  [*See* Vicki Caldwell Dep., at p. 162, l. 3 – p. 163, l. 4, Exh. A-1].

57.     Charles Caldwell also testified: "Q.  How was your privacy invaded by Sheriff Wegener?  MR. REED:  Object to the form of the question.  A.  Well, a lot of untruths were said about us.  People we didn't know were asking us ridiculous questions.  It was imposed in that -- or supposed in that synopsis that Vicki and I were common-law, for instance.  And we are legally married by a minister.  That we engage in lewd behavior -- sexual behavior, both with ourselves and with animals.  I mean, first of all, it's untrue.  Secondly, if it were true -- and it

**ARGUMENT**

Defendants Fred Wegener, Monte Gore, Gregory S. Flint and Stephen Groome are entitled to summary judgment on the Plaintiff's 42 U.S.C. § 1983 and claims under Colorado law.  First, Plaintiffs' First Amendment claim alleging the Park County Defendants retaliated against them for their political support of Don Anthony during his political campaign for Sheriff of Park County fails because Plaintiffs cannot establish any of the Defendants had any knowledge of Mr. Anthony's political activities or the Plaintiffs' alleged political support of Mr. Anthony at the time any adverse actions were taken concerning Plaintiff's employment.  Second, Plaintiff's due process claim also fails because the Plaintiff had no property interest in their continued employment with Park County subject to the protections of the Due Process Clause and the Park County Defendants did not take any action violative of any liberty interest of the Plaintiffs.  Third, Plaintiffs' defamation, intentional infliction of emotional distress and invasion of privacy claims all fail because Plaintiffs cannot demonstrate the Park County Defendants were involved in any public dissemination of the Webber Park investigation.  Fourth, Plaintiffs' wage claim fails because the Park County Defendants are improper parties for any such claim.  Fifth, to the extent Plaintiffs seek relief under the Colorado Criminal Justice Act they never pled any such claim in their Complaint.

## I.  THE PARK COUNTY DEFENDANTS ARE ENTITLED TO QUALIFIED IMMUNITY FROM THE PLAINTIFF'S 42 U.S.C. § 1983 CLAIMS AGAINST THEM

Defendants Wegener, Gore, Flint and Groome are entitled to qualified immunity from the Plaintiff's 42 U.S.C. § 1983 claims because the Plaintiffs cannot demonstrate any violation of their constitutional rights by the individual Defendants as a matter of law.[2]

The applicable inquiry for this Court differs when the issue of qualified immunity is raised by an individual defendant.  *Gross v. Pirtle,* 245 F.3d 1151, 1155 (10th Cir. 2001).  After an individual defendant raises the affirmative defense of qualified immunity, the burden shifts to the plaintiff.  *Scull v. New Mexico,* 236 F.3d 588, 595 (10th Cir. 2000); *Adkins v. Rodriguez,* 59 F.3d 1034, 1036 (10th Cir. 1995).  At that point, "[t]he plaintiff initially bears a heavy two-part burden when the defendant pleads the defense of qualified immunity."  *Mick v. Brewer,* 76 F.3d 1127, 1134 (10th Cir. 1996); *Albright v. Rodriguez,* 51 F.3d 1531, 1534 (10th Cir. 1995).  The plaintiff must demonstrate: (1) the defendant's conduct violated the law; and (2) the law was clearly established when the alleged violation occurred.  *Pueblo Neighborhood Health Centers, Inc. v. Losavio*, 847 F.2d 642, 646 (10th Cir. 1988).

---

[2]  It is not clear from the Plaintiffs' Complaint whether the Plaintiffs' intend to advance 42 U.S.C. § 1983 claims against the individual Park County Defendants in both their official and individual capacities.  The Park County Defendants' arguments assume the Plaintiffs attempt claims in their individual capacities.  To the extent the Plaintiffs attempt 42 U.S.C. § 1983 claims against the Park County Defendants in their official capacities, such a claim is in reality a claim against Park County itself.  *See, e.g., McMillian v. Monroe County, Ala.,* 520 U.S. 781, 785 n. 2 (1997).  As such, Plaintiffs would have to demonstrate that an official custom, policy or practice violated their constitutional rights.  *See, e.g., Board of County Commissioners of Bryan County v. Brown,* 520 U.S. 397, 404 (1997).  The Park County Defendants reserve their right to address any attempted official capacity claims advanced by the Plaintiffs pursuant to 42 U.S.C. § 1983 in their Reply Brief.

