```
 1              UNITED STATES DISTRICT COURT

 2              FOR THE DISTRICT OF COLORADO

 3   Civil Action No. 07-cv-00371-RPM-MEH

 4   CHARLES CALDWELL and VICKI CALDWELL,

 5           Plaintiffs,

 6   vs.

 7   THE COUNTY OF PARK, a body corporate and politic and a
     political subdivision of the State of Colorado, FRED
 8   WEGENER, MONTE GORE, GREGORY S. FLINT, STEVEN GROOME,
     SHAWNA WHITEOWL, and MARK DAMON,
 9
             Defendants.
10   _____

11              DEPOSITION OF VICKI CALDWELL
                     February 27, 2008
12   _____

13   APPEARANCES:
     FOR THE PLAINTIFFS:          JAMES A. REED, ESQ.
13                                James A. Reed, P.C.
                                  320 S. Cascade Avenue
14                                Colorado Springs, CO  80903

15   FOR THE DEFENDANTS,          ANDREW J. RINGEL, ESQ.
     THE COUNTY OF PARK, FRED     Hall & Evans, L.L.C.
16   WEGENER, MONTE GORE,         1050 Seventeenth Street
     GREGORY S. FLINT and         Suite 600
17   STEVEN GROOME:               Denver, CO  80202

18   FOR THE DEFENDANT,           RICHARD M. LAMPHERE, ESQ.
     SHAWNA WHITEOWL:             Steven U. Mullens, P.C.
19                                105 E. Moreno Avenue
                                  Colorado Springs, CO  80903
20
     FOR THE DEFENDANT,           MICHAEL K. OBERNASSER, ESQ.
21   MARK DAMON:                  Law Office of Dennis
                                     Hartley, P.C.
22                                1749 South Eighth Street
                                  Suite 5
23                                Colorado Springs, CO  80906

24   ALSO PRESENT:                Charles Caldwell

25
```

CARPENTER REPORTING, INC.
(303) 752-1200

Defendants Park County

Exhibit A-1

1    been on your health insurance both at Park County and

2    at Teller County?

3            A    Yes, sir.

4            Q    Okay.  Do you have to pay to have your

5    husband insured through your insurance with Teller

6    County?

7            A    I did until we went to the health

8    savings high-deductible.  That was one of the factors

9    that I decided to choose that.

10           Q    How much was it to add him to your

11   insurance, to the best of your memory?  Are we talking,

12   you know, $500 a month?  Are we talking 100?

13           A    No.  For Teller County, I believe I was

14   paying approximately $100 a month for the two of us.

15           Q    Okay.  Okay.  Other than -- well, let me

16   back up.  Let's talk about the next category, pain and

17   suffering and emotional distress.  Can you describe for

18   me what your current emotional, either well-being or

19   lack of well-being is today.

20           A    Well, today, I'm stressed.  When this --

21   I'm doing much better the farther away we get from the

22   time period when all of this came out.

23           Q    Can you give me a sense of when it --

24   well, let me ask it a better way.  What was your

25   emotional well-being or lack of well-being like when

1      A    No, sir.

2           Q    I notice that they have a Dublin, Ohio

3    office.

4      A    Yes, they do.

5           Q    Okay.  Take a look at the last page of

6    Exhibit No. 30.  Can you identify -- excuse me -- can

7    you identify that document for me?

8      A    Yes.  That's a letter of recommendation

9    from Kevin Huddleston, who was my supervisor at

10   MidFirst Bank in Oklahoma City.

11          Q    And that was a job that you had after

12   Peak Professional Services?

13     A    Actually, it was the same time.

14          Q    Okay.

15     A    Peak Professional Service is a temporary

16   service.  They placed me at MidFirst Bank.

17          Q    Okay.  I understand.

18               (Marked for identification was

19   Deposition Exhibit No. 31.)

20          Q    (BY MR. RINGEL)  Take a look at Exhibit

21   No. 31, and when you've done it, let me know.

22     A    (Deponent reviewing exhibit.)

23               Okay.

24          Q    Does your signature appear on this

25   document?

1          A     Yes, sir.

2          Q     Okay.  What is this document?

3          A     It is the -- where it's -- it's a

4 document that the Park County sheriff's office --

5 everyone who was hired there signs an oath of office

6 and the sheriff signs that he is appointing them to the

7 position.

