1          UNITED STATES DISTRICT COURT

2          FOR THE DISTRICT OF COLORADO

3    Civil Action No. 07-cv-00371-RPM-MEH

4    CHARLES CALDWELL and VICKI CALDWELL,

5          Plaintiffs,

6    vs.

7    THE COUNTY OF PARK, a body corporate and politic and a
     political subdivision of the State of Colorado, FRED
8    WEGENER, MONTE GORE, GREGORY S. FLINT, STEVEN GROOME,
     SHAWNA WHITEOWL, and MARK DAMON,

9

          Defendants.

10   ─────────────────────────────────────────────────────

          DEPOSITION OF CHARLES CALDWELL
11              February 26, 2008

     ─────────────────────────────────────────────────────

12   APPEARANCES:
     FOR THE PLAINTIFFS:          JAMES A. REED, ESQ.
13                                James A. Reed, P.C.
                                  320 S. Cascade Avenue
14                                Colorado Springs, CO   80903

15   FOR THE DEFENDANTS,          ANDREW J. RINGEL, ESQ.
     THE COUNTY OF PARK, FRED     Hall & Evans, L.L.C.
16   WEGENER, MONTE GORE,         1050 Seventeenth Street
     GREGORY S. FLINT and         Suite 600
17   STEVEN GROOME:               Denver, CO   80202

18   FOR THE DEFENDANT,           RICHARD M. LAMPHERE, ESQ.
     SHAWNA WHITEOWL:             Steven U. Mullens, P.C.
19                                105 E. Moreno Avenue
                                  Colorado Springs, CO   80903

20

     FOR THE DEFENDANT,           MICHAEL K. OBERNASSER, ESQ.
21   MARK DAMON:                  Law Office of Dennis
                                     Hartley, P.C.
22                                1749 South Eighth Street
                                  Suite 5
23                                Colorado Springs, CO   80906

24   ALSO PRESENT:                Vicki Caldwell

25

Defendants Park County

Exhibit A-4

1    Park County.

2              MR. OBERNESSER:  I'm sorry.  I didn't

3    hear what you said.

4              A    During the time I was on leave --

5              MR. OBERNESSER:  Okay.  Thank you.

6              A    -- from Park County.

7              Q    (BY MR. RINGEL)  And when was that?  If

8    you need to approximate, that's fine.

9              A    I'm very bad with dates.  I can't

10   honestly remember.  I was on leave for three months

11   without any knowledge of why I was on leave.

12             Q    Okay.  And the period of leave was prior

13   to the termination of your employment; is that right?

14             A    Yes.

15             Q    And if I'm -- if my memory is right,

16   your employment was terminated February 22nd of 2006;

17   is that right?

18             A    It was actually terminated the 10th.

19             Q    February 10th?

20             A    I was notified the 22nd.

21             Q    Okay.  Terminated February 10th.

22   Okay.  Can you give me a sense of when the three months

23   of leave was in relationship to your termination?

24             A    The three months prior to that.  Three

25   and a half months prior to that.

1          Q     Is there anything physically that

2    prevents you from being a respiratory therapist today?

3          A     Just knowledge.  I've been out of the

4    field for 26 years and technology has passed me by.

5          Q     Understood.  Okay.  Do you know if

6    respiratory therapists have to be licensed by the State

7    of Colorado?

8          A     Yes, sir, they do.

9          Q     Okay.  All right.  Let's go back to

10   question No. 12, which is on page 5 and 6, if you

11   would.  The next category on page 6 that we've talked

12   about is -- that you identified is pain and suffering/

13   emotional distress.  Do you see that?

14         A     Yes, sir.

15         Q     Okay.  Can you describe for me your

16   present emotional well-being or lack of well-being

17   related to the events that are the subject of this

18   lawsuit.

19         A     My current state of emotion, sir?

20         Q     Correct.

21         A     I've calmed down considerably.  I'm

22   frustrated, and I'm -- I'm somewhat hurt because I've

23   never been accused of things like that.  Had a great

24   respect -- still do have a great respect for law

25   enforcement and its functions, and I feel very bad that

1    I -- I can no longer be a part of that.

2           Q    Do you have any symptoms currently of

3    emotional distress or pain and suffering?

4           A    Slight hypertension, but nothing

5    serious.

6           Q    Are you on -- are you on medication for

7    hypertension?

8           A    Not currently.

9           Q    Had you been?

10          A    I had been.

11          Q    What's the reason for your not being on

12   your hypertension medication today?

