1

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF COLORADO

Civil Action No. 07-CV-000371-RPM-MEH

CHARLES CALDWELL, and
VICKI CALDWELL,

Plaintiffs,

vs.

THE COUNTY OF PARK, a body corporate and politic and a
political subdivision of the State of Colorado,
FRED WEGENER, MONTE GORE,
GREGORY S. FLINT, STEVEN GROOME,
SHAWNA WHITEOWL, and MARK DAMON,

Defendants.
---------------------------------------------------------------
SCHEDULING ATTORNEY:                    )
JAMES A. REED, ESQ..                    )
320 South Cascade Avenue                )
Colorado Springs, CO  80903             )
Telephone:  719-636-9343                )
Attorney Registration No. 23308         )
                                        )

DEPOSITION OF MONTE KEVIN GORE
March 5, 2008

APPEARANCES:

FOR THE PLAINTIFFS:
    JAMES A. REED, P.C.
    320 South Cascade Avenue
    Colorado Springs, CO  80903
    BY JAMES A. REED, ESQ.

FOR THE DEFENDANTS, COUNTY OF PARK, FRED WEGENER, MONTE GORE,
GREGORY S. FLINT and STEVEN GROOME:
    HALL & EVANS, L.L.C.
    1125 17th Street, Suite 600
    Denver, CO  80202-2052
    BY KATHERINE M. L. PRATT, ESQ.

Defendants Park County
Exhibit A-8

## Page 6

1 one of my questions?
2    A   Correct.
3    Q   And those objections are more or less for the
4 record. You're still required to answer the question unless
5 she tells you you're not to answer the question.
6    A   I'll follow the council of my Attorney.
7    Q   Good. The other thing is if I ask a question
8 that is perhaps not as artfully worded as I intend it to be
9 and it seems to call for some sort of communication between
10 you and your Attorneys, I didn't mean it that way, okay?
11   A   (Nod of head.)
12   Q   I'm not going to ask you what your Attorneys
13 have advised you or what communications you've had with your
14 Attorney. If I ask you about communications generally and I
15 don't exclude communications with your Attorney, you should
16 at least mentally do that yourself; do you understand?
17   A   I do.
18   Q   Let's go back through your history. What's
19 your education?
20   A   Bachelors degree in criminal justice.
21   Q   When did you get that and where?
22   A   Completed that 2000 and from St. John's
23 University.
24   Q   Where is St. John's?
25   A   It's actually in Louisiana.

## Page 7

1    Q   What brought you to Colorado?
2    A   Well, I've lived in Colorado. I actually just
3 took the courses through them.
4    Q   All right. Any further education beyond your
5 bachelors degree?
6    A   I have had obviously training in law
7 enforcement. I'm a certified law enforcement officer. I
8 have went through Law Enforcement Academy. I've had numerous
9 courses in law enforcement and management and ethics and
10 pretty much the whole gamut of law enforcement training.
11   Q   The certification to be a law enforcement
12 officer, that was through the certification authority here in
13 Colorado?
14   A   That's correct.
15   Q   When did you get that?
16   A   I think that was in '92.
17   Q   So you actually did that before you went off to
18 the academy in Louisiana?
19   A   Yes. And then I have all together probably
20 about 26 years of law enforcement.
21   Q   Let's go into that. What was your first job in
22 law enforcement?
23   A   I started as a 21-year-old kid at the Otero
24 County Sheriff's Office.
25   Q   As a full-fledged police officer or --

## Page 8

1    A   It was as a detention deputy at that time.
2    Q   And if you can, just go through, I'd like to
3 ask you as few questions as possible in this phase, just go
4 through the major jobs you've held. And by major I mean
5 anything you've held for anything more than about a year.
6    A   Otero County Sheriff's Office I was there from
7 I believe 1981 to like 1988. Then Place Number One, I went
8 to work for the Weld County Sheriff's Office, was there from
9 '88 to around '92.
10   Q   What did you do for Weld?
11   A   I was assigned to the jail in Weld.
12   Q   All right.
13   A   And then went from there to the Summit County
14 Sheriff's Office and went into the jail there, and went into
15 civil and then went into patrol and then went into
16 administration.
17   Q   How long were you at Summit?
18   A   12 years.
19   Q   When did you leave Summit?
20   A   September of 2000, and I came over here. I
21 left there with the rank of captain and came over here as the
22 rank in captain.
23   Q   How long was the program in Louisiana?
24   A   It was a, basically I ended up taking college
25 courses from like Red Rocks and different things like that,

