IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO

Civil Action No.  07-CV-00371-RPM-MEH

CHARLES CLADWELL, and
VICKI CALDWELL,                          Plaintiffs,

v.

FRED WEGENER,
MONTE GORE,
GREGORY S. FLINT,
STEVEN GROOME,
SHAWNA WHITEOWL, and
MARK DAMON,                          Defendants.

---

## RESPONSE TO PARK COUNTY DEFENDANTS' MOTION FOR SUMMARY JUDGMENT

---

Plaintiffs respond to Park County Defendants' (Defendants Fred Wegener, Monte Gore, Gregory S. Flint and Steven Groome) Motion for Summary Judgment as follows:

### SUMMARY OF THE ARGUMENT

Since each of the Park County Defendants has raised the defense of qualified immunity in this case, our analysis will focus on whether the Plaintiffs have met their burden of showing that these Defendants violated a clearly established federal right. See, *Anderson v. Creighton,* 483 U.S. 635, 107 S.Ct. 3034, 97 L.Ed.2d 523 (1987). The three federal rights involved in this case are deprivation of property rights without due process of law (both Caldwells), deprivation of a liberty right without due process of law (both Caldwells), and violation of both of the Caldwells' First Amendment right to free speech.

1

The Plaintiffs at the time of the job separations in this case had a clearly protected federal right. Rewarding one's political friends and punishing one's political enemies, through their respective government jobs, is unconstitutional, violating the First and Fourteenth Amendments. *Elrod v. Burns,* 427 U.S. 347, at 355-356 (1976). These rights do not depend upon a vested property or liberty right, but stand on their own. *Bd. Of County Commissioners v. Umbehr*, 518 U.S. 668, at 673-674 (1996).

The Park County Defendants violated that right as to each Plaintiff. The Plaintiffs were known by all Park County Defendants to be friends of Undersheriff Don Anthony, and it was also known that Mr. Anthony planned an eventual run for Sheriff. The time line of the events in this case make clear that by mid to late 2005, Sheriff Wegener felt threatened by Mr. Anthony, and a pattern of harassing treatment was begun against both Plaintiffs and Mr. Anthony in order to reduce Mr. Anthony's anticipated political support, culminating in the suspension without pay of each Plaintiff and Mr. Anthony for pretextual reasons. Mr. Anthony was fired for speaking to Ms. Caldwell about Park County Sheriff's Office related matters. Ms. Caldwell was constructively discharged when the harassment became too much for her to bear and made her job impossible for her to do. Mr. Caldwell was discharged on the pretext that he had "lied" on a nine month old job application. Neither Plaintiff was given a meaningful notice of hearing or an opportunity to be heard on the discipline used against them.

The evidence supports that these Defendants disseminated a baseless investigation report to the Park County Attorney and District Attorney, the Colorado Bureau of Investigation, the Federal Bureau of Investigation, the Jefferson County Sheriff's Office, to *The Flume*, a local

newspaper located in Fairplay, and to a local delegate to the Park County Republican Assembly, purposefully damaging Plaintiffs' reputations for honesty and integrity (liberty interests). Each of the Plaintiffs suffered a suspension without pay (property interest). Ms. Caldwell was a permanent employee (the loss of job affecting her own individual property interest).

The State law claims are well taken, and supported by the evidence to date.

## RESPONSE TO STATEMENT OF UNDISPUTED MATERIAL FACTS

1.      Plaintiffs generally take exception to Defendants' conclusory outline of purported "undisputed" material facts.[1]

2.      The facts as indicated by Defendants' counsel to be "undisputed" for the most part are either incomplete, inaccurate, misstated or misleading as being taken out of context. The facts critical to a just determination of this case on the issues are disputed.

**Critical Facts Plaintiffs Assert are Disputed:**

1.      Paragraph 5 of the Park County Defendants' "Undisputed Facts" fails to clearly state that Plaintiff Vicki Caldwell was a full time permanent employee of the Sheriff's Office. [See, Exh. 1 – Park County Sheriff's Office Policy and Procedures Manual, Policy 303; and Exh. 2 -- Vicki Caldwell's Appointment and Oath of Office as of December 22, 2003], having served over the requisite one year period set forth in the policy.

2.      Paragraph 6 of Defendants' motion fails to include a significant part of Defendant Flint's written output and fails to give a full sense of the circulation these documents enjoyed.

---

[1]  Ironically, Defendants' counsel states that the facts are undisputed for purposes of this motion but then goes on to reserve the right to contest "every one of these facts" at a later time. This makes them sound disputed.

As part of his work up on the so called Webber Park Investigation, Mr. Flint prepared not only the Webber Park Investigation/Brief Synopsis, dated 10/04/05 (attached Exh. 3), and a Witness/Victim List of the Webber Park Investigation (Exh. 4 attached), but a Potential Charges Webber Park Investigation list (Exh. 5 attached), a Short History on Primary Involved Suspects (Exh 6. attached), Webber Park Field Notes (Exh. 7) and a schematic drawing showing which informant had tied which suspect to what crime(s) (Exh. 8). See, Flint Deposition, pp 220 ℓ11 to p 226 ℓ10).

Exh. 3 is a remarkable 8-page work citing not a single piece of hard evidence, yet laying sizeable credibility to a rumor-filled, uncorroborated trail of neighborhood slander in a neighborhood with a rampant history of unfounded complaints and cross-complaints. Mr. Flint was made aware of these back and forth allegations by his informants (see Flint Deposition, p 174 ℓ19 to p 180 ℓ3; p 182 ℓ4 to p 184 ℓ9),  yet he failed to do any follow up interviews of the neutral, uninvolved residents of Webber Park valley (uninvolved meaning neither complainants or cross-complainants) to verify an objective sense of the matters being alleged (see, Flint Deposition, p 210 ℓ1 to p 212 ℓ1); there was no effort to use the so called confidential informant information received to support search warrant requests or to do any other follow up (see, e.g., Flint Deposition, p 203 ℓ3 to p 205 ℓ6); no surveillance or photography by trained police or use of drug K-9s to ferret out the alleged poaching, drug, and/or ongoing witness intimidation being alleged by Mr. Flint's informants (see, e.g. Flint Deposition, p 206 ℓ10 to p 208 ℓ1); and apparently no other effort was made to determine the background and credibility of the principal complainants (see, generally, Flint Deposition, p 132 ℓ22 to p 142 ℓ25); and Exh. 36, Park County Sheriff's Office Policy and Procedures Manual, Policy 727.

Plaintiffs have retained an expert witness, Richard Reisler, formerly a highly placed administrative and investigative officer of many, many years experience with the Colorado Springs Police Department, now retired, who has given the opinion that:

> If this document [the Webber Park Synopsis] was used to make any decisions that would affect employment status, or the arrest and filing of criminal charges, then this document is fatally flawed. I find it outrageous and certainly 'outside the normal and accepted' format in conducting an investigation!
> \*   \*   \*
> This document is filled with conjecture and paranoia.
> \*   \*   \*
> To make known this information seriously damages a person's ability to obtain work.

See, Exh. 9, at pp 4 and 7.

The crimes alleged were first degree murder, conspiracy to murder, accessory to a crime, abuse of public office, official oppression/misconduct, obstruction of government operation(s), COCA (*sic*), obstruction of a police officer, DA' Power to grant immunity (?), intimidation of a victim or witness, complicity, concealing death, and harassment. (See, Exh. 5 attached).

Mr. Flint disseminated these writings not only within the Park County Sheriff's Office, but to the local District Attorney's Office, the Colorado Bureau of Investigation (CBI), the Jefferson County Sheriff's Office, the Park County Attorney's Office, and to the FBI (all found at Flint Deposition, p 223 ℓ6 to p 225 ℓ12; p 236 ℓ1 to p 238 ℓ9; and Exhs. 10, 11, and 12), all with the full knowledge and agreement of Defendants Gore and Wegener (see Flint Deposition, p 224 ℓℓ7-23; and p 238 ℓℓ2-9).

Eventually, this matter was finally referred to CBI for a truly professional investigation. After a very short investigation by the CBI, the supposedly murdered woman was found alive and well and running a shop in Manitou Springs. The reporting agent for the CBI, Mr. Volz,

determined that the confidential informants had been engaged in neighborhood disputes and common harassing type behavior with those they had claimed were criminals.  He further determined that no hard evidence existed to prove that any crimes in fact had ever occurred, and that at least one of the so-called confidential informants, Defendant Whiteowl, admitted that she intentionally exaggerated her claims to get the attention of the police.  This agent recommended closing of the investigation because any further effort would be unduly expensive and very unlikely to produce substantial corroborating evidence.  This report was finished February 2, 2006. See, Exh. 13.

