IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO

Civil Action No. 07-cv-000371-RPM-MEH

CHARLES CALDWELL, and
VICKI CALDWELL,

Plaintiffs,

v.

THE COUNTY OF PARK, a body corporate and politic and a political subdivision of the State
of Colorado,
FRED WEGENER,
MONTE GORE,
GREGORY S. FLINT,
STEVEN GROOME,
SHAWNA WHITEOWL, and
MARK DAMON

Defendants.

## PLAINTIFFS' EXPERT WITNESS DISCLOSURE

COME NOW the Plaintiffs, Charles "Chuck" Caldwell and Vicki Caldwell, by and
through their undersigned counsel, and hereby make the following Expert Witness Disclosure:

1.     Richard Reisler, 15776 Agate Creek Drive, Monument, CO 80132, (719) 244-
6200.

Mr. Reisler will testify consistently with his attached report. His rate for
document review, report preparation, depositions and court testimony is $75.00 per hour. A copy
of Mr. Reisler's report, *Curricula Vitae*, and Trial Deposition Testimony Log are attached hereto
as Exhibit A.





Respectfully submitted this 29th day of January, 2008.

s/ James A. Reed
James A. Reed
James A. Reed, P.C.
320 S. Cascade Avenue
Colorado Springs, CO 80903
Tel. (719) 636-9343 / Fax (719) 633-2355
*Attorney for Plaintiffs*

## CERTIFICATE OF SERVICE

The undersigned hereby certifies that on this the 29th day of January, 2008, the foregoing document was served via U.S. Mail, first class postage prepaid, and properly addressed to:

*Attorney for Defendants County of Park, Wegener, Gore, Flint and Groome:*
Katherine M.L. Pratt, Esq.
Andrew D. Ringel, Esq.
Hall & Evans, L.L.C.
1125 17th Street, Suite 600
Denver, CO 80202-2052
Prattk@hallevans.com
Ringela@hallevans.com

*Attorney for Defendant Damon:*
Michael Obernesser, Esq.
Dennis W. Hartley, P.C.
1749 South 8th Street, Suite 5
Colorado Springs, CO 80906
mobernesser@gmail.com

*Attorney for Defendant Whiteowl:*
Richard Lamphere, Esq.
105 East Moreno Avenue
Colorado Springs, CO 80903
lampheresum@yahoo.com

s/ Julia Vendeland
Julia Vendeland
James A. Reed, P.C.
320 S. Cascade Avenue
Colorado Springs, CO 80903
Tel. (719) 636-9343 / Fax (719) 633-2355

# RICHARD REISLER
## *PRIVATE INVESTIGATIONS, LLC*
15776 Agate Creek Drive
Monument, CO. 80132
719-244-6200   FAX 719-488-9359
Richardpi379@hotmail.com

## CONFIDENTIAL REPORT

January 28, 2008

Dear Mr. Reed,

I have been asked to offer an opinion on the investigation conducted by Detective Corporal Gregory S. Flint, dated 9/22/05, and the firing of Deputy Chuck Caldwell, referred to as the Webber Park Investigation/Brief Synopsis.

Relative to that request, I have read the material listed below:

Park County Office of the County Attorney letter, dated March29, 2006, referred to as page 00043.

Webber Park Investigation /Brief Synopsis pages 00044 through 00055.

Park County Sheriff's Office Policy and Procedure Manual Pages 000385 through 000450.

Park County Sheriff's Office Internal Investigations Case# 2006-IA-002

Civil Action No. 07-cv-00371RPM-MEH Charles Caldwell and Vicky Caldwell

Colorado Court Database pages 000256 through 000318

Letter dated April 5, 2006, from Charles Caldwell to Sheriff Fred Wegener, pages 00056 through 00060

Memo dated 11/17/2005, from Captain Monte Gore to Vicky Caldwell, pages 000061 through 00065

Hand written correspondence date 12/7/06, pages 000066 through 000083    667/8★9

District Court, County of Park, State of Colorado, Case No. 2005-C 000238, pages 000084 through 000255    AMENDED TO WILL★★

1

SUMMARY

This document specifies that starting in mid September, 2003, Detective Flint was joined with Ron Zaccagnini, of the Colorado Division of Wildlife, to investigate a large scale poaching operation in the Webber Park area.

During the investigation, at least three of the suspects were producing Meth. Six or seven other suspects aided in the process of producing this Meth. These suspects were described as being extremely into "Snuff Pornography". There is information that an Indian woman, named Sophie, would "winter up" with one of the single males. This woman disappeared leading the reader of this investigation to presume that she was murdered, and her body is in a collapsed mine.

The source of this information is given as C.I.2005-05.

Detective Flint briefs his under sheriff, Anthony, on 11-03-03, and explains that a large scale poaching operation, Meth and Marijuana cultivation is occurring. At this same briefing, information is relayed that two civilians are involved. They are identified as Vicky Merritt and Chuck Caldwell. Both of them are known to Detective Flint.

Under Sheriff Anthony asked about Vicky's involvement. Detective Flint reports that she has knowledge of these events, but no involvement yet. They continue to discuss Vicky, because Under Sheriff Anthony wants to hire her as a bookkeeper.

On December 3, 2003, Ron Zaccagnini reports that there is a "leak" in the investigation and wants his map back, which details the locations of these illegal events.

Not much happens until June of 2004 when bits of information come in through an unidentified deputy. That information states that Webber Park crew has moved freezers and other equipment to the "Happy Ass Ranch". This equipment is used to manufacture Meth. The Happy Ass Ranch becomes a focus point. By the time the snow breaks, in April of 2005, Sergeant Brown and Detective Flint agree to scout the area for surveillance locations, but because of bad weather that never happens.

On June 22, 2005, a report is given to Under Sheriff Anthony. Detective Flint is ordered to re-open the "Webber Park" investigation. He is advised that this same CI (2005-05) has contacted the FBI.

Under Sheriff Anthony wants the Department of Wildlife officer Zaccagnini to join in on this investigation. Detective Flint questions why a case which has been closed for two years is being re-opened. The other unusual point is that a former suspect, Chuck Caldwell was being defended by the Under Sheriff, who made a statement that he did not think Chuck (Caldwell) did anything wrong by talking to them. ('Them' is unclear in this report).

Detective Flint also wonders why he is being asked to circumvent his chain of command.

Under Sheriff Anthony goes on to talk about a large RAVE party that is to occur at the Happy Ass Ranch. Detective Flint wonders why extra people are not put to work. 48 traffic stops of people, traveling the route to this RAVE, fail to produce any drugs.

CI 2005-05 gives information that a drug purchase took place, and the purchaser was a PCSO (Park County Sheriff's Officer).

There is talk about a leak, and that Chuck Caldwell bought Marijuana at a bait shop in Lake George.

CI 2005-05 has a tape of death threats that was received. Only two of the six threats are recovered from the cell phone of CI 2005-05.

From July 1, to September 8, 2005, numerous tapes and photographs of potential suspects are obtained by Detective Flint.

Detective Flint reports rumors to the County Attorney, Gromme, that inappropriate County money is being spent. Later the County Attorney confirmed this rumor; the Under Sheriff Anthony and Lt. Raschs are identified as the people involved.

Detective Flint related that, at lower and higher levels of the spectrum, numerous policies and laws have been broken, and numerous policy violations have occurred. He also reveals that, within seventy two hours of this report, he is aware of more incidents describing sexual harassment and the unlawful arrest of a 72 year old man.

On September 8, 2005, Deputy Fikejs talks with Detective Flint and advises him that Deputy Caldwell and George Porter had recently threatened CI 2005-05 and CI 2005-08 in person.

Detective Flint video tapes an interview with CI 2005-08. He concludes that the Park County Sheriff's Office personnel have utilized their positions to steer, impede or deliberately stall legitimate investigations.

A request is made for the assistance of an unidentified Bureau.

This document also contained a four page Witness/Victim list of the Webber Park Investigation.

