IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO

Civil Action No. 07-cv-000371-RPM-MEH

CHARLES CALDWELL, and
VICKI CALDWELL,

Plaintiffs,

v.

THE COUNTY OF PARK, a body corporate and politic and a political subdivision of the State of Colorado,
FRED WEGENER,
MONTE GORE,
GREGORY S. FLINT,
STEVEN GROOME,
SHAWNA WHITEOWL, and
MARK DAMON

Defendants.

## AFFIDAVIT OF CHARLES CALDWELL

Charles Caldwell, being first sworn to tell the truth in this document, states as follows:

1. My name is Charles Caldwell.

2. Between April, 2005 and February 2006, I was an employee of the Park County Sheriff's Office, engaged as a case manager in the Jail Division. In February, 2006, I was fired by Sheriff Wegener and Undersheriff Gore, and the official reason was that I had lied on my job application when I had first applied for this job.

3. I have read the Briefs which my attorney has prepared in my federal District Court case against Park County Defendants, and against Mr. Damon and Ms. Whiteowl, and the



EXHIBIT 34

facts as outlined in those briefs are true to my best knowledge and belief, but there are a few extra things I feel that I need to say. These are in no particular order.

4. In the first several months after my suspension in October, 2005, I had extreme problems with being unable to sleep; I suffered nervous conditions leading to major weight gain, from compulsive eating; I was very frustrated, angry, and my ability to enjoy sexual relations with my wife Vicki were greatly diminished.

5. I felt that I could not even apply with another law enforcement agency because of the wide distribution of the false charges that had been raised in the Webber Park Synopsis and the claim of dishonesty as to my job application. I have been involved in law related jobs for more than 13 years, and I know that these types of allegations, coupled with my having been fired from my last agency job, makes the chance of being hired very remote.

6. Don Anthony and his wife are my friends. I have known them since 1999. I have house sat their home during vacations, attended parties and gatherings at their home, and have had them to my home any number of times. I attended coffees with Mr. Anthony in Lake George over the years on a regular basis.

7. It was common knowledge in the Park County Sheriff's office that Mr. Anthony intended at some point to run for Sheriff. Once his firing happened, and at time when Vicki, my wife was still employed at the Sheriff's Office, Mr. Anthony told me at the coffee shop that he might as well make the run for Sheriff in the very next election. When I was asked about this in my deposition, and even afterwards when I did the corrections to my deposition, I assumed that the question I was being asked about Mr. Anthony's announcing to run for Sheriff meant a formal announcement in the papers and with the clerk's office. Now that I see what use the attorneys for the Sheriff and Mr. Gore and Mr. Flint are making of this statement, I felt it

important to correct this misunderstanding. Everyone I knew at the Sheriff's office, including the Sheriff, Mr. Gore, and Mr. Flint knew about his general plans as well.

8.      Ms. Whiteowl lived in Webber Park for many years. Mr. Damon moved there around 2003. It became common knowledge that both of them had troubles with paranoia.

Mr. Damon would come over to our house at times and would complain that people were spying on him, that there were unknown people stalking him at night behind his house, he thought we were videotaping and spying on him, he felt that neighbors where he used to live were "out to get him," and that he feared the government would try to condemn his property and take it from him. To our knowledge, none of these things were true, certainly nothing that accused us of anything wrong.

Ms. Whiteowl had a long history of calling the Sheriff's Office and making false and outrageous claims. These included that the people in the valley were harassing her; threatening her and her animals; abusing her animals (even to the point of an accusation that someone had sexually molested her goat); shooting at her house; driving by her house real slowly, or on the other hand, driving past her house so quickly that she feared she might be run over; that people were growing fields of marijuana in the valley, despite the fact we were at 9,000 feet altitude and it was hard to get much of anything to grow in any of the gardens in the valley. She also made a claim that one of the neighbors had purposefully used a bull dozer to damage the county road near her house, even though there is no county road even in our valley. She complained about dogs attacking her livestock, and she repeatedly threatened to shoot the neighbors' dogs anywhere she saw them near her property. She even threatened one 12 year old neighbor, by shooting over her head when that girl was out walking her dog. She had signed numerous

County Court complaints accusing her neighbors of all sorts of these things, and they had had to go to Court to straighten her claims out. Most of her claims were thrown out of Court.