Only if the plaintiff establishes the defendant violated clearly established law, does the burden return to the defendant. *County of Sacramento v. Lewis,* 523 U.S. 833, 841 n. 5 (1998); *Mick*, 76 F.3d at 1134. "If the plaintiff successfully establishes the violation of a clearly established right, the burden shifts to the defendant, who must prove that there are no genuine issues of material fact and that he or she is entitled to judgment as a matter of law." *Gross,* 245 F.3d at 1156 (citations and internal quotation marks omitted); *Hinton v. City of Elwood,* 997 F.2d 774, 779 (10th Cir. 1993). Finally, although this Court must review the evidence in the light most favorable to the Plaintiff on summary judgment, "the record must clearly demonstrate the plaintiff has satisfied [her] heavy two-part burden; otherwise, the defendants are entitled to qualified immunity." *Gross,* 245 F.3d at 1156 (alteration added).

Applying these principles, a plaintiff must first demonstrate the individual defendant's conduct violated the law by coming forward with specific facts to establish the violation. *Taylor v. Meacham*, 82 F.3d 1556, 1559 (10th Cir.), *cert. denied,* 519 U.S. 871 (1996). "Plaintiff has the 'burden to show with particularity facts and law establishing the inference that defendant violated a constitutional right.'" *Abeyata By & Through Martinez v. Chama Valley Ind. Sch. Dist. No. 19*, 77 F.3d 1253, 1255 (10th Cir. 1996) (quoting *Walter v. Morton*, 33 F.3d 1240, 1242 (10th Cir. 1994)). A plaintiff suing public officials must set forth specific facts showing the personal involvement of each named individual defendant. *Green v. Branson*, 108 F.3d 1296, 1302 (10th Cir. 1997); *Mitchell v. Maynard*, 80 F.3d 1433, 1441 (10th Cir. 1996). Conclusory, nonspecific and generalized allegations of constitutional deprivations are insufficient. *Pride v. Does*, 997 F.2d 712, 716 (10th Cir. 1993). The Supreme Court's abrogation of the heightened pleading requirement for qualified immunity cases in *Crawford-El*

16

*v. Britton,* 523 U.S. 574 (1998), is inapposite to qualified immunity determinations made on summary judgment. *Medina v. Cram,* 252 F.3d 1124, 1128-29 (10th Cir. 2001); *Gross,* 245 F.3d at 1155 n.1.

Second, the plaintiff must also prove the relevant law was clearly established when the alleged violation occurred. "To be clearly established, '[t]he contours of the right must be sufficiently clear that a reasonable official would understand that what he is doing violates that right.'" *Albright,* 51 F.3d at 1535 (quoting *Anderson v. Creighton,* 483 U.S. 635, 640 (1987)). The right must be clearly established in a "particularized" sense. *Anderson,* 483 U.S. at 640. For a right to be "'particularized,' there must ordinarily be a Supreme Court or Tenth Circuit decision on point, or 'clearly established weight of authority' from other courts." *Wilson v. Meeks,* 52 F.3d 1547, 1552 (10th Cir. 1995) (quoting *Medina v. City and County of Denver,* 960 F.2d 1493, 1498 (10th Cir. 1992)). *See also Wilson v. Layne,* 526 U.S. 603, 616  (1999).

## A.   PLAINTIFFS CANNOT SHOW THE PARK COUNTY DEFENDANTS RETALIATED AGAINST THEM FOR THEIR ALLEGED EXERCISE OF THEIR FIRST AMENDMENT RIGHTS.

Plaintiffs lack any evidence to support the notion that the Park County Defendants terminated Charles Caldwell or constructively discharged Vicki Caldwell in retaliation for either Plaintiff's alleged exercise of their First Amendment rights.  To prevail on their First Amendment retaliation claim, Plaintiffs must show: (1) the speech at issue was constitutionally protected; and (2) that Plaintiffs' speech was a substantial or motivating factor in Plaintiffs' termination. *Board of County Comm'rs v. Umbehr,* 518 U.S. 668, 675 (1996).  Plaintiffs assert they supported Don Anthony, the former Undersheriff for Park County, as a candidate for the Republican nomination for the Office of Sheriff of Park County in opposition to Sheriff Fred

Wegener and were terminated (or constructively discharged) in retaliation for supporting Mr. Anthony as a political candidate.  Plaintiffs have produced no evidence, however, that any such speech, if they made any, was a substantial or motivating factor in Plaintiffs' termination or alleged constructive discharge.  Plaintiff cannot establish any of the Park County Defendants possessed any knowledge of either Mr. Anthony's candidacy for Sheriff or the Plaintiffs' political support of Mr. Anthony prior to taking any actions respecting the Plaintiffs' employment with the Park County Sheriff's Office.  Absent such knowledge and evidence establishing a causal connection between the Plaintiffs' political activities and the adverse employment action, Plaintiffs' First Amendment retaliation theory fails as a matter of law.