8          Q     Okay.  And it looks to me like this

9 indicates that your position as business manager

10 started December 22nd of 2003.  Is that when it, in

11 fact, started?

12          A     I believe that is the date, sir.

13          Q     Okay.  Do you know what the number by

14 your name is on the top part?  The 3571?

15          A     I am not sure on that, but I would

16 assume it would be my employee ID number.

17          Q     Is that a sheriff's department number,

18 or a Park County number?

19          A     I would think it would be a sheriff's

20 department number.

21          Q     Okay.

22          (Marked for identification was

23 Deposition Exhibit No. 32.)

24          Q     (BY MR. RINGEL)  Take a look at 32, and

25 when you have, let me know, please.

1   husband.   It would have been several months later.

2          Q     Okay.

3          MR. RINGEL:  We've been going for a

4   pretty good clip.  Now seems to be a decent time for a

5   break.  Is that okay with everybody?

6          MR. REED:  Yes.

7          (There was a recess taken from 10:23

8   a.m. to 10:29 a.m.)

9          Q     (BY MR. RINGEL)  We had been talking

10  last about a meeting that occurred with you, Mr. Gore,

11  and you believe Sergeant Muldoon in Mr. Gore's office

12  approximately a week after the event of the personnel

13  files being removed from your custody and control.

14         A     Yes.

15         Q     What was the next thing that happened

16  with respect to your employment with the sheriff's

17  department?

18         A     The next thing I remember at this time

19  is Don Anthony came in for a meeting with the

20  investigators on his case.  And I went to lunch.  When

21  I came back from lunch, Don Anthony was in the parking

22  lot.  He called me over to his car.  He asked me about

23  the amount of money for a personal plane fare that he

24  had used the County credit card for.  He wanted to know

25  if that had been repaid and I told him, to my

1    knowledge, it had not.  He wanted to know how much it

2    was for.  I said I would have to go find that, look

3    that up.  So I went back to my office.  Got that

4    information.  I took it out -- I went through the

5    lobby.  He was sitting in the lobby.  I gave him that

6    information.

7            The next day, I believe it was, he

8    called me and said he was going to bring in a check for

9    it.  I said okay.  So he did come in that next day.  I

10   was called up to the front desk when he arrived.  I

11   took his check.  He asked for a receipt.

12           While I was filling out the receipt,

13   Undersheriff Gore came down and asked me what I was

14   doing.  I told him.  He took the money -- the check

15   from Don Anthony and then he later -- he called me up

16   to his office.  Asked me the sequence of events.  What

17   had occurred.  I told him.  He told me -- he put me on

18   paid administrative leave -- or he put me on leave

19   and -- for disobeying the order of not telling him that

20   Don Anthony had spoken to me.  And I told him that I

21   assumed he knew because when Don Anthony first spoke to

22   me, he said that the investigator had told him to get

23   with me.  So -- and, to my understanding, Mr. Gore was

24   in charge of the investigation on Don Anthony, so I

25   assumed he knew about it.

```
 1              Q      -- for Mary Anthony?

 2              A      I think so, yes.

 3              Q      Do you know when that trip to

 4     Washington, D.C., occurred?

 5              A      No, sir, I don't.

 6              Q      Okay.

 7                     (Marked for identification was

 8     Deposition Exhibit No. 35.)

 9              Q      (BY MR. RINGEL)  Take a look,

10     Mrs. Caldwell, at Exhibit 35.  And when you have had

11     that opportunity, let me know, and then I'll ask you

12     about it.

13              A      (Deponent reviewing exhibit.)

14                     Okay.

15              Q      This memorandum reflects, generally

16     speaking, the events that you just told me about.  Is

17     that fair?

18              A      Yes, sir.

19              Q      Okay.  So the first -- the meeting --

20     the -- not even a meeting.  When you -- when you

21     encountered Mr. Anthony in the parking lot, when you

22     returned from lunch, that occurred on the 16th of

23     November of 2005; is that right?

24              A      Yes, sir.

25              Q      Okay.  And then the -- him giving you
```

1    the check and you giving him the receipt and being

2    interrupted by Mr. Gore occurred on the 17th?

3                A    Yes, sir.

4                Q    Okay.  So, then, you were later called

5    up and -- to Mr. Gore's office on the 17th?