13          A    Because of our medical plan, I just

14   can't afford the medications.

15          Q    And you get medical insurance through

16   your wife's employment; is that right?

17          A    Yes, sir.

18          Q    And I know this and you know this, but

19   let me ask it for the record:  Your wife is Vicki

20   Caldwell?

21          A    Yes, sir.

22          Q    When did you and Mrs. Caldwell become

23   married?

24          A    May 11th, 1996.

25          Q    Okay.  And what -- and that was in the

1    for word, if that makes sense.  Okay?

2           A    All right, sir.

3           (Deponent reviewing exhibit.)

4           MR. REED:  In other words, blame it on

5    your attorney if you don't know what he's talking

6    about.

7           A    Okay.

8           Q    (BY MR. RINGEL)  Okay.  Let me ask you

9    sort of a general question about the Webber Park area.

10    Is Webber Park like a subdivision, for lack of a better

11    understanding?

12           A    Yes, sir.  Uh-huh.

13           Q    And when we're talking about -- I

14    understand that it's a valley; right?

15           A    Yes, sir.

16           Q    What's the geography?  If you were going

17    to describe for me, you know, the Webber Park area is

18    between these roads or between these mountains or

19    whatever, how would you do it for me?

20           A    It's a beautiful little mountain valley,

21    high mountain valley off County Road 31 in Park County.

22    Basically, it lies between Tarryall Road or 77 Highway

23    and Badger Flats.

24           Q    And how big an area are we talking about

25    in terms of geography?

1          A      Roughly just over 600 acres.

2          Q      Okay.  Is it all privately owned, or

3     some of it, you know, State or Federal land?

4          A      It's all privately owned, and it's

5     surrounded by national forest.

6          Q      Okay.  So it's like a private enclave in

7     the middle of a national forest?

8          A      Yes, sir.

9          Q      Okay.  How many people, generally

10    speaking, reside in the Webber Park area?

11         A      There's eight to ten that live there

12    full-time.

13         Q      Okay.

14         A      There's a number of properties that

15    people will be there one or two weeks a year.

16         Q      It's like a second home or something

17    like that?

18         A      To some people.

19         Q      Okay.  How many different kinds of

20    properties are in the Webber Park area, generally

21    speaking?

22         A      I really don't know.  I think there's

23    around probably 20 properties, 25.  And that's a guess.

24         Q      Okay.  I understand.  But there are

25    about ten or so permanent residents in the area?

1            A     Yes, sir.

2            Q     And during the time -- for -- from what

3 period of time to what period of time did you live

4 there?

5            A     From March of 1999 until we moved to

6 Cripple Creek.

7            Q     Okay.  How did you hear about the Webber

8 Park area?

9            A     Well, we were looking for property about

10 15 or 16 years ago.  We found a piece up there that was

11 for sale and bought it and then we started building on

12 it in '99.

13           Q     Okay.

14           A     So we owned it for some years prior to

15 that.

16           Q     How big a piece of property did you own?

17           A     10.7 acres.

18           Q     Do you still own it?

19           A     Yes, sir.

20           Q     Okay.  Is anybody living there since you

21 moved to Cripple Creek?

22           A     No, sir.

23           Q     Is it something that you can maintain at

24 a distance?

25           A     Yes.

1        A    Yes, sir.

2        Q    Okay.  Can you give me a sense, during

3 the time that you were a reserve officer, about how

4 many hours a year you were working in that capacity,

5 generally speaking?

6        A    It varied, but I would guess probably

7 between 60 and 100 hours in a year's time.

8        Q    Okay.  And you were okay with donating

9 that -- your time, effectively, as a volunteer to the

10 Forest Park police department?

11        A    Absolutely.

12        Q    Okay.  Who other than Chief Tucker knew

13 you were a reserve officer?

14        A    There again, Dave, whose name I can't

15 remember.  Dyer, whose first name I can't remember.

16 And I believe that's it.

17        Q    Okay.  Have you ever seen or do you

18 recall filling out any kind of paper work that would

19 demonstrate you were an employee or a reserve officer

20 of the Forest Park police department at any time?

21        A    No, sir.

22        (Marked for identification was

23 Deposition Exhibit No. 5.)

24        Q    (BY MR. RINGEL)  Okay.  Take a look at

25 Exhibit No. 5.  Does your signature appear on this oath

1    of office?

2              A     Yes, sir.

3              Q     And did you sign this on April 27th of

4    2005?

5              A     Yes, sir.

6              Q     Okay.  And is it fair to say that that

7    was the date that you were appointed as a case manager

8    with the Park County sheriff's department?