## Page 9

1 converting them into hours along with other law enforcement
2 training and then ended up converting those to credit hours,
3 and then took several courses there to finish off the
4 bachelors.
5    Q   I'm trying to figure how you finished that up
6 if you were at Summit until 2000 and then you came here.
7    A   Well, it was like a correspondence type course;
8 you could do it over the internet.
9    Q   So the three courses or so you said you took
10 you took by correspondence?
11   A   Correct.
12   Q   And so when exactly did you get to Park County
13 as a job?
14   A   As I said, September of 2000.
15   Q   What was your first or what were your first
16 duties in 2000?
17   A   Jail captain.
18   Q   Will you explain to me what a jail captain
19 does?
20   A   Basically you're the jail administrator.
21   Q   How long did you do that?
22   A   I did that until I was promoted to under
23 sheriff.
24   Q   And I know the answer to this but I'll ask you
25 for the record, when you were promoted to under sheriff?

Page 10

1   A   I'd have to check. I was so busy at the time.
2   I didn't pay too much attention. I think it was right around
3   2006, I believe.
4   Q   All right. And before you became officially
5   the under sheriff, were you acting under sheriff?
6   A   I was.
7   Q   For how long a period of time?
8   A   I would say approximately two months.
9   Q   Other than we've talked about, have you had any
10  other significant job experiences as a law enforcement
11  officer?
12  A   Pretty much just what we've talked about.
13  Q   What are your duties or what were your duties
14  as acting under sheriff and then later under sheriff? What
15  does your under sheriff position entail?
16      MS. PRATT: Object to form. Go ahead.
17      THE WITNESS: Well, essentially you are the
18  second in command of a sheriff's office in this case, and so
19  you have budgetary issues, staffing issues, just about all
20  the issues that you would have in any business, how to pay
21  the bills, how to assign staff.
22  Q   BY MR. REED: Do you act as a supervisor for
23  the police officers?
24  A   I do.
25  Q   So the patrol officers, detectives, when they

Page 11

1   have investigations they come to you?
2   A   Well, typically they would go to their
3   supervisors. If it was something that they needed guidance
4   on or something like that or more of a bigger issue, then
5   they would come to me.
6   Q   With respect to any allegations of criminal
7   behavior on behalf of or against, rather, personnel of the
8   Park County Sheriff's Office, would that sort of information,
9   the reports, have to come to you?
10  A   Yes, it would.
11  Q   When did you first meet Sheriff Wegener?
12  A   I think it was just prior -- Well, actually, I
13  met -- I think the first time I'd met him I was a lieutenant
14  at Summit County and they had an officer that had been
15  involved in a shooting and we ended up -- I ended up coming
16  over to assist, and I believe that was the Brookhardt case.
17  Q   How did you assist?
18  A   Ended up being assigned search details and
19  searching for the guy.
20  Q   Did that involve things like getting search
21  warrants?
22  A   Not at that point. He was actually out in the
23  woods hiding and he had several caches of stuff. He had been
24  burglarizing homes and taking stuff from homes and things
25  like that, and so basically it was just a massive search for

Page 12

1   the individual.
2   Q   A manhunt?
3   A   A manhunt.
4   Q   Have you been trained in things like getting
5   search warrants?
6   A   I have.
7   Q   Where at?
8   A   Well, I think probably back at the Law
9   Enforcement Academy.
10  Q   Have you had updated training since then on
11  things like getting search warrants?
12  A   Probably in the course of some of the training,
13  but I can't remember specifically.
14  Q   Are you familiar with the concept of probable
15  cause in order to get a search warrant?
16  A   I am.
17  Q   And have you received training in how to write
18  a proper police report?
19      MS. PRATT: Object to form. Go ahead.
20      THE WITNESS: Yes.
21      MR. REED: And my use of the word proper is
22  meant to be the same as the police academy, the certification
23  board, their use of it. Do you understand what I'm talking
24  about when I say proper procedure for getting a search
25  warrant, or excuse me, for writing a police report, for

Page 13

1   writing a police report?
2       MS. PRATT: Form. Go ahead.
3       THE WITNESS: Well, I know the training that I
4   have had, as a cadet officer, we were trained to write
5   reports in specific ways. Coming up through the ranks, I've
6   had different supervisors who have had different styles of
7   writing reports, so I hope that answers your question.
8       MR. REED: What's important to put in a police
9   report if the police report is done properly?
10      MS. PRATT: Object to form. Go ahead.
11      THE WITNESS: Well, I would say probably as
12  much information as possible kind of covering the who, what,
13  when, where and how and why.
14      MR. REED: If someone says I heard someone else
15  say certain things, how do you follow that up? I mean, if
16  one witness says I heard another witness who may have seen a
17  burglary, how would you follow that up as a police officer
18  investigating that burglary?
19      MS. PRATT: Object to form.
20      THE WITNESS: Well, one way would be to follow
21  up with that individual that was reported to have stated that
22  they'd seen or knew something.
23  Q   BY MR. REED: Go to the source, if I'm hearing
24  you correctly?
25  A   That's correct.