Even after the findings by CBI, the Webber Park Synopsis was given to at least one delegate to the Park County Republican Assembly, just before that Assembly was scheduled to be held, in an apparent effort to besmirch Don Anthony (who did file to run for the Republican nomination for Sheriff in 2006) and his supporters, the Caldwells.  Mr. Caldwell also received a phone call from a reporter who worked for the *The Flume*, who indicated her paper had been given a copy of the investigation, discussed it with Mr. Caldwell, and asked Mr. Caldwell his reaction. This occurred within a month of his termination from the Park County Sheriff's Office, making the date prior to March 22, 2006 (see, Charles Caldwell Deposition, p 169 ℓ13 to p 170 ℓ2). Mr. Caldwell did not himself receive a copy of the report until after March 29, 2006, based on the date on the transmittal letter from Mr. Groome, who handled the Colorado Open Records Act request from the Caldwells (see, Exh. 3 -- cover letter). Since those types of personnel documents can only be authorized to be removed from the Sheriff's Office by the Sheriff or Undersheriff, and even more so, since sensitive material of this nature up to that point had been kept <u>locked</u> in the Sheriff's personal office, it is clear that the Sheriff himself at least had a direct

involvement in releasing this information to a member of the public and to the press for political reasons (see, Anthony Affidavit, attached as Exh. 14, paras. 14 and 15; and Anthony Deposition, p 86 ℓℓ20-23; confirmed by the Gore Deposition, p 133 ℓℓ11-15). Also see each of the Caldwell Affidavits, Exhs. 34 and 35.

3.      As alleged in paragraph 7 of the Defendants' motion, Mr. Anthony was suspended with pay, on October 13, 2005, pending investigation, for an alleged sexual harassment. What is not told is that these charges were never pursued against him, despite a protracted investigation. (Anthony Affidavit, Exh. 14, para. 9; and Gore Deposition, p 189 ℓℓ11-23).

4.      Similarly, counsel makes a point of informing the Court that Mr. Caldwell, one of the Plaintiffs in this case, was also suspended by the Defendants with pay, on October 14, 2005. Apparently, no one thought to actually commence an investigation until January 17, 2006, when Mr. Caldwell was formally given notice of new allegations against him. Counsel also similarly fails to inform the Court that Mr. Caldwell was cleared of all criminal wrongdoing after an investigation, but after a goodly portion of the widespread dissemination listed above had already occurred. (Significantly, the release to the county delegate occurred after Mr. Caldwell and Mr. Anthony had already been absolved of criminal behavior.) See, Exh. 14, para 14; Gore Deposition, p 189 ℓℓ11-23); and Exh. 34.

5.      Paragraph 11 of Defendants' Motion suggests that Ms. Caldwell was accused of having participated in some kind of unspecified wrongdoing regarding her computer, and that there had been an unattributed complaint that she "appeared to be hiding something under her desk in her private office." It was only in this lawsuit that the source of this allegation was finally attributed. It was made by Bobbi Priestley, the very same woman who had unsuccessfully

7

claimed to have been sexually harassed by Mr. Anthony (see, Exh. 15). In his deposition, Mr. Gore explained that the concern with her computer was a suspicion, without more, that she may have accessed investigations files in order to pass information on to her husband (Gore Deposition, p 158 ℓℓ19-24). Without any evidence that this had ever happened, and without so much as notice, a hearing, or an appeal being offered to Ms. Caldwell on this wholly unsupported and untested allegation, Mr. Gore ordered Ms. Caldwell henceforth to keep the door to her office open at all times so that her behavior could be monitored (Exh. 16). Nobody ever thought to look under Ms. Caldwell's desk at the time the report was supposedly made to see what was "hidden" (Gore Deposition, p 146 ℓ19 to p 147 ℓ19), and no check was done at the time to see what if any problems existed with her computer. Only after her separation from the Sheriff's Office, was a rather sophisticated IT review made of her computer, which showed that there had been no unauthorized access to  investigations files through her computer, despite Mr. Gore's original, baseless accusations (Gore Deposition, p 153 ℓℓ13-16; and Exh. 17).

6.      Shortly after the accusations were made against Ms. Caldwell about the hiding of things under her desk, and the suspected misuse of her computer, Mr. Gore called her into his office to direct her to have no communications whatsoever with Mr. Anthony, who, together with his wife, were family friends of the Caldwells, and to report any incidental contact she might have with him to Mr. Gore immediately.[2]  The follow up memorandum to her directs that she

---

[2]   Mr. Gore's position here is confusing. Counsel says the order was simply to report any contact.  Mr. Gore at his deposition said that the oral order was for her to have *no contact at all* with Mr. Anthony whatsoever.  (Gore Deposition, p 179 ℓ9 to p 181 ℓ12).  In any event, by the time it was reduced to writing, the writing simply refers to reporting contacts. Exh. 16.

leave her door open, that she report all modifications, additions, or deletions to her computer, and that she report any communication she may have from that point forward with Don Anthony. See, Exh. 16.

7.    Paragraph 13 of Defendants' motion describes the November 16, 2005, interaction between Vicki Caldwell and Mr. Anthony in the parking lot of the Park County Sheriff's Office (PCSO) as a "meeting" between the parties in question, as if the contact was prearranged or possibly initiated by Ms. Caldwell. In fact, Mr. Anthony had come to the PCSO that morning to meet with the investigators in his matter, not Mrs. Caldwell. When lunch time came, Mrs. Caldwell went to lunch, not being part of that meeting with the investigators and Mr. Anthony. When Ms. Caldwell was returning from lunch sometime later, Mr. Anthony intercepted her in the parking lot as she was entering the Sheriff's Office, to make an inquiry about the expense reimbursement. Mr. Anthony told Ms. Caldwell that the investigator asked him to obtain confirmation from her as to whether or not he had reimbursed the county for the expense, how much the expense was, and had suggested that he get with her to verify those things. Because Mr. Gore was active in the investigation, and because he had not given her any prior indication that the investigation involved any reimbursement issues, Ms. Caldwell assumed that he had authorized this contact. (Vicki Caldwell Deposition, p 63 ℓ18 to p 64 ℓ25).[3]

---

[4]    The "investigator" refers to the independent investigation that was requested by Park County officials to investigate the sexual harassment claim against Mr. Anthony described in paragraph 7 of the Defendants' Statement of Undisputed Material Facts. That independent investigation was being performed by a Jefferson County Sheriff's Office investigator. Ms. Caldwell believed she was cooperating with this official process as requested by this investigator by following through with the verification of the reimbursement as the PCSO's business and finance manager.

8.      Paragraph 14 of the Park County Defendants' motion is simply not true and is based on the self-serving statement of Defendant Gore.  Paragraphs 15-17 establish that Ms. Caldwell was not hiding anything, but simply received the reimbursement check from Anthony after confirming that reimbursement had not been made, and was in the process of receipting for the same to Anthony directly and openly in the station house.  This was her job. See, Exh. 35. These contacts were not in contradiction of Defendant Undersheriff Gore's "order" to report any contacts between Ms. Caldwell and Anthony, as described in paragraph 7 of Defendants' Motion. They were in the open in furtherance of the ongoing independent investigation, as Ms. Caldwell understood the situation. Mr. Gore's observing Anthony leaving Caldwell's office in the lobby of the PCSO itself attests to the open way in which this was handled.  (See, Vicki Caldwell Deposition, p 63 ℓ18 to p 64 ℓ25).

9.      Paragraph 18 of the Park County Defendants' motion describes the "communication and meeting" between Vicki Caldwell and Anthony as "insubordination and failure to follow Mr. Gore's previous order to report any contact with Mr. Anthony directly to him" as the reason Vicki Caldwell was placed on administrative leave.  This suspension occurred within minutes of the reimbursement check having been paid.  The suspension was without advance notice that discipline was being considered, was without an independent investigation or hearing having been conducted by someone other than Mr. Gore, who had raised the complaint himself.  It was without the benefit of an impartial arbiter to decide the merits of the matter. (Vicki Caldwell Deposition, p 64 ℓℓ12-25.)  Gore's apparent findings or conclusions to support his restrictive "order" in the first place, and his own interpretation of that order, especially in the context of an ongoing independent investigation, were inaccurate and wholly unfair.  Ms.

Caldwell had no opportunity to report the interaction that had just occurred, that it had occurred openly and in furtherance of the ongoing independent investigation, and was done in furtherance of her regular duties as business and finance manager of the office, all of which was documented and reported through the paid check, receipt and general ledgers.  None of these facts, reported by Ms. Caldwell or known by Gore, were considered or made a difference to Mr. Gore's determination on the issue.  What is more, Mr. Gore further directed Ms. Caldwell to have no contact whatsoever with anyone in the Park County Sheriff's Office about this matter, even to include the Sheriff himself. (See, Exh. 16).  BUT, any appeal of Mr. Gore's arbitrary decision would have to be directed to the Sheriff, in writing, within three days. Mr. Gore's order, literally applied, effectively denied Mrs. Caldwell any appeal.  See, Park County Sheriff's Office Policy and Procedures Manual, Policy 320 (IV)(E)(1) (attached as Exh. 18).  Following her being given administrative leave, Mr. Gore ordered her escorted from the building with her belongings in a box in front of all of the front office staff (Vicki Caldwell Deposition, p 77 ℓℓ10-17) which resulted in Ms. Caldwell suffering humiliation in front of her co-workers (Vicki Caldwell Deposition, p 78 ℓℓ14-19).