OPINION

On page 8 of the Webber Park investigation (my page 00050), there is a notation stating that: "Due to the fact I am collecting this information outside the normal accepted department's reporting format, I will use this document as an informal Offense/Incident Report". This notation is signed by Detective Flint and dated October 4, 2005. This same notation appears on page 4 of 4 of the Witness/Victim list (my page 00055).

If this document was used to make any decisions that would affect employment status, or the arrest and filing of criminal charges, then this document is fatally flawed. I find it outrageous and certainly "outside the normal and accepted" format in conducting an investigation!

This document is filled with conjecture and paranoia.

The reader is asked to accept that the informants, CI 2005 -05 and CI 2005-08, are reliable sources of information. It is common and accepted practice to document the reliability of informants. A review of the Park County Sheriff's Office Policy Manual requires this as well, yet nowhere in this report is the credibility of the informants offered.

I specifically refer to the Park County Sheriff's Office Policy and Procedure Manual:

Policy 727 Confidential Informants Chapter VII, sub section II Definitions:

CONFIDENTIAL INFORMANT FILE: File maintained in order to document all information that pertains to confidential informants.

UN RELIABLE CONFIDENTIAL INFORMANT FILE: File containing information pertaining to individuals determined generally unfit to perform as informants.

After reading this entire file, consisting of the documents I listed on pages one and two of my report, the confidential informant identified as CI 2005-05 is Shawna Whiteowl. Ms. Whiteowl was charged with giving false information in Park County Sheriff's Office Criminal Offense report #9902130 (my page 000174) 18-8-111 and was charged under summons #16231 (my page 000176). This summons included a charge of Harassment 18-9-111.

The details of report #9902130 reflect Shawna Whiteowl as a frequent complainer who not only exaggerates but gives information that she knew was incorrect to law enforcement, as a way to annoy her neighbors. I refer to page 2 of 2 report #9902130 (my page 000174) in which Whiteowl reported that Terry Rook had damaged the public roadway but knew he was on private property. This same report related that a history of

4

complaints from Whiteowl, that were investigated, were unfounded.
This is hardly the profile of a reliable informant.

The allegation that a large scale poaching operation, Meth lab and viewing of snuff porn films is offered as fact in absence of any proof.

The reader is lead to believe, by *innuendo,* that a murder occurred ten years ago. I refer to the Indian woman (Sophie) who would "winter up" with single men. Even though the possibility that a human being may have been murdered, which is a class one felony, the highest crime on the books, there is no reference to any official investigation to determine if the crime of murder occurred. In addition, a person had been interviewed who had confirmed there was such a woman. A confidential informant indicated the site of a cave where the body would be located.

The allegations of a "large scale" poaching operation are offered without confirmation (evidence) that this occurred. There are no references to blood trails, animal remains, reports of gun fire, or interviews.

In any criminal investigation there is a format. This format includes:

- Listing the Criminal Statutes that are alleged to have been violated
- Listing the elements of the crimes that the investigation must prove
- List specific dates and times of interviews
- Make use of investigative tools such as Polygraph Exams, Search Warrants, Subpoenas
- Documentation of evidence that is collected

An investigation must answer the questions of who, what, why, where, when and how.

In the report that Mr. Caldwell bought Marijuana at a bait shop in Lake George, the reader is not given any proof. Common and accepted practice would require that a sample of the material, suspected of being Marijuana, be obtained. A "presumptive field test" is then performed which would establish probable cause to arrest an offender. In this case there was an absolute lack of probable cause to charge anyone.

For a conviction of the charge of possessing the Marijuana, it would have then been sent to a crime lab, such as CBI, for further testing. Once a report is issued confirming the substance has in fact been identified as an illegal substance (Marijuana in this case), then there is enough evidence to obtain a conviction.

None of these procedures were conducted in this report.

From the reports I have read, no sample of the suspected Marijuana was logged in as evidence.
No evidence is offered as to how the reporting person knows the substance is Marijuana.

5

From reading this document it appears to me that there is a request for help from an unidentified "Bureau".

From reading the information contained in this document, there is no offer of proof to substantiate these allegations. If I were reviewing this document, as one submitted by a detective who worked for me, I would not find it suitable to forward to the local prosecutor's office for a "Filing Review", because there is no evidence to support allegations.

I have been a sworn officer for thirty two years. I served as a Homicide Detective for eight of those years, numerous assignments as Detective Sergeant supervising the Major Crimes Unit and various task force investigative units, Special Investigator to dozens of Grand Juries, primary investigator and advisor to Internal Affairs Unit on several high profile internal inquiries. It is my opinion that the allegations of wrong doing by sworn deputies are disturbing and warranted a thorough investigation.

This report does not meet the criteria of an investigation because none of the allegations are supported by evidence. Perhaps there is such evidence, but it is not detailed in this report.

I did read investigative reports filed by the Park County Sheriff's Office that do follow common and accepted practice, such as and to include:
- #9902130
- #9900918
- #2006001912

I would conclude that the common and accepted method for conducting an investigation was known to the Park County Sheriff's deputies. It just was not followed in the Webber Park investigation.

In the letter from Sheriff Fred Wegener to Chuck Caldwell, dated 02/22/2006, (my page 000008) Chuck Caldwell is terminated effective February 10, 2006. The grounds for Termination of Employment are based upon false statements on Mr. Caldwell's application.

In a memo from Sergeant Muldoon, dated Thursday December 08, 2005, a call was made to verify that Chuck Caldwell did work for the Forest Park Police Department in Oklahoma. This call was not made to the agency Mr. Caldwell indicated he had worked for, but rather to the Oklahoma County Sheriff's Office (my page 00010).

The fact that there is a letter from the Chief of Police from Forest Park Police Department in Oklahoma is included in the documents I read, confirming that Chuck Caldwell did

work for them, along with training documents from Park County showing that Chuck was doing a good job, paint a clear picture upon which to base my opinion.

It is my opinion, after review of the stated documents, and the Webber Park Investigation that the false information on Mr. Caldwell's application for employment were merely a pretext for firing him.

Perhaps Sheriff Wegener could have Mr. Caldwell if he chose to do so.   However, to base the termination on the subject matter I reviewed is without foundation.

As I have stated before, I have been a sworn Peace Officer in the State of Colorado.  I have conducted criminal investigations on members of my place of employment (Colorado Springs Police Department) and arrested the offenders on criminal charges.  I have conducted many internal investigations making recommendations for progressive discipline, from counseling to termination of employment.

It has been my experience that in the field of Police work, someone who has been "fired" from a law enforcement agency is not readily employable in that same profession.

To make known this information seriously damages a person's ability to obtain work.


Richard Reisler

# RICHARD REISLER
## PRIVATE INVESTIGATIONS, LLC
15776 Agate Creek Drive
Monument, CO. 80132
719-244-6200   FAX 719-488-9359
*Richardpi379@hotmail.com*

Thirty Two Years of service all with CSPD

July, 15, 2006 Retired

2000-2006- CSPD *Patrol Division* Colorado Springs Police Department, Falcon
Division. I supervised the Swing shift activities.

1998-2000- CSPD *Falcon Investigations* unit. I supervised the Crimes against property
unit.

1998-2000-CSPD *Neighborhood Traffic Unit* Supervisor.(Concurrent with Falcon
Investigations

1993-1998- CSPD *Major Crimes* unit, Sexual assaults against adults and children,
Homicides against children, and the victims service unit supervisor.

1990-1993-CSPD *Falcon Investigations* unit and Theft and Auto Burglary Unit
supervisor.