9. Within the first month after I was fired, I received a telephone call from a woman named Kathy, who was a reporter at the Fairplay Flume, who asked me to meet with her. I did meet her at the Fairplay Hotel bar two days later. She told me that investigative papers concerning Webber Park had come into her news office, and she wanted to know what I could tell her about the Webber Park Investigation. This was before I knew that there was a Webber Park Investigation or any papers detailing it. I think this conversation was sometime early in March, 2006. I did not get a copy of the Webber Park Synopsis until at the very end of March.

10. Further Affiant sayeth naught.

Dated: 7-27-08

Charles Caldwell

STATE OF COLORADO  )
                   )
COUNTY OF EL PASO  )

Subscribed and sworn to before me by the Affiant, Charles Caldwell, on this 27th day of July, 2008.

Witness my hand and official seal.

My commission expires: 12/10/09



Notary Public

My Commission Expires 12-10-09

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO

Civil Action No. 07-cv-000371-RPM-MEH

CHARLES CALDWELL, and
VICKI CALDWELL,

Plaintiffs,

v.

THE COUNTY OF PARK, a body corporate and politic and a political subdivision of the State of Colorado,
FRED WEGENER,
MONTE GORE,
GREGORY S. FLINT,
STEVEN GROOME,
SHAWNA WHITEOWL, and
MARK DAMON

Defendants.

## AFFIDAVIT OF VICKI CALDWELL

Charles Caldwell, being first sworn to tell the truth in this document, states as follows:

1. My name is Vicki Caldwell.

2. Between December 2003, to December of 2005. I was an employee of the Park County Sheriff's Office, engaged as the business manager. My duties involved payroll, accounts payable, accounts receivable, invoicing for the Jail, and some human resources work. My work involving accounts receivable in part required that I pursue reimbursements from Sheriff's Office employees for any County credit card expenditures for personal purposes.

3. Beginning in October, 2005, I was made the subject of repeated harassing behavior by Mr. Gore, which I did not understand at the time. I had done well in the office for



the entire time I had worked there prior to that time. I had been given raises and was complimented by my superiors.

4. I have read the briefs prepared by Mr. Reed, my attorney, and I swear that the information pertaining to me in the facts as contained in those briefs are true and correct. In addition to those statements, I would like to add the following:

5. In the months of October, 2005, and at least up until about February, 2007, when we decided to file this lawsuit, I had extreme problems with being unable to sleep; I suffered nervousness; I was anxious, depressed, frustrated, angry, and my ability to enjoy sexual relations with my husband, Chuck, was greatly diminished.

6. I obtained a job with the Teller County Finance Office in January, 2006, but only because of my relationship with Mary Anthony, who served as a reference for me. I felt that I could not use the Park County Sheriff's Office as a reference in obtaining any new job. Mary was a finance assistant in that office, and still is. Without this intervention, I feel that it would have been very difficult for me to have obtained a suitable job, given the problems that I had gone through with the Park County Sheriff's Office. Even having said this, I must also say that this new job paid $8,000.00 per year less than what I had been making with Park County.

6. Don Anthony and his wife are my friends. I have known them since 1999. I have house sat their home during vacations, attended parties and gatherings at their home, and have had them to my home any number of times. I attended some coffees with Mr. Anthony in Lake George, but not as many as my husband. I have worked with Mary Anthony for seven and a half years total (some before and some after the Sheriff's Office).

7. It was common knowledge in the Park County Sheriff's Office that Mr. Anthony intended at some point to run for Sheriff. Once his firing happened, and at a time when I was

still employed at the Sheriff's Office, my husband Chuck came home and told me that Mr. Anthony had said he was going to run for Sheriff in the 2006 election. Within days of my own leaving, I spoke directly to Mr. Anthony, and he confirmed his plans to me. I believe that most of the office knew of Mr. Anthony's plans, informally, by mid January, 2006, since this is a small community and Mr. Anthony had been privately speaking to a number of people about his plans and what support he might have.

8. Ms. Whiteowl lived in Webber Park for many years. Mr. Damon moved there around 2003. It became common knowledge that both of them had troubles with paranoia.