Mr. Caldwell's employment and Ms. Caldwell resignation from her position both occurred several months *before* Mr. Anthony declared his candidacy for the office of Sheriff of Park County.[3]  As a result, it is simply not possible for any of the Park County Defendants to have engaged in political retaliation against the Plaintiffs based on their *future* support of Mr. Anthony's political campaign.  Mr. Caldwell was placed on paid administrative leave on October 14, 2005, and his employment with the PCSO was terminated on February 10, 2006.  [¶¶ 2, 9 & 25].[4]   In turn, Ms. Caldwell was suspended from her employment on November 17, 2005, received a written reprimand on November 22, 2005, and resigned her employment on December 1, 2005, effective December 15, 2005.  [¶¶ 10-24].

---

[3]  Because Vicki Caldwell resigned her employment, her only potentially viable claim is one for constructive discharge.

[4]  For ease of reference, whenever possible, citations to factual references are made to the paragraph numbers contained in the above Statement of Undisputed Material Facts.

Mr. Anthony testified he did not decide to run for Sheriff until January 2006.  [¶ 25]. Mr. Anthony also testified that he did not publicize his decision to run for Sheriff until March 2006 and that the Caldwells did nothing to publicly support him until that time.  [¶¶ 25-31].  By March of 2006 neither of the Caldwells were employed by the PCSO, and any adverse action taken with respect to their employment had occurred previously.  Thus, there is not and cannot be any causal connection between any First Amendment activity engaged in by the Plaintiffs and any allegedly retaliatory action taken by any of the Park County Defendants.

Moreover, in addition to the fundamental timing problem with the Plaintiffs' First Amendment theory, Plaintiffs also have absolutely no evidence any of the Park County Defendants were actually aware of their engaging in any First Amendment protected activity. No evidence exists any of the Park County Defendants were aware the Plaintiffs were political supporters of Mr. Anthony.  At best, Plaintiffs speculate that because they were friends with Mr. Anthony the Park County Defendants must have known that they would be his political support. But even the Plaintiffs admit that being someone's friend differs from being an individual's political support.  [¶¶35, 39].  Plaintiffs simply lack any actual evidence that any of the Park County Defendants had any knowledge that the Plaintiffs politically supported Mr. Anthony in his race for Sheriff.  [¶¶ 33-39].  Plaintiffs' "gut feeling," speculation and assumptions are insufficient to state any viable claim as a matter of law.  Fundamentally, the absence of any actual evidence any of the Park County Defendants knew of Plaintiffs' political activities undercuts any conclusion they took action to retaliate against the Plaintiffs in violation of their First Amendment rights.

**B.     PLAINTIFFS' DUE PROCESS CLAIMS AGAINST THE PARK COUNTY DEFENDANTS FAIL AS A MATTER OF LAW.**

Plaintiffs' due process claims against the Park County Defendants fail as a matter of law for multiple reasons.   First, Charles Caldwell had no protected property interest in his employment as a probationary employee.   Second, Vicki Caldwell's due process rights were not violated because she resigned her employment and was not constructively discharged.   Third, neither Charles Caldwell nor Vicki Caldwell states any viable liberty interest claim because the reasons for the adverse employment actions taken against them were never publicly disseminated by the Park County Defendants.

The record demonstrates unequivocally that Plaintiffs received all of the due process required by the United States Constitution.   The touchstone for determining violations of the procedural protections of the Due Process Clause of the Fourteenth Amendment is notice and an opportunity to be heard prior to the government's deprivation of a protected property or liberty interest.   *Goldberg v. Kelley*, 397 U.S. 254, 267 (1970); *Armstrong v. Manzo*, 380 U.S. 319, 333 (1976).   Initially, for any procedural due process protections to attach, a public employee must have a protected property interest in continued employment.   *Board of Regents v. Roth,* 408 U.S. 564, 577 (1972); *Derda v. City of Brighton,* 53 F.3d 1162, 1163-1164 (10th Cir. 1995). Assuming the employee has a protected property interest, the determination next moves to whether the employee received sufficient due process prior to the termination of their public employment.   In *Cleveland Bd. of Educ. v. Loudermill*, 470 U.S. 532 (1985), the Court described the due process required in the context of the termination of a public employee.   *Id.* at 542-45.   The Court examined the pre-termination and post-termination elements required by due process.   In so doing, however, the Court surveyed the entirety of the process available to the

public employee in determining whether any due process violation occurred.  *Id.* at 546 (noting holding on sufficiency of pre-termination hearing depended on availability of full post-termination hearing under state law); *id.* at 547-48 (holding all the process that was due plaintiffs was "provided by a pretermination opportunity to respond, coupled with post-termination administrative procedures as provided by the Ohio statute.").  In addition, the Court carefully "pointed out that 'the formality and procedural requisites for the hearing can vary, depending on the importance of the interests involved and the nature of the subsequent proceedings.'" *Id.* at 546 (quoting *Boddie v. Connecticut*, 401 U.S. 371, 378 (1971) (alteration omitted)).