6                A    Yes, sir.

7                Q    Okay.  And that's when you were put on

8    administrative leave?

9                A    Yes, sir.

10               Q    Okay.  Who was present during that

11   meeting?  When you were placed on administrative leave?

12               A    I believe that Sergeant Muldoon was

13   there, as well as Captain Gore.

14               Q    Okay.  Was anybody else present?

15               A    I don't think so.

16               Q    And was it in Mr. Gore's office

17   upstairs?

18               A    I believe so, yes.

19               Q    Have you told me everything that you

20   remember about that meeting?

21               A    Everything I remember at this time, yes.

22               Q    Okay.

23                    (Marked for identification was

24   Deposition Exhibit No. 36.)

25               Q    (BY MR. RINGEL)  Take a look at Exhibit

1      A    Well, he would be supposed to reimburse

2  it in a fairly timely manner.  Part of my job was to

3  track things that were owed to the sheriff's office,

4  and at the end of the year, I would -- anybody that I

5  knew of that had done personal things and owed us

6  money, I would remind them they needed to pay it back.

7      Q    Okay.

8           (Marked for identification was

9  Deposition Exhibit No. 37.)

10     Q    (BY MR. RINGEL)  Take a look at No. 37,

11 and when you've had the opportunity to look at it, let

12 me know.

13     A    (Deponent reviewing exhibit.)

14          Okay.

15     Q    Okay.  Look at the first paragraph.  Do

16 you know what meeting Mr. Gore is referring to in that

17 first paragraph?

18     A    That is the meeting I discussed with you

19 that would have happened maybe a week or so after

20 October 17th, where he told me that I had been

21 accused of suspicious activity.

22     Q    And that was related to maybe making

23 changes on your computer and slipping something under

24 your desk?

25     A    Yes, sir.

1          Q     Okay. The first three paragraphs of

2 this memorandum seem to me to relate to that earlier

3 meeting. Would you agree with that?

4          A     I believe that is correct, yes, sir.

5          Q     Okay. Is there anything in these

6 three -- first three paragraphs of this memorandum that

7 is inconsistent with your memory of that meeting with

8 Mr. Gore?

9          A     I don't specifically remember him using

10 the example of running into him in a grocery store at

11 that meeting, but, other than that, yes, I would say

12 this coincides with my remembrance of the meeting.

13          Q     Okay. All right. When did you give

14 Mr. Gore your memo, which is Exhibit 35?

15          A     That same day, November 17th, 2005.

16          Q     Would it have been prior to the later

17 meeting on that day with Mr. Gore and -- and

18 Mr. Muldoon and yourself?

19          A     I believe so. I think -- I believe that

20 he asked me to go write up the events and then come

21 meet with him.

22          Q     Did Mr. Gore present this document,

23 Exhibit 37, to you at the meeting with himself and

24 Mr. Muldoon?

25          A     Yes, he did.

1   Sandra West.   Those are the -- possibly Rose Avey, but

2   I'm not sure.

3           Q    Other than the -- those three that

4   work -- that work or in Ms. Avey's case, worked in the

5   front office, was anybody else a witness to these

6   events between you and Mr. Muldoon?

7           A    Not that I recall at this time.

8           Q    All right.   After you were placed on

9   administrative leave, at some point, I understand you

10  come -- you were called back to the office.   Is that

11  fair?

12          A    Yes, sir.

13          Q    Okay.   When were you called to report

14  back to the sheriff's department?

15          A    I believe it was approximately three

16  days later.   The information should be on the next --

17  the written reprimand, that's the day that I came back.

18          Q    Okay.   So the day of the written

19  reprimand is when you came back?

20          A    Yes, sir.

21          Q    All right.   Who called you to tell you

22  to come back?

23          A    I can't remember if it was Gore or

24  Muldoon.   I really can't remember.

25          Q    But you believe it was one of those two?

1          A     I think so, yes.

2          Q     It wasn't Ms. Avey or another

3 administrative assistant?

4          A     I don't believe so, no.

5          Q     Do you remember anything about the

6 conversation between either yourself and Mr. Gore or

7 Mr. Muldoon, telling you that you needed to report back

8 to the sheriff's department?

9          A     I don't remember anything other than

10 asking me to come back in.

11          Q     And, in terms of timing, when was the

12 phone call versus the -- the day that you came back?