9              A     I would think so, sir.

10             Q     Okay.  Who did you meet with on your

11   first day of work?

12             A     I met with the sheriff, I met with -- at

13   the time Captain Gore, I was introduced to him, and

14   to -- to the other caseworker.  I just went blank on

15   her name.

16             Q     Darlene Ellis?

17             A     Yes, sir.

18             Q     Okay.  All right.

19             A     And Sergeant -- at that time, Muldoon.

20             Q     Okay.  You worked as a part-time case

21   manager?

22             A     Yes, sir.

23             Q     What did you do, generally speaking?

24             A     I classified the inmates as they came in

25   based on their records for housing assignments.  I

1   and so it didn't make much sense.  But I understood his

2   point and I never did it again.

3           Q    Okay.

4           (Marked for identification was

5   Deposition Exhibit No. 6.)

6           Q    (BY MR. RINGEL)  Okay.  Exhibit No. 6 is

7   a variety of different documents related to this

8   suspension and investigation and I'm going to ask you

9   about that generally and we're going to refer to these

10  as we talk about it.  Okay?

11          A    Yes, sir.

12          Q    Did you receive this first page of

13  Exhibit 6?

14          A    Yes, sir.

15          Q    Okay.  And when did you receive that?

16          A    On the date on it.  10-14-05.

17          Q    Okay.  Did you have a meeting with

18  Captain Gore on October 14th, 2005?

19          A    No, sir.

20          Q    Okay.

21          A    Qualify a meeting.  I was called in and

22  handed this.

23          Q    Okay.  Fair enough.

24          A    It wasn't discussed.

25          Q    Okay.  So describe what happened as far

1    terminated, but I'm not really certain.

2           Q    Okay.  What is your understanding of the

3    form of his announcement?  How did he go about making

4    anybody know that he was a candidate for the office of

5    sheriff of Park County?

6           A    I don't know how he formally announced

7    it.  I remember when he procured signs and pins and all

8    that, but I don't remember when or how he formally

9    announced it.

10          Q    When did you first learn that he was

11   going to be a candidate for sheriff?

12          A    While I was on suspension.

13          Q    Okay.  When he got signs and that sort

14   of thing as you just described, when did that occur?

15          A    I can't remember the month.

16          Q    Okay.  Were you on suspension, or

17   were -- had you been terminated already?

18          A    I had been terminated by the time he

19   actually procured signs and pins.

20          Q    Did you sign a petition for him as part

21   of the process of him getting on the ballot?

22          A    Yes, sir, I did.

23          Q    Okay.  Do you know when that occurred,

24   approximately?

25          A    No, sir.  Prior to the caucus.

1    Q    Okay.  What period of time did you wear
2    a pin of Mr. Anthony's?
3         A    After I was terminated.
4         Q    Okay.  All right.  What facts do you
5    know that Sheriff Wegener was aware of your support for
6    Mr. Anthony as a candidate for sheriff?
7         A    I'm really not sure how to answer that.
8    It was I voiced my opinion around town.  I never
9    discussed politics on the job.
10        Q    I mean, did you ever have a conversation
11   with Sheriff Wegener that you were an Anthony supporter
12   directly?
13        A    No, sir.
14        Q    Okay.  Are you aware of Sheriff Wegener
15   knowing that you were an Anthony supporter?
16        A    I'm pretty sure he was.
17        Q    What makes you believe he knew you were
18   an Anthony supporter?
19        A    Because some of the deputies hung around
20   Lake George and so forth.  We did talk and he talked to
21   them.  So --
22        Q    Okay.  So you believe he learned you
23   were an Anthony supporter through some of the other
24   deputies that work for him?
25        A    I believe so.

```
 1          Q     Okay.  Who do you think provided -- who

 2   do you think was another deputy that provided such

 3   information to the sheriff?

 4          A     Well, without implementing (sic) them,

 5   because they never discussed their feelings with me,

 6   Rick Page, I discussed it with.  Bruce West, I

 7   discussed it with.  And John Jasper.

 8          Q     Do you have any information that any of

 9   those three gentlemen discussed you being a supporter

10   of Mr. Anthony with Sheriff Wegener?

11          A     I have no idea.

12          Q     Okay.  Do you have any other basis to

13   think that Sheriff Wegener knew you were a supporter of

14   Mr. Anthony, other than what we've now talked about?

15          A     No, sir.

16          Q     Okay.  Can you put into a time frame

17   when you believe Sheriff Wegener knew you were a

18   supporter of Mr. Anthony?

19          A     Not with any validity.  That is, nothing

20   I can give you backing on, other than just gut feeling.

21          Q     Tell me your gut feeling.

22          A     And it would be about a week prior to my

23   being put on suspension.

24          Q     Okay.  Okay.  Do you have the belief

25   that Monte Gore knew you were a supporter of
```

1   Mr. Anthony?

2           A     Yes, sir.  Under the same circumstances

3   and conditions.