Page 102

1 it real quick.
2          Okay. This is a -- I would not consider this
3 to be a report. This appears to be a memo from then Sergeant
4 Muldoon to me indicating that he did not call the Forest Park
5 P.D. directly and has a recommendation by Caldwell provided
6 by that agency was to feel the superlatives and consider --
7          MS. PRATT: Slow down. The court reporter.
8          THE WITNESS: All right. -- has anything, part
9 of a good ole boy network.
10         MS. PRATT: I believe the question is whether
11 it reflects a proper investigation.
12         THE WITNESS: I think it would be -- to me it's
13 more of a memo directed to me.
14         MR. REED: Does it reflect a proper
15 investigation?
16         MS. PRATT: Object to the form. And you can
17 answer to the best of your ability.
18         THE WITNESS: Okay. It appears to be a memo
19 directed to me.
20         MR. REED: Does it reflect a proper
21 investigation?
22         MS. PRATT: Same objection. Go ahead.
23         THE WITNESS: (At which time the Witness reads
24 the document.) To answer your question directly, it appears
25 to be a memo. I would not feel it's an investigation unto

Page 103

1 itself. Maybe part of an investigation.
2          MR. REED: So you consider that Officer Muldoon
3 did not do an investigation at all?
4          MS. PRATT: Form. I don't think that's...Okay.
5          MR. REED: I'm trying to get your sense of what
6 7 does. Let's ask the question this way: Do you feel that
7 Exhibit -- and I am saying 7. I mean 9. Do you feel that
8 Exhibit 9 was the basis upon which my client, Mr. Caldwell,
9 was fired?
10         MS. PRATT: Form and foundation. Go ahead.
11         THE WITNESS: I think it could be part of why
12 your client was discharged.
13         MR. REED: What was the rest of it?
14         MS. PRATT: Form and foundation. Go ahead.
15   Q    BY MR. REED: When you say it's only part, what
16 else was my client fired for?
17   A    In my opinion?
18   Q    Yes.
19   A    I think he had performance issues and I think
20 he should have been terminated for failure to meet
21 probationary period.
22   Q    QDo you consider that putting something in a
23 client's -- Would you agree that 9 and 8 both went in my
24 client's personnel file?
25         MS. PRATT: Form and --

Page 104

1          THE WITNESS: I believe so.
2          MS. PRATT: Form and foundation.
3          MR. REED: With respect to items like 8 and 9
4 being in a personnel file, do you understand that firing
5 someone for lying on their application directly reflects on
6 their honesty? Would you agree with that?
7          MR. OBERNESSER: Object to the form.
8          MS. PRATT: Form and foundation.
9    Q    BY MR. REED: Would you agree with that?
10   A    That lying on an application...
11   Q    Directly reflects on my client's honesty?
12   A    I would say that would be an issue, correct.
13   Q    And that with respect to any police agency
14 hiring my client anyplace where he applies after being fired
15 for lying on the application here that he is, in effect, his
16 ability to get a job somewhere else is going to be somewhat
17 chilled by putting this in the personnel file; don't you
18 agree?
19         MS. PRATT: Form and foundation.
20         MR. OBERNESSER: Calls for speculation.
21   Q    BY MR. REED: Don't you agree?
22   A    I do not agree.
23   Q    So if the next agency down the road calls you
24 guys and says why was he let go, what do you say?
25         MS. PRATT: Form, foundation.