   10.   Paragraphs 19-24 of Defendants' Statement contain generally accurate factual assertions that also demonstrate the unrelenting and retaliatory bullying of Vicki Caldwell because of her support of Don Anthony that culminated in the termination of both of them.  Vicki Caldwell was first placed on administrative leave (with pay) on November 17, 2005, "pending an investigation" of this contact.  On November 22, 2005, without any investigation being conducted, and without even the semblance of a pre-termination hearing, Mr. Gore called Ms. Caldwell into his office and handed her a suspension letter, obviously typed in advance,

informing her that disciplinary measures were authorized because the "insubordination" was "so blatant that an investigation was unnecessary" (see, Exh. 19), suspending her <u>without pay</u> for three working days.  Despite being the same supervisor who had brought the complaint against her in the first place, and without any independent investigation, and without allowing her a pre-disciplinary hearing before an independent arbiter, Mr. Gore has testified that he thought this procedure was appropriate (Gore Deposition, p 166 ℓ21 to p. 167 ℓ19).  Even more surprisingly, Mr. Gore has testified that he feels he has the authority to suspend an employee without pay, despite the presence of the Sheriff to handle the matter, directly contrary to the Park County Sheriff's Office Policy and Procedures Manual, Policy 320 (IV)( D)(1).  See attached Exh. 18 and Gore Deposition, p 168 ℓ1 to p 169 ℓ21.

11.   Paragraph 24 of Defendants' motion correctly states that Mrs. Caldwell resigned given her treatment by Undersheriff Gore as outlined above, tendered on December 1, 2005, effective December 15, 2005.  Mr. Gore admitted in his deposition that this was after he had told her to keep her door open; that she was not to have any contact with anybody at the Sheriff's Office but Mr. Gore; that she expressly could have no contact at all with Don Anthony, a personal friend of hers; and that if she had any contact with him, she had to report that contact immediately, apparently meaning she should break off the contact in midstream and get to a phone immediately; that she was under suspicion because some unnamed person had suggested that she was hiding something under her desk; and that the department was concerned that she was inappropriately using her computer to gather information to pass on to "others."  Gore Deposition, p 195 ℓ23 to p 196 ℓ15.  She had been ordered to report "every modification, addition or deletion to [her] computer to Mr. Gore (which as the Court and a jury could easily

decide, made her job nearly impossible to perform).[4]  Exh. 16.  And the Undersheriff had gone through a series of discussions with her, prior to her resignation letter, about how her husband was going to be arrested in only a few days, then when that didn't happen, how CBI had taken over the investigation and would be talking to him (something the IA investigator later said she knew nothing about).  Finally, when she had been suspended with pay and had been humiliated in front of her co-workers, she resigned. (Vicki Caldwell Deposition, p 77 ℓℓ10-17). Ms. Caldwell's letter of resignation (Exh. 20) directly refers to the hostile and unhappy environment she had been made to suffer at work during this entire time.

12.     There is virtually no discussion of Plaintiff Chuck Caldwell in the facts related by Defendants' counsel.  Chuck Caldwell submitted a job application, Exh. 21 to the PCSO.  As part of his application, Mr. Caldwell submitted a letter of recommendation from Jeff Tucker, Chief of Police of the Forest Park Police Department in Oklahoma (attached as Exh. 22) and was hired April 27, 2005, by the PCSO (Exh. 23) as a part-time case manager with the jail division.  At the time he was hired, Mr. Caldwell had already been considered by Mr. Flint as a major suspect as to poaching in the so-called Webber Park Investigation (see Flint Deposition, p 35 ℓ1 to p. 36 ℓ15), even though no hard evidence had been produced to support a claim that poaching was even taking place, much less that Mr. Caldwell was involved.  The only tie to poaching was the word of the so-called "confidential informant" (Mr. Damon), who never saw poached animals or meat, had never seen Mr. Caldwell or anyone else killing any animals illegally, and could not direct any officers to blood trails, refuse hides or waste meat from dressing of any animals. No

---

[4]  As this Court can readily appreciate, computer work, such as the drafting and typing of this brief, involves perhaps thousands of modifications, additions, and deletions with each document.  Having to report every one would be impossible.

dogs were used to locate poaching sites. Although an alleged "cold room" was claimed to exist under one of the buildings on Mr. Caldwell's property, no effort at any time was made to search that property to confirm any of this. See, Exh. 9.

13.     The day after Mr. Anthony was suspended (October 13, 2005), Mr. Caldwell was also suspended. Initially the allegation was that a criminal complaint had been made against them (Exh. 24). Investigations into allegations of wrongdoing by a member of the PCSO are to be concluded within 20 working days of when they are first brought (see, Park County Sheriff's Office Policy and Procedures Manual, Policy 319 (IV)(F)(1), attached as Exh. 25). That did not happen here. By mid-January, 2006, within days after Mr. Anthony's letter to the editor of *The Flume*, and at about the same time as his coffees in Lake George where he discussed his political plans were in full swing, the allegation against Mr. Caldwell was expanded into the full range of allegations contained in the Webber Park Synopsis. See, Exh. 26.

14.     After the twenty day period had already passed, on or about December 8, 2005, but before Mr. Caldwell was advised of any results of the investigation, Defendant Gore ordered a side investigation to determine whether Mr. Caldwell had lied on his job application. He did not have this second investigation done by the same IA investigator already handling Mr. Caldwell's matter, and Mr. Caldwell was never advised of this investigation (up until a Colorado Open Records Act request well after his firing revealed it). Exh. 27 is a report of the results of that "investigation." To summarize, it indicates that the investigator felt that the letter of recommendation from Chief Tucker was so glowing as to raise a question of a "good old boy" connection, and that direct contact with the Forrest Park Police Department to determine if Mr. Caldwell had ever worked there would be unavailing somehow. Instead, the call went to another

agency in the area, a member of which then called an officer's wife with working experience at the Forrest Park Police Department, who said she didn't know Mr. Caldwell (Exh. 27).

15.     From his suspension on October 14, 2005, to January 17, 2006, Mr. Caldwell received no official information on the status of his investigation.[5]  In January, there was an interview given by Mr. Caldwell with the IA investigator for the Sheriff's Office on the original claim of criminal behavior.  No further contact occurred until February 22, 2006, when Mr. Caldwell was instructed to come into the PCSO to talk to Sheriff Wegener directly.  (Charles Caldwell Deposition, p 111 ℓ1 to p 112 ℓ25; p 126 ℓℓ11-17).  Mr. Caldwell was prevented from working at the PCSO during that entire time (Charles Caldwell Deposition, p 125 ℓ18 to p 126 ℓ2).  During that entire time, Mr. Caldwell had been told he could not talk to anyone about his suspension, not even his own wife, by Defendant Gore (Charles Caldwell Deposition, p 110 ℓℓ4-12).

16.     On February 22, 2006, Mr. Caldwell went to the PCSO to meet with Sheriff Wegener and Undersheriff Gore, at their request.  Without fanfare, he was simply handed Exhs. 28 and 29 (attached), and asked to leave (Charles Caldwell Deposition, p 128 ℓ20 to p 129 ℓ5). Exh. 28 is the written final disposition of the regular channel Internal Affairs investigation, clearing Mr. Caldwell of any criminal involvement. Exh. 29 is a letter of termination, giving as the reason for his termination the alleged fact that he had lied of his job application over 9 months earlier.  Exh. 29 is dated February 22, but somehow fires Mr. Caldwell "effective"

---

[5]  Curiously, Defendant Gore told Ms. Caldwell at some point that her husband's arrest was imminent within the next few days, but no such arrest ever took place.  Then she was told that CBI had taken over the investigation, but the IA investigator called later and said she knew nothing about that.  CBI set up but then cancelled a scheduled interview with Mr. Caldwell.

February 10, 2006, effectively turning the last 18 days of his suspension into a <u>suspension</u> <u>without pay</u>.

17.     When Mr. Caldwell asked for detailed information on the accusation of lying, in an effort to find out what he was alleged to have lied about, he was told by Sheriff Wegener that this meeting was not "the time or place" for such a request, and that he would have to apply for those records later. (Charles Caldwell Deposition, p 131 ℓ22 to p 132 ℓ5).  Mr. Caldwell was never given any pre-termination notice that any investigation was afoot about some lie on his job application, or what that lie supposedly was.  He had no chance to confront any accusers or to present evidence of his own.  He did not receive documents from his personnel file until June, 2006, after repeated CORA requests.  Exhs. 30A through 30E show the CORA correspondence leading up to this final release of the requested information more than four months after the firing.