1987-1990- CSPD *SWAT* Team Supervisor

1987-1993-CSPD *Explosives* Unit Supervisor

1987-1990-CSPD and District Attorneys office supervisor of a *Career Criminal Unit*
(TRACC)

1987-2006 -CSPD-Promoted to the rank of Sergeant

1980-1987-CSPD *Homicide* Detective

1979-1980-CSPD *Detective Property* Crimes Detective

1976-1979-CSPD Officer assigned to the *Special Anti Crime Squad* (Burglary/ Robbery
crime prevention unit

1974-1976-CSPD *Patrol Officer*

| COMMENDATIONS: | SPECIAL TRAINING |
| --- | --- |
| Medal of Valor | Certified EOD (Dept. Defense/FBI |
| Distinguished Service Medal | Certified Arson (Nat'l Fire Academy) |
| Two Commendation Ribbons | Crime Prevention (CPTED) |
| Numerous written commendations | Dignitary Protection (Secret Service) |
| | Certified Locksmith (Foley Belsaw) |
| | Certified Instructor (Colorado Peace Officers |
| | Standards in Training) |

| DATE/PROGRAM | SPONSOR | HOURS |
|---|---|---|
| 1992/ADVANCED TERRORIST ACTIVITIES | IABTI | 9 6 |
| 1990/HAZ-MAT/AWARENESS | CSFD | 24 |
| 1990/SHOCAP/MVT CONF. | CCA ASSOC. | 40 |
| 1990/BOMB TECH FAA | DEPT. OF TRANSPORTATION | 20 16 |
| 1990/TERRORISM/BOMBS | IABTI | 40 |
| 1989/ADVANCED EXPLOSIVES | IABTI | 20 |
| 1989/HIGH RISK WARRANTS | IACP | 24 |
| 1989/IMPROVISED BOMBS | IABTI | 24 |
| 1988/RAILROAD HAZ-MAT | BURLINGTON | 16 |
| 1988/MP-5 SUB-GUNS | H&K | 40 |
| 1987/CAREER CRIMINALS | CSPD | 160 |
| 1987/VIP PROTECTION | SECRET SERVICE | 40 |
| 1987/EXPLOSIVES TECH. | FBI/DEF. DEPT. | 120 |
| 1985/INSTRUCTORS' CLASS | CLETA | 15 |
| 1983/FIRE/ARSON INVESTIGATION | NATIONAL FIRE ACADEMY | MOS. |
| 1983/LOCKSMITHING | BELSAW | 8 16 |
| | | |
| 1983/BIKERS INTELL. | COBRA | 40 |
| 1982/CRIME SCENE INVESTIGATION | NAT'L. LAW ENFORCE- | 4 |
| | MENT INSTITUTE | 0 |
| 1981 /HOMICIDE/SEX CRIMES | FBI | 4 |
| 1980/INVESTIGATIVE TECHNIQUES | CLETA | 0 |
| 1980/HOMICIDE SCHOOL 1979/AUTO | CO/WY DETECTIVE ASSOC. | 8 |
| THEFT SCHOOL 1979/CRIME AGAINST | CAIA | 16 |
| ELDERLY 1978/BODY LANGUAGE | NRP & TEACHERS' ASSOC. | 4 |
| 1977/DUI SCHOOL 1977/ADVANCED | WITNESS AWARENESS CLINIC | 0 |
| LATENT PRINTS | COLO. DIV. OF SAFETY | 8 40 |
| 1976/BURGLARY/ROBBERY INVEST. | FBI | 4 0 |
| 1974/POLICE RECRUIT ACADEMY | CBI | 460 |
| | CSPD/CLETA | |

## SUPERVISORY EXPERIENCE:

May 1990 to Present: Falcon Investigations Unit * TABU Unit * Explosives Unit

As supervisor of the Falcon Investigations Unit, I maintain statistical data, screen cases and supervise five detectives covering two shifts.

I supervise the TABU Unit (see Annual Report attached) and share responsibility for the Explosives Unit with another supervisor.

January 1988 to May 1990: Tactical Unit * Explosives Unit * RAT Unit

In order to facilitate the opening of the new Area Commands, I was asked to combine supervisory responsibilities of the Explosives Unit and the Tactical Enforcement Unit (freeing one sergeant position) and dropping the TRACC Unit (which was transferred under Major Crimes). As supervisor of the Tactical Unit, I was also responsible for the RAT Unit.

I have planned and participated in over eighty SWAT deployments, the majority of which were high risk warrant services.

As Tactical Sergeant, I have responded to and made plans for deployments to abortion protests, peace marches, Presidential visits and an assortment of other special events.

**Internal Affairs Related Experience:**

1987 I was promoted to the rank of Sergeant at Colorado Springs Police Department. As such I attended "in service training" which consisted of a mandatory two week assignment in IA.

While CSPD maintains a separate Internal Affairs unit, each sergeant is expected to conduct a preliminary inquiry on any compliant received. Those investigations are then either sent to IA or returned to the Sergeant for completion.

As a Sergeant I have been assigned to investigate a large number of complaints. I have had addition tours of duty as refresher courses in I.A.

During 1992, while assigned as the Detective Sergeant to Falcon Investigations I worked all "overflow" cases sent to IA.

I have conducted several extensive internal investigations. One of those cases resulting in a recommend termination of employment for a twenty year veteran. That recommendation was accepted.

During my assignment to the Major Crimes unit as Detective Sergeant, I was asked to give technical support to IA. This resulted in a sting operation of a veteran who was suspended. I conducted a criminal investigation against that same veteran; however the statute of limitations had expired.

I conducted a criminal investigation against a sixteen year veteran and wife, also a sworn officer. This officer was arrested and criminally charged with a felony, he resigned as did his wife. The officer plead guilty, his wife was facing a misdemeanor, however the statute of limitations expired and there was no prosecution, her resignation was accepted.

I have attended numerous Ethics classes sponsored by CSPD. I have taught three classes to officers on the promotional list, to the rank of Sergeant; those classes were in Police Ethics taught at the CSPD training Academy.

I investigated two cases involving alleged misconduct by Judges from the Fourth Judicial District. One case was unfounded; the other resulted in that Judge seeking psychiatric support and a six month review.

I have been asked by my agency to take over a unit after the previous supervisor who transferred for a failure to command. I accepted that position earning several written commendations.
I incorporate Police Ethic into the courses I have taught.

# MAJOR CRIMINAL INVESTIGATIONS CONDUCTED BY
## RICHARD REISLER

| Year | Victim | Offense/Report Number | Disposition of Case |
|------|--------|----------------------|---------------------|
| 1980 | David Allen Ringer | Homicide/89-7131 | Cleared |
| 1980 | Augustus Perreira | Homicide/80-7381 | Cleared (Police Officer Killed) |
| 1980 | Olive Groskinski | Homicide/80-11895 | Cleared |
| 1980 | Stanley Johnson | Homicide/80-12682 | Cleared |
| 1980 | John Charley | Homicide/80-15822 | Cleared |
| 1980 | William Strader | Homicide/80-1 7482 | Cleared |
| 1980 | Susan Geary | Homicide/80-22274 | Cleared |
| 1981 | Eddie Sanchez | Homicide/81-1334 | Cleared |
| 1981 | Radford Miles | Homicide/81-3443 | Opened |
| 1981 | Kevin Adams | Homicide/81-4188 | Cleared |
| 1981 | Michael Hurley | Homicide/81-6681 | Cleared (Police Officer Killed) |
| 1981 | Virginia Eatherton | Homicide/81-7471 | Cleared |
| 1981 | Charles Catalano | Homicide/81-9269 | Cleared |
| 1981 | Jimmy Shadday | Homicide/81-10901 | Cleared |
| 1981 | Teresita Olguin | Homicide/81-16104 | Cleared |
| 1981 | Michael Jeffries | Homicide/81-26130 | Cleared |
| 1982 | Curtis Litsair | Homicide/82-1555 | Cleared |
| 1982 | Iris Daily | Homicide/82-1 321 2 | Cleared |
| 1982 | Jerry Terry | Homicide/82-21 021 | Cleared |
| 1982 | Mark Dabling | Homicide/82-27538 | Cleared (Police Officer Killed) |
| 1982 | David McLaughlin | Homicide/82-28827 | Opened |
| 1983 | Cynthia McLuen | Homicide/83-3176 | Cleared |
| 1983 | Donald Emmett | Homicide/83-10725 | Cleared |
| 1983 | Keith Axelson | Homicide/83-11023 | Cleared |
| 1983 | Fernanda Jaurequi | Homicide/83-21855 | Cleared |
| 1983 | Beverly Huckleberry | Homicide/83-26499 | Cleared |
| 1984 | James Semon | Homicide/84-11745 | Cleared |
| 1984 | John Berg | Homicide/84-25913 | Cleared |
| 1985 | Cassandra Rundle | Homicide/85-4771 | Opened |
| | Melanie Sturm | Homicide/85-4771 | Opened |
| | Detrick Sturm | Homicide/85-4771 | Opened |
| 1985 | Raymond Archuleta | Homicide/%-23593 | Cleared |
| 1985 | John Crawford | Homicide/85-26957 | Cleared |
| 1985 | Robert Costello | Homicide/85-28822 ..... | Cleared |
| 1986 | Peter Martinez | Homicide/86-9435 | Cleared (Justified) |
| 1986 | Joanne McNamara | Homicide/86-14221 | Cleared |
| | Debra Green | Homicide/86-14221 | (Archebeque - |
| | James Roepke | Homicide/86-14221 | Suspect in Mass |
| | Sandra Howard | Homicide/86-14221 | Murder Killed |
| | Elaine Sindledecker | Homicide/86-14221 | Himself) |