Mr. Damon would come over to our house at times and would complain that people were spying on him, that there were unknown people stalking him at night behind his house, he thought we were videotaping and spying on him, he felt that neighbors where he used to live were "out to get him," and that he feared the government would try to condemn his property and take it from him. To our knowledge, none of these things were true, certainly nothing that accused us of anything wrong.

Ms. Whiteowl had a long history of calling the Sheriff's Office and making false and outrageous claims. These included that the people in the valley were harassing her; threatening her and her animals; abusing her animals (even to the point of an accusation that someone had sexually molested her goat); shooting at her house; driving by her house real slowly, or on the other hand, driving past her house so quickly that she feared she might be run over; that people were growing fields of marijuana in the valley, despite the fact we were at 9,000 feet altitude and it was hard to get much of anything to grow in any of the gardens in the valley. She also made a claim that one of the neighbors had purposefully used a bull dozer to damage the county road near her house, even though there is no county road even in our valley. She complained about

dogs attacking her livestock, and she repeatedly threatened to shoot the neighbors' dogs anywhere she saw them near her property. She even threatened one 12 year old neighbor, by shooting over her head when that girl was out walking her dog. She had signed numerous County Court complaints accusing her neighbors of all sorts of these things, and they had had to go to Court to straighten her claims out. Most of her claims were thrown out of Court.

9. Further Affiant sayeth naught.

Dated: July 27, 2008

Vicki Caldwell

STATE OF COLORADO   )
                    )
COUNTY OF EL PASO   )

Subscribed and sworn to before me by the Affiant, Vicki Caldwell, on this 27th day of July, 2008.

Witness my hand and official seal.

My commission expires: 12/10/09



Notary Public

My Commission Expires 12-10-09

Policy 727

# PARK COUNTY SHERIFF'S OFFICE
# POLICY AND PROCEDURE MANUAL

| Effective Date: 01/01/2005 | Approval: | Number: 727 |
|---|---|---|
| Subject: Confidential Informants | | |
| Reference: | | Standard: |
| Chapter: VII | Reevaluation Date: | No. Pages: 5 |

### I. PURPOSE:

The purpose of this policy is to provide regulations for the control and use of confidential informants (CI).

### II. DEFINITIONS:

<u>CONFIDENTIAL INFORMANT FILE:</u> File maintained in order to document all information that pertains to confidential informants.

<u>UNRELIABLE INFORMANT FILE:</u> File containing information pertaining to individuals determined generally unfit to perform as informants.

### III. POLICY:

In many instances, a successful investigation cannot be conducted without the use of CIs. While the use of CIs is an effective tool in investigations, it can be undermined by the misconduct of either the CI or the officer utilizing the informant. Therefore, it shall be the policy of this law enforcement agency to take necessary precautions by developing sound informant control procedures.

### IV. PROCEDURE:

A. Establishment of an Informant File System

1. The commanding officer in charge of the criminal investigations function shall be responsible for developing and maintaining master informant files and an indexing system.

2. A file shall be maintained on each CI used by officers. Each file shall be coded with an assigned informant control number and shall contain the following information:

   a. Informant's name;

   b. Name of officer initiating use of the informant;

   c. Informant's photograph, fingerprints, and criminal history record;

12/30/2004 SB/dla


EXHIBIT 36

1

Policy 727

    d.    Briefs of information provided by the CI and its subsequent reliability. If an informant is determined to be unreliable, the informant's file shall be placed in the unreliable informant file;

    e.    Signed informant agreement; and

    f.    Update on active or inactive status of informant.

3.    The confidential and unreliable informant files shall include an indexing system. An informant history summary, coded with the informant control number, shall be prepared to correspond to each informant file and include the following information:

    a.    Special skills and/or avocations;

    b.    Date of birth;

    c.    Aliases;

    d.    Height, weight, hair color, eye color, race, sex, scars, tattoos, or other distinguishing features;

    e.    Current home address and telephone number;

    f.    Residential addresses over the last five years;

    g.    Current employer, position, address, and telephone number;

    h.    Marital status and number of children;

    i.    Vehicles owned and their registration numbers; and

    j.    Places frequented.