Initially, the Court described the nature and scope of the pre-termination hearing after noting, "[i]n general, 'something less' than a full evidentiary hearing is sufficient prior to adverse administrative action."   *Id.* at 545 (alteration added).   To satisfy due process, the "pre-termination hearing need not definitively resolve the propriety of the discharge." *Id.*  Instead, the purpose of a pre-termination hearing is to provide "an initial check against mistaken decisions--essentially, a determination of whether there are reasonable grounds to believe that the charges against the employee are true and support the proposed action." *Id.* at 545-46.  As such, the Court held the pre-termination meeting must include three elements: (1) oral or written notice of the charges against the employee; (2) an explanation of the employer's evidence; and (3) an opportunity to present the employee's side of the story.  *Id.* at 546.

In *Loudermill*, the Court concluded an additional component of due process was a post-termination hearing.  *Id.* at 546-47.  The Court did not have the opportunity to discuss in detail the requirements for such a hearing because plaintiff merely challenged the timing not the substance of his post-termination procedures.  *Id.*  However, subsequent cases have described an

adequate post-termination hearing as a hearing before an impartial tribunal where the public

employee has the opportunity to be represented by counsel, to present evidence, and to cross-

examine adverse witnesses.  *See, e.g., **Tonkovich v. Kansas Bd. of Regents***, 159 F.3d 504, 517-

18 (10th Cir. 1998); ***Workman v. Jordan***, 32 F.3d 475, 480 (10th Cir. 1994), *cert. denied,* 514

U.S. 1015 (1995); ***Calhoun v. Gaines***, 982 F.2d 1470, 1476-77 (10th Cir. 1992).  Applying these

principles to the facts of the instant case demonstrates the Park County Defendants provided

Plaintiffs with due process.

> **1.    Charles Caldwell Lacked a Protected Property Interest in Continued Employment as a Probationary Employee**

Charles Caldwell asserts he was terminated from his position as a probationary part-time

case manager at the PCSO without due process of law.  He claims he was not afforded notice and

an opportunity to be heard nor to refute the allegations against him before Sheriff Wegener

terminated his employment.  Such an argument fails as a matter of law.

Mr. Caldwell worked as a part-time case manager in the jail for the PCSO from April 27,

2005 to February 10, 2006.  [¶2].  PCSO employment policies include a period of probation for

all non-commissioned personnel of one (1) year from the date of employment, which may be

extended for a period of up to three (3) months for training or disciplinary purposes.  [¶ 4].  Mr.

Caldwell was a probationary employee at the time his employment with the Park County

Sheriff's Office was terminated.  [¶¶ 2 & 4-5].  As such, Mr. Caldwell lacked any protected

property or liberty interest in continued employment.  *See, e.g., **Walker v. United States,*** 744

F.2d 67, 68 (10th Cir. 1984) (probationary employee lacks property interest protected by due

process); ***Richardson v. City of Albuquerque,*** 857 F.2d 727, 731 (10th Cir. 1988) (same);

***Grusendorf v. City of Oklahoma City,*** 816 F.2d 539, 540 n. 1 (10th Cir. 1987) (same); *see also*

*Codd v. Velger*, 429 U.S. 624, 624-25 (1977) (absence of protected property interest entitles no due process protection).  Because he had no property interest in continued employment, Mr. Caldwell was not entitled to notice and an opportunity to be heard prior to the termination of his employment.  It is axiomatic that if there is no property or liberty interest at stake, there is no concomitant right to due process.

> **2.     Vicki Caldwell Received Appropriate Process and Was Not Constructively Discharged**

Initially, to any extent Ms. Caldwell challenges her three-day suspension without pay that occurred as part of her written warning in November 2005, Ms. Caldwell received all of the process due her.  Assuming *arguendo* that a three-day suspension without more is a sufficient adverse action to trigger the protections of the Due Process clause, Ms. Caldwell was provided notice and an opportunity to be heard prior to the suspension being given to her.  Mr. Gore provided her with what he believed she did wrong and she was provided with the opportunity to present her side of the story.  [¶¶ 10-23].  Nothing else is required by due process, particularly given the minimal sanction that is at issue with respect to her suspension.

Further, any claim by Ms. Caldwell of a denial of due process related to her resignation of her employment in December 2005 fails because Ms. Caldwell cannot demonstrate she was constructively discharged.  It is undisputed Ms. Caldwell was not terminated; she resigned her position with the PCSO.  [¶ 24].  Because she chose to resign, thereby voluntarily giving up any property interest she may have had in her job with the PCSO, she could not have been deprived of any due process rights she may have otherwise possessed.  To any extent Ms. Caldwell seeks to state a due process claim based on the allegation she was constructively discharged, such an allegation lacks any factual support and therefore must be dismissed as a matter of law.