13          A     I believe I received the phone call the

14 evening before I was asked to come in the next day.

15          (Marked for identification was

16 Deposition Exhibit No. 38.)

17          Q     (BY MR. RINGEL) Take a look at Exhibit

18 38, if you would, Mrs. Caldwell. And when you have

19 looked at it, let me know. And then I'll ask you about

20 it.

21          A     (Deponent reviewing document.)

22          Okay.

23          Q     You come back to the sheriff's office

24 and what -- who did you meet with?

25          A     With Captain Gore and Cindy Gharst.

1        Q    Okay.  And you believe that that was on
2    November 22nd, 2005?
3        A    I believe so, yes.
4        Q    And where did that meeting take place?
5        A    It was upstairs.  I think it was in the
6    captain's office, but it may have been in the meeting
7    room next door.  I don't remember for sure.
8        Q    Okay.  There's a conference room or
9    meeting room next to Mr. Gore's office?
10       A    There was.  It was going to be another
11   office, but it hadn't been converted yet.
12       Q    Okay.  And, obviously, you don't know
13   what its status is now?
14       A    No, sir.
15       Q    Which is why you're saying that there
16   was.  I understand.
17            Okay.  Tell me everything you remember
18   about your meeting on November 22nd, 2005, with
19   Mr. Gore and Ms. Gharst.
20       A    I came in to the meeting.  Captain Gore
21   gave me this.  He asked me to read it.  And I did.  And
22   he asked me if I had questions about it.  I believe
23   that I reminded him that I -- the reason I didn't tell
24   him about the meeting is that I thought he already
25   knew.  But I did agree that I had spoken to Don Anthony

1    and not told him.

2              I -- Mr. Gore was -- Captain Gore seemed

3    angry with me and he reminded me that he had been very

4    direct in the previous -- his previous directives, very

5    explicit.  And then he went on to tell me that,

6    basically, that I needed to continue and report any

7    further contact with Don Anthony or Lieutenant Rasch.

8    At that time, I told him that while I was on leave, I

9    had been in a restaurant and Mr. Anthony had come in.

10   We'd had a discussion.  He asked me to write that up in

11   a memo form, which I did, and gave to him.

12             Q    We're going to look at that next, I

13   promise.

14             A    And he told me that he -- he reminded

15   me -- again, he suggested that it was not a good idea

16   for me to have contact with Don Anthony, Lieutenant

17   Rasch, or Mary Anthony.  And at that point is when I

18   remember him mentioning, I understand that Lake George

19   is a small town and you're going to run into them.

20   However, if you happen to meet them at the gas station

21   or store or something, you might say hi, but then you

22   need -- you shouldn't have any activity with them,

23   interaction.

24             At that point, I told him I didn't think

25   he had the right to tell me who I could be friends

1     with.  He said that that's not what he intended to say.

2     And I said, Well, that's what it sounds like to me.

3     And I signed this reprimand and -- I can't remember if

4     I came back to work that day or he wanted me to come

5     back the next day.  I don't remember.

6                Q     Did Mrs. -- Ms. Gharst say anything

7     during that meeting?

8                A     I don't believe so, no.

9                Q     Did you -- do you remember anything else

10    that occurred during that meeting?

11               A     Not at this time.  No.

12               Q     Did you tape record that meeting?

13               A     No, sir, I did not.

14               Q     How long did that meeting occur?

15               A     30 minutes or so.

16               Q     Did you think that the three-day docking

17    of pay was fair?

18               A     No, sir, I don't.

19               Q     Did you express that to Mr. Gore?

20               A     I can't remember whether I did or not.

21               Q     Did you express that to Ms. Gharst?

22               A     If I did it, it would have been in the

23    meeting at the time.

24               Q     Other than this meeting with Ms. Gharst,

25    did you have any further communications with her about

1       A     That was about a week after my husband

2   was put on leave, so it would have been -- he was put

3   on leave the 14th, so it would have been

4   approximately a week after that.

5       Q     All right.  I understand.  Thank you for

6   indulging my clarification.

7             All right.  Did you complain about the

8   written reprimand issued by Mr. Gore to you to anyone

9   associated with Park County?