4           Q     Okay.  In other words, you think that

5   Mr. Gore knew you were a supporter of Mr. Anthony in a

6   similar fashion as you described that the sheriff knew

7   about it?

8           A     Yes, sir.

9           Q     Okay.  Do you have -- did you ever have

10  a conversation with Mr. Gore about you being a

11  supporter of Mr. Anthony?

12          A     No, sir.

13          Q     Okay.  Did anyone tell you that they

14  told Mr. Gore that you were a supporter of Mr. Anthony?

15          A     No, sir.

16          Q     Okay.  Did anybody tell you that they

17  told the sheriff that you were a supporter of

18  Mr. Anthony?

19          A     No, sir.

20          Q     Okay.  Do you have the belief that Greg

21  Flint knew you were a supporter of Mr. Anthony?

22          A     Yes.

23          Q     Okay.  And what is the basis of that

24  belief?

25          A     The same as with the other two.

1    Q    Okay.  Did you ever have a conversation

2  with Mr. Flint, indicating that you were a supporter of

3  Mr. Anthony?

4    A    No, sir.

5    Q    Did anybody tell you they told Mr. Flint

6  that you were a supporter of Mr. Anthony?

7    A    Not that I'm aware of.

8    Q    Do you have a belief that Steve Groome

9  knew you were a supporter of Mr. Anthony?

10    A    I have no knowledge of Mr. Groome in any

11  capacity.

12    Q    Do you believe it was common knowledge

13  that you were a supporter of Mr. Anthony at the Park

14  County sheriff's office?

15    A    I believe so.  Everyone knew that we

16  were close friends.

17    Q    Okay.  But would you agree with me that

18  being close friends with someone and being a supporter

19  of them in a political campaign might be different?

20    A    That's true.  Yes.

21    Q    Okay.  Was it common knowledge that you

22  were a political supporter of Mr. Anthony in the

23  sheriff's office?

24    A    It was once I was on suspension and once

25  he announced his running, yes.

1    neighbor's house one evening and -- in a pretty bad

2    state and started babbling and, at that point, my wife

3    and I left.

4         Q    Okay.  So you were present?

5         A    Yes.

6         Q    Whose house was it?

7         A    Jack Sworowski.

8         Q    Who else was present that observed

9    Mr. Damon on that night?

10        A    George Porter.  And Suzanna Ross.

11        Q    Okay.  Was there anything that inhibited

12   your ability to observe or understand what Mr. Damon

13   was saying on that night?

14        A    I just had no reason to hang around, and

15   I left.

16        Q    Okay.  I mean, were you intoxicated in

17   any fashion?

18        A    No, sir.

19        Q    Okay.  Were you under the influence of

20   anything that would have impaired your perceptions on

21   that night?

22        A    No, sir.

23        Q    Okay.  Okay.  What's -- do you

24   understand that, in this complaint, you've alleged that

25   you were retaliated against because you were a

1    supporter of Mr. Anthony in his race for sheriff?

2          A    Yes, I do.

3          Q    Okay.  What, specifically, did Sheriff

4    Wegener do to retaliate against you?

5          A    Well, I was terminated.

6          Q    Okay.  So that's what he did?

7          A    I'm not sure if I'm overstepping here or

8    not.  Can I bring up the synopsis?

9               MR. REED:  Just answer the questions.

10         A    A lot of -- a lot of my feelings and a

11   lot of my sincere beliefs come sort of after the fact

12   when I tried to find out what I had been investigated

13   for, why I had been investigated.  This is after being

14   terminated.  Then comes out this eight-page synopsis.

15   And, in reading that, it looks like it went back clear

16   back to 2003 before I even worked there as a setup for

17   me being involved politically with Don Anthony.  So, to

18   say that I was retaliated, I think it was retroactive.

19   I don't think it was -- I think it was after the fact,

20   not before the fact, if that makes any sense.

21         Q    (BY MR. RINGEL)  You think that -- no.

22   That doesn't make sense.

23         A    I believe the whole synopsis was written

24   post-event.