Page 105

1          THE WITNESS: Usually I would defer that to
2 H.R..
3          MR. REED: And what does H.R. say?
4          MS. PRATT: Form and foundation.
5          THE WITNESS: Usually they were employed from
6 this time to this time.
7          MR. REED: If the question is asked, "Why was
8 he let go", why does H.R. say?
9          MS. PRATT: Form and foundation.
10         THE WITNESS: You'd have to take that up with
11 H.R.. I believe they give dates that they were employed and
12 that's about it.
13         MR. REED: Do they say whether the termination
14 was voluntary?
15         MS. PRATT: Form, foundation.
16         THE WITNESS: I don't know.
17   Q    BY MR. REED: Who would know?
18   A    Cindy Garse (phonetic). She is the Director of
19 H.R..
20   Q    Was Cindy Garse present when my client was
21 terminated?
22         MS. PRATT: Form, foundation.
23         MR. REED: If you know.
24         (At which time there was a knock at the door.)
25         THE WITNESS: Thanks, Carmella.

## Page 114

1  MS. PRATT: Form, foundation.
2  THE WITNESS: It appears to be an I.D..
3  MR. REED: Do you have any reason to believe
4  it's a forgery?
5  MS. PRATT: Form and foundation.
6  THE WITNESS: I don't know.
7  MR. REED: Do you have any reason to believe
8  that in any way it doesn't correctly state what is on there
9  that my client worked for that department?
10  MS. PRATT: Form and foundation.
11  THE WITNESS: I don't know.
12  MR. REED: Is that a no, you don't have any
13  reason or yes, you do have some reason, or what? I'm
14  curious. Curious is not the word. I'm confused by when you
15  say I don't know to a question. Do you have any reason?
16  When are you going to know?
17  MS. PRATT: Form and foundation.
18  THE WITNESS: I don't know whether this
19  document is real, whether it is not real.
20  MR. REED: Do you have any information that
21  it's not real?
22  MS. PRATT: Foundation.
23  THE WITNESS: I have no information that it's
24  not.
25  Q  BY MR. REED: My client showed you this before

## Page 115

1  he was fired; isn't that true?
2  A  I do not remember.
3  Q  If he says he showed you this before he was
4  fired in casual conversation, he pulled it out and showed you
5  the badge and this I.D., are you saying that never happened
6  or you just don't recall whether that ever happened?
7  MS. PRATT: Form.
8  THE WITNESS: I don't recall.
9  MR. REED: In Exhibit 8 is there any indication
10  my client is given an opportunity to respond to the
11  allegations that he had lied on his application?
12  MS. PRATT: Form, foundation.
13  MR. REED: Before he was fired?
14  MS. PRATT: Form and foundation.
15  THE WITNESS: Letter from the sheriff dated 2-
16  22 of '06 indicates he was terminated.
17  Q  BY MR. REED: Does it indicate the hearing was
18  held?
19  A  The letter does not.
20  Q  Does the letter indicate, does it ask my client
21  for information concerning the lie, giving him a chance to
22  respond?
23  MS. PRATT: Form.
24  THE WITNESS: I'm not sure what the
25  conversation between Sheriff Wegener --

## Page 116

1  MR. REED: I'm just asking about the letter.
2  Does the letter seem to indicate that there's any request for
3  any information about the truth of what happened?
4  MS. PRATT: Form and foundation.
5  THE WITNESS: It does not appear to.
6  MR. REED: Is it the policy of the department
7  to fire somebody without giving them a chance to respond to
8  whatever allegation is causing them to be fired?
9  MS. PRATT: Object to the form. Object to the
10  foundation.
11  THE WITNESS: That depends.
12  Q  BY MR. REED: On what?
13  A  If we have an employee that is past the
14  probationary period, generally they will be given a letter of
15  termination from me and that will be notice that they have
16  the right to a hearing. If it's a probationary employee we
17  don't go through that process.
18  Q  First, do you know whether Mr. Caldwell was a
19  probationary employee at that time?
20  A  He may have been.
21  Q  You don't know?
22  A  I don't remember.
23  Q  Okay. And second --
24  A  I was trying to answer your question.
25  Q  And secondly, is it your position that a

## Page 117

1  probationary employee is not entitled on a new allegation to
2  contest that allegation before he's fired?
3  MS. PRATT: Form, foundation. Calls for legal
4  conclusion. Calls for speculation.
5  THE WITNESS: Typically if we have a
6  probationary employee they are not given the opportunity to
7  talk to the sheriff or appeal that.
8  MR. REED: So if a completely off the wall
9  allegation is made against someone who is on probation that
10  turns out to be patently false, they still get fired and
11  don't have a chance to respond; is that what you're saying?
12  MS. PRATT: Object to the form.
13  THE WITNESS: No. That's your opinion that it
14  was false.
15  MR. REED: I'm asking you if that's what you're
16  saying?
17  MS. PRATT: Object to the form.
18  MR. OBERNESSER: Calls for speculation.
19  Q  BY MR. REED: Is that what you were saying?
20  A  What I am saying, and I'll repeat it again, is
21  that you had asked if we have -- what our process is for
22  employees, and I said there's two different processes; one
23  for an employee who has passed probationary period and one
24  for an employee who has not, and then I stipulated to or
25  advised you what those were.