18.     If given adequate notice and a hearing, Mr. Caldwell could have presented the following evidence on his own behalf concerning the alleged lie about his employment with the Forrest Park Police Department:

  a)     A copy of his badge issued by the Forrest Park Police Department.  Exh. 31;

  b)     A copy of his Forrest Park Police Department Commission and ID Card. Exh. 32;

  c)     A copy of Police Chief Jeff Tucker's Letter of Reference attesting to his employment with the Department.  Exh 22;

  d)     Chief Tucker's sworn testimony that Mr. Caldwell told the truth when he

wrote in his application that he had worked for the Forrest Park Police Department in a reserve and undercover capacity and that the above documents and badge were authentic, even to the point of having Mr. Caldwell's thumbprint on the back of the ID Card.  (Tucker Deposition, p 13 ℓ2 to p 14 ℓ17; p 32 ℓ3 to p 33 ℓ7; p 35 ℓ20 to p 40 ℓ2); and Exh. 32.

19.         Paragraphs 26-39 of the Defendants' motion (under the heading, **"Don Anthony's Run for Sheriff of Park County**), are selective renditions of facts, statements and self-serving excerpts from depositions that are disputed.  Mr. Anthony has provided an Affidavit more fully discussing these issues, attached as Exh. 14, which makes clear that the decision to run for Sheriff had matured over several years; had been discussed directly by him with Sheriff Wegener; was commonly known throughout the Sheriff's Office and the Park County Republican Party (Defendants Wegener and Gore were both active in Republican politics in Park County at the time, and still are); and that he directly told the County Republican Central Committee of his plan to run early in 2006, either January or February, at a meeting attended by both Wegener and Gore (who confirms his memory of this at Gore Deposition, p 122 ℓ23 to p 124 ℓ10).  Despite counsel's hopes to the contrary, the fact of this announcement at Central Committee, together with the language used by Mr. Anthony in his January 13, 2006, letter to the editor of the *The Flume* newspaper (attached hereto as Exh. 33) clearly supports the facts set out in his Affidavit. It says Mr. Anthony has "greatly valued the time [he has] been allowed to serve the public," stresses his long experience and working knowledge, and states that he hopes to be able to be given the "opportunity [to serve the public] again in the future."  A reasonable reading of this document is that Mr. Anthony may well be seeking office in Park County in the near future.

20.     Similarly, defense counsel criticizes Plaintiffs' statements describing (as counsel puts it) "gut feelings," "common knowledge in the community," or impressions and assumptions with regard to the context and timing of the relatively sudden and connected series of unreasonable disciplinary decisions and actions by these Defendants.  Plaintiffs' expert witness, Richard Reisler, clearly states that no employment or criminal filing decisions of any sort should have been based on the unfounded and patently unprofessionally-obtained and prepared reports and investigative findings contained in the "Webber Park Synopsis." (Exh. 9, at p 4)  He further states that the conclusions of the internal investigation as to Mr. Caldwell's purported lying on his employment application are completely unsupported.    Their use in terminating Mr. Caldwell's employment was clearly a mere "pretext." (Exh. 9, at p 7).  The circumstantial nature of the evidence and timing of arbitrary decisions (should a jury find them so) would clearly be some evidence of efforts to punish the Caldwells for their relationship to Mr. Anthony, and would be some evidence of the willfulness of their behavior for purposes of the state claims against them.   They are not only plausible as a general matter in the context of the small-town environment in which these events occurred but are highly inferential considering the "witch hunt" mentality and the timing and nature of the actions that followed.

21.     Paragraphs 40-57 of the remainder of the Statement (under the heading, **"Park County Defendants Did Not Publicize Anything About the Plaintiffs"**) mainly outlines deposition excerpts in which the Plaintiffs, truthfully and forthrightly, express their belief that the wholly untruthful and defamatory "facts" contained in the Webber Park Synopsis were disseminated by the Defendants. The Affidavits of Mr. Anthony (Exh. 14) and Mr. Caldwell (Exh. 34) clearly set out the time line of the behavior by the Defendants, circumstantially setting

18

up their motives for acting as they did, but more importantly, clearly establishes that the Webber Park Synopsis and associated documents were given to the local newspaper and later a County Assembly delegate, at a time when these documents by both practice and policy were exclusively under the control of Defendants Wegener and Gore, locked up in the Sheriff's own personal office. (Exh. 14)  Mr. Gore confirms that only the Sheriff would have control over the release of these documents.  Gore Deposition, p 133 ℓℓ11-15.  Circumstantial evidence of this fact is as probative as any direct evidence. In addition the Park County Sheriff Office Policy and Procedures Manual clearly states that all internal investigative reports and evidence are to be kept in the personnel office and cannot physically be removed from there without the express consent of the Sheriff or Undersheriff. Because of the sensitive nature of these very documents, by practice they would have been kept under lock and key in the Sheriff's own personal office. See Anthony Affidavit, Exh 14, para 15.  The fact that the Webber Park report was in the exclusive and secure possession of the Defendants at the time that it began to appear with the press and with Assembly delegates is inferentially corroborative of its dissemination by the Defendants.

22.     Neither Mr. nor Mrs. Caldwell has felt able to apply for or receive another law enforcement related job in Colorado, given the extreme broadcast nature of the allegations against them, particularly with the shared computer data bases of both the Colorado Bureau of Investigation and the FBI. Plaintiffs' expert asserted that in his life-long career as a police officer and detective, being "fired" from a law enforcement agency renders future employment in that profession unlikely.  Exh 9, p. 7.  Both Caldwells have suffered anxiety, depression, frustration, nervousness, anger, and diminished sexual relations.  Charles Caldwell Deposition, p 35 ℓ1 to p

36 ℓ10; Vicki Caldwell Deposition, p 18 ℓ15 to p 24 ℓ22.  Mr. Caldwell's stress level eventually gave rise to heart difficulties for which he had to get medical treatment.    Charles Caldwell Deposition, p 37 ℓ13 to p 40 ℓ12. Also see, Caldwell Affidavits, Exhs 34 and 35.

Certainly, all of the above are areas of factual dispute are proper for jury resolution.

## ARGUMENT

### I.   Qualified Immunity Under 42 U.S.C. Section 1983 [6]

As an initial matter, Plaintiffs would clarify that their claims are against the Defendants in their individual capacities.  Plaintiffs reserve their right to amend the Complaint filed herein to raise claims against the Defendants in their respective official capacities in the event that facts arise grounding such claims.

Qualified immunity protects public officials from individual liability in a § 1983 action unless the officials violated "clearly established ... constitutional rights of which a reasonable person would have known." *Harlow v. Fitzgerald,* 457 U.S. 800, 818, 102 S.Ct. 2727, 2738, 73 L.Ed.2d 396 (1982).  Once a defendant to a § 1983 action raises a qualified immunity defense, the burden shifts to the plaintiff to show both facts and law to establish that the defendant is not entitled to a qualified immunity. *Dixon v. Richer,* 922 F.2d 1456, 1460 (10th Cir.1991). The plaintiff must "come forward with facts or allegations sufficient to show both that the defendant's alleged conduct violated the law and that that law was clearly established when the alleged violation occurred." See *Siegert* v. *Gilley,* 500 U.S. 226, at 232-233 (1991); *County of Sacramento* v. *Lewis,* 523 U.S. 833, at 841, n. 5 (1998); and *Pueblo Neighborhood Health Centers Inc. v. Losavio,* 847 F.2d 642, at 646.  If the plaintiff meets this requirement, then the

---

[6]  The Park County Defendants' argument starts at page 15 of their brief.

normal burden of the movant for a summary judgment motion falls again upon the defense. *See id.*

Since each of the Park County Defendants have raised the defense of qualified immunity in this case, our analysis will focus on whether the Plaintiffs have met their burden of showing that these Defendants violated a clearly established federal right. See, *Anderson v. Creighton,* 483 U.S. 635, 107 S.Ct. 3034, 97 L.Ed.2d 523 (1987).

The three federal rights involved in this case are in violation of both of the Caldwells' First Amendment right to free speech (in the form of support for a political candidate of their choice); deprivation of property rights without due process of law (both Caldwells); and deprivation of a liberty right without due process of law (both Caldwells).

### A.    The Park County Defendants Violated Both Plaintiffs' Clearly Established First Amendment Rights to Support the Candidate of their Choice.[7]

The United States Supreme Court has long held that governmental employees, even those without contractual or tenured rights, have a constitutional right to be free from even the "chilling" effect of governmental impingement on first amendments rights to free speech, including freedom to voice a preference for his or her political affiliation, to voice hostility to prominent political figures, or for supporting of affiliating with a political party or candidate. These rights do not hinge on a vested property or liberty right. See, *Board of County Commissioners v. Umbehr,* 518 U.S. 668, 673-74 (citing several United States Supreme Court cases back to 1967 to support its assertion that these first amendment constitutional rights have been "long-held"). The government "may not deny a benefit to a person on a basis that infringes

---

[7] This section responds to Defendant Park County Defendants' argument at page 17 of their brief.

his constitutionally protected . . freedom of speech," even if he has no entitlement to that benefit. *Id.* See, also *Perry v Sindermann*, 408 U.S. 593, 597 (1972).