# RICHARD REISLER
## PRIVATE INVESTIGATIONS, LLC
15776 Agate Creek Drive
Monument, CO. 80132
719-244-6200   FAX 719-488-9359
Richardpi379@hotmail.com

### Trial Deposition Testimony Log

1/24/08

I have recently retired from active duty as a sworn officer on the Colorado Springs Police Department.

I have not yet had the opportunity to give testimony as an expert.

During the thirty two years I served as an Officer I have been accepted as an expert and given testimony on two cases involving the use of explosives and one case involving the recognition of burglary tools. I did not record the dates or Criminal Docket numbers of those cases which would have occurred in the 1990's.

I served as a special investigator to the El Paso County Grand Jury in about twenty cases and have testified in numerous criminal cases.

Richard Reisler



**COPY**



### *Park County Sheriff's Office*
### *Investigations*

**ʋ:** Mr. Bradley / Agent in Charge

**ROM:** Detective Cpl. Greg Flint

**ɹTE:** October 5th 2005

**ₑ:** Webber Park Investigation

---

⌐;

·st off, I would like to apologize for the delay in this information being sent to you. I have had to sandwich this ɾestigation in between my normal caseload.

nave been many new developments from the last time I have spoken with you. I am now finding out that, there are ɪny internal issues I was unaware of until just this last week. Some of these incidents are described in part, on the last three ges of the Brief Synopsis. Even as I was completing this memo to you, the female officer who had made a "sexual ɾassment" complaint and reported job intimidation on behalf of two other female officers, has approached me, and ʟunteered to give me a copy of an audiotape she had made during this series of incidents.

this point in time, I could be considered as somewhat of a "road map" for this investigation. Should your agency adopt ʏ portion of this case, I can lead you to other officers with information and help you recover any of the documented dence that I know exists in several circles.

sed upon my past training and experience, I now believe that violations and/or criminal acts have occurred in five of the ɟor following areas;
  Departmental policies and procedures- Repeated violations of policy.
  Unethical or Potentially Unlawful Orders issued – as demonstrated in the WPI book.
  "Sexual Harassment" and Civil Rights Violation(s) – The sexual harassment and intimidation of female employees. The civil rights violation(s) that occurred to a prisoner.
  Fraudulent Spending and unethical use of Department Equipment- As reported by the Park County Attorney and other officers of this agency.
  Criminal Violations- Obstruction, Official Mis-Conduct and Theft, as described in WPI book.

ould like to personally thank you for even taking the remotest interest in this case. I am kind of in a "shell shocked" state ɴind at this point in time. The harder I look, the more I find.

ɪpectfully yours;

ve Corporal Gregory S. Flint

**EXHIBIT**

**10**



Park-Caldwell 0729
Confidential

54

**To:**      District Attorney Chilson

**CC:**      Case File

**From:**    Detective Cpl. Gregory S. Flint

**Date:**    8/10/2005

**Re:**      Please review these tapes of the Webber Park Investigation

---

Dear Molly;

Please review these video and cassette tapes regarding the Webber Park investigation. I am sending these tapes directly to you to minimize its distribution. Please share them with Jim Howell.

The video taped interview was prompted to be just an overview of criminal activity this Confidential Informant has been exposed to over an approximate two and a half year period. The C/I is currently preparing an accurate journal of this activity.

The second thing that prompted this recording at this time is the immediate threat to the victim's life and property that have occurred over the last nine-week period. On several occasions the suspect(s), including one law enforcement officer have repeatedly attempted to isolate or have the C/I meet them in remote areas. I wanted to create somewhat of a living testament as to what the C/I has been exposed too. I have made several working copies of these tapes to utilize during this investigation. The original copies of any and all documentation are being maintained by an officer of the court in a location outside this agency.

At this time, it would appear that there is an overall criminal conspiracy involving sworn and civilian members of the Park County Sheriff's Office, as well as the local criminal element. It is also apparent that a law enforcement officer outside of our agency is a participant as well.

What is becoming ever increasingly apparent to me is that much of this criminal enterprising is occurring on multiple levels involving law enforcement and the local element. Some individuals are involved in all the major criminal activity and others are used to gather information or "tip off" the suspects of pending future law enforcement action.



**Confidential**

**EXHIBIT**
**11**

Park-Caldwell 0835
Confidential



August 10, 2005

The C/I at one point has reported this criminal activity to the FBI. In good faith and conscience I could not delay him any longer in re-contacting the FBI. He lives in fear everyday of being murdered. There is now some evidence that a LEO may have been setting up both the C/I and myself to be ambushed at the drop point where I was to meet and receive information from him.

I spoke with Jim briefly the other day and advised him of most of this information. He expressed a strong willingness to keep your office involved in this investigation. I personally believe that we can't do it without you and your office no matter who adopts this case from me. If we pool our resources I believe we can bring this nasty business to a successful close.

I am fairly sure I don't have to explain to you the unwanted risk that has been placed upon my family and myself as I proceed to "break ranks" on this investigation. At some point I could even be deemed a "rouge cop." But unlike some of my fellow officers at this agency, I have a fair working knowledge of the entire criminal justice system. I don't wear my ego or emotions on my sleeve. I do, however, believe in honor and integrity above all else in the law enforcement field. When a law enforcement system can no longer distinguish between criminal activity and its unethical practices, then it can no longer "police itself."

I barely know you. In part that's because I did not want to participate in the majority of complaints levied against Sean and your office. As I have expressed to Betty and Sean both, I refuse to participate in counter productive behavior that yields in negative results to all parties involved, no matter who complains first.

Having said that, by proxy and by my law enforcement experience, I immediately look at you as the Chief Law Enforcement Officer in the judicial district when it comes to matters of "police corruption and unethical practices." In short it means you have my unconditional trust, loyalty and dedication of duty to follow this action through to its closure.

Molly I am requesting for your assistance with this investigation. I have developed another victim and potential witness to this criminal enterprising. Please review these tapes and let me know to what level of assistance you can provide. We are fairly desperate in need of your assistance.

Thanks in advance.


Respectfully Yours;

Detective Corporal Gregory S. Flint

Park-Caldwell 0836
Confidential

2



# *Park County Sheriff's Office*
# *Investigations*

*DATE:* October 6, 2005

*TO:* Molly Chilson

*FROM:* Detective Cpl. G. Flint

*RE:* Webber Park Investigation

*COPIES TO:* Case file

---

Dear Molly;

Sorry this information is much later then I would have liked to wait. New intelligence is coming in almost daily to me. I am moving away from the Webber Park Investigation and tracking almost straight out right corruption, such as; Sexual Harassment /Intimidation and Department Policy violations that are too numerous to count at this point in time.