4.    Informant files shall be maintained in a secured area within the criminal investigations section.

5.    The two informant files shall be utilized in order to

    a.    Provide a source of background information about the informant;

    b.    Provide a complete history of the information received from the informant;

    c.    Enable review and evaluation by the appropriate supervisor of information given by the informant; and

    d.    Minimize incidents that could be used to question the integrity of investigators or the reliability of the CI.

      6.    Access to the informant files shall be restricted to the chief law enforcement executive, the commander of criminal investigations, or their designees.

      7.    Only commissioned personnel may review an individual's informant file upon the approval of the commander of investigations. The requesting officer shall submit a written request explaining the need for review. A copy of this request, with the officer's name, shall be maintained in the CI's file.

B.    Use of Informants

      1.    Before using an individual as a CI, an officer must receive initial approval from a supervisor authorized to make this approval.

      2.    The officer shall compile sufficient information through a background investigation in order to determine the reliability and credibility of the individual.

      3.    After the officer receives initial approval to use an individual as a CI, an informant file shall be opened.

      4.    All persons determined to be unsuitable for use as a CI shall be referenced in the Unreliable Informant File.

      5.    An officer wishing to utilize an unreliable informant shall receive prior approval from the chief executive officer, or his or her designee.

C.    General Guidelines for Handling CIs

      1.    All CIs are required to sign and abide by the provisions of the departmental informant agreement.(see Appendix A) The officer utilizing the CI shall discuss each of the provisions of the agreement with the CI, with particular emphasis on the following:

          a.    Informants are not law enforcement officers. They have no arrest powers, are not permitted to conduct searches and seizures, and may not carry a weapon;

          b.    Informants will be arrested if found engaging in any illegal activity. They will receive no special legal considerations; and

          c.    Informants are not to take, and the department will not condone, any actions that may be considered entrapment. Entrapment occurs where the informant encourages, persuades, or otherwise motivates a person to engage in criminal activity.

      2.    No member of this agency shall knowingly maintain a social relationship with CIs while off duty, or otherwise become personally involved with CIs. Members of this agency shall not solicit, accept gratuities, or engage in any private business transaction with a CI.

      3.    Whenever possible, an officer shall always be accompanied by another officer

Policy 727

when meeting with a CI.

4. Juveniles shall only be utilized as CIs in accordance with departmental regulations and state laws pertaining to juveniles.

12/30/2004 SB/dla

4

Policy 727

## APPENDIX A

### INFORMANT AGREEMENT

During my association with the Park County Sheriff's Office as an Informant, I, the undersigned, do hereby agree to be bound by the following conditions and procedures while so associated:

1. I agree that I have no police power under the State of Colorado or any local governmental subdivision and have no authority to carry a weapon while performing my activity as an Informant.

2. I acknowledge that I am associated with the Park County Sheriff's Office as an Informant on a case or time basis as an independent contractor and that any payment I receive from the Park County Sheriff's Office will not be subject to Federal or State Income Tax Withholding or Social Security. All reporting of income is the responsibility of the Informant.

3. I further acknowledge that as an Informant and independent contractor, I am not entitled to Workman's Compensation or Unemployment Compensation from the State of Colorado and I shall not hold Park County liable for any injuries or damage incurred by reason of my association with the Park County Sheriff's Office.

4. I further agree not to divulge to any person, except the investigator with whom I am associated, my status as an Informant for the Park County Sheriff's Office unless required to do so in court and shall not represent myself to others as an employee or representative of the Park County Sheriff's Office.

5. I further agree not to use the Park County Sheriff's Office or any of its officers as credit references or employment references unless prior approval is obtained from the investigator with whom I am associated.

6. I further agree that my association with the Park County Sheriff's Office does not afford me any special privileges.

7. I further agree that after making a purchase of anything of evidentiary value, I will contact the investigator with whom I associated as soon as possible for delivery of such evidence to him.

8. I further agree to maintain a strict accounting of all funds provided to me by the Park County Sheriff's Office as part of my activity as an Informant. I understand that misuse of county funds could be grounds for criminal prosecution against me.

9. Finally, I agree that violation of any of the above-enumerated provisions will be grounds for immediate termination and probable criminal charges.

Dated this _____ day of ____, 20____.

Informant _____    _____
                    Printed Name                              Signature

Informant DOB _____  Address _____

_____

Investigator _____    _____
                    Printed Name                              Signature

12/30/2004 SB/dla

5