Ms. Caldwell bears the burden of proving she was constructively discharged from her position with the PCSO. ***Daemi v. Church's Fried Chicken, Inc.,*** 931 F.2d 1379, 1386 (10th Cir. 1991). Under a theory of constructive discharge, Plaintiff must prove her working conditions were so intolerable she had no choice but to resign her position with the PCSO by demonstrating a reasonable person in the Plaintiff's position would have perceived continued work at her workplace intolerable. ***Sprague v. Thorn Ams.***, 129 F.3d 1355, 1367 (10th Cir. 1997); ***Heno v. Sprint/United Management, Co.,*** 208 F.3d 847, 858 (10th Cir. 2000). "In order to survive a motion for summary judgment on a constructive discharge claim, [plaintiff] 'must allege facts sufficient to demonstrate under an objective test that a reasonable person would have viewed her working conditions as intolerable.'" ***Heno***, 208 F.3d at 858 (quoting ***Jeffries v. Kansas***, 147 F.3d 1220, 1233 (10th Cir. 1998). Under this inquiry, an employee's subjective beliefs are irrelevant and "if an employee resigns of her own free will, even as a result of the employer's actions, that employee will not be held to have been constructively discharged." ***Jeffries***, 147 F.3d at 1233. When a public employee resigns, unless she can prove a claim for constructive discharge, she is not entitled to any due process because she voluntarily relinquished her property interest in her job. ***Singer v. Denver Sch. Dist. No. 1,*** 959 F. Supp. 1325, 1331 (D. Colo. 1997) (citing ***Parker v. Bd. of Regents of Tulsa Jr. College***, 981 F.2d 1159, 1162 (10th Cir. 1992)).

The undisputed facts of this case show only Ms. Caldwell was given a written reprimand and docked three days of pay for her failure to follow an express directive from Undersheriff Gore not to have any contact with Mr. Anthony. Ms. Caldwell was also required to leave her office door open. There is simply no basis upon which a reasonable person could find that Mrs.

Caldwell's discipline for an incident she readily admitted occurred and the requirement that her office door remain open constituted "intolerable" working conditions sufficient to state any viable constructive discharge claim.  Ms. Caldwell cannot, as a matter of law, prevail on a claim for constructive discharge.  Because she was not constructively discharged, Ms. Caldwell has no viable due process claim.

> **3.** **Plaintiffs Have No Viable Liberty Interest Claim**

While not entirely clear from the Plaintiffs' Complaint, it appears Plaintiffs also assert a claim of due process based on their liberty interest.  Plaintiffs state no viable liberty interest claim here because no evidence exists the reason for Mr. Caldwell's termination or Ms. Caldwell's suspension were ever publicly disseminated by the Park County Defendants.

In the absence of a protected property interest, a public employee may be entitled to the protections of due process in circumstances where an employment termination occurs that implicates the public employee's good name, reputation, honor and integrity.  ***Miller v. City of Mission,*** 705 F.2d 368, 373 (10th Cir. 1983); ***Walker,*** 744 F.2d at 69.  Here, arguably, the suspension of Ms. Caldwell and the termination of Mr. Caldwell implicate their good names and reputations.  However, Plaintiffs cannot succeed with any due process claim on this basis because absolutely no evidence exists that any of the Park County Defendants publicly disseminated any information to anyone about the reason for Ms. Caldwell's suspension or Mr. Caldwell's termination.  Plaintiffs allege in their Complaint that the Park County Defendants published the Webber Park investigation and related documents. [Compl. ¶¶ 1, 19, 25-26].  Nothing about Ms. Caldwell's suspension or Mr. Caldwell's termination is contained in those documents.  [¶ 6].  And no evidence whatsoever exists that any of the Park County Defendants

disclosed anything related to the personnel actions taken against the Plaintiffs publicly at all. The absence of any public dissemination of any allegedly stigmatizing information concerning the Plaintiffs forecloses any liberty interest claim.  *See, e.g., Bishop v. Wood,* 426 U.S. 341, 348-349 (1976); *Lancaster v. Independent Sch. Dist. No. 5,* 149 F.3d 1228, 1235 (10th Cir. 1998).

## II.  PLAINTIFFS' STATE LAW CLAIMS FAIL BECAUSE PLAINTIFFS CANNOT DEMONSTRATE ANY OF PARK COUNTY DEFENDANTS ENGAGED IN WILLFUL AND WANTON CONDUCT AND ALSO FAIL ON THEIR MERITS

Plaintiffs' state law claims alleging defamation, intentional infliction of emotional distress and invasion of privacy are subject to the Colorado Governmental Immunity Act, C.R.S. §§ 24-10-101 *et seq.*  Initially, the Plaintiffs' state law claims are indisputably tort claims. *Keohane v. Stewart*, 822 P.2d 1293, 1297-98 (Colo. 1994) (defamation sounds in tort); *Rugg v. McCarty*, 476 P.2d 753, 756 (Colo. 1970) (recognizing intentional infliction of emotional distress as tort claim under Colorado law); *Robert C. Ozer, P.C. v. Borquez*, 940 P.2d 371, 377-79 (Colo. 1997) (recognizing right of action in tort for invasion of privacy).  Further, none of the Plaintiffs' claims fall within any area where the Park County Defendants' sovereign immunity has been waived by the Colorado General Assembly.  *See* C.R.S. § 24-10-106(1).  Thus, the only basis Plaintiffs have to advance their claims against the Park County Defendants is by establishing these Defendants' actions were willful and wanton.  *See* C.R.S. § 24-10-118(2)(a).