10      A     I probably complained to my husband.

11      Q     Okay.

12      A     That's all I remember.

13      Q     You didn't do anything to try to get

14  this -- the written reprimand and the three days

15  docking of pay reversed by the sheriff, did you?

16      A     No.  I don't remember doing anything

17  like that.

18      Q     Did you -- were you aware that you could

19  do something like that?

20      A     I was aware that the sheriff has the

21  final say on these types of items.  I guess I just

22  assumed that he knew about this and it -- it didn't

23  seem -- I was so disgusted, I didn't feel like

24  fighting.

25      Q     Okay.  Did you have any -- do you have

1          A     No, it did not.  Because they have no

2    control over the sheriff's department.  The sheriff has

3    total control over anyone who works for him.

4          Q     Okay.  And I assume it didn't occur to

5    you to go to the Board of County Commissioners for the

6    same reason?

7          A     Yes, sir.

8          Q     Okay.

9                (Marked for identification was

10   Deposition Exhibit No. 39.)

11         Q     (BY MR. RINGEL)   Take a look at Exhibit

12   39, and when you've had the opportunity to look at it,

13   please let me know.

14         A     (Deponent reviewing exhibit.)

15               Okay.

16         Q     What is Exhibit 39?

17         A     It is the memo that I referenced earlier

18   that I wrote to Captain Gore, detailing the contact I

19   had with Don Anthony while I was on administrative

20   leave.

21         Q     Okay.  You said something about -- and I

22   just wanted to clarify something -- it made me think

23   that the restaurant that you went to where you were

24   having breakfast was owned by Mr. Anthony.  Is that

25   true, or is that --

1    A    No, sir.

2    Q    Okay.  What restaurant was it?

3    A    Mountain Shadows in Lake George.

4    Q    Okay.  All right.  In this memorandum,

5    it indicates that during this breakfast, Mr. Anthony

6    told you that he had been fired from his employment

7    with the sheriff's department.

8    A    Yes, sir.

9    Q    Okay.  Do you know when he was fired?

10   A    He was fired the -- the day that he came

11   and gave me the money, to my understanding, or the day

12   after.  Something like that.

13   Q    Okay.  Something in the neighborhood of

14   the 17th or 18th of November?

15   A    Yes.

16   Q    Okay.  Fair enough.  Did Mr. Anthony

17   tell you who he intended to appeal his termination to?

18   A    I don't remember discussing that, no.

19   Q    Okay.  But he did tell you he was going

20   to appeal his termination?

21   A    I don't remember him doing that.  Oh,

22   yes, he did.  He did tell me he intended to appeal his

23   termination.

24   Q    Okay.  Did you have an understanding of

25   what that meant?

1       A    That would be with the sheriff, I would

2   assume.  And -- and that is who he appealed -- who he

3   appealed to.  I do know that.  Later.

4       Q    Okay.  So it's your understanding that

5   Mr. Gore terminated Mr. Anthony's employment?

6       A    Yes.  I think that was my understanding

7   at the time.  Yes.

8       Q    Okay.  And then Mr. Anthony appealed and

9   then the sheriff upheld that termination?  Is that your

10  understanding?

11      A    That is my understanding, yes.

12      Q    Okay.  Do you know when the termination

13  of Mr. Anthony was upheld by the sheriff?

14      A    I know he had the meeting on the appeal.

15  I believe it was November 30th, 2005.  Because he

16  came to the office to meet with the sheriff on that

17  date.

18      Q    And you saw him on that day?

19      A    Yes.

20      Q    Did you write a memo about that?

21      A    I didn't talk to him on that day.  I

22  didn't have to write a memo.

23      Q    Fair enough.  Okay.  Is there anything

24  else that you remember about that breakfast with

25  Mr. Anthony that is -- that you haven't told me or is

1   accused me of, to me, was -- made no sense.  I mean,

2   hiding something under my desk.  That makes no sense to

3   me.

4              In hindsight, I believed that it had to

5   do with him trying to get rid of anybody they felt

6   would support Don Anthony for sheriff.  At this time, I

7   decided that my working there was not good for my

8   health and I fully expected, when I turned in my

9   resignation on December 1st, that they would not allow

10  me to work out my two-week notice.  I expected them to

11  say pack your stuff and go.

12         Q     They didn't do that, though; right?

13         A     No.  They did not.  They did have me --

14  it surprised me, they had me continue to work my

15  notice.