25         Q    Okay.  I understand.  After your

1    termination?

2            A    Yes.

3            Q    Okay.  What makes you believe that?

4            A    Well, first of all, if they had actually

5    done an investigation since 2003, I can't believe that

6    my wife or I either one would have ever been hired

7    there to begin with.  I can't believe if they had done

8    that extensive an investigation since 2003, that there

9    was never even so much as a search warrant, let alone

10   any subpoenas or warrants issued.

11           Q    Okay.  But back to my original question

12   that started this part of our conversation.

13           A    Okay.

14           Q    Other than your termination, did Sheriff

15   Wegener do anything that you believe retaliated against

16   you for being a political supporter of Don Anthony?

17           A    No.

18           Q    Okay.  What did Greg Flint do in

19   retaliation for you being a political supporter of Don

20   Anthony?

21           A    He's the one that wrote up the synopsis.

22           Q    Okay.  So his activities related to the

23   investigation, whatever they were, and the fact that he

24   wrote up the synopsis is what he did that was

25   retaliation?

1        A    I believe so.

2        Q    Okay.  What did Monte Gore do to you

3   that was retaliation?

4        A    There again, he authorized and approved

5   the synopsis.  And the investigation on my -- on my

6   alleged falsehood on my application post-fact.

7        Q    What makes you believe that Mr. Gore was

8   involved in the investigation of whether you had worked

9   for the Forest Park police department or not?

10       A    Because on the document we went through

11  earlier, then Sergeant, now Lieutenant Muldoon stated

12  as per your suggestion, performed this investigation

13  and so forth.  It was addressed to Steve Groome -- I

14  mean Monte Gore.

15       Q    So that's what makes you believe that

16  Mr. Gore was involved?

17       A    Yes.

18       Q    Okay.  I understand.  All right.  What

19  did -- other than that -- do you have any belief that

20  Mr. -- well, do you have any information or

21  understanding that Mr. Gore was involved in any

22  decision related to your termination?

23       A    Yes, sir, I believe he was.

24       Q    Okay.  What makes you believe that?

25       A    In my mind, the entire thing was a

1    conspiracy to eliminate anyone that was supportive of

2    Mr. Anthony.

3           Q     Okay.  What did Mr. Groome do that was

4    retaliation against you?

5           A     The only thing I know about Mr. Groome

6    was he was who, supposedly, Flint referred to and who

7    held information and evidence.  At least by the

8    synopsis, that was his role.

9           Q     Okay.  But, other than what is contained

10   in that synopsis, you don't know what Mr. Groome did or

11   didn't do related to you at all; right?

12          A     No, sir.  No, sir.

13          Q     Okay.  Do you have any basis to know

14   whether or not Sheriff Wegener had read or knew about

15   the synopsis at the time that he terminated your

16   employment?

17          A     Well, he should have.  He's the

18   custodian of records according to Mr. Groome, the

19   county attorney, and I had requested information from

20   him and was -- from doing so that I received that

21   synopsis.

22          Q     Okay.

23          A     So I certainly do believe he had full

24   knowledge of it.

25          Q     Okay.  But you don't -- he never told

1    you I know about the synopsis or the investigation of

2    Webber Park; right?

3         A    No, sir.

4         Q    And you never have heard from anyone

5    else that he told that to someone else; right?

6         A    I haven't talked to anyone else.

7         Q    Okay.  Well, you've -- you've talked to

8    a lot of people about your lawsuit; right?

9         A    Yes.

10        Q    Okay.  And none of those people that you

11   talked to said, yeah, Sheriff Wegener told me he knew

12   all about the Webber Park investigation prior to --

13        A    No.

14        Q    -- when we terminated Chuck Caldwell?

15        A    No.

16        Q    Okay.  Do you have any -- at some point,

17   Mrs. Caldwell was disciplined by Mr. Gore; correct?

18        A    Yes, sir.

19        Q    If I'm understanding the chronology

20   correct, you weren't working at the sheriff's office

21   when that occurred?