### Page 126

1  it was an open records request, and I believe the discussion
2  with the County Attorney was possibly was it a wise course of
3  action.
4  Q   I'm sorry. What wasn't a wise course of
5  action?
6  A   To be identifying that report as public
7  information.
8  Q   Who would have kept track? Who would have kept
9  possession of any open records act request by Don Anthony to
10 the department?
11 A   I believe at the time it would have been
12 Attorney Groome.
13     MR. REED: Counsel, that was not included in
14 the most recent set of discovery nor for the first 26 days,
15 so is that something you could track down for us?
16     MS. PRATT: I don't know if he has it or not if
17 it's not been produced.
18     MR. REED: It may well be something that's
19 important.
20     MS. PRATT: I'll be glad to recheck but I don't
21 know that he has it. And so that we are clear, what you're
22 looking for, you're referring to some sort of an open records
23 report from Don Anthony with respect to the Webber Park
24 investigation; that's what I'm looking for?
25     MR. REED: Yes. To either the department

### Page 127

1  itself or to the County Attorney.
2      MS. PRATT: I can check to see if one exists.
3      MR. REED: And any response, for example, if
4  the Webber Park investigation was given to him, that would be
5  nice to have. If it wasn't given to him, that would be nice
6  to have.
7      MS. PRATT: Sure.
8      MR. REED: Any other conversations with any
9  other person concerning the release of information to the
10 Webber Park Synopsis to anyone?
11     MS. PRATT: Form.
12 Q   BY MR. REED: And here I'm talking about
13 besides the ones you just identified.
14 A   I don't recall any.
15 Q   Are you saying it might have happened; you just
16 don't recall, or are you saying it didn't happen?
17     MS. PRATT: Form.
18     THE WITNESS: I'll say I don't believe it would
19 have happened and I don't recall any other conversation.
20 Q   BY MR. REED: Did you ever speak in any detail
21 with Sheriff Wegener concerning the firing of Mr. Caldwell?
22 A   I did speak to him about the firing of
23 Caldwell.
24 Q   Did you speak to him about that firing either
25 before it happened or after?

### Page 128

1  A   I believe I did.
2  Q   Let's break it down. Before the firing or
3  after or both?
4  A   I'm sorry. Repeat the question.
5  Q   I'm trying to pin down when this might have
6  happened, if there is a conversation between you and the
7  sheriff concerning the firing of Mr. Caldwell, did it happen
8  before the firing of Mr. Caldwell?
9  A   I believe there would have been discussion with
10 the sheriff about firing Caldwell before he was fired.
11 Q   Did you show the sheriff the memo that you'd
12 been given from this Sergeant Muldoon?
13 A   I believe he would have had that information
14 provided to him.
15 Q   Did you provide it to him?
16 A   I am not sure.
17 Q   Who else would have provided it to him if not
18 you?
19 A   It could have been Sergeant Muldoon.
20 Q   Well, is Muldoon answering to you on the
21 request for the background or to the sheriff?
22     MS. PRATT: Form.
23     THE WITNESS: I think he was answering to me;
24 however, with the caveat that it is a small department and it
25 would have been possible for the sheriff to engage Sergeant

### Page 129

1  Muldoon in conversation.
2      MR. REED: Did Sheriff Wegener know that such
3  an investigation was taking place before the memo came out?
4      MS. PRATT: Foundation.
5      THE WITNESS: I believe he would have known.
6  Q   BY MR. REED: What makes you believe that?
7  A   Because I don't believe I would have conducted
8  an investigation without his approval and knowledge.
9  Q   Why?
10 A   That would be in this case more standard
11 operating procedure.
12 Q   You're saying that the sheriff has to be
13 approached whenever a background check is being done on
14 anyone?
15     MS. PRATT: Form.
16     THE WITNESS: No, I would not say that.
17 Q   BY MR. REED: Maybe you can explain then what
18 you are saying.
19 A   I believe that if an employee was being looked
20 at for termination that the sheriff would be appraised of the
21 progress of that.
22 Q   So my client was being looked at for
23 termination when the instruction to Sergeant Muldoon was
24 first being considered?
25     MS. PRATT: Object to the form.