*Elrod v Burns*, 427 U.S. 347 (1976) directly addressed the political practice of rewarding one's friends and punishing one's opponents through government employment practices. That case dealt with the Sheriff's Office in Cook County, Illinois. Elrod, a democrat, had been elected to replace the previous Sheriff, a Republican. The common practice in Cook County up to that time had been to replace all non-civil service position employees at the time of the shift in power, with replacements from one's own political party. Justice Brennan speaking in a plurality decision, wrote, at pp. 355--356:

> The cost of the practice of patronage is the restraint it places on freedoms of belief and association. . . .
>
>              \* \* \*
>
>     It is not only belief and association which are restricted where political patronage is the practice. The free functioning of the electoral process also suffers. Conditioning public employment on partisan support prevents support of competing political interests. Existing employees are deterred from such support, as well as the multitude seeking jobs . . . [T]he greater the dependence on it becomes. . . the greater becomes the power to starve political opposition . . . Patronage thus tips the electoral process in favor of the incumbent . . . The impact on the process can be significant.
>
>     Our concern with the impact of patronage on political belie[f] and association does not occur in the abstract, for political belief and association constitute the core of those activities protected by the First Amendment. . . There can no longer be any doubt that freedom to associate with others for the common advancement of political beliefs and ideas is a form of "orderly group activity" protected by the First and Fourteenth Amendments . . . .

And at p. 360, Footnote 13:

>     *. . . Since the government . . . may not seek to achieve an unlawful end. . . the inducement afforded by placing conditions on a benefit need not be particularly great in order to find that rights have been violated. Rights are infringed both where the government fines a person a penny for being a*

*Republican and where it withholds the grant of a penny for the same reason.*

Plaintiffs thus had a clearly established federal right at the time of the events in late 2005 and early 2006. This right is independent of any other property or liberty rights the Plaintiffs may also have enjoyed at the time.

The defense argues that no evidence can be produced to show that the so-called Park County Defendants had any knowledge of Plaintiffs' "political activities" at the time of Mr. Caldwell's firing on February 22, 2006, or Ms. Caldwell's employment separation in December of 2005. They put their stock in the assertion that these events predated Don Anthony's *formal* decision to run for Park County Sheriff, announced in January, 2006 at the Republican Central Committee meeting, and which he later legally established by his filing with the Park County Clerk's Office on March 1, 2006.

Motive virtually always must be proven by circumstantial evidence. There is no detailed x-ray or cat scan that can be made of a person's thought processes even with today's advanced scientific technology. It is common with people acting consciously to wrongfully deprive others of rights or property that they do not publicly announce their plans.

The Supreme Court, in *Holland v. United States*, 348 U.S. 121, 137-138 (1954), drew no legal distinction between direct or circumstantial evidence:

> Circumstantial evidence . . . is intrinsically no different from testimonial evidence. Admittedly, circumstantial evidence may in some cases point to a wholly incorrect result. Yet this is equally true of testimonial evidence. In both instances, a jury is asked to weigh the chances that the evidence correctly points to guilt against the possibility of inaccuracy or ambiguous inference. In both, the jury must use its experience with people and events in weighing the probabilities.

23

Our case is analogous to "mixed motive" employment discrimination cases (where both legitimate and illegitimate reasons may have motivated an employer's actions, and a jury is left to determine which to believe) under Title VII, 42 U.S.C. 2000 *et. seq.* The Supreme Court has held that circumstantial evidence may be the basis of proof to support a claim of discrimination under the Act. See, *Desert Palace, Inc., v. Costa,* 123 S.Ct. 2148 (2003).

The Defendants' argument would seem to require that a formalized announcement of one's candidacy is necessary, before a violation of the right to support that candidate can be found. This misses the point of unconstitutional chilling effect problems entirely.

First of all, it should not be determinative of the issue at hand that Don Anthony had not made a final decision as to whether he would run for Sheriff in 2006, until January of 2006, or that he formalized that decision officially in his public announcement in March of 2006.

Mr. Anthony, in his sworn Affidavit, states that he had numerous discussions with Sheriff Wegener for the several years leading up to late 2005, even to the point of obtaining from Defendant Wegener his promise to endorse Mr. Anthony for the position once Sheriff Wegener stepped down. He goes on to state that he discussed this important decision at coffees he held in Lake George, attended by Sheriff's Office personnel, soon after his own termination. (See, Exh. 14, paras. 3, 4, 12, and 14). Mr. Anthony was terminated November 18, 2005. Indeed, it is almost a certainty that not only his friends and family, but others in the community at large, had to be included in his assessment of the support he might have to pursue such a political endeavor. His Affidavit speaks of coffees held in Lake George to sound out his plans, shortly after his own termination from the Sheriff's office, with other Sheriff's Office personnel present. (Exh. 14, para. 12, attached).

24

The series of actions taken by the Defendants in the months before Plaintiffs were discharged from their employment at the Park County Sheriff's Office, whether that be the initiation of bogus and unfounded investigations of Mr. Anthony and each of the Plaintiffs that led to or substantially contributed to their respective terminations or the willingness to rely on such unprofessionally gathered "facts" as contained in the "Webber Park Synopsis," are highly inferential of motivations beyond routine or normal official inquiry of potential wrongdoing by employees of the Sheriff's Office.

Mr. Anthony, in his Affidavit, (Exh. 14, paras. 13 to 15), states succinctly the circumstances on which a jury could determine wrongful conduct:

> 13.   The problems for the Caldwells did not seriously start until the effort to remove me had begun.  I was suspended on October, 13, 2005.  Chuck Caldwell was suspended on October 14, 2005, I was terminated the day after merely speaking with Vicki Caldwell, about routine Sheriff's Office business (November 18, 2005).  She was disciplined at about the same time, losing pay.  At about the same time I decided to talk about a run for sheriff at coffees in Lake George, Mr. Gore suddenly decides to reinvestigate Chuck Caldwell's job application for deficiencies, about 9 months after he had been hired.  Then, when I announce at a Central Committee meeting that I will run for Sheriff, Chuck Caldwell is shortly thereafter fired for dishonesty, in a half-baked investigation concerning whether he had actually worked for the Forrest Park Police Department in Oklahoma, without anyone even contacting the Forrest Park Police Chief, who wrote Mr. Caldwell the letter of recommendation.  The Park County Sheriff's Office had this letter in their personnel files the whole time.

> 14.   I sought the nomination as the Republican candidate for Sheriff and officially filed my intent to do so early in March, 2005 [*sic*].  One week before the County Assembly in April, 2006, the Webber Park Synopsis was given to at least one delegate who intended to attend the assembly. . . .I saw the document myself.

> 15.   . . . Such records, especially records of an internal investigation dealing with allegations as serious as those in the Webber Park Synopsis, could only be released with the full approval of the Sheriff himself, since they are kept locked in the Sheriff's personal office.

It should also be noted that this same Synopsis was given to a reporter for the local Park County newspaper, *The Flume*, in the week immediately prior to the Republican County Assembly, at which the county party would determine which candidates to put on the Sheriff's race primary ballot. That reporter contacted Mr. Caldwell by phone and read at length from these documents to get his response.   Mr. Anthony's name was all over that rumor-filled document as a suspect in wrongdoing.   This release was at least a week before any lawful release by the Defendants under the Colorado Open Records Act had taken place (such a request made only by the Caldwells, not by the newpapers or any delegate surely). It occurred at a time when these documents were under the sole care and custody of the Sheriff (see Critical Disputed Facts, para. 2, at page 5 of this brief). The potential political use involved here screams to be heard by a jury.

     **B.**    **Plaintiffs' Due Process Claims Against The Park County Defendants are Well Taken under the Law.[8]**

The County defendants argue that the Caldwells' due process claims should fail as a matter of law for three reasons: They claim that Mr. Caldwell was only a probationary employee and had no property interest in continued employment protected; that Vicki Caldwell voluntarily resigned and thus was not denied a property interest by the County; and that neither of the Caldwells' liberty interests were violated because the adverse employment actions against them were never publicly disseminated.   These do not sound like arguments of law, but rather arguments that the facts, as the County would have this Court see the facts, do not support a

---

[8]   This section responds to the Park County Defendants' argument starting at page 20 of their brief.

decision in the Caldwells' favor under a summary judgment/failure to raise a genuine issue analysis. Each argument will be taken in turn.[9]

### 1.    Mr. Caldwell's Property Interest.

We do not intend to take much time with this argument. As stated in paragraphs 13-16 of the Critical Facts in Dispute section of this brief, Mr. Caldwell was initially given administrative leave (with pay) October 14, 2005, pending an investigation which clearly was delayed. Only after it became very clear in January, 2006 that Mr. Anthony was running for Sheriff, did Mr. Caldwell get fired for supposedly "lying" on his job application with the PCSO about having worked at a previous job in Oklahoma (see, pp. 16–18, "Critical Facts" above). This firing was on February 22, 2006. For unexplained reasons, *the firing was made retroactive to February 10, 2006*. The result was that Mr. Caldwell lost 18 days of job compensation, with neither a pre-termination nor a post-termination hearing of any sort. Both *FDIC v Mallen*, 486 U.S. 230, at 243 (1988), and *Cleveland Bd. of Ed. v Loudermill*, 470 U.S. 532, at 543 (1985) recognized the severity of depriving someone of the means of their livelihood. These cases emphasize that both the length and the finality of the deprivation must be taken into account in determining what