This is intelligence that I have gathered so far. The people I refer to in my summary are as follows;

   *Bobbie Priestly* – Has repeatedly been Sexually Harassed by Under Sheriff Anthony. There has been unlawful touching of her person ( affectionately grabbed in a hug and then kissed). Sexual advances have been made towards her on numerous occasions, many of which she tape recorded. Officer Priestly has secured a lawyer and reported this incident to Sheriff Wegener. During her reporting of this incident, she even played portions of the audiocassette for the Sheriff.

   Officer Priestly reported this incident to Sheriff Wegener on September 27th 2005. As of the date of this memo, no administrative action has occurred. Under Sheriff Anthony has not been re-assigned to a location where he would not interact with victim or placed on "administrative leave with pay," pending the outcome of this serious allegation of mis-conduct and "sexual harassment."

   All three animal control officers have received threats regarding their jobs, abrupt scheduling changes for no apparent reason and orders that are selective in nature. Many of the orders appear to be retaliatory in their origin.



**EXHIBIT**

**12**

## Confidential

Park-Caldwell 0725
Confidential

*Sven Bonnelvcke* - Has had three Internal Affairs investigations against him in approximately a forty-five day period. Sometimes Guerity was read to him, sometimes it was not, if he was even notified of the personnel action. Sven Bonnelycke has had a close relationship with Officer Priestly. To the best of my knowledge he has been exonerated on all three investigations. He is currently seeking legal counsel.

*Vern Waggener* - Mr. Waggener's information is at the end of my summery. I do know from State and Federal Correctional guidelines/mandates require that, any form of a "Strip Search" be articulated and show probable cause for that search. Additional PCSO Jail requirements are that the request be reviewed and approved by a supervisor.

On October 5th 2005, we had a meeting with supervisors only. In that meeting approximately six other major policy violations were reported against Under Sheriff Anthony and Lt. Rasch. Each and every policy violation was "glossed over" and/or minimized by Sheriff Wegener. Upon hearing this information, Bobbie Priestly has become fearful and is now backing down on her complaint.

Intel that I received as I was preparing your mailing is as follows; the trip to Nicaragua is now in excess of $ 4,800.00, and appears to be climbing. At this point I am unable to tell you if it is on Sheriff Wegener or Under Sheriff Anthony's card. It may even be on both individual's cards.

I was also advised that all three County Commissioners have knowledge of these inappropriate expenditures and have requested for a "full blown" audit of the credit cards in question. Additionally, they are still in full support of any investigation that uncovers internal corruption. Steve Groome is still volunteering to be a contact person regarding this portion of the investigation.

In the interest of trying to protect the Jail Division, I would like to bounce this idea off of you. After you review this group of witness statements in the recent Harassment case, I believe that enough probable cause exists to arrest Chuck Caldwell and related parties, for at least one count of Intimidation of a Witness and Conspiracy to Intimidate a Witness.

If you recall, I was asked to report to Under Sheriff Anthony only on the Webber Park Investigation. This investigation of Harassment and Intimidation did not start in the Webber Park Valley. The victim just happens to live there. We can secure our warrants in advance, have them sealed for safety and security reasons and I can make my notifications to command just moments before we take PCSO personnel into custody. If you were to swear me in as a "special investigator," only as it relates to this investigation, then I can be "wired" or carry a telephone recording kit with me when command begins to lose control. Assuredly, the Under Sheriff will lose his temper and I can hopefully legally exploit the situation to our advantage.

I know it sounds risky, but we really have nothing to lose. If the U/S "blows" while I have him on tape, we will be able to gain all sorts of information and possibly a partial admission and/or a confession. If they don't take the bait, then we will still have arrested one key person and two others that will be dismantling their corrupt power base. The pressure on them at that point will be so great, they will be worried about who is going to speak out or confess first. It could open a whole new set of potential avenues for us to investigate.

Park-Caldwell 0726
Confidential

**Confidential**

These recent sets of complaints have really caused them to become off balanced and skittish. We may never have another opportunity like this again. The meth lab investigation has appeared to have temporarily stalled out, as the statue of limitations clock is running on the remaining charges as they relate to the death threats and harassment case of CI 2005-05.

I appreciate your sincerity about protecting those of us who are involved in this investigation. But the reality of the matter is, I accepted the responsibility of this investigation and its inherent risks from the first time I corresponded with you.

I have had a fair amount of experience in long-term "deep undercover" operations to short-term reverse stings. Everything from large narcotics buys, to penetrating a "Nazi Skin Head" group. We can get this job done if we work together. The truth of the matter is, I was the one U/S Anthony placed in charge of an investigation he had hoped would fail or "just go away." What I am trying to say is good or bad, I have the closest rapport regarding this investigation. If he stays true to form, utilizing his supervisor to subordinate intimidation role, that's when he will make his mistake(s) and I can capitalize upon them.

I know that I may be making it all sound easy on paper, but if the group employs good sound safety tactics we can make it happen. If you give me the go ahead, I will start putting together affidavits for the arrest warrants. I still have the meth lab warrants started on disc, and can add to them when necessary also.

Thanks for your time and consideration of this request.

Respectfully Submitted;

Detective Corporal Gregory S. Flint

**Confidential**

| REPORT DATE<br>February 2, 2006 | COLORADO BUREAU OF INVESTIGATION<br>**REPORT OF INVESTIGATION** | FILE<br>2005-002031 |
|---|---|---|
| TYPE REPORT<br>Initial / Final | REPORT BY<br>Agent Dan Volz | AREA<br>Park County, State of<br>Colorado |

| NATURE OF CASE |
|---|
| Public Corruption / Narcotics |

**SYNOPSIS:** The Park County Sheriff's Office requested the Colorado Bureau of Investigation to investigate alleged criminal activity and public corruption within the Webber Park area of Park County, Colorado.

**LIST OF WITNESSES:**

SHAWNA WHITE-OWL, Also Known As (AKA), ROBBI CAROL DEYOUNG, Date of Birth 11/18/1955, 1805 Webber Park Drive, Lake George, Colorado 80827, (719) 439-4869.

MARK DAMON, Date of Birth 04/18/1955, 221 Pikeview Drive, Lake George, Colorado 80827, (719) 338-8708 or (719) 338-9282.

ELIZABETH HOLLENDORFER, Date of Birth 02/14/1966, 2269 Webber Park Drive, Lake George, Colorado 80827, (719) 331-8241.

MARY CAMILLE COWMAN, Date of Birth 03/06/1940, 30 Burns Road, Manitou Springs, Colorado 80829.

GREG FLINT, Deputy.  Park County Sheriff's Department, 1180 County Road 16, Fairplay, Colorado 80440, (719) 836-2494.

FRED WEGENER, Sheriff.  Park County Sheriff's Department, 1180 County Road 16, Fairplay, Colorado 80440, (719) 836-2494.

**REQUESTING AGENCY:** Park County Sheriff's Office.

**DATE/TIME OF REQUEST:** October 31, 2005.

**DATE/TIME OF INCIDENT:** September, 2003 to current.

**VICTIM:** State of Colorado.





Park-Caldwell 0705
Confidential

| TYPE OF REPORT | NAME OF AGENT | CASE NUMBER | DATE | PAGE |
|---|---|---|---|---|
| Initial / Final | Dan Volz | 2005-002031 | February 2, 2006 | 2 |

**SUSPECT:**   Various

**LOCATION OF
INCIDENT:**   Webber Park Subdivision – Park County, Colorado

**ACTION
TAKEN:**

On October 31, 2005, Park County Sheriff FRED WEGENER requested that the Reporting Agent (RA) initiate a criminal investigation into alleged ongoing criminal activity within the Webber Park subdivision of Park County, Colorado.

The Webber Park subdivision is a remote, open-valley area with no public power, water, or telephone service. Each of the homes constructed within the subdivision apparently are situated on several acres of privately owned land.