Willful and wanton conduct connotes acts or omissions that extend beyond mere unreasonableness.  *Moody v. Ungerer,* 885 P.2d 200, 205 (Colo. 1994); *Terror Mining Company, Inc. v. Roter,* 866 P.2d 929, 933-34 (Colo. 1994).  "Willful and wanton conduct is purposeful conduct committed recklessly that exhibits an intent consciously to disregard the safety of others."  *Forman v. Brown,* 944 P.2d 559, 564 (Colo. App. 1996).  Here, Plaintiffs

have presented insufficient evidence as a matter of law that the Park County Defendants' actions rise to the level of willful and wanton conduct.  Therefore, Plaintiffs' state law claims are subject to dismissal under the Colorado Governmental Immunity Act.

Further, even if Plaintiffs somehow could establish the Park County Defendants' actions were even arguably willful and wanton, Plaintiffs' state law claims also fail on their merits as a matter of law.

A.   **PLAINTIFFS CANNOT PROVE THE PARK COUNTY DEFENDANTS DEFAMED THEM.**

Plaintiffs assert the Park County Defendants defamed them by the statements included in the Webber Park / Brief Synopsis.  They say those statements were published in their personnel files and to the local newspaper, the Fairplay Flume.  Because there is no evidence establishing that any of the Park County Defendants published any allegedly defamatory information to anyone, Plaintiffs' claim fails.

In Colorado, a claim for defamation "requires, at a minimum, publication of a false statement of defamatory fact."  *Churchey v. Adolph Coors Co.*, 759 P.2d 1336, 1341 (Colo. 1988) (citing *Burns v. McGraw-Hill Broadcasting, Co.*, 659 P.2d 1351, 1360 (Colo. 1983)).  In this case, there is no evidence to support the notion that the Park County Defendants published any allegedly defamatory matter about the Plaintiffs to anyone.  Plaintiffs assume and speculate that the Park County Defendants were involved in releasing the Webber Park Investigation information publicly.  However, other than pursuant to a legitimate request under the Colorado Criminal Justice Records Act or the Colorado Open Records Act, no actual evidence exists that any of the Park County Defendants were involved in any public dissemination of any such information.  [¶¶ 40-57].  Assuming *arguendo* Plaintiffs were not involved in an ongoing

27

criminal enterprise, a notion the Park County Defendants may dispute at trial, if necessary, their claim for alleged defamation fails because there is no evidence that the Park County Defendants published any purportedly defamatory matter about them to anyone.  Plaintiffs' own testimony belies their allegations.  [¶¶ 40-57].

Moreover, the Park County Defendants possessed a qualified privilege to investigate alleged wrongdoing by Park County employees and others.  Although not explicitly plead in their Complaint, to any extent Plaintiffs argue the publication occurred when the Park County Defendants circulated the Webber Park Investigation/Brief Synopsis and the Witness/Victim List between themselves, the Park County Defendants possessed a qualified privilege to investigate alleged criminal wrongdoing by the residents of Webber Park, including Plaintiffs.  *Thompson v. Public Serv. Co.*, 800 P.2d 1299, 1306 (Colo. 1990).  To overcome such a qualified privilege, Plaintiffs must show the Defendants "published the material with malice, that is, knowing the matter to be false, or acted with reckless disregard as to its veracity."  *Id.* (quoting *Churchey*, 759 P.2d at 1346).  There is no such evidence here.

Finally, Plaintiffs cannot state any defamation claim based on the disclosure of the Webber Park Investigation information to the Plaintiffs or others pursuant to legitimate requests pursuant to the Colorado Criminal Justice Records Act and the Colorado Open Records Act. Any disclosure by the Park County Defendants, to any extent any such disclosure occurred, in response to such requests should be subject to a qualified privilege.  It makes no logical sense to hold the Park County Defendants civilly liable in tort for their *compliance* with the terms of the CCJRA and the CORA.  Once again, absolutely no evidence exists the Park County Defendants released any such information with malice.

**B.     PLAINTIFFS CANNOT DEMONSTRATE THE PARK COUNTY DEFENDANTS INTENTIONALLY INFLICTED SEVERE EMOTIONAL DISTRESS ON THEM.**

Plaintiffs assert the Park County Defendants intentionally caused them severe emotional distress.  To prove their claim for intentional infliction of severe emotional distress Plaintiffs must show: (1) the Park County Defendants engaged in extreme and outrageous conduct; (2) that the Defendants did so recklessly or with the intent to cause Plaintiffs severe emotional distress; and (3) that Defendants' conduct caused Plaintiffs severe emotional distress.  ***Coors Brewing Co. v. Floyd***, 978 P.2d 663 (Colo. 1999); ***Hoffsetz v. Jefferson County Sch. Dist.***, 757 P.2d 155, 159 (Colo. App. 1988).