16              I believe that is everybody -- that we

17  have discussed everything that led to my resignation.

18         Q     Okay.  You were paid through

19  December 15th, 2005; correct?

20         A     Yes, sir.

21         Q     Except for the three days that you were

22  docked --

23         A     Yes, sir.

24         Q     -- pay?  Do you have any idea of what

25  the -- the value of the three days would be for you in

```
 1   sheriff, did he suggest that he was going to run

 2   against the incumbent sheriff, Fred Wegener, or was he

 3   going to wait until Mr. Wegener's term was over and

 4   then run for sheriff?

 5            A     I don't believe he actually mentioned

 6   one way or another to me.

 7            Q     Okay.  You understand that the position

 8   of sheriff at Park County has term limits?

 9            A     I -- yes.

10            Q     Okay.  Prior to Mr. Anthony officially

11   announcing for -- his candidacy for sheriff, which you

12   said occurred after he was fired, was there -- were you

13   aware of discussion either with Mr. Anthony or others

14   or word on the street or word in the sheriff's

15   department office or anything along those lines that he

16   was, in fact, going to run for sheriff in the upcoming

17   election?

18            A     I was not aware of anything like that,

19   no.

20            Q     Did you do anything to assist

21   Mr. Anthony in his effort to run for sheriff of Park

22   County at any time?

23            A     Yes, I did.

24            Q     Okay.  What did you do?

25            A     Verbally supported him in his effort.
```

1    Wore buttons for him.  We did give a -- my husband and

2    I -- a donation to his campaign.  Basically, just gave

3    general support, talked him up around the community,

4    that type of thing.

5              Q    How public was your support of

6    Mr. Anthony as far as from your perspective?

7                   MR. REED:  Object to the form of the

8    question.

9              A    Very public.

10             Q    (BY MR. RINGEL)  Okay.

11             A    We also did go to the caucus, I believe,

12   which was my first experience with caucus situations,

13   and made our support known there.

14             Q    When was the caucus?

15             A    I think it was in February or March.

16   I'm not sure.  And then we went to the general

17   assembly, which was in the beginning -- towards the

18   beginning of April 2006.

19             Q    So when you said February or March,

20   before you were talking about February or March of '06?

21             A    Yes, sir.

22             Q    Okay.  And then there was another

23   assembly in March or April of '06?

24             A    I believe it was the beginning of April

25   '06.

1    could comment about a particular article or particular

2    topic raised in the newspaper?

3              A    Yes, sir.

4              Q    Okay.  Who -- do you believe that Fred

5    Wegener knew prior to Mr. Anthony's official

6    announcement that he had plans to run for sheriff?

7              MR. REED:  Objection to the form of the

8    question.

9              A    I don't know for sure that he did.  In

10   looking back with the incidences that have occurred, I

11   would think that he did, but I cannot say for sure.  I

12   have no actual knowledge of that.

13             Q    (BY MR. RINGEL)  Did Mr. Wegener know

14   about your support of -- well, let me ask it in a

15   better way.  Do you have any basis for knowing or

16   concluding that Mr. Wegener knew you were a political

17   supporter of Mr. Anthony?

18             MR. REED:  Objection to the form of the

19   question.

20             A    I -- yes.  I think that it was well

21   known to Sheriff Wegener that Don Anthony and I were

22   close friends and had been prior to -- for several

23   years prior to my employment there.  I believe that,

24   you know, it would have been obvious to anyone working

25   there that when he ran for sheriff, I would support

1    Q    How about Mr. Gore?

2    A    No, sir.

3    Q    And Mr. Flint?

4    A    No, sir.

5    Q    Okay.  Do you have any information that

6  Mr. Wegener was involved with Ms. Wissel --

7    A    Wissel.

8    Q    I'm sorry.  With Ms. Wissel's obtaining

9  the Webber Park synopsis to give it to Mr. Coggin?

10    A    I have no idea how she acquired it.

11    Q    Okay.  So you don't know whether

12  Mr. Gore, Mr. Flint, Mr. Groome, or Mr. Wegener was

13  involved with her acquiring that one way or the other?

14    A    No, sir, I don't.

15    Q    Okay.  Do you have any other basis for

16  understanding -- for your conclusion that the Webber

17  Park synopsis was made public the end of March, early

18  April '06?

19    A    Nothing else that I remember at this

20  time.  No.