22        A    No, sir.

23        Q    Okay.

24        A    I was on administrative leave.

25        Q    So you don't have any direct information

```
1           Q     How long after?

2           A     Within a month.

3           Q     Okay.  This is a good transition because

4    we're talking about the synopsis.  You understand that

5    you've made a claim of defamation in this lawsuit;

6    right?

7           A     Yes, I do.

8           Q     What I want to ask you initially is what

9    statements anybody made that were defamatory, in your

10   view.

11          A     All of them.

12          Q     Okay.  Let me be more specific.  Are you

13   aware of anyone making a defamatory statement of you

14   that's not included in the synopsis?

15          A     No.  I'm not.

16          Q     Okay.  So anything that you believe was

17   defamatory of you is within that eight-page synopsis?

18          A     Yes, sir.

19          Q     Okay.

20          A     I could possibly remember something

21   later on.  That's been a lot of time and an awful lot

22   of accusation, but the crux of it certainly is

23   contained in there.

24          Q     Okay.  Fair enough.  Who --

25          A     Well, I can think of one thing offhand.
```

1   I've been accused of being harassing and intimidating

2   for nine years by Ms. Whiteowl.

3          Q     All right.  I'm going to let my -- the

4   other folks that represent Mr. Damon and Ms. Whiteowl

5   ask you about what they did that's defamatory.  Okay?

6   But what I want to understand is -- we'll start with

7   each of my clients.

8          A     Okay.

9          Q     Did Sheriff Wegener make any statement

10  about you that you considered defamatory?

11         MR. REED:  Counsel, how many times are

12  you going to ask this question?  This is at least the

13  third time, by my count.  I'm taking pretty close

14  notes.

15         MR. RINGEL:  Defamation?  This is the

16  first we've talked about defamation.

17         MR. REED:  Well, you went through -- you

18  went through --

19         MR. RINGEL:  Went through political

20  support.  This is now about defamation.  By my count,

21  I've asked three questions about defamation.

22         MR. REED:  I'll let it go one more time.

23         A     Can you re -- repeat the question,

24  please.

25         Q     (BY MR. RINGEL)  I can.  What statements

1    did Sheriff Wegener make that you consider defamatory?

2        A    Directly, none.

3        Q    Okay.  Explain that.  Did he make -- did

4    he --

5        A    By approving of that synopsis and by

6    approving of the way I was terminated, I took it as

7    being very defamatory, but he didn't make the statement

8    verbally as such.

9        Q    Okay.  You believe Sheriff Wegener was

10   involved in the publication of the synopsis; fair

11   statement?

12       A    I believe he was -- approved -- involved

13   in the approval of it.

14       Q    Okay.  But you're not accusing him of

15   making any statement directly that was defamatory to

16   you?

17       A    Correct.

18       Q    Okay.  Same question with respect to

19   Mr. Gore.

20       A    It would be the same answer.

21       Q    Okay.  How about Mr. Groome?

22       A    As I said, I've never dealt with him, so

23   I would use the same answer there, too.

24       Q    Okay.  What about Mr. Flint?

25       A    He made assumptions and made concrete

statements about our activities in that valley, all of which were defamatory, none of which were true. He wrote that synopsis as fact, not as question, and I consider them all defamatory.

Q   Okay. So his defamation of you is what he wrote in that synopsis?

A   Yes, sir.

Q   Okay. All right. From your understanding, how was the synopsis publicly disseminated, if it was?

A   We had several citizens of that community that wound up with a copy. Just how they got it or where they got it, we don't know. The paper said that they received a copy of it. I received it after termination when I wrote for other material and was inadvertently sent that. It's the first time I became aware of it. So how it was disseminated to other members of the community, I don't know.

Q   Who, other than the newspaper, do you believe had a copy of the synopsis?

A   The people in the community that you were talking about. I don't even know some of the people that asked me about it.

Q   Okay. Can you name any person by name who asked you about the synopsis?

1          MR. RINGEL:  I understand.

2          Q     (BY MR. RINGEL)  How was your privacy

3   invaded by Sheriff Wegener?

4          MR. REED:  Object to the form of the

5   question.

6          A     Well, a lot of untruths were said about

7   us.  People we didn't know were asking us ridiculous

8   questions.  It was imposed in that -- or supposed in

9   that synopsis that Vicki and I were common-law, for

10  instance.  And we are legally married by a minister.

11  That we engage in lewd behavior -- sexual behavior,

12  both with ourselves and with animals.  I mean, first of

13  all, it's untrue.  Secondly, if it were true -- and it

14  certainly is not -- that's our private lives and has no

15  business being made public.  A police report is one

16  thing, but to release that kind of information to the

17  general public is certainly an invasion of privacy to

18  me.

19         Q     (BY MR. RINGEL)  But, as you said, you

20  don't know who was involved in the release of that

21  information to the general public?

22         A     No, I'm not.

23         Q     Did you ever complain to anyone about

24  the termination of your employment with Park County?

25         A     Did I ever what?