Page 170

1  MR. REED: Is that a general practice of yours?
2  THE WITNESS: Could I review my -- Have you got
3  a copy of my memo where I suspended her?
4  MS. PRATT: I think it was previously marked as
5  37.
6  MR. LAMPHERE: What exhibit number is that?
7  MS. PRATT: 37.
8  THE WITNESS: Let me refresh my memory for a
9  second. Okay.
10  MR. REED: Can I hand you my 37 because I've
11  got 38.
12  THE WITNESS: There should be another one,
13  actually where I...
14  MS. PRATT: Here is your 37.
15  Q  BY MR. REED: Here is a 38. Look at that. Is
16  that what you're looking for?
17  A  I think so. Let me read it here.
18  Okay. I'll attempt to answer your question.
19  On November the 17th I placed Vicki Caldwell, 2005, on
20  administrative leave. On November the 22nd, 2005, I issued
21  her a written reprimand and I docked her for three days of
22  pay.
23  Q  Did you give her a hearing on November 17th?
24  MS. PRATT: Form.
25  THE WITNESS: I don't recall.

Page 171

1  Q  BY MR. REED: Did you give her notice prior to
2  November 17th that you had some problem with her behavior?
3  And I don't mean the initial two paragraphs here. I mean
4  that she hadn't complied with what you'd earlier ordered her
5  to do and you were therefore considering some action against
6  her on November 17th?
7  Did you give her any prior notice of that in an
8  attempt to take an action against her?
9  A  I believe I noticed her on November the 17th.
10  Q  So come to my office, told her what was wrong,
11  disciplined her then and there, right?
12  MS. PRATT: Form.
13  Q  BY MR. REED: Is that a fair statement?
14  A  I think I put her on administrative leave on
15  the 17th. I believe I disciplined her on the 22nd.
16  Q  Why was it a concern for you that she was
17  talking to Don Anthony about reimbursing the county?
18  A  At the time we had an ongoing investigation.
19  Q  Did your investigation include any issues
20  concerning reimbursement of the county?
21  A  It did.
22  Q  Did you understand part of her job as the
23  finance director was to see that people reimbursed the
24  county?
25  MS. PRATT: Form.

Page 172

1  THE WITNESS: If I could comment?
2  Q  BY MR. REED: I'm asking you for your answer,
3  yes.
4  A  We had an ongoing investigation at the
5  sheriff's office concerning misuse of, well, concerning
6  sexual harassment, and as we looked into that, it appeared
7  that there may have been misuse of funds.
8  Q  So you were doing a general background on --
9  MS. PRATT: Could you let him finish his
10  answer? Could you let him finish his answer?
11  MR. REED: Well, I've got a question.
12  MS. PRATT: Well, he can finish his answer and
13  then you can ask the next question.
14  MR. REED: His answers sometimes get longer
15  than they should.
16  MS. PRATT: Let him answer the question. Go
17  right ahead.
18  THE WITNESS: In the course of having Phil Baca
19  perform the investigation, other issues came up regarding
20  misuse of credit cards on the part of Lieutenant Raschs and
21  Don Anthony, misuse of assigned sheriff's office property.
22  And I believe that Phil Baca had questioned
23  Under Sheriff Anthony about not reimbursing the county as he
24  should have on a trip, a business trip that he took where his
25  wife accompanied him and that the county was not reimbursed

Page 173

1  for her.
2  Since the investigation had taken a turn into
3  financial areas regarding Don Anthony, I had contacted Vicki
4  Caldwell who was the financial officer and made it very clear
5  that since this was an ongoing investigation, any contact,
6  whatsoever, even incidental from Don Anthony to her was to be
7  immediately reported to me.
8  MR. REED: Had this by this time become a
9  general investigation of Mr. Anthony for anything he might
10  have done wrong ever in his history with the Park County
11  Sheriff's Office?
12  MS. PRATT: Object to the form.
13  THE WITNESS: I would suggest you contact Phil
14  Baca as the lead investigator.
15  MR. REED: No. I'm talking to you. I'm asking
16  you what you understand. Do you understand that at this
17  point in the conversation concerning Mr. Anthony, involvement
18  of dealings with Mr. Anthony, that what originally was a
19  sexual allegation has now turned into a full-fledged
20  investigation of everything Mr. Anthony had done while he was
21  with the Park County Sheriff's Office?
22  MS. PRATT: Form and foundation.
23  Q  BY MR. REED: Your understanding.
24  A  To the best of my recollection, as I have
25  previously stated, as Phil Baca conducted the investigation,