---

[9]   Generally speaking these Plaintiffs agree that the overall issues are controlled under the law as stated in *Walker v. United States*, 744 F2d 67, at 68 *reversed on other grounds*  (C.A.10—Okla, 1984),:

> The fifth amendment prohibits the government from depriving a person of liberty or property without due process of law. U.S.Const. amend. V. "The fundamental requirement of due process is the opportunity to be heard 'at a meaningful time and in a meaningful manner.' " *Mathews v. Eldridge*, 424 U.S. 319, 333, 96 S.Ct. 893, 901, 47 L.Ed.2d 18 (1976) (quoting *Armstrong v. Manzo*, 380 U.S. 545, 552, 85 S.Ct. 1187, 1191, 14 L.Ed.2d 62 (1965)). However, this requirement is triggered only when a liberty or property interest is implicated. *Board of Regents v. Roth*, 408 U.S. 564, 569-70, 92 S.Ct. 2701, 2705, 33 L.Ed.2d 548 (1972). Thus, the issue here is whether, in terminating appellant, the government deprived him of a protected liberty or property interest and, if so, whether the procedures utilized satisfied applicable constitutional standards.

process is due.  In *Gilbert v Homar*, 520 U.S. 924, at 932, (1997), the court went on to rule that the process used against an employee suspended without pay would be considered due, *under circumstances where a sufficiently prompt post suspension hearing occurred*, and the lost income was relatively insubstantial.[10]

In our case there was no advance notice of the supposed lie, and no pre- nor post-suspension/termination hearing, *ever*.  Mr. Caldwell was not even told what the nature was of the lie of which he was accused at his firing.  He asked expressly, and was expressly told that he would have to seek this information later through formal channels.

### 2.    Ms. Caldwell's Property Interest/Due Process.

The County Defendants next argue that Ms. Caldwell quit her job, rather than getting fired, and that as such she was not entitled to due process relative to her job separation.  Further they argue that, with respect to her suspension without pay November 22, 2005, her loss was *de minimis*, and/or that she received adequate due process in any event.

Under Colorado law, to prove a constructive discharge, a plaintiff must present sufficient evidence establishing deliberate action on the part of an employer which makes or allows an employee's working conditions to become so difficult or intolerable that the employee has no other choice but to resign." *Wilson v. Bd. of County Comm'rs,* 703 P.2d 1257, 1259 (Colo.1985) (citing *Irving v. Dubuque Packing Co.,* 689 F.2d 170 (10th Cir.1982)); *Montemayor v. Jacor Communications, Inc.,* 64 P.3d 916, at 921 (Colo. App. 2002).

---

[10]   *Gilbert* did not involve the "no penny for a Republican" type retributions referred to as violations of rights by the *Elrod* Court, *supra.*

A successful argument of constructive discharge "depends upon whether a reasonable person under the same or similar circumstances would view the . . . working conditions as intolerable." *Boulder Valley Sch. Dist. R-2 v. Price,* 805 P.2d 1085, 1088 (Colo.1991) (quoting *Wilson v. Bd. of County Comm'rs, supra* ), *overruled in part on other grounds by Cmty. Hosp. v. Fail,* 969 P.2d 667 (Colo.1998). Cumulative events can cause working conditions to deteriorate to an intolerable level. *Hogue v. MQS Inspection,* 875 F.Supp. 714 (D.Colo.1995).

In the *Montemayor* case, the owner allowed the employing company's vice president and sales manager to conduct a campaign to undermine the company president's authority; to paint her as unstable, unethical, incompetent, and lacking in credibility; to humiliate her publicly in the eyes of her subordinates; so as to eliminate her authority and demote her in violation of an employment contract. Plaintiff continued substantially to perform her part of the agreement, reporting to work daily and attempting to fulfill her assigned work, even when teamed by the employer with the harassing sales manager.  The court concluded that the Record on Appeal supported the verdict at the trial level that defendants created an environment that a reasonable person in the same or similar circumstances would view as intolerable, and that the plaintiff was constructively discharged from her position.

The evidence in our case strongly supports the idea that the actions in the latter half of 2005, and early in 2006, by the Sheriff and Undersheriff, Defendants Wegener and Gore, both directly and through the aid of Defendant Flint, were expressly designed to undercut Mr. Anthony and his friends and supporters in the PCSO, and to ruin any political ambitions he had for the future by wrecking his credibility with the public and depriving him of support.

Mr. Gore admitted in his deposition that he had told Mrs. Caldwell early in October 2005, that she was under suspicion because an unnamed person had accused her of hiding something (undisclosed to her) under her desk; and henceforth that she had to keep her door open. She was told by Mr. Gore that the department was concerned that she was inappropriately using her computer to gather information to pass on to "others." Gore Deposition, p 195 ℓ23 to p 196 ℓ15. She had been ordered to report "every modification, addition or deletion to [her] computer to Mr. Gore (which a jury could easily decide would make the job of Finance Officer nearly impossible to perform). Exh. 16.

Later, without much explanation, she was told that she expressly could have no contact at all with Don Anthony, a personal friend of hers, and that if she had any contact with him, she had to report that contact immediately.  Then she was disciplined, without anything resembling notice or a hearing, for "violating" this no contact order by telling Mr. Anthony of the amount of a credit card reimbursement he had asked about, and accepting a reimbursement check from him, clearly a part of her job responsibilities as the Sheriff's Department Finance Officer (this after she had been told that it was at the direction of the investigator dealing with Mr. Anthony).  As part of her suspension, she was then told that she could not have any contact with anyone at the Sheriff's Office except Mr. Gore, a clear violation of her right to contact the Sheriff to appeal Mr. Gore's suspension of her, and she was led out of the building carrying a box of her belongings in front of all the front office personnel, adding substantially to her already significant humiliation. Exh. 19 makes very clear that she could look forward to additional punishments if she engaged in any further behavior "similar" to that for which she had just been disciplined. Once the three day without pay suspension was served, and in the spirit of further harassment, she was told by

Mr. Gore that she could expect the arrest of her husband within days. (Vicki Caldwell Deposition, p 77 ℓℓ10-17).

Ms. Caldwell's letter of resignation (Exh. 20) directly refers to the hostile and unhappy environment she had been made to suffer at work during this entire time.

With respect to Counsels' *de minimis* argument, the suspension without pay cost Ms. Caldwell three days wages. In determining if this punishment was intended to chill her from supporting Mr. Anthony as a candidate, even in the future, it exceeds the "penny for a Republican" criteria approved in the *Elrod* case, *supra.*

Despite defense counsels' claim that due process was provided in any event, that is simply not true. Mr. Gore himself testified that there was no advance notice to Ms. Caldwell that discipline was contemplated prior to either of her suspensions (November 16, with pay, and November 22. 2005, converting that to without pay). She was not given adequate time to prepare to meet the charges he himself brought against her, and she was wholly deprived of any impartial investigation or hearing where Mr. Gore served as both accuser and arbiter. (See, Critical Facts, paras. 10 and 11 above). She was given six months probation, a direct and arbitrary violation of PCSO Policy 320 (II), Exh 18.

### 3.    Plaintiffs' Liberty Interest Claim.

The dismissal of a government employee can implicate a liberty interest. See *Board of Regents v. Roth,* 408 U.S. 564, 573, 92 S.Ct. 2701, 2707, 33 L.Ed.2d 548 (1972). See, generally, R. Rotunda, J. Nowak & J. Young, *Treatise on Constitutional Law: Substance and Procedure* § 17.4(d) (1986). The Due Process Clause forbids arbitrary deprivations of liberty. 'Where a person's good name, reputation, honor, or integrity is at stake because of what the government is

doing to him,' the minimal requirements of the Clause must be satisfied. *Goss v. Lopez*, 419 U.S.

565 (1975); and *Wisconsin v. Constantineau*, 400 U.S. 433, 437, 91 S.Ct. 507, 510, 27 L.Ed.2d

515 (1971); *Board of Regents v. Roth, supra.*

In the *Roth* case, the Court held that "(w)here a person's good name, reputation, honor, or

integrity is at stake because of what the government is doing to him, notice and an opportunity to

be heard are essential." Due process requires an opportunity to refute the charge before the

employer. The purpose of such notice and hearing is to provide the person an opportunity to clear

his name. *Id*, at p. 573-574.  For, "(t)o be deprived not only of present government employment

but of future opportunity for it certainly is no small injury . . .." *Joint Anti-Fascist Refugee*

*Committee v. McGrath,* 341 U.S. 123, at 185 (1951) (Jackson, J., concurring).  See, *Truax v.*

*Raich*, 239 U.S. 33 (1915). The Court has held, for example, that a State, in regulating eligibility

for a type of professional employment, cannot foreclose a range of opportunities 'in a manner . . .

that contravene(s) . . . Due Process,' *Schware v. Board of Bar Examiners,* 353 U.S. 232 (1957);

and, specifically, in a manner that denies the right to a full prior hearing, *Willner v. Committee on*

*Character,* 373 U.S. 96 (1963);  See, *Cafeteria Workers v. McElroy,*  367 U.S. 886, at 898 (1961).