The nature of the allegations reported by Sheriff WEGENER resulted from an investigation conducted by Park County Sheriff Detective GREG FLINT. FLINT's investigation was initiated in September, 2003 and alleged the following regarding Webber Park:

- CHARLES CALDWELL, VICKI MERRITT, GEORGE PORTER, WAYNE WODORA, JACK SWOROWSKI, ANDY SWOROWSKI, SUSANNA ROSS STEWART, BILL SWANSON, and MIKE PRIESTLY are all residents of Webber Park.
- In one way or another, all of the above-mentioned individuals are involved in criminal activities within the Webber Park area, which include a large-scale wildlife poaching operation, methamphetamine production and sales, marijuana production and sales, homicide, harassment, theft, and cruelty to animals.
- Park County Undersheriff DON ANTHONY protects the Webber Park residents and warns them of any ongoing criminal investigations into their activities.
- Colorado Division of Wildlife Officer RON ZACCAGNINI also leaks sensitive investigative information to Undersheriff ANTHONY and Webber Park residents.

According to the documentation received by the RA, the vast majority of the information that FLINT compiled was based upon statements and observations of two cooperating Webber Park residents identified as MARK DAMON and SHAWNA WHITE-OWL.

On November 7, 2005, the RA conducted an interview with SHAWNA WHITE-OWL in Woodland Park, Colorado. The interview produced the following information:

- WHITE-OWL moved into Webber Park in 1994.
- WHITE-OWL associated with ANDY SWOROWSKI, JACK SWOROWSKI, JESSE SWOROWSKI, JAKE SWOROWSKI, WAYNE WADORA, GEORGE PORTER, RICKY VANVLIET, DAVID VANVLIET, CHUCK CALDWELL, VICKI MERRITT, and BILL SWANSON who all lived in Webber Park as well.

Park-Caldwell 0706
Confidential

| TYPE OF REPORT | NAME OF AGENT | CASE NUMBER | DATE | PAGE |
|---|---|---|---|---|
| Initial / Final | Dan Volz | 2005-002031 | February 2, 2006 | 3 |

- Shortly after WHITE-OWL moved into Webber Park, JACK SWOROWSKI told WHITE-OWL numerous "crazy" things when he would get drunk, including the following:
  - In 1995, SWOROWSKI told WHITE-OWL that people wouldn't believe how easy it is to make methamphetamine. SWOROWSKI was taught how to make it and now makes it himself. "Simon" from Bulgaria taught SWOROWSKI how to make methamphetamine.
  - DON ANTHONY, the Undersheriff of Park County, tips the Webber Park residents off when they are being investigated for drug activity.
  - SWOROWSKI wanted to have sex with WHITE-OWL before she dies.
  - SWOROWSKI and WAYNE WADORA burnt TERRY ROOKS house down in 1994 because he was too violent and they did not like his guns.
  - BOB HORNS burnt his own house down to collect insurance money.

- In 1995, WHITE-OWL saw a large mound of a white crystal substance on a table in JACK SWOROWSKI's house. At the time, SWOROWSKI told her that it was ceremonial salts.
- In 1995, WHITE-OWL was inside RICKY VANVLIET's house when his nephew told her that she couldn't go downstairs into the basement because they were growing marijuana there. A couple of years later, WHITE-OWL was in one of VANVLIET's outbuildings and saw water pipes going from the building into the residence. WHITE-OWL knew these particular pipes were used for growing marijuana for two reasons; WHITE-OWL used to grow marijuana back in California and she used to do some residential plumbing and knew they were not used for common residential use.
- On numerous occasions, WHITE-OWL observed CHUCK and VICKI CALDWELL smoking marijuana with other Webber Park residents. The last time observed was November, 2002.
- In 2002, GEORGE PORTER and BILL SWANSON were in contact with WHITE-OWL when PORTER told WHITE-OWL that he wanted to have sex with her goats. During the same time period, WHITE-OWL noticed unusual trauma to her female goats genitalia.
- In 2004, WHITE-OWL saw GEORGE PORTER pass a small piece of cellophane to a guy at the Ponderosa Store.
- Lately in the early morning hours, especially on Monday's, WHITE-OWL smells a chemical smell in the valley that she associates with methamphetamine production. The smell never happens in the winter. The smell closely resembles burning plastic and Styrofoam. WHITE-OWL's neighbor burns trash that contains a lot of plastic and it emits a similar odor.
- WHITE-OWL did not know anything about poaching allegations until MARK DAMON told her about his knowledge of the crimes. Over the ten-year period that WHITE-OWL has lived in Webber Park, she has heard 5-10 gunshots at night during

| TYPE OF REPORT | NAME OF AGENT | CASE NUMBER | DATE | PAGE |
|---|---|---|---|---|
| Initial / Final | Dan Volz | 2005-002031 | February 2, 2006 | 4 |

the summer non-hunting season. Sometimes the shots were preceded by Elk bugles and sometimes they were not.

- DOW officer RON ZACHANINI is corrupt. ZACHANINI looks the other way in certain instances involving poaching.
- ZACHANINI uses his position as a DOW officer to try and have sexual relationships with females.
- When ZACHANINI investigated the poaching allegations in Webber Park, he attempted to have sexual relations with WHITE-OWL by putting his hands inside the back of her pants.
- ZACHANINI also attempted to have sexual relations with WHITE-OWL's neighbor, "BETH", during the same investigation.

At the conclusion of the interview, WHITE-OWL conceded that she didn't have much evidence to support any allegation of ongoing criminal activity within Webber Park.

During the interview it became apparent that the majority of WHITE-OWL's complaints regarding the Webber Park residents stemmed from common neighbor disputes and harassing type behavior.

WHITE-OWL admitted that in the past she has exaggerated the facts regarding the Webber Park residents in attempts to finally get something done with them.

WHITE-OWL added that the tension between her and the neighbors was so bad that she was fearful of them.

On November 23, 2005, the RA conducted an interview with MARK DAMON at his residence within Webber Park. The interview, along with statements written by DAMON, produced the following information:

- DAMON moved into Webber Park in October of 2002.
- Soon after moving in, DAMON became friendly with other Webber Park residents, GEORGE PORTER, SUSANNA ROSS-STEWART, CHUCK CALDWELL, BILL SWANSON, WAYNE WODORA, JACK SWOROWSKI and VICKI MERRITT.
- DAMON drank alcohol and smoked marijuana with some of the Webber Park residents.
- In late October or early November, 2002, GEORGE PORTER showed DAMON several explicit photographs of himself apparently conducting sexual acts upon a goat.
- During the same time period, BILL SWANSON stopped DAMON on the road just outside of Webber Park. During their conversation, PORTER's head popped up out of SWANSON's lap.
- On November 25, 2002, CHUCK CALDWELL and VICKI MERRITT, had Thanksgiving dinner at their house. At the dinner event, MERRITT told DAMON

| TYPE OF REPORT | NAME OF AGENT | CASE NUMBER | DATE | PAGE |
|---|---|---|---|---|
| Initial / Final | Dan Volz | 2005-002031 | February 2, 2006 | 5 |

that if he got a deer or elk down and could not eat all of the meat, they could sell it for him.