Here, there is simply no evidence that the Park County Defendants engaged in any extreme or outrageous conduct, that they did so recklessly or intentionally, or that Plaintiffs suffered severe emotional distress.  Plaintiffs point to no evidence showing the Park County Defendants engaged in any extreme and outrageous conduct.  To any extent Plaintiffs claim the Park County Defendants engaged in such conduct by investigating allegations of criminal activity and corruption within the PCSO, such allegations are wholly unfounded.  The PCSO's purpose is to protect and serve the residents of Park County, Colorado by investigating allegations of criminal wrongdoing.  Certainly allegations of corruption within the PCSO must be taken with utmost seriousness.  It makes no sense to argue that PCSO employees violated some duty to the Plaintiffs by undertaking the very duty they are, as law enforcement officers, sworn to uphold.  There is also no evidence of any malicious intent or any severe emotional

distress experienced by either Plaintiff.  For these reasons, Plaintiffs' intentional infliction of emotional distress claim must be dismissed.[5]

Finally, Plaintiffs' intentional infliction of emotional distress claim also fails for similar reasons as their defamation claim, namely, that the Plaintiffs cannot demonstrate the Park County Defendants improperly disclosed the Webber Park Investigation publicly.  Because the disclosure of the Webber Park Investigation represents the factual predicate of the Plaintiffs' intentional infliction of emotional distress claim, [Compl. ¶¶ 1, 19, 26-27], this claim fails for the identical reasons as the Plaintiffs' defamation claim.

**C.      PLAINTIFFS HAVE NO EVIDENCE THE PARK COUNTY DEFENDANTS INVADED THEIR RIGHT TO PRIVACY.**

To prevail on a tort claim for invasion of privacy in the nature of unreasonable publicity given to one's private life a Plaintiff in Colorado must prove: (1) the fact or facts disclosed must be private in nature; (2) the disclosure must be made to the public; (3) the disclosure must be one which would be highly offensive to a reasonable person; (4) the fact or facts disclosed cannot be of legitimate concern to the public; and (5) the defendant acted with reckless disregard of the private nature of the fact or facts disclosed.  ***Robert C. Ozer, P.C.***, 940 P.2d at 377-79.  Here, Plaintiffs cannot prove any of the elements of such a claim, making summary judgment appropriate.

---

[5]  Moreover, the Colorado Workers' Compensation Act constitutes the exclusive remedy available to an employee for a co-employee's alleged commission of intentional infliction of emotional distress during the scope of the employment.  ***Hoffsetz***, 757 P.2d at 159 (citing ***Kandt v. Evans***, 645 P.2d 1300 (Colo. 1982); ***Farmer v. Central Bancorporation, Inc.***, 761 P.2d 220 (Colo. App. 1988)).  To any extent Plaintiffs argue Defendants' actions as co-employees give rise to liability, there is no evidence that either Plaintiff submitted a claim to the Workers' Compensation Division alleging emotional distress.  As a result, any such claim is barred.

Inherent in a claim for invasion of privacy is the notion that the fact allegedly disclosed is true.  Otherwise, the plaintiff's claim would be for defamation.  Plaintiffs assert all of the statements made in the Webber Park Investigation / Brief Synopsis are untrue.  It is simply not possible for Plaintiffs to recover on a claim for invasion of privacy if the statements allegedly publicized are untrue.

Similarly to Plaintiffs' claim for defamation, there is no evidence any of the Park County Defendants disclosed any information about the Plaintiffs to anyone, much less publicized it. Unlike a claim for defamation, to prevail on a claim for invasion of privacy, the private facts allegedly disclosed must be disclosed to the general public or a large number of persons.  ***Robert C. Ozer, P.C.***, 940 P.2d at 377-79.  There is no evidence to support the notion that the Park County Defendants disclosed anything about Plaintiffs to anyone. [¶¶ 40-57].  Hence, summary judgment should be granted on Plaintiffs' claim for invasion of privacy.

### III.  PLAINTIFFS HAVE NO EVIDENCE DEMONSTRATING THEY WERE NOT PAID ALL WAGES TO WHICH THEY WERE ENTITLED

Plaintiffs claim they are entitled to $980.00 in unpaid wages.  [*See* Plaintiffs' Complaint, ¶¶ 51-53].  Plaintiffs produced no evidence to support such a claim.  Vicki Caldwell was docked three days pay for a disciplinary infraction.  Thus, there is no evidence she was entitled to be paid for the three days she was suspended for violating a direct order from her superior. [¶¶ 18, 20-22].  Charles Caldwell points to no evidence to suggest he was not paid any wages he was owed.  In fact, he expressed testified he was paid while he was on administrative leave.  [¶ 9].