21    Q    Okay.  Mr. Caldwell said yesterday, I

22  believe that he had had several just, you know, John Q.

23  Public citizens or Jane Q. Public come up to him and

24  ask him about some of the allegations that were

25  contained in the Webber Park synopsis.  Do you remember

1        Q    Okay.  Do you have any basis to believe

2  that Monte Gore knew that you were a political

3  supporter of Don Anthony prior to November of 2005?

4        A    Just the information I gave earlier that

5  it was generally known that we were friends and that I

6  would -- could easily be assumed to support him.

7  Whenever he ran.

8        Q    And you would agree with me, would you

9  not, that being someone's friend and voting for them or

10  supporting them for a political office are two

11  different things?

12        A    I would agree that they're two different

13  things, but someone who is a trusted friend and is in

14  that position of undersheriff already, it's a natural

15  assumption that -- I mean, I was working for him and I

16  liked working for him.  I think he was doing a good

17  job, so ...

18        Q    Was there anyone else in the Park County

19  sheriff's department at the time that you worked there

20  other than yourself and your husband who you would

21  characterize as a supporter of Mr. Anthony?

22        A    Nobody that I could say definitely

23  would, no.

24        Q    So -- okay.  Fair enough.  Do you have

25  any information to believe that Mr. Flint knew that you

1   were a political supporter of Mr. Anthony?

2          A    I had met Mr. Flint on the -- previous

3   to working at the sheriff's office at social functions,

4   and he knew of my friendship with Don Anthony.  I don't

5   remember specifically saying anything to him, but, you

6   know -- it never came up when he ran for sheriff I

7   would support him, but I would think he could have

8   inferred it as the same as Captain Gore and Sheriff

9   Wegener and everyone else that worked there.

10         Q    Okay.  Was Lieutenant Rasch a supporter

11  of Mr. Anthony?

12         A    He is now.

13         Q    Okay.

14         A    I don't know if he would have been prior

15  to the incidents that occurred where both he and

16  Mr. Anthony were terminated.

17         Q    So do you believe anybody who worked in

18  the sheriff's department would have thought that

19  Mr. Rasch was a supporter of Mr. Anthony prior to the

20  incidents that happened related to Mr. Rasch that led

21  to his termination?

22         A    I really don't know if anybody else

23  would -- perhaps some of the people that knew

24  Lieutenant Rasch better.  I didn't know him that well.

25         Q    Do you have any basis for understanding

1   that Mr. Groome knew you were a political supporter of

2   Mr. Anthony?

3           A     I would not have any basis for that

4   belief because I had met Mr. Groome a couple of -- a

5   few times in the course of my duties, knew who he was,

6   but I had never discussed my personal life with him or

7   anything.

8           Q     You'd recognize him if he walked into

9   this room?

10          A     Yes, sir, I would.

11          Q     Okay.  You'd been in meetings with him

12  or whatnot?

13          A     Yes, sir.

14          Q     Okay.  And you believe he would

15  recognize you?

16          A     I don't know.  He might.

17          Q     Okay.  What did Mr. Wegener do to you

18  that you consider defamatory?  Do or say.  Do to you or

19  say about you that you consider defamatory.

20          A     Well, I -- I believe that he would have

21  had to have been involved in the release of that Webber

22  Park synopsis and that he would have had knowledge of

23  its release since it is a Park County sheriff's office

24  report.  And there's a lot of defamation things in

25  there.

1        Q     Okay.  But, other than the release of

2    that report, has Mr. Wegener done anything or said

3    anything that you consider defamatory?

4        A     Not that I recall right now.  No.

5        Q     Okay.  What has Mr. Gordon done to

6    defame you?

7        A     The same response as far as being

8    involved in the release of the Webber Park synopsis.

9    And I was un -- with the reprimand that he gave me and

10   that was put in my personnel file and I don't truly

11   believe it was a fair reprimand.  And so by that being

12   in my personnel file, my attempts to -- anybody that I

13   apply with for another job, I'm either going to have to

14   tell them, please don't call the sheriff's office or

15   worry about them saying negative comments about me

16   because of that being in my file.

17       Q     So you believe the written reprimand

18   that Mr. Gore gave to you constitutes defamation?

19             MR. REED:  I will object to the form of

20   the question.