In the recent case of *Beatty v. Thomas*, reported at 2005 WL 1667745 at p. 10 (E.D.Va.,

June 13, 2005), the court held that, where the government employee had claimed that his liberty

interest was implicated because, subsequent to his termination, the employer had disclosed

reasons for his employment and fabricated information that limited his future opportunities for

employment.

> Courts recognize a violation of an employee's liberty may occur if a
> termination damages the employee's reputation or good name, or if the
> termination denies him the freedom to take advantage of other employment

opportunities. See, *Bd. of Regents*, 408 U.S. at 573; *Kostishak v. Mannes*, 145 F.3d 1325 (4th Cir.1998). Charges that the employee is guilty of dishonesty or immorality are generally considered stigmatizing because they call into question the person's "good name, reputation, honor, or integrity." *Id.*

\* \* \*

Once a plaintiff shows that his liberty interest is implicated by a government termination, due process generally requires that the aggrieved employee be afforded notice and a hearing to clear his name. See, *Beckham v. Harris*, 756 F.2d 1032, 1038 (4th Cir.1985).

In our case, the allegations against each of the Caldwells directly reflected on their character and honesty. Mrs. Caldwell's suspension letters (particularly Exh. 16) gave a strong indication that she was not trusted at her job. She was accused of hiding things under her desk, manipulating the computer to pass on information to others and then hiding that fact, and meeting with Undersheriff Anthony in an implied effort to undercut an investigation against him. When she was suspended, she was escorted out of the complex in front of her co-workers, sending the message that she could not be trusted to leave on her own without taking or doing something untoward. Critical Facts, para. 9. Mr. Caldwell was point blank terminated for dishonesty on his job application. See, Exh. 29.

Neither Caldwell received advance notice that they were going to be disciplined. Mr. Caldwell was suspended October 14, 2005, for one reason (of which he was cleared), had more reasons alleged against him on January 17, 2006 (of which he was also cleared), and then was fired for lying on his job application. He was only told to come down to meet with the Sheriff and Mr. Gore on February 22, 2006, and at that meeting he was handed the pre-typed letter of termination. When he asked for an explanation of what it was that he had supposedly lied about,

he was told "it is not the time or place" and was shown the door.  The official reason for his discharge was that he had been dishonest.  See. Exh. 29; Critical Facts, paras. 16-18.

Mrs. Caldwell was suspended on the same day as she supposedly had violated Mr. Gore's no contact order, with no time to properly prepare and present a response, and without being told that a suspension was even being considered.  Five days later, she was again suspended, this time without pay, without any investigation or hearing, and without an impartial arbiter.  The allegations in Exh. 16 were given as the reasons for her discipline.  Critical Facts, paras. 9-11.

Moreover, both Caldwells are named throughout the Webber Park Synopsis as suspects in illegal poaching operations, manufacture of methamphetamines, marijuana sales and use, interference with police investigations in the valley, animal abuse, and even implicated in a possible murder.  See, Exhs. 3-8.  With the approval of Sheriff Wegener and Undersheriff Gore, Mr. Flint broadcast these documents not only within the Park County government offices (County Attorney, District Attorney, and PCSO Internal Affairs), but to other Sheriff's Offices (Jefferson County), to the Colorado Bureau of Investigation, and to the Federal Bureau of Investigation.  With respect to the Park County Sheriff's Office election coming up in 2006, a race in which both Mr. Wegener (as candidate), and Mr. Gore (as having taken over Mr. Anthony's position in the PCSO) had a stake, these same documents were given by someone to the reporter from *The Flume*, and to at least one delegate to the Park County Republican Assembly.  At the time these documents were released, they were by both policy and practice being held confidential, locked up in the Sheriff's own personal office.  Critical Facts, para. 2.; Exh 14, para. 15.  Mr. Caldwell has had to take a job giving tours at the Molly Kathleen mine to tourists in Cripple Creek, and Mrs. Caldwell now works for the Teller County Treasurers Office.

Given the vicious attack on each of their reputations, neither has felt able to seek another job in law enforcement in Colorado. Caldwell Affidavits, Exhs. 34 and 35. This is consistent with the opinion of Richard Reisler, an expert retired police administrator and officer from the Colorado Springs Police Department, retained by the Plaintiffs, who has reviewed the matter in detail. His report is attached as Exh. 9.

## II.  State Law Claims Against Park County Defendants/Willful and Wanton Acts/The Colorado Governmental Immunity Act.[11]

Colorado's Governmental Immunity Act, C.R.S. §24-10-118(1) and (2)(a), provides that any action in tort or that could lie in tort against a public employee acting pursuant to his or her duties and within the scope of his or her employment is subject to the provisions of the Act, including immunity from liability, unless the action or omission grounding the claim for relief is willful and wanton.

Plaintiffs concede that the state claims in this matter, defamation, intentional infliction of emotional distress and invasion of privacy are actions in tort under Colorado law. However, the immunity protection of the Colorado Governmental Immunity Act does not apply to those tortuous claims in this matter because the Defendants' actions and omissions were willful and wanton.

The Colorado Governmental Immunity Act does not define the phrase "willful and wanton." Colorado courts that have addressed the issue have applied the definition set forth in Colorado's exemplary damages statute, C.R.S. §13-21-102(1)(b). *Cossio v. City and County of Denver*, 986 F. Supp. 1340 (D. Colo. 1997); *O'Hayre v. Bd. of Educ. for Jefferson County Sch.*

---

[11] This section responds to the Park County Defendants' argument which begins on page 26 of their brief.

*Dist. R-1*, 109 F. Supp.2d 1284 (D. Colo. 2000).  C.R.S. §13-21-102(1)(b) provides: "'willful and wanton conduct' means conduct purposefully committed which the actor must have realized as dangerous, done heedlessly and recklessly, without regard to consequences, or of the rights and safety of others, particularly the plaintiff."

"Wanton and reckless" disregard as used in this statute means conduct that creates a substantial risk of harm to another and is purposefully performed with an awareness of the risk in disregard of the consequences. *Tri-Aspen Constr. Co. v. Johnson,* 714 P.2d 484 (Colo. 1986); *Juarez v. United States*, 798 F.2d 1341 (10th Cir. 1986); *Miller v. Solaglas California, Inc.*, 870 P.2d 559 (Colo. App. 1993); *Archer v. Farmer Bros. Co.*, 70 P.3d 495 (Colo. App. 2002), aff'd on other grounds, 90 P.3d 228 (Colo. 2004).  And whether "wanton reckless disregard" exists in a particular case is ordinarily a question of fact for the jury. *Butters v. Mince,* 43 Colo. App. 89, 605 P.2d 922 (1979), rev'd on other grounds, 200 Colo. 501, 616 P.2d 127 (1980); *Coors v. Sec. Life of Denver Ins. Co.*, 112 P.3d 59 (Colo. 2005).

The Defendants' actions and omissions upon which all three of Plaintiffs' state tort claims arise (defamation, intentional infliction of emotional distress, and invasion of privacy) were willful and wanton in that they were done in reckless disregard to Plaintiffs' rights and the likely consequences to those rights.  All three state claims involve, at least in part, the disclosure of the contents of the "Webber Park/Brief Synopsis," and its related papers (Exhs. 3-8).  This mass of wholly unsupported rumor, hearsay, and defamatory remarks, disguised by Mr. Flint to approximate an investigative criminal report, dated October 4, 2005, outlines a series of claimed criminal acts and enterprises, naming the Plaintiffs throughout as suspects and conspirators. There is not one iota of supposed "fact" contained in the report corroborated by independent

police work. (See, para. 2, "Critical Facts" and Exh. 9 regarding a more detailed critique of these documents.)

This report was submitted by Defendant Flint to Defendants Gore and Wegener, as supervisors, and with their approval, to the Park County Attorney, the District Attorney, CBI, the FBI, and the Jefferson County Sheriff's Office. Defendants Wegener and Gore placed the report in Plaintiffs' personnel files and thereafter provided this report to the public, including the local newspaper, in total disregard of the effect it would have on Plaintiffs' rights. We know this last fact because it ended up in the hands of a local news reporter and a County Assembly delegate just prior to the Park County Republican Assembly, at which the party nominee for Sheriff in the upcoming election was to be decided. These people immediately brought the documents to the attention of Mr. Anthony and Mr. Caldwell. At the time this disclosure happened, the documents were required by the PCSO Policy and Procedures Manual to be secured in the department's personnel files as confidential documents, not to be released. None of these documents, despite counsels' claims to the contrary, had yet been released under the Colorado Open Records Act to Mr. Anthony or any Plaintiff. The Webber Park synopsis was locked in the files of the Sheriff himself in his personal office. See, Critical Facts, para. 2; and Exh. 14, para.15.