- DAMON learned about a nearby area that the Webber Park resident's called Sophie's Valley.
  - o Based upon statements made by various Webber Park residents, DAMON learned that the area was named after a woman, SOPHIE, who lived alone in the valley years ago.
  - o SOPHIE built and lived in a tee-pee type structure and spent time making various artwork.
  - o At some point, SOPHIE turned up missing from the area.
  - o Based upon statements made by WODORA and SWOROSKI, DAMON felt that SOPHIE was probably killed by one of the Webber Park residents and possibly buried in a nearby mineshaft.
- In late December, 2002, CHUCK CALDWELL told DAMON that the Webber Park residents were under investigation. CALDWELL stated that DON ANTHONY gave him the information.
- Throughout 2003, CHUCK CALDWELL told DAMON about various police business via DON ANTHONY. Later, MERRITT told DAMON that she and CALDWELL housesit for ANTHONY.
- At one point, CALDWELL also told DAMON that DON ANTHONY sells acid.
- CALDWELL told DAMON that DON ANTHONY was creating a job for him at the Park County Jail.
- Three days before he started the job, DAMON was in CALDWELL's house and observed CALDWELL smoking marijuana with MIKE PREISTLEY.
- A month before CALDWELL took the job, DAMON accompanied him to the Lake George Bait Shop where he observed CALDWELL purchase a half-ounce of marijuana.
- February or March, 2003, DAMON heard a rifle shot at approximately 1:00 A.M. SWANSON and WODORA's vehicles then drove to a spot nearby and stayed there for approximately 40 minutes.
  - o The next day, DAMON told SWANSON that he saw them poaching and SWANSON "turned five shades red", left and went to CALDWELL's.
  - o Then next day, SWANSON loaded about five conventional refrigerators from his house onto a flatbed trailer.
  - o WHITE-OWL told DAMON that she saw SWANSON take the refrigerators out of the valley at 4:00 A.M., then bring them back into the valley the back way and deliver them to WODORA's house.
- In October, 2003, WHITE-OWL introduced DAMON to Division of Wildlife Officer RON ZACHANINI. They discussed poaching and the possibility of the Webber Park residents being involved in methamphetamine production.
- ZACHANINI asked DAMON to watch the Webber Park residents for any out-of-the ordinary behavior.

Park-Caldwell 0709
Confidential

| TYPE OF REPORT | NAME OF AGENT | CASE NUMBER | DATE | PAGE |
|---|---|---|---|---|
| Initial / Final | Dan Volz | 2005-002031 | February 2, 2006 | 6 |

- DAMON began watching the area more closely. The following observations were noted:

  o One night a week, the Webber Park residents would station various "look-outs" to watch DAMON's cabin and other ridges during the night.
  o SWANSON and CALDWELL would drive forest service roads, check Thorpe Gulch and come back to Webber Park.
  o At night, PORTER or WODORA would throw pebbles at DAMON's bedroom window. If DAMON would make a noise, they would give a fake coyote call or crow like a raven.
  o JACK SWOROWSKI and some of the others would make numerous trips at night back and forth to the small outbuildings near SWOROWSKI's chicken coups.
  o In February, 2005, DAMON walked over to JACK SWOROWSKI's residence and noticed an extremely strong smell of ammonia and fertilizer.

- DAMON gave ZACHANINI frequent updates regarding the activity he observed, however, DAMON soon believed that ZACHANINI was leaking his information to DON ANTHONY for the following reasons:

  o DAMON told ZACHANINI that he was going to purchase some binoculars with camera capabilities to take pictures of his observations. Two days later, WODORA came over to DAMON's house, observed the binocular camera and told DAMON that he should take pictures of everyone's houses with those.
  o DAMON gave ZACHANINI three detailed drawings of the Webber Park suspect's homes. Two days later, JACK SWOROWSKI asked DAMON if he was drawing pictures of the resident's homes.
  o CALDWELL came over to DAMON's and was angry. CALDWELL told DAMON that he could set him up for a 15-year prison sentence, and that he knew DAMON was under investigation for narcotics distribution.

- May, 2005, DAMON started receiving voicemail messages from PORTER. The messages were threatening and DAMON believed that they were death threats.
  o DAMON notified ZACHANINI and asked him to record the messages. ZACHANINI told DAMON that he would get with DON ANTHONY to record the messages, however, all the messages did not get recorded before the phone company automatically deleted them.

- Two separate shots from firearms were fired into the general direction of DAMON's home.
  o The first shot came from the area of a vehicle that JACK SWOROWSKI and SUSANNA ROSS-STEWART were in.
  o The second shot came from JACK SWOROWSKI's residence.

Park-Caldwell 0710
Confidential

| TYPE OF REPORT | NAME OF AGENT | CASE NUMBER | DATE | PAGE |
|---|---|---|---|---|
| Initial / Final | Dan Volz | 2005-002031 | February 2, 2006 | 7 |

- o DAMON never notified authorities because he felt that the Sheriff's Office was corrupt.

- CALDWELL began driving past DAMON's residence and shooting an air rifle at his horses once a week.
- DAMON now believes that the Webber Park residents have his cell phone frequency and listen to his conversations.
- DAMON added that the tension between he and the neighbors was so bad that he was fearful of them.

On January 6, 2006, the RA contacted ELIZABETH HOLLENDORFER, Date of Birth 02/14/1966. HOLLENDORFER lives at 2269 Webber Park Drive, which sits in between the properties that DAMON and WHITE-OWL occupy respectively.

HOLLENDORFER told the RA that she has never observed any activity that would make her believe that criminal activity is taking place within Webber Park. HOLLENDORFER could not corroborate any observations made by DAMON and or WHITE-OWL, with one exception.

HOLLENDORFER told the RA that ZACHANINI made advances towards her regarding a possible romantic relationship while he was investigating Webber Park. HOLLENDORFER did not feel awkward about the situation until she found out that ZACHININI was married. HOLLENDORFER then ended any possible romantic involvement with ZACHANINI.

The RA contacted several longtime residents of the area near the Webber Park subdivision in an attempt to identify "SOPHIE". The RA received information about MARY CAMILLE COWMAN, Date of Birth 03/06/1940. The RA contacted COWMAN by telephone and received the following information:

- COWMAN is also known as SOPHIE COWMAN.
- COWMAN currently has an art studio located at 725 Manitou Avenue #2, Manitou Springs, Colorado.
- COWMAN built and lived in a small structure on National Forest Service land within Webber Park between 1975 and 1976.
- When the Forest Service got upset with COWMAN, she moved out.
- COWMAN believes that part of the structure is still standing within Webber Park.
- COWMAN describes herself as an artist and old hippy that just thought it would be neat to live out in Webber Park in the seventies.

In an attempt to corroborate some of WHITE-OWL's statements, the RA asked the Park County Sheriff's Office for any reports regarding fire investigations involving TERRY ROOKS and or BOB HORNS. As of the date of this report, no reports were provided.

Park-Caldwell 0711
Confidential

| TYPE OF REPORT | NAME OF AGENT | CASE NUMBER | DATE | PAGE |
|---|---|---|---|---|
| Initial / Final | Dan Volz | 2005-002031 | February 2, 2006 | 8 |

Sheriff WEGENER did contact the RA by telephone and stated that he believed that a fire investigation was initiated on one of the houses in question. WEGENER told the RA that the fire was ruled accidental.

As of the date of this report, the RA has not received any copies of the alleged death threat messages that were left for DAMON.

In closing, the majority of information received from DAMON and WHITE-OWL is very stale. The inability to corroborate information is substantial.

Through all available information given to the RA, no other investigative leads, information, or intelligence has ever been developed that identifies similar criminal activity taking place within Webber Park.

Other investigative techniques would be exhaustive and expensive, and in the RA's opinion it is not reasonable to assume that it would be productive.

Dan Volz
Agent
(Reporting)

Robert Brown
Agent-in-Charge
(Reviewing)

DV/pas

Park-Caldwell 0712
Confidential

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO

Civil Action No. 07-cv-000371-RPM-MEH

CHARLES CALDWELL, and
VICKI CALDWELL,

Plaintiffs,

v.

THE COUNTY OF PARK, a body corporate and politic and a political subdivision of the State
of Colorado,
FRED WEGENER,
MONTE GORE,
GREGORY S. FLINT,
STEVEN GROOME,
SHAWNA WHITEOWL, and
MARK DAMON

Defendants.

---

### AFFIDAVIT OF DONALD L. ANTHONY

I, Donald L. Anthony, the undersigned, after being first duly sworn, state under oath as
follows:

1.      My name is Donald L. Anthony.  From the spring of 1989 until November, 2005,
I was employed by the Park County Sheriff's Office, in Colorado.  Initially I was a reserve
officer/dispatcher for the Sheriff's Office. Eventually, by January, 2004, I had been promoted to
Undersheriff for the entire Office.

2.      During this same time, I became active in the Park County Republican Party,
eventually rising to the level of Second Vice Chairman for the County.