Even if such evidence existed, the Colorado Wage Claim Act, C.R.S. § 8-4-101, does not apply to "the state or its agencies or entities, counties, cities and counties, municipal corporations, quasi-municipal corporations, school districts, and irrigation, reservoir, or drainage

conservation companies or districts organized and existing under the laws of Colorado."  C.R.S. § 8-4-101(5).  Such entities are excluded from the definition of "employer."  *Id.*  Park County is a political subdivision of the State of Colorado.  [*See* Plaintiff's Complaint, ¶ 6; Answer, ¶ 6].  It would make little sense to exempt the public entities listed in section 101(5) of the Wage Claim Act only to hold individual public employees liable.  Moreover, the Colorado Supreme Court found in ***Leonard v. McMorris***, 63 P.3d 323, 333 (Colo. 2003), "Colorado's Wage Claim Act does not make officers and agents of a corporation jointly and severally liable, along with the corporation, for the payment of wages and compensation due and payable to the employee under the employment contract and the Wage Claim Act."  The same reasoning should apply to a member of a public entity.  Summary judgment is, therefore, appropriate on Plaintiffs' Wage Claim Act claim.

## IV.  PLAINTIFFS NEVER PLED A CLAIM FOR RELIEF PURSUANT TO THE CRIMINAL JUSTICE RECORDS ACT

To any extent Plaintiffs seek relief pursuant to the Criminal Justice Records Act, C.R.S. § 24-72-301, *et seq.*, they have not pled such a claim in their Complaint and cannot do so now. Plaintiffs' computation of alleged damages as set forth in the Scheduling Order filed in this action includes a reference to a fine Plaintiffs claim they are seeking pursuant to the Criminal Justice Records Act against Defendant Groome.  [*See* Scheduling Order, at p. 8].  However, Plaintiffs never assert a Criminal Justice Records Act claim in their Complaint.  [*See* Plaintiff's Complaint].  F.R.C.P. 8 ("A pleading that states a claim for relief must contain: … (b) a short and plain statement of the claim showing that the pleader is entitled to relief … ."); *see also*, 2-8 Moore's Federal Practice – Civil § 8.04.  Based on the Scheduling Order, if Plaintiffs are

attempting a Criminal Justice Records Act claim, because it was not pled in the Plaintiffs'

Complaint, it is not properly before this Court.

<u>**CONCLUSION**</u>

In conclusion, for each of the reasons, Defendants Fred Wegener, Monte Gore, Gregory

S. Flint and Stephen Groome respectfully request that the Court enter summary judgment on all

of the Plaintiffs Charles Caldwells' and Vicki Caldwells' claims against them in their entirety

with prejudice, and for all other and further relief as this Court deems just and appropriate.

Dated this 16th day of June 2008.

Respectfully submitted,

<u>*s/ Katherine M.L. Pratt, Esq.*</u>
Andrew D. Ringel, Esq.
Katherine M.L. Pratt, Esq.
Hall & Evans, L.L.C.
1125 17th Street, Suite 600
Denver, CO 80202-2052
303-628-3453
Fax: 303-628-3238
ringela@hallevans.com
prattk@hallevans.com
**ATTORNEYS FOR DEFENDANTS FRED
WEGENER, MONTE GORE, GREGORY FLINT
AND STEPHEN GROOME**

<u>**CERTIFICATE OF SERVICE (CM/ECF)**</u>

      I HEREBY CERTIFY that on the 16th day of June, 2008, I electronically filed the foregoing **PARK COUNTY DEFENDANTS' MOTION FOR SUMMARY JUDGMENT** with the Clerk of Court using the CM/ECF system which will send notification of such filing to the following e-mail addresses:

James A. Reed, Esq.
jreedpc@aol.com
*Attorney for Plaintiffs*

Richard Lamphere, Esq.
Steven U. Mullens, Esq.
lampheresum@yahoo.com
SUMullens@aol.com
*Attorneys for Defendant Shawna White Owl*

Michael K. Obernesser, Esq.
mobernesser@gmail.com
*Attorney for Defendant Mark Damon*

                            <u>s/Martha Fiser, Secretary to</u>
                            Andrew D. Ringel, Esq.
                            Katherine M.L. Pratt, Esq.
                            Hall & Evans, L.L.C.
                            1125 17th Street, Suite 600
                            Denver, CO 80202-2052
                            303-628-3453
                            Fax: 303-628-3238
                            ringela@hallevans.com
                            prattk@hallevans.com
                            **ATTORNEYS FOR DEFENDANTS FRED WEGENER, MONTE GORE, GREGORY FLINT AND STEPHEN GROOME**

H:\Users\PRATTK\CALDWELL\Pleadings\MSJ Brief - Final.doc