21       A     I'm not 100 percent sure of the term

22   "defamation," what all that entails.  I think it is a

23   negative comment about me and my work ethics and

24   abilities.

25       Q     (BY MR. RINGEL)  Okay.  That's perfectly

1  fair.  Other than the written reprimand and the release

2  of the Webber Park synopsis, has Mr. Gordon anything

3  else to defame you or said anything else to defame you?

4        A    Nothing I remember right now.

5        Q    Okay.  What has Mr. Flint done to defame

6  you?

7        A    Author that report.

8        Q    By "that report," you mean the Webber

9  Park synopsis?

10       A    Yes, sir.

11       Q    Okay.  Anything else?

12       A    I don't know of anything personally

13 right now, no.

14       Q    I mean, am I correct in thinking that in

15 your day-to-day work at the Park County sheriff's

16 office, you didn't have much of any contact with

17 Mr. Flint?

18       A    He was in the squad room often and I had

19 daily -- not necessarily daily, but constant -- regular

20 contact with him.

21       Q    Okay.

22       A    And I had never had a problem with him

23 until after Chuck was placed on leave.

24       Q    How -- how was there a problem with

25 Mr. Flint after your husband was suspended?

1   Mr. Flint as social friends in any kind of way prior to

2   this?

3           A    No.  I would not say that we were

4   friends.  We had met at social functions and, at one

5   point, I believe we may have gone out to dinner with he

6   and his wife and a couple of other friends of ours that

7   were mutual friends of his, but no.  I didn't really

8   know him well.

9           Q    You worked together and you were social

10  acquaintances?  Is that a fair characterization?

11          A    I would think that's fair, yes.

12          Q    Okay.  All right.  What did Mr. Groome

13  do to defame you?

14          A    Well, he obviously was involved in this

15  document, the Webber Park synopsis, and I believe it

16  refers to him as being the -- I forget what it's

17  called, but the holder of the reports and stuff.  He is

18  the one who mailed it to us.  Therefore, he obviously

19  had access to it.  And I don't know who else he may

20  have given it to.  And as his position as County

21  attorney, I would think that he would be the one that

22  gave it out to the newspaper, but I don't know that for

23  sure.

24          Q    In fact, you don't know one way or the

25  other whether Mr. Groome gave it to anybody, other than


1    you and your husband?

2           A     I do not have evidence of that, no.

3           Q     Has anyone invaded your privacy other

4    than the information that's in the Webber Park

5    synopsis?

6           A     I'm not thinking of any other incidents

7    at this time that would be considered invasion of

8    privacy, other than the Webber Park synopsis and it

9    being given to people.

10          Q     Okay.

11          A     I would -- I'm not a police officer and

12   I've never worked in law enforcement prior to this.  In

13   the Webber Park synopsis, it speaks about Greg Flint

14   and several other officers investigating things and

15   videotaping things in Webber Park.  I mean, I have no

16   idea if they were looking in my windows or what that

17   means.  So that could be considered an invasion of

18   privacy to me.

19          Q     If, in fact, they were doing that kind

20   of thing?

21          A     Yes.  To me that -- yes.  Yes.

22          Q     But you don't know one way or the other

23   what their investigatory activities consisted of?

24          A     Other than what's listed in there -- in

25   the report, no.

1          Q     If it says they were doing surveillance,

2     you don't know if that surveillance was looking at your

3     house one way or the other?

4          A     That's correct.

5          Q     Okay.  You indicated earlier that you

6     believe the Webber Park synopsis was written later than

7     it purports to have been written.

8          A     Yes, sir.

9          Q     Okay.  When is your understanding of

10    when it purports to have been written?

11         A     A police report, I would think, my

12    understanding is it should begin to be written at the

13    time that the investigation begins and continue to add

14    information as the investigation continues, which, if

15    you go with that, then the first part of that should

16    have been written in 2003.  And I believe that it was

17    compiled after that, either after my husband was fired

18    or after I was terminated and he was put on leave or,

19    you know, somewhere in that time period that they

20    decided that they were going to use this against Don

21    Anthony and my husband and I and told Greg Flint to put

22    it together.  That's my belief at this time.

23              (Marked for identification was

24    Deposition Exhibit No. 46.)

25         Q     (BY MR. RINGEL)  Take a look at Exhibit