The "Webber Park/Brief Synopsis" was so clearly devoid of any investigative and law enforcement value that it should have been discarded entirely and with due care of the consequences of its potential injury to those individuals named in it. Plaintiffs' expert, retired Detective Richard Reisler of the Colorado Springs Police Department, after reviewing the "Webber Park/ Brief Synopsis," as well as documentation such as the PCSO Policies and Procedures Manual, described the report as "outrageous," "fatally flawed," and "outside the

normal and accepted" procedure for conducting an investigation. He concludes that making this information known would seriously damage a person's ability to obtain work. (See, Exh. 9, pp. 4 and 5)

As such, the Defendants' actions and omissions in maintaining, and then disclosing, the information contained in the "Webber Park/Brief Synopsis" and supporting documents, was clearly willful and wanton and, therefore, outside the purview of the immunity protection of the Colorado Governmental Immunity Act.

### A.    **Defamation.**

Defendants' primary argument is that the Plaintiffs cannot prove that the many and sordid statements contained in the "Webber Park/Brief Synopsis" documents were published by the Defendants to anyone.

This is a disputed issue of material fact and for the jury to decide.

First of all, Defendants' claim that the only disclosure made of the "Webber Park/Brief Synopsis" papers was under the Colorado Open Records Act. However, this report was disseminated to agencies and individuals outside of the Park County Sheriff's Office, including to the CBI,[12] the County Attorney's Office, the District Attorney's Office and the Jefferson County Sheriff's Office, all with the full knowledge and approval of Defendants Gore and Wegener, well before the Plaintiffs requested their records under the Colorado Open Records Act. (Critical Facts, para 2, above).

---

[12]   On February 2, 2006, the CBI recommended closing the investigation that culminated in the "Webber Park/Brief Synopsis" report, concluding that any further effort was unlikely to produce substantial corroborating evidence. See, Exh 13.

Moreover, the Webber Park Synopsis was given to at least one delegate to the Park County Republican Assembly, and to a local newspaper reporter, shortly before the assembly was scheduled to be held.  Critical Facts, para. 2.; Exh. 14, para. 14.

Since personnel records in the Park County Sheriff's Office are releasable only under the authority of the Sheriff or Undersheriff, and since sensitive material in the nature of the Webber Park Synopsis was kept under lock and key, it is clear that Defendants Gore and/or Wegener had to have been involved in the dissemination and publication of the wholly groundless and defamatory Webber Park Synopsis.

Clearly, on Plaintiffs' state claim for defamation, there remains issues of material fact to be resolved by the jury.

**B.** **Intentional infliction of emotional distress.**

As an initial matter, Defendants were ***not*** "undertaking the very duty they are, as law enforcement officers, sworn to uphold," at the time they inflicted the emotional harm of which Plaintiffs complain.  Defendants' actions and omissions that caused Plaintiffs' injuries were wholly contrary to accepted and established procedures, protocol and practices.  Those actions and omissions include the failure to allow substantive and procedural due process, failure to follow known and accepted investigative and reporting techniques and protocol, and the failure to keep confidential internal and other sensitive information from general dissemination.

Defendants assert that there is no evidence of any malicious intent and that the Plaintiffs' cannot demonstrate the Defendants improperly disclosed the Webber Park Synopsis publicly. Plaintiffs here incorporate the response to the defamation claims, above, to assert that genuine issues of material fact exist as to the disclosure.

Malicious intent is not an element of this tort in Colorado, only that the Defendants acted recklessly or with the intent to cause severe emotional distress. See Colorado Jury Instructions, 4th Ed. 23:1.   A jury could readily find such a mental state on the part of the Defendants from both the nature of the Webber Park Synopsis papers and their contents, the timing of their disclosure, and the public nature of the recipients to whom the material was given (half a dozen police agencies around the state, a delegate to the Park County Republican Assembly, and the press).  Critical Facts, para 2;  and  Exh. 9.

Plaintiffs have described the emotional distress that each suffered from the series of actions taken against them in their respective positions with the Park County Sheriff's Office, all of which culminated in the realization and knowledge that the "outrageous" and "fatally defective" Webber Park Synopsis, and its defamatory contents had been given to or otherwise discussed with individuals outside of the sheriff's office.   Critical Facts, above, para. 15;  and Caldwell Affidavits, Exhs. 34 and 35.

Both Plaintiffs suffered distress of such a severe nature that physiological symptoms resulted.   Charles Caldwell describes having heart palpations and general nervous conditions after learning the reason for his termination and learning of the contents and disclosure of the Webber Park Synopsis to members of the press and Republican Party Assembly. Vicki Caldwell describes similar nervous conditions, including the onset of insomnia, as having begun after the shock of learning of the general dissemination of the Webber Park Synopsis.   Caldwell Affidavits, Exhs. 34 and 35.

## C.   Invasion of Privacy.

The tort of invasion of privacy by intrusion "requires an unreasonable manner of intrusion or an intrusion for an unwarranted purpose." *Denver Publ'g Co. v. Bueno*, 54 P.3d 893 (Colo. 2002).  In *Robert C. Ozer, P.C. v. Borquez,* 940 P.3d 317 (Colo. 1997), the Colorado Supreme Court recognized four different ways that one may ground a claim under the general tort heading of invasion of privacy:

> (1)   unreasonable intrusion upon the seclusion of another;
>
> (2)   appropriation of another's name or likeness;
>
> (3)   unreasonable publicity given to another's private life; and
>
> (4)   publicity that unreasonably places another in a false light before the public.

The last two ways apply to the Plaintiffs' claims in this case.  In order to prevail on such a claim, the *Ozer* court held that the following requirements must be met: (1) the fact or facts disclosed must be private in nature; (2) the disclosure must be made to the public; (3) the disclosure must be one which would be highly offensive to a reasonable person; (4) the fact or facts disclosed cannot be of legitimate concern to the public; and (5) the defendant acted with reckless disregard of the private nature of the fact or facts disclosed. *Id.,* at 377.

As an initial matter, the fifth requirement by definition would vitiate any immunity protection under Colorado's Governmental Immunity Act. Also by definition, the tort of invasion of privacy, if proven, would support an award of exemplary damages under Colorado law.

*Borquez v. Robert C. Ozer, P.C.*, 923 P.2d 166 (Colo. App. 1995), aff'd in part and rev'd in part on other grounds, 940 P.2d 371 (Colo. 1997).

Again, the Plaintiffs would incorporate the factual assertions under the Defamation heading, above, to support their position that the Defendants necessarily disclosed or allowed the disclosure of the defamatory information to the public, and that the disclosures would be highly offensive to a reasonable person. The requirement that the facts disclosed must be private in nature is fulfilled by the clear confidential nature of the contents of the Plaintiffs' personnel files and the offensive nature of the requirements satisfied because of the contents of the "fatally flawed" investigations that purported to conclude that the plaintiffs were criminals, dishonest and corrupt. See, Exhs. 3-8; and Exh. 9.

Plaintiffs' invasion of privacy claim is viable and each element abundantly supported by the totality of the factual circumstances underlying all of the Plaintiffs' federal and state claims.

## CONCLUSION

Defendants' Motion for Summary Judgment should be denied as to all Park County Defendants and as to all of Plaintiffs' § 1983 and State claims for relief as there are genuine issues of material fact disputes in every area of review by the ultimate fact finder.

Respectfully submitted this 28th day of July, 2008

> *s/ James A. Reed*
> James A. Reed
> James A. Reed, P.C.
> 320 S. Cascade Avenue
> Colorado Springs, CO  80903
> Tel. (719) 636-9343 / Fax (719) 633-2355
> *Attorney for Plaintiffs*

## CERTIFICATE OF SERVICE

The undersigned hereby certifies that on this the 28th day of July, 2008, the foregoing document was served via PACER/ECM to:

*Attorney for Defendants County of*
*Park, Wegener, Gore, Flint and Groome:*
Katherine M.L. Pratt, Esq.
Andrew D. Ringel, Esq.
Hall & Evans, L.L.C.
1125 17th Street, Suite 600
Denver, CO  80202-2052
Prattk@hallevans.com
Ringela@hallevans.com

*Attorney for Defendant Damon:*
Michael Obernesser, Esq.
Dennis W. Hartley, P.C.
1749 South 8th Street, Suite 5
Colorado Springs, CO  80906
mobernesser@gmail.com

*Attorney for Defendant Whiteowl:*
Richard Lamphere, Esq.
Steven U. Mullens, P.C.
105 East Moreno Avenue
Colorado Springs, CO  80903
lampheresum@yahoo.com

  s/  Julia Vendeland
Julia Vendeland
James A. Reed, P.C.
320 S. Cascade Avenue
Colorado Springs, CO  80903
Tel. (719) 636-9343 / Fax (719) 633-2355