3.      As my experience level grew in the Sheriff's Office and in politics, I became sure
that upon the eventual retirement of the then Sheriff, Fred Wegener, one of the Defendants in this
case, I would run as a Republican candidate to replace him as the elected Sheriff.



EXHIBIT
14

4.     Mr. Wegener was fully aware of my desire to run for Sheriff, he and I discussed it repeatedly over the last years of my employment by the Park County Sheriff's Office. Moreover, Sheriff Wegener indicated to me that he would publically endorse me as his replacement when that time came.   There was no secret about my plans.   It was common knowledge in the Sheriff's Office and among the Republican County Officers.

5.     Sometime in 2005, I became aware of efforts by one of my subordinates, then Captain Monte Gore, another Defendant in this action, to undercut my position with the Sheriff. Mr. Gore had from the moment of my appointment as Undersheriff, a position he clearly thought should have gone to him, dealt with my orders to him begrudgingly.  On numerous occasions, he would go outside of the chain of command, around me, to raise matters with the Sheriff directly. He would attempt repeatedly to cut me out of matters which were my direct responsibility.

6.     In the summer of 2005, shortly after Sheriff Wegener left to go to an FBI academy in Virginia for three months of training, the Sheriff called me to complain that I had been referred to either in the press or on some document I signed as the "acting" Sheriff.  Sheriff Wegener was upset and quite pointedly made it clear to me that I was the Undersheriff, and I was to remember that.  He seemed threatened by the whole incident.  Obviously, his information came from someone then at the Sheriff's Office.  It is my belief that Mr. Gore and/or Mr. Flint were behind this.

7.     At another point in the summer of 2005, apparently Corporal Gregory Flint, another of the Defendants here, reopened a closed investigation into allegations arising out of the Webber Park area, an area in eastern Park County, near Lake George.  This investigation, initially in 2003, had been to pursue allegations of poaching, then later drug allegations against residents of that valley.  That investigation had been set aside as a result of no credible proof ever having been discovered to support the allegations.  Nevertheless, in 2005, with Sheriff Wegener in Virginia at FBI school, Mr. Flint and Mr. Gore decided to reopen the investigation of the Webber Park matters, but with a view to whether I had been involved somehow with the Caldwells in official corruption.  I am unaware even to this day how Mr. Gore and Mr. Flint could in good faith realistically believe such patently false allegations in the total absence of any evidence to support them.  The Colorado Bureau of Investigations (C.B.I.) has subsequently investigated these allegations and found no support for them at all.

8.     Mr. Gore and Mr. Flint had a history together, both having served in police agencies in Summit County at the same time.  As Sergeant, and then Undersheriff, I had cause on a number of occasions to write Mr. Flint up for failing to stay current on his written police reports.  Consistently he was 10 to 15 reports behind in his daily work.  Eventually he was transferred away from my supervision to duty in the jail, then under Mr. Gore's supervision.  Mr. Gore took him in and later restored him to investigative duties.

9.    Finally in 2005, Mr. Flint and Mr. Gore somehow both became involved in an unfounded allegation of sexual harassment against me. It is unknown how or why they became involved since the processing of such an allegation was not within either of their official duties. Nevertheless, I was suspended with pay pending an investigation. Mr. Gore was named acting Undersheriff in my absence. A detective from Jefferson County conducted the investigation. I took a polygraph and passed it, indicating that no sexual harassment had ever occurred.

10.    During my suspension, information arose that I may have failed to reimburse the Sheriff's Office for my wife's portion of an official trip I took to Washington D.C. earlier in the year. This amounted to a few hundred dollars and I thought I had already paid it. The investigator suggested that I talk to the finance officer to get the exact amount and to confirm whether it had been paid. The finance officer at that time (November, 2005) was Ms. Vicki Caldwell, one of the Plaintiffs in this case. The suggestion seemed to make common sense and I followed it. On November 16, 2005, I approached Ms. Caldwell in the parking lot of the Sheriff's Office, told her what the investigator had said for me to do, and she agreed to look the matter up and give me the exact amount.

11.    The day after my conversation with Ms. Caldwell, I was terminated without notice or a hearing by Mr. Gore. His "official" reason was that I had violated his order to me not to have any contact with anyone at the Sheriff's Office other than himself while the investigation was pending, even to the extent I was told that I could not talk to Mr. Wegener, the Sheriff himself. Because this reimbursement did not have anything to do with the allegations of sexual harassment, and because the investigator himself suggested the contact, I did not feel that I was violating any legitimate order to me by simply asking for a confirmation of non-payment and the amount owed. Shortly after being told the amount that was in fact unpaid, I paid it in full to the finance office. Mr. Gore labeled this behavior insubordinate, a failure to follow direct orders, and fired me. This was November 18, 2005. Sheriff Wegener upheld the termination by giving me a pre-typed letter denying my appeal at the end of my meeting with him. This appeal and the letter denying it were on November 30, 2005.

12.    Once I had been terminated, I felt there was no longer a reason to wait to run for Sheriff. I discussed my thinking at regular coffees each morning in the Lake George area, including with various Sheriff's Office personnel present. I announced my plans at a Republican Control Committee meeting early in 2006. I do not recall the exact date of that meeting, but I think it was in January or February, 2006. I believe both Mr. Groome and Sheriff Wegener were present. I believe my decision surprised Sheriff Wegener only in the sense of my timing, that I did not wait another term. All Defendants in this case knew I wanted to run for Sheriff at some point.

13.    The problems for the Caldwells did not seriously start until the effort to remove me had begun. I was suspended on October 13, 2005. Chuck Caldwell was suspended on October 14, 2005. I was terminated the day after merely speaking with Vicki Caldwell, about routine Sheriff's Office business (November 18, 2005). She was disciplined at about the same time, losing pay. At about the same time I decided to talk about a run for Sheriff at coffees in

Lake George, Mr. Gore suddenly decides to reinvestigate Chuck Caldwell's job application for deficiencies, about 9 months after he had been hired. Then, when I announce at a Central Committee meeting that I will run for Sheriff, Chuck Caldwell is shortly thereafter fired for dishonesty, in a half-baked investigation concerning whether he had actually worked for the Forrest Park Police Department in Oklahoma, without anyone even contacting the Forrest Park Police Chief, who wrote Mr. Caldwell the letter of recommendation. The Park County Sheriff's Office had this letter in their personnel files the whole time.

14.     I sought the nomination as the Republican candidate for Sheriff and officially filed my intent to do so early in March, 2005. One week before the County Assembly in April, 2006, the Webber Park Synopsis was given to at least one delegate who intended to attend the assembly. This delegate was James Coggin, who immediately brought this document to my attention. I saw the document itself.

15.     I know, both from my own personal experience of over 16 years with the Park County Sheriff's Office, and from my reading of the Park County Sheriff's Office Policy and Procedure Manual, which I had a large part in writing myself, that this type of personnel record is required to be kept in the personnel office and not to be removed without the prior permission of the Sheriff or Undersheriff [Policy 317(IV)(B)(1)]. Internal investigations are considered to be confidential [Policy 319(IV)(G)(1)], even to the point that these records "will not be considered for release to the accused employee or their legal representative." [Policy 320(IV)(E)(5)]. Such records, especially records of an internal investigation dealing with allegations as serious as those in the Webber Park Synopsis, could only be released with the full approval of the Sheriff himself, since they were kept locked in the Sheriff's personal office.

16.     It is my clear belief that the Caldwells became unwanted in the Park County Sheriff's Office once Monte Gore and Gregory Flint convinced Sheriff Wegener to let me go, and I made it clear I intended to run for Sheriff. The whole trail of the events here shows that.

17.     Further Affiant sayeth naught.

Dated:     _July 23, 2008_                    _Donald L. Anthony_
                                                    Donald L. Anthony

4

STATE OF COLORADO )
)
COUNTY OF EL PASO )

Subscribed and sworn to before me by the Affiant, Donald L. Anthony, on this 23rd day of July, 2008.

Witness my hand and official seal.

My commission expires: __12/10/09__



My Commission Expires 12-10-09

_Julia L. Vendeland_